No. 23-10520

---

# In the
# United States Court of Appeals
# For the Fifth Circuit

---

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; PENNSYLVANIA HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; WASHINGTON HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; TAMPA BAY HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; GULF COAST RACING, L.L.C.; LRP GROUP,
LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING LSP,
L.L.C.; TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.,

*Plaintiffs-Appellants*

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs-Appellants*

v.

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD NANCY COX;
JOSEPH DUNFORD; FRANK KEATING; KENNETH SCHANZER; HORSERACING
INTEGRITY AND SAFETY AUTHORITY, INCORPORATED; FEDERAL TRADE
COMMISSION; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE
WILSON; LISA LAZARUS; STEVE BESHEAR; ADOLPHO BIRCH; ELLEN
MCCLAIN; CHARLES SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER;

BILL THOMASON; LINA KHAN, CHAIR; REBECCA SLAUGHTER,
COMMISSIONER; ALVARO BEDOYA, COMMISSIONER; D. G. VAN CLIEF,

*Defendants-Appellees*

---

On Appeal from United States District Court
for the Northern District of Texas, Lubbock Division
Case No. 5:21-cv-00071-H
Honorable James Wesley Hendrix

---

## OPENING BRIEF OF PLAINTIFFS – APPELLANTS GULF COAST RACING, L.L.C.; LRP GROUP, LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING LSP, L.L.C.; AND TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.

---

MAYNARD NEXSEN PC

By: *Gregory Sapire*

Gregory P. Sapire
    *Counsel of Record*
Travis Maples
2500 Bee Caves Road
Building 1, Suite 150
Austin, Texas 78746
(512) 431-9518
GSapire@maynardnexsen.com

S. Reeves Jordan
1901 Sixth Ave. N., Suite 1700
Birmingham, Alabama 35203
(205) 415-4907
rejordan@maynardnexsen.com

*Attorneys for Plaintiffs-Appellants Gulf
Coast Racing, LLC; LRP Group,
Limited; Valle de Los Tesoros, Limited;
Global Gaming LSP, LLC; and Texas
Horsemen's Partnership, LLP*

By: */s/ Ilan Wurman*

Ilan Wurman
Sandra Day O'Connor College of Law*
Arizona State University
MC 9520
111 E. Taylor St.
Phoenix, Arizona 85004
(480) 965-2245
ilan.wurman@asu.edu

*Provided for identification purposes
only.

**Filed: July 5, 2023**

ii

# CERTIFICATE OF INTERESTED PERSONS

No. 23-10520

_____

NATIONAL HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION, ET AL.,

*Plaintiffs-Appellants*

v.

JERRY BLACK, *ET AL.*,

*Defendants-Appellees*

The undersigned counsel of record certifies that the following persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made so the judges of this Court can evaluate possible disqualification or recusal.

| National Horsemen Plaintiffs-Appellants | Counsel |
|---|---|
| National Horsemen's Benevolent and Protective Association Arizona Horsemen's Benevolent and Protective Association Arkansas Horsemen's Benevolent and Protective Association Indiana Horsemen's Benevolent and Protective Association | Daniel R. Suhr, Lead Counsel NATIONAL CENTER FOR JUSTICE & LIBERTY<br><br>Fernando M. Bustos BUSTOS LAW FIRM PC |

| | |
|---|---|
| Illinois Horsemen's Benevolent and Protective Association Louisiana Horsemen's Benevolent and Protective Association Mountaineer Park Horsemen's Benevolent and Protective Association Nebraska Horsemen's Benevolent and Protective Association Oklahoma Horsemen's Benevolent and Protective Association Oregon Horsemen's Benevolent and Protective Association Pennsylvania Horsemen's Benevolent and Protective Association Tampa Bay Horsemen's Benevolent and Protective Association Washington Horsemen's Benevolent and Protective Association[1] | |

---

[1] The National Horsemen Plaintiffs-Appellants also identify those who or which are financially interested in the outcome of the litigation through them as any owner, breeder, trainer, jockey, racehorse veterinarian, person licensed by a State racing commission, or worker in the horseracing industry, including but not limited to members of the Jockey Club, as well as any owner, operator, or employee of a horse racetrack.

| Gulf Coast Racing Plaintiffs-Appellants | Counsel |
|---|---|
| Gulf Coast Racing, LLC[2]<br>LRP Group, Limited[3]<br>Valle de Los Tesoros, Limited[4]<br>Global Gaming LSP, LLC[5]<br>Texas Horsemen's Partnership LLP | Gregory P. Sapire, Lead Counsel<br>Travis A. Maples<br>S. Reeves Jordan<br>MAYNARD NEXSEN PC<br><br>Ilan Wurman<br>TULLY BAILEY, LLP<br>ARIZONA STATE UNIVERSITY |

[2] Those who or which are financially interested in the outcome of the litigation through Plaintiff-Appellant Gulf Coast Racing LLC are 361 Muy Buena Suerte, LLC; Joseph V. LaMantia, III; Stephen L. LaMantia Special Trust; Stephen L. LaMantia; Gregory M. LaMantia; Anthony LaMantia; Verna Ann Peisen; Marty Peisen; The Alexandra Ann Peisen 2011 Trust; Alexandra Ann Peisen; The Lisa Marie Peisen 2011 Trust; Lisa Marie Peisen; The Jessica Reine Peisen 2011 Trust; Jessica Reine Peisen; The Joseph V. LaMantia IV 2011 Trust; Joseph V. LaMantia IV; The Angela Reine LaMantia 2011 Trust; Angela Reine LaMantia; Gregory LaMantia, Jr.; The Nicholas LaMantia 2011 Trust; Nicholas LaMantia; The Morgan Jessica LaMantia 2011 Trust; Morgan Jessica LaMantia; The Katherine Janice LaMantia 2011 Trust; Katherine Janice LaMantia; The Samantha Lovell LaMantia 2011 Trust; Samantha Lovell LaMantia; The Molly Joann LaMantia 2011 Trust; Molly Joann LaMantia; The Lauren Amanda LaMantia 2011 Trust; Lauren Amanda LaMantia; The Mary Elizabeth LaMantia 2011 Trust; Mary Elizabeth LaMantia; The Reine Ann LaMantia 2011 Trust; Reine Ann LaMantia; The Anthony LaMantia, Jr. 2011 Trust; Anthony LaMantia, Jr.; Paul W. Bryant, Jr.; Scott Phelps; Nick Serafy; and Mikal Watts.

[3] Those who or which are financially interested in the outcome of the litigation through Plaintiff-Appellant LRP Group, Limited are Graham Gaming, L.P.; Charles W. Graham, DVM; Nancy Smith Graham; Tyler Graham; George A. Wolff; Paul W. Bryant, Jr.; Robert Johnson, Jr.; Scott Phelps; Joseph R. Strauss, III Descendant's Trust; Joseph R. Strauss; Joseph R. Strauss, III; Susan Bronson Straus Descendant's Trust; Susan Bronson

Straus; Jocelyn Straus Selig Descendant's Trust; Jocelyn Straus Selig; Nick Serafy; Phillip Adams; Muy Buena Suerte, Ltd.; Joseph V. LaMantia, III; Stephen L. LaMantia Special Trust; Stephen L. LaMantia; Gregory M. LaMantia; Anthony LaMantia; Verna Ann Peisen; Marty Peisen; The Alexandra Ann Peisen 2011 Trust; Alexandra Ann Peisen; The Lisa Marie Peisen 2011 Trust; Lisa Marie Peisen; The Jessica Reine Peisen 2011 Trust; Jessica Reine Peisen; The Joseph V. LaMantia IV 2011 Trust; Joseph V. LaMantia IV; The Angela Reine LaMantia 2011 Trust; Angela Reine LaMantia; Gregory LaMantia, Jr.; The Nicholas LaMantia 2011 Trust; Nicholas LaMantia; The Morgan Jessica LaMantia 2011 Trust; Morgan Jessica LaMantia; The Katherine Janice LaMantia 2011 Trust; Katherine Janice LaMantia; The Samantha Lovell LaMantia 2011 Trust; Samantha Lovell LaMantia; The Molly Joann LaMantia 2011 Trust; Molly Joann LaMantia; The Lauren Amanda LaMantia 2011 Trust; Lauren Amanda LaMantia; The Mary Elizabeth LaMantia 2011 Trust; Mary Elizabeth LaMantia; The Reine Ann LaMantia 2011 Trust; Reine Ann LaMantia; The Anthony LaMantia, Jr. 2011 Trust; Anthony LaMantia, Jr.; Apuesta, LLC; Silver Creek Racing, Ltd.; Bradley Hickman Jr. Trust; Clifton Hickman Trust; Margaret Hickman Lane Trust; Holt Kostohryz Trust; Kathryn Kostohryz Trust; Kelly Kostohryz Trust; George Kostohryz III Trust; Holt Hickman Irrevocable Asset Trust; Silver Creek Racing Management LLC; Brad Hickman Trust; and Brenda Kostohryz Trust.

[4] Those who or which are financially interested in the outcome of the litigation through Plaintiff-Appellant Valle de Los Tesoros, Limited are Graham Gaming, L.P.; Charles W. Graham, DVM; Nancy Smith Graham; Tyler Graham; George A. Wolff; Paul W. Bryant, Jr.; Robert Johnson, Jr.; Scott Phelps; Joseph R. Strauss, III Descendant's Trust; Joseph R. Strauss; Joseph R. Straus, III; Susan Bronson Straus Descendant's Trust; Susan Bronson Straus; Jocelyn Straus Selig Descendant's Trust; Jocelyn Straus Selig; Nick Serafy; Phillip Adams; Hidalgo Muy Buena Suerte, Ltd.; Joseph V. LaMantia, III; Stephen L. LaMantia Special Trust; Stephen L. LaMantia; Gregory M. LaMantia; Anthony LaMantia; Verna Ann Peisen; Marty Peisen; The Alexandra Ann Peisen 2011 Trust; Alexandra Ann Peisen; The Lisa Marie Peisen 2011 Trust; Lisa Marie Peisen; The Jessica Reine Peisen 2011 Trust; Jessica Reine Peisen; The Joseph V. LaMantia IV 2011 Trust; Joseph V. LaMantia IV; The Angela Reine LaMantia 2011 Trust; Angela Reine LaMantia; Gregory LaMantia, Jr.; The Nicholas LaMantia 2011 Trust; Nicholas LaMantia; The Morgan Jessica LaMantia 2011 Trust; Morgan Jessica LaMantia; The Katherine Janice LaMantia 2011 Trust; Katherine

| State of Texas Plaintiffs-Intervenors-Appellants | Counsel |
|---|---|
| The State of Texas<br>Texas Racing Commission | Lanora Christine Pettit, Lead Counsel<br>Beth Klusmann<br>Taylor Gifford<br>OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br><br>Virginia S. Fields<br>TEXAS RACING COMMISSION |

---

Janice LaMantia; The Samantha Lovell LaMantia 2011 Trust; Samantha Lovell LaMantia; The Molly Joann LaMantia 2011 Trust; Molly Joann LaMantia; The Lauren Amanda LaMantia 2011 Trust; Lauren Amanda LaMantia; The Mary Elizabeth LaMantia 2011 Trust; Mary Elizabeth LaMantia; The Reine Ann LaMantia 2011 Trust; Reine Ann LaMantia; The Anthony LaMantia, Jr. 2011 Trust; Anthony LaMantia, Jr.; Apuesta Hidalgo, LLC; Silver Creek Racing, Ltd.; Bradley Hickman Jr. Trust; Clifton Hickman Trust; Margaret Hickman Lane Trust; Holt Kostohryz Trust; Kathryn Kostohryz Trust; Kelly Kostohryz Trust; George Kostohryz III Trust; Holt Hickman Irrevocable Asset Trust; Silver Creek Racing Management LLC; Brad Hickman Trust; and Brenda Kostohryz Trust.

[5] Those who or which are financially interested in the outcome of the litigation through Plaintiff-Appellant Global Gaming LSP, LLC are Racing Partners of Texas, LLC; Ricky Knox; Global Gaming Solutions, LLC; and The Chickasaw Nation, a federally recognized Indian tribe with immunity from unconsented suit.

| Authority Defendants-Appellees | Counsel |
|---|---|
| Jerry Black<br>Katrina Adams<br>Leonard Coleman<br>MD Nancy Cox<br>Joseph Dunford<br>Frank Keating<br>Kenneth Schanzer<br>Lisa Lazarus<br>Steve Beshear<br>Adolpho Birch<br>Ellen McClain<br>Charles Scheeler<br>Joseph DeFrancis<br>Susan Stover<br>Bill Thomason<br>D. G. Van Clief<br>Horseracing Integrity and Safety Authority, Inc. | Pratik A. Shah, Lead Counsel<br>Lide E. Paterno<br>Aileen M. McGrath<br>Brennan H. Meier<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>John C. Roach<br>David T. Royse<br>RANSDELL ROACH & ROYSE, PLLC |
| FTC Defendants-Appellees | Counsel |
| Federal Trade Commission<br>Lina M. Khan<br>Noah Joshua Phillips<br>Rebecca Kelly Slaughter<br>Alvaro Bedoya<br>Christine S. Wilson[6] | Joseph F. Busa, Lead Counsel<br>Mark Bernard Stern<br>Alexander Svedlov<br>Stephen Ehrlich<br>Courtney Dixon<br>UNITED STATES DEPARTMENT OF JUSTICE |

/s/ Gregory P. Sapire
Counsel of Record for Plaintiffs-Appellants Gulf Coast Racing LLC *et al.*

---

[6] All of the foregoing individuals among the FTC Defendants are sued in their official capacities as Commissioners of the Federal Trade Commission.

## REQUEST FOR ENLARGED AND DIVIDED ORAL ARGUMENT

The Gulf Coast Racing Plaintiffs request oral argument for two reasons. First, the importance and complexity of the legal issues: The law in question involves a unique arrangement by which Congress has purported to make an end-run around the Appointments Clause by empowering a supposedly private, nonprofit organization that incorporated itself shortly before the law's enactment. This arrangement raises numerous structural constitutional questions, including the interrelation of the Appointments Clause with the private nondelegation doctrine.

Second, the Gulf Coast Racing Plaintiffs filed their case in a different division from the National Horsemen Plaintiffs and have always led with a different argument—the Appointments Clause as opposed to the private nondelegation doctrine. They therefore request oral argument because of the importance of emphasizing the different nature of their claims, and the relationship of their claims to the National Horsemen Plaintiffs' claims. To that end, the Gulf Coast Racing Plaintiffs also request **enlarged** and **divided** oral argument time.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

REQUEST FOR ENLARGED AND DIVIDED ORAL ARGUMENT ....vii

TABLE OF CONTENTS ......................................................................viii

TABLE OF AUTHORITIES...................................................................x

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED ............................................................................3

RELEVANT CONSTITUTIONAL PROVISIONS ....................................3

INTRODUCTION....................................................................................4

STATEMENT OF THE CASE ................................................................7

SUMMARY OF ARGUMENT ...............................................................13

STANDARD OF REVIEW....................................................................20

ARGUMENT .......................................................................................20

I.  This Court can consider the Gulf Coast Racing Plaintiffs'
    Appointments Clause challenge because the Court is not bound by
    an uncontested assumption it made in a different case under a
    different clause of the Constitution. ..............................................20

II. The Authority's Directors are Officers of the United States who
    must be appointed pursuant to the Appointments Clause. ..........27

    A.  Because its actions alter legal rights and relations, the
        Authority necessarily exercises government power and the
        Appointments Clause applies. .............................................27

    B.  The Authority's Directors are at a minimum inferior
        officers... ..............................................................................38

C. The Authority's Directors are non-inferior officers who must be appointed by and with advice and consent. ..................... 50

D. The so-called private nondelegation cases are consistent with the Appointments Clause framework. .................................. 52

III. Because the Authority's Directors are officers, they must be removable by the President or the Federal Trade Commission .... 61

IV. HISA commandeers the states by forcing them to administer the program on threat of preemption .................................................. 62

CONCLUSION ........................................................................................ 65

CERTIFICATE OF SERVICE .............................................................. 68

CERTIFICATE OF COMPLIANCE ...................................................... 69

# TABLE OF AUTHORITIES

## Cases

*Auffmordt v. Hedden,*
    137 U.S. 310 (1890)................................................................56

*Bank of U.S. v. Planters' Bank of Ga.,*
    22 U.S. 904 (1824)..........................................................29, 30

*Bond v. United States,*
    564 U.S. 211 (2011)............................................................64

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam) ...............................31, 32, 35

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936)............................................................52

*CFPB v. Gordon,*
    819 F.3d 1179 (9th Cir. 2016) .............................................49

*Collins v. Yellen,*
    141 S. Ct. 1761 (2021)..................................................31, 46

*Contender Farms, LLP v. USDA,*
    779 F.3d 258 (5th Cir. 2015).............................................65

*Cooper Tire & Rubber Co. v. Farese,*
    248 F. App'x 555 (5th Cir. 2007)........................................26

*Cusack Co. v. City of Chicago,*
    242 U.S. 526 (1917)............................................................53

*Dep't of Transp. v. Ass'n of Am. R.R.,*
    575 U.S. 43 (2015) (Thomas, J., concurring) .....................34

*DIRECTV, Inc. v. Budden,*
    420 F.3d 521 (5th Cir. 2005)................................................2

*Edmond v. United States,*
    520 U.S. 651 (1997) ........................................................ 47

*Eubank v. City of Richmond,*
    226 U.S. 137 (1912) ........................................................ 52

*Free Enterprise Fund v. Public Co. Accounting and*
    *Oversight Board (PCAOB),*
    561 U.S. 477 (2010) .................................................. passim

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ........................................................ 39

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    920 F.3d 1 (D.C. Cir. 2019) ...................................... 16, 49

*Hall v. Hall,*
    138 S. Ct. 1118 (2018) ................................................... 25

*Herron v. Fannie Mae,*
    861 F.3d 160 (D.C. Cir. 2017) ............................. 30, 36, 37

*In re Air Crash Disaster,*
    549 F.2d 1006 (5th Cir. 1977) ...................................... 25

*In re Hennen,*
    38 U.S. (13 Pet.) 230 (1839) ......................................... 45

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................. 14, 33

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    796 F.3d 111 (D.C. Cir. 2015) ...................................... 49

*Kajmowicz v. Whitaker,*
    42 F.4th 138 (3d Cir. 2022) .......................................... 49

*Kerpen v. Metro. Wash. Airports Auth.,*
    907 F.3d 152 (4th Cir. 2018) ........................................ 38

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) ...................................................... 16, 49

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ............................................................ 5, 6, 35, 37

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ................................................................ passim

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................... 58

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014) ......................................................................... 24

*Moreau v. Harris Cnty.*,
    158 F.3d 241 (5th Cir. 1998) ............................................................ 2

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ..................................................................... 62

*Myers v. United States*,
    272 U.S. 52 (1926) ........................................................................... 46

*Nat'l Horsemen's Benev. & Protective Ass'n v. Black*,
    53 F.4th 869 (2022) ................................................................... 11, 20

*New York v. United States*,
    505 U.S. 144 (1992) ......................................................................... 62

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ................................................................... 63, 64

*NLRB v. Newark Electric Corp.*,
    14 F.4th 152 (2d Cir. 2021) ............................................................ 49

*Oklahoma v. United States*,
    62 F.4th 221 (2023) ........................................................... 12, 19, 63

*Printz v. United States,*
521 U.S. 898 (1997)................................................................62

*Seila Law v. CFPB,*
140 S. Ct. 2183 (2020) (Kagan, J., dissenting in part)......................30

*Seminole Tribe v. Florida,*
517 U.S. 44 (1996)................................................................23

*South Dakota v. Dole,*
483 U.S. 203 (1987)...............................................................63

*Sunshine Anthracite Coal Co. v. Adkins,*
310 U.S. 381 (1940)...................................................... 18, 53, 58

*Terrell v. Household Goods Carriers' Bureau,*
494 F.2d 16 (5th Cir. 1974)......................................................26

*Texas v. Rettig,*
987 F.3d 518 (5th Cir. 2021)............................................ 18, 53, 54, 55

*United States v. Arthrex,*
141 S. Ct. 1970 (2021)...........................................................51

*United States v. Eli Lilly & Co.,*
4 F.4th 255 (5th Cir. 2021) ......................................................2

*United States v. Germaine,*
99 U.S. 508 (1878)........................................................ 46, 55, 56

*United States v. Johnson,*
256 F.3d 895 (9th Cir. 2001) (per curiam) (en banc)..........................22

*United States v. Maurice,*
26 F. Cas. 1211 (C.C.D. Va. 1823) ..............................................56

*United States v. Moore,*
95 U.S. 760 (1877)...............................................................45

*United States v. Perkins*,
   116 U.S. 483 (1886) ................................................................ 46

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*,
   945 F.3d 206 (5th Cir. 2019) ................................................. 20

*Washington ex rel. Seattle Title Tr. Co. v. Roberge*,
   278 U.S. 116 (1928) ................................................................ 53

*Wilkes-Barre Hosp. Co., LLC v. NLRB*,
   857 F.3d 364 (D.C. Cir. 2017) .............................................. 49

*Williams v. Seidenbach*,
   958 F.3d 341 (5th Cir. 2020) (en banc) ................................. 1

**Statutes**

1 Stat. 145 (1790) ................................................................... 56

15 U.S.C. § 3051 ................................................................... 4, 8

15 U.S.C. § 3052 ............................................................... passim

15 U.S.C. § 3053 ................................................................. 10, 11

15 U.S.C. § 3054 ............................................................... passim

15 U.S.C. § 3055 ................................................................. 8, 39

15 U.S.C. § 3056 ................................................................... 39

15 U.S.C. § 3057 ............................................................... passim

15 U.S.C. § 3058 ................................................................... 43

15 U.S.C. § 41 ................................................................... 19, 61

15 U.S.C. § 7217 ................................................................... 47

15 U.S.C. § 78o ................................................................. 18, 59

15 U.S.C. § 78s.................................................................. 18, 59

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

28 U.S.C. § 1337 ....................................................................1

5 U.S.C. § 551 ......................................................................48

Bituminous Coal Act of 1937,
      50 Stat. 72 (1937)........................................................ 18, 58

Consolidated Appropriations Act, 2023,
      Pub. L. No. 117-328, 136 Stat. 4459 (2022).......................... 11

## Other Authorities

1 William Blackstone,
      Commentaries on the Laws of England (1765) ................................ 45

2 Records of the Federal Convention of 1787
      (M. Farrand ed. 1911) ..................................................... 50

Ilan Wurman,
      *Nonexclusive Functions and Separation of Powers Law*,
      107 Minn. L. Rev. 735 (2022)............................................. 33

Office of Legal Counsel, "Officers of the United States Within the
      Meaning of the Appointments Clause,"
      31 Op. O.L.C. 73 (2007) ............................................ passim

Rule 1010 *et seq.*,
      88 Fed. Reg. 5070 (Jan. 26, 2023)..........................................9

Rule 2000 *et seq.*,
      87 Fed. Reg. 435 (Jan. 5, 2022) ...........................................9

Rule 8000 *et seq.*,
  87 Fed. Reg. 4023 (Jan. 26, 2022)............................................9, 43, 45

Rule 8500 *et seq.*,
  87 Fed. Reg. 9349 (Feb. 18, 2022)......................................................9

Rule 9000,
  87 Fed. Reg. 29,862 (May 17, 2022) ................................................9

## Constitutional Provisions

U.S. Const. art. I, § 1....................................................................28

U.S. Const. art. I, § 8....................................................................29

U.S. Const. art. II, § 1 ........................................................3, 19, 28

U.S. Const. art. II, § 2 ...................................................... passim

U.S. Const. art. III, § 1.................................................................28

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because this claim presents federal questions under Article II, Sections 1 and 2 of the Constitution, and under 28 U.S.C. § 1337 because the Act of Congress in question regulates commerce. This Court has jurisdiction under 28 U.S.C. § 1291. The District Court entered its order and final judgment on May 4, 2023, and Plaintiffs filed their notices of appeal on May 17 and 18, 2023. ROA.2706-62, 2825-31.

The Court has asked Plaintiffs to brief whether the District Court's decision is final. *See Williams v. Seidenbach*, 958 F.3d 341 (5th Cir. 2020) (en banc). In *Williams*, the plaintiff voluntarily dismissed remaining defendants **after** judgment with respect to other defendants. *Id.* at 344. The Court held that an entry of partial summary judgment was necessary, otherwise the plaintiff's voluntary dismissal would merely dodge finality rules when in fact no judgment had been entered with respect to all the parties. *Id.*

Here, however, Plaintiffs abandoned certain claims **before** the entry of any judgment. As this Court has held: "If a party abandons one of its claims, a judgment that disposes of all remaining theories is final and

appealable so long as it is apparent that the district judge intended the judgment to dispose of all claims." *Moreau v. Harris Cnty.*, 158 F.3d 241, 244 (5th Cir. 1998); *see also DIRECTV, Inc. v. Budden*, 420 F.3d 521, 524-25 (5th Cir. 2005). And in *United States v. Eli Lilly & Co.*, this Court squarely confronted whether the rule of *Williams* applied to a voluntary dismissal made "before" the adverse order and concluded "that the prior without-prejudice dismissals did not deprive the district court's subsequent decision of finality." 4 F.4th 255, 261 (5th Cir. 2021).

The trial order clearly indicated that Judge Hendrix understood the Gulf Coast Racing Plaintiffs' other claims to be "abandoned" and that his order disposed of all claims. ROA.2719 ("[T]he Gulf Coast [Racing] plaintiffs have abandoned their third, fourth, sixth, seventh, and ninth claims."); ROA.2761 (Gulf Coast Racing Plaintiffs "voluntarily withdrew Counts 3, 4, 6, 7, and 9"). This is the same posture in which this Court first heard this case and no similar jurisdictional issue was identified. ROA.1553 (noting NHBPA plaintiffs "abandoned" various claims, "so they are dismissed"). Because the claims were abandoned **before** entry of judgment, the District Court's order is final.

## ISSUES PRESENTED

1.    Whether the Authority's Directors, because they exercise government power, are officers of the United States who must be appointed according to the Appointments Clause.

2.    Whether the Authority's Directors, because they exercise government power, must be removable by the President or the FTC.

3.    Whether HISA violates the anti-commandeering doctrine by forcing states to administer the federal program on penalty of preemption.

## RELEVANT CONSTITUTIONAL PROVISIONS

"The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1.

"He . . . by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, para. 2.

## INTRODUCTION

This case is about power. It is about whether Congress can confer coercive powers upon individuals who have not been properly constituted government officers. In the Horseracing Integrity and Safety Act of 2020 ("**HISA**"), 15 U.S.C. §§ 3051 *et seq.*, Congress empowered a group of purportedly private individuals—incorporated weeks before the law's passage under the laws of Delaware as the Horseracing Integrity and Safety Authority (the "**Authority**")—to exercise governmental power over the horseracing industry. The "Authority," composed of a Board of Directors (the "**Board**") appointed by a Nominating Committee whose composition is itself determined by the Authority's own incorporation documents, is empowered by law to, *inter alia*, subpoena documents and compel testimony; search businesses and seize documents; conduct adjudicatory proceedings; and prosecute actions in federal court like other federal prosecutors. The Authority also makes legislative rules that alter the rights and obligations of private parties relating to anti-doping, medication protocols, and racetrack safety for the horseracing industry nationwide.

No private individual has such powers. No private individual can show up at one's door to demand or seize documents under sanction of law. No private individual has the power to hale another into court to enforce offenses against the public. And no private individual has the power to make a code of laws to impose on others. But the "Authority" does. Its powers are the very definition of government power. And those powers would be considered "executive power" if exercised by an officer or agency of the United States. As a result, the Authority's Directors are officers of the United States who must be properly appointed according to Article II, Section 2 of the Constitution, and properly removable under Article II, Section 1.

The District Court failed to conduct an Appointments Clause analysis, however, because it applied a series of cases (principally *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995)) to conclude erroneously that the Authority was in fact a private entity. *Lebron* and its progeny deal with a different question: whether certain entities that do not exercise any governmental power—such as Amtrak, the Smithsonian, the Bank of the United States, or Reagan National Airport—are nevertheless part of the "government" for certain

constitutional purposes. Although these are private entities engaging in private, nongovernmental conduct, *Lebron* holds that such entities are nevertheless the government for constitutional purposes such as the First Amendment if they meet certain factors (*e.g.*, if they are "government-created" or their boards are government appointed). *See id.* at 391, 396.

That has nothing to do with this case, where the Authority **exercises government power**. Because it exercises government power—its actions alter legal rights and relations or carry into execution rules that do—the Appointments Clause applies, full stop. Relying on *Lebron* led the District Court to beg the very question at issue: It held that the Appointments Clause does not apply because the Authority is not appointed by the government. ROA.2725 ("[T]he Authority is a private entity under *Lebron* . . . because it is not government created, and its directors are not government appointed."); ROA.2731 ("[T]he Authority is a private entity because it is neither government-created nor government-appointed."). Entirely circular and incorrect, that analysis makes sense only when the question is whether an entity that does **not** exercise government power is nevertheless "the government," hence

whether its officials are appointed by the government is a key factor. But here, the question is whether the Authority's Directors **must** be appointed by the "government," not whether they **are** the government because they are already appointed.

When the correct Appointments Clause cases are applied, there is no question that the Authority's Directors are, at a minimum, inferior officers of the United States. As such, they must be properly appointed (and here they were not), and they must be properly removable (and here they are not). The Court should reverse the District Court and enjoin HISA.

## STATEMENT OF THE CASE

HISA purports to bestow powers upon a "private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority.'" 15 U.S.C. § 3052(a). This "Authority" was incorporated in Delaware on September 8, 2020, ROA.4223, weeks before HISA passed in the House of Representatives on September 29, 2020, ROA.4252-4317. On September 30, 2020, the Authority filed its bylaws. ROA.4229-51. Those bylaws provide, as does HISA itself, for a Board of Directors and a Nominating Committee that appoints the

Directors. 15 U.S.C. § 3052(b) (Board); *id.* § 3052(d) (Nominating Committee); ROA.4233-40. The bylaws themselves name the initial members of the Nominating Committee. ROA.4239-40. They also provide that the Directors can only be removed by other Directors. ROA.4236 ("Directors shall be removable, for cause, by the affirmative vote of all Directors then in office.").

HISA empowers the Authority to "develop[] and implement[] a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." 15 U.S.C. § 3052(a); *see also id.* § 3055(a)(1). A "covered horserace" is "any horserace involving covered horses that has a substantial relation to interstate commerce." *Id.* § 3051(5). "[C]overed persons" means "all trainers, owners, breeders, jockeys, racetracks, veterinarians," or other persons "engaged in the care, training, or racing of covered horses." *Id.* § 3051(6). "[C]overed horse" is any "Thoroughbred horse," but the statute provides for the expansion of the Authority's jurisdiction to other breeds. *Id.* § 3051(4).

HISA authorizes the Board to make rules for accessing documents, issuing subpoenas, and engaging in investigations. *Id.* § 3054(c). It grants

the Authority "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction." *Id.* § 3054(h). It grants the Authority power to "commence a civil action against a covered person or racetrack" that has violated the Act and to commence such actions "to enjoin . . . acts or practices" that violate the Act. *Id.* § 3054(j)(1). HISA provides that the Authority "shall issue" or "shall establish" rules regarding "safety, performance, and anti-doping and medication control rule violations," *id.* § 3057(a)(1), (c)(1), adjudicatory processes, *id.* § 3057(c), and "civil sanctions" for violations, *id.* § 3057(d).

The Authority has promulgated a registration rule, requiring all covered persons to register with the Authority and consent to searches and seizures, Rule 9000, 87 Fed. Reg. 29,862, 29,866-67 (May 17, 2022); a legislative rule relating to racetrack safety, Rule 2000 *et seq.*, 87 Fed. Reg. 435, 445-59 (Jan. 5, 2022); rules on civil sanctions, enforcement, and adjudicatory processes, Rule 8000 *et seq.*, 87 Fed. Reg. 4023, 4028-31 (Jan. 26, 2022); a rule on fee assessments, Rule 8500 *et seq.*, 87 Fed. Reg. 9349, 9352-53 (Feb. 18, 2022); and, most recently, a legislative rule on anti-doping and medication control, Rule 1010 *et seq.*, 88 Fed. Reg. 5070, 5084-5201 (Jan. 26, 2023).

HISA provides for limited oversight by the Federal Trade Commission (the "**FTC**"). Under HISA, the Authority's rules do not become effective without FTC approval, but the FTC "shall"—that is, it must—approve the rules if they are "consistent with" the Act and with "applicable rules approved by the Commission." 15 U.S.C. § 3053(c)(2)(B). The FTC-promulgated rules are procedural, detailing the Authority's rulemaking process. *Id.* § 3053(a) ("The Authority shall submit to the Commission, in accordance with such rules as the Commission may prescribe . . . .").

When Congress first enacted HISA, it was clear that the FTC could consider neither the policy merits of the Authority's rules, nor public comments on them. For example, when considering the Enforcement Rule, the FTC specifically refused to address the rule's policy merits. ROA.4433 ("Under the Act, the Commission reviews the Authority's proposals for their consistency with the Act and the Commission's [procedural] rule, not for general policy."); *see also* ROA.4411, 4434, 4440 (similar); ROA.4484 (same); ROA.4468 (same); ROA.4393 (same).

On March 15, 2021, the National Horsemen Plaintiffs filed a lawsuit in the Lubbock Division of the Northern District of Texas.

ROA.66-93. They and the Defendants filed cross motions on private nondelegation and due process claims. ROA.345-84, 443-73, 474-511. On April 25, 2022, Judge Hendrix entered final judgment against the National Horsemen Plaintiffs and the Texas intervenors. ROA.1720, 1747. On November 18, 2022, this Court reversed the District Court and held HISA invalid under the private nondelegation doctrine in part because, unlike the Securities and Exchange Commission (**"SEC"**) in a different statutory context, the FTC did not have the power to abrogate, modify, or add to the Authority's rules. *Nat'l Horsemen's Benev. & Protective Ass'n v. Black*, Case No. 22-10387, Doc. 187-1, 53 F.4th 869 (2022) ("NHBPA I").

In December 2022, HISA was amended in response to this Court's decision. The amendment granted the FTC power to "abrogate, add to, and modify" the Authority's rules "as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this Act and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this Act." Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. O, tit. VII, § 701, 136 Stat. 4459, 5231-32 (2022); 15 U.S.C. § 3053(e)

(as amended). On January 31, 2023, this Court denied Defendants' motion to vacate the panel opinion, and instead remanded the case to the District Court and provided that any further appeal shall be to the same panel. Case No. 22-10387, Doc. 223-1. On March 3, 2023, the U.S. Court of Appeals for the Sixth Circuit upheld HISA on private nondelegation grounds in light of Congress's amendment. *Oklahoma v. United States*, Case No. 22-5487, Doc. 81-2, 62 F.4th 221 (2023). On April 17, 2023, the plaintiffs in that case petitioned for rehearing *en banc*, which was denied on May 18, 2023.

While all of these proceedings, centered on private nondelegation challenges, were ongoing, the Gulf Coast Racing Plaintiffs filed a separate lawsuit in the Amarillo Division of the Northern District of Texas on July 29, 2022, where they made different claims. ROA.4846-4905. These Plaintiffs argued—and continue to argue—that HISA violates the Constitution because it contradicts the Appointments Clause and the vesting of the removal power in the President. ROA.4873-81. These Plaintiffs argued in the alternative that HISA violates the private nondelegation doctrine. ROA.4888-91. On November 21, 2022—three days after this Court invalidated HISA on private nondelegation

grounds—the Gulf Coast Racing Plaintiffs filed their motion for summary judgment, still leading with their Appointments Clause and removal claims. ROA.5284-5347. They also made other legal claims that they did not pursue at trial and are not at issue here.

On April 6, 2023, after an emergency motion was filed, Judge Kacsmaryk transferred the Gulf Coast Racing Plaintiffs' case to the Lubbock Division. ROA.5614-17. On April 11, Judge Hendrix consolidated the two cases. ROA.5894-99. On April 26, Judge Hendrix held a half-day bench trial. ROA.3028-3205. On May 4, 2023, Judge Hendrix issued a final order and judgment upholding HISA and dismissing all Plaintiffs' and Intervenors' claims. ROA.2706-62. On May 17, 2023, the Gulf Coast Racing Plaintiffs filed their notice of appeal. ROA.2827-29.

## SUMMARY OF ARGUMENT

HISA violates the Appointments Clause and the vesting of executive power in the President because any individual wielding government power, and who satisfies the definition of an officer, must be properly appointed and properly removable.

1.     This Court can consider the Gulf Coast Racing Plaintiffs' challenges. The District Court incorrectly believed that it had to accept this Court's assumption in *NHBPA I* that the Authority was a private entity, as a "necessary implication" of this panel's decision, even though none of the parties in *NHBPA I* had disputed that assumption. The District Court's own cited authorities make clear that only matters actually **decided** by an appellate court—whether expressly or by necessary implication—bind a district court. Uncontested assumptions might be necessary predicates of a court's decision; but those assumptions are not binding because the court does not "decide" or "determine" them.

2.     a. Because the Authority exercises government power—its actions alter legal rights and relations, *see INS v. Chadha*, 462 U.S. 919, 952 (1983)—the Appointments Clause applies. *See, e.g.*, Office of Legal Counsel, "Officers of the United States Within the Meaning of the Appointments Clause," 31 Op. O.L.C. 73, 73-74 (2007) (any position "invested by legal authority with a portion of the sovereign powers of the federal Government" is a federal office). The cases relied upon by the District Court to conclude that the Authority was a "private" entity

involve organizations like Amtrak, the Smithsonian, Reagan National Airport, and the Bank of the United States, that do not exercise any government power. These cases hold that such entities may nevertheless be part of the "government" for certain constitutional purposes such as the First Amendment if, for example, they are "government created" or "government appointed." Such cases are inapplicable here where the very question is whether the Authority's Directors **must** be government appointed **because** they exercise government power.

b. Applying the correct cases under the Appointments Clause, *see, e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2052-53 (2018); *Free Enterprise Fund v. Public Co. Accounting and Oversight Board (PCAOB)*, 561 U.S. 477, 484-86 (2010), confirms that the Authority's Directors are, at a minimum, inferior officers of the United States. They exercise continuing statutory duties and therefore have continuing offices established by law—whether or not they purported to incorporate themselves as a private entity prior to the law's enactment.

The Authority's Directors also exercise significant discretion over important functions. They exercise the same adjudicatory functions as the Administrative Law Judges ("**ALJs**") that the Supreme Court in

*Lucia* held to be officers. The Directors also engage in rulemaking functions with FTC review identical to SEC review of PCAOB rules in *Free Enterprise Fund*; and the Supreme Court recognized that the PCAOB's board members were officers of the United States, despite the statutory language labeling them otherwise. Finally, the Directors engage in prosecutions in federal court, a core executive function.

The degree of the Authority's subordination to the FTC—an issue critical to a so-called private nondelegation challenge—is irrelevant to an Appointments Clause challenge. Subordination only matters for determining whether an officer is inferior or principal, not whether an official is an officer to begin with. *Lucia*, 138 S. Ct. at 2052 & n.4. For that reason, too, the FTC cannot "ratify" the decisions of the Authority. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10-14 (D.C. Cir. 2019); *Landry v. FDIC*, 204 F.3d 1125, 1132 (D.C. Cir. 2000) (ratification does not moot Appointments Clause challenge to inferior officer).

Because the Authority's Directors are (at least) inferior officers who must be appointed by and with Senate advice and consent unless Congress by law has vested their appointments in the President or the

head of department, U.S. Const. art. II, § 2, para. 2, the Directors were not constitutionally appointed.

c. Not only are the Authority's Directors officers, they are principal or non-inferior officers who must be appointed by and with advice and consent of the Senate. The Opinions Clause suggests that there is a single "principal officer" in each executive department. U.S. Const. art. II, § 2, para. 1. And the Appointments Clause provides that Congress may by law vest the appointment of **inferior** officers in the President, a principal officer, or a court. *Id.* art. II, § 2, para. 2. Therefore, the Constitution recognizes three kinds of officers: the principal officer of a department, non-inferior officers who are not the principal, and inferior officers.

Because the Authority's legislative rules and policy choices become federal law—the FTC can, but need not, choose to modify those rules, and if it does so choose, it can only do so through a new rulemaking that takes effect later in time while the Authority's diktats remain enforceable—the Authority's Directors are not inferior officers because they are not subject to continuous and ongoing direction and control of other officers. A number of the Authority's investigative and adjudicative functions are

also subject to almost no control from the FTC, again rendering the Authority's Directors non-inferior officers.

d. The so-called private nondelegation cases are consistent with the Appointments Clause framework. *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021), involved actuarial contractors whose duties were episodic. In *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), the coal boards had no more power than private parties: they could suggest to the agency what they thought coal prices should be, but it was up to the agency "to prescribe" prices and the statute provided that the agency "may" rely on the boards' recommendations. Bituminous Coal Act of 1937, 50 Stat. 72, 77-79 (1937). As for the Maloney Act, which requires securities brokers to be members of so-called self-regulatory organizations ("**SROs**"), those SROs are at least plausibly private entities because the regulated individuals participate in their own governance and there is a right of exit: any group of individuals can create their own, competing SROs. *See* 15 U.S.C. §§ 78o, 78s. If there is no compulsion, there is no government power.

3.      Because the Authority exercises government power, its Directors must be subject to the President's removal power. U.S. Const.

18

art. II, § 1. The Supreme Court has held that two layers of for-cause removal are unconstitutional. *Free Enter. Fund*, 561 U.S. at 496-97. Here, the President cannot remove the FTC commissioners without cause. 15 U.S.C. § 41. And the Authority's Directors cannot be removed by the FTC Commissioners at all, as the statute provides that their removals are to be governed by their own bylaws. 15 U.S.C. § 3052(b)(3)(D).

4.     Finally, HISA unconstitutionally commandeers the states. The Sixth Circuit disagreed, citing to the general rule that "[i]nstead of preempting state law altogether, Congress may offer States a regulatory role contingent on following federal standards." *Oklahoma*, 62 F.4th at 234. Here, however, HISA does something entirely different and novel: it forces the states to **administer** HISA on **threat** of preemption. That violates the anti-commandeering principle.

Because the Authority is unconstitutionally structured, this Court should reverse the District Court and enjoin HISA.

## STANDARD OF REVIEW

This Court "review[s] a district court's judgment regarding the constitutionality of a statute de novo." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 212 (5th Cir. 2019).

## ARGUMENT

**I.   This Court can consider the Gulf Coast Racing Plaintiffs' Appointments Clause challenge because the Court is not bound by an uncontested assumption it made in a different case under a different clause of the Constitution.**

The District Court first held with respect to the Gulf Coast Racing Plaintiffs' appointments and removal claims that it was precluded from ruling in their favor because it was bound by the factual assumption this Court made in *NHBPA I* that the Authority was a private entity. As this panel will recall, the National Horsemen Plaintiffs in that prior case had abandoned their Appointments Clause claim. This Court observed: "The Horsemen also claimed HISA was unconstitutional under the public non-delegation doctrine and the Appointments Clause. The district court did not rule on those claims and so they are not before us." 53 F.4th at 875 n.11.

One would think that the District Court—and certainly this Court—is not bound on an issue that was never before either court and

that no other court has ruled on. And yet, because it misapplied cases distinguishing dicta from holdings, the District Court concluded that it was so bound. The District Court believed that this Court's holding in *NHBPA I* "is necessarily predicated on the Authority being a private entity," and was swayed by "the simple fact that the Fifth Circuit called the Authority a private entity throughout its opinion." ROA.2726.

The District Court's own cited authorities reveal that it misapplied these "precedents on precedent." For example, the court wrote that "those parts of the decision consisting of the 'court's determination of a matter of law pivotal to its decision'—are given the weight of binding precedent." ROA.2726 (quoting BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 44 (2016) (quoting Francis Bacon, "The Lord Keeper's Speech in the Exchequer" (1617), in 2 THE WORKS OF FRANCIS BACON 477, 478 (Basil Montagu ed., 1887))). That quotation makes clear that an appellate court's "**determination**" of a matter of law pivotal to its decision is binding precedent; in *NHBPA I*, this Court never **determined** that the Authority was private because the point was not argued but rather abandoned. This Court therefore **assumed**, but it did not **determine**, that the Authority was private.

The District Court also cited *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (per curiam) (en banc), ROA.2726-27, in which the Ninth Circuit debated the test for distinguishing dicta from precedent. That court rejected a narrower test according to which only rules that were "logically essential" to the holding were binding, and adopted a broader approach, "whether an issue is 'necessarily decided' for purposes of collateral estoppel." *Johnson*, 256 F.3d at 915. Even under this broader approach, neither the District Court nor this Court would be bound by the assumption that the Authority is private. That is because for collateral estoppel to apply, an issue must **actually be litigated**. As the Ninth Circuit explained, the test applies where "the court heard evidence and argument from both parties, and specifically ruled on the issue." *Id.* This Court in *NHBPA I* did neither.

Similarly, the District Court cited an old encyclopedia entry for the proposition that "[i]t is accepted that '[a]n inferior court cannot decide adversely to a decision of [a superior court] and send the case up to that court again upon the ground that in the former decision of the court . . . certain points were not sufficiently argued.'" ROA.2730 (quoting Basil Jones, *Stare Decisis*, in 26 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF

LAW 158, 170 (David S. Garland & Lucius P. McGehee eds., 2d ed. 1904)). But that encyclopedia entry makes clear that "a decision affirming a judgment does not become a precedent as to any question not argued or expressly presented to the court," or where the court was not "directly drawn to" or "distinctly expressed" its mind upon the subject. *Id.*

Nor does *Seminole Tribe v. Florida*—the Authority's preferred case—justify the District Court's analysis. In *Seminole Tribe*, the Supreme Court declared that "[w]hen an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." 517 U.S. 44, 67 (1996). The Court was talking about an issue—whether "state sovereign immunity [w]as an essential part of the Eleventh Amendment"—that it actually considered and determined in previous cases, but which was not strictly necessary to the results in those cases. *See id. Seminole Tribe* says nothing whatsoever about the binding force of uncontested assumptions.

Consider also *Free Enterprise Fund*: there, the Supreme Court concluded that two layers of for-cause removal were unconstitutional. *Free Enter. Fund*, 561 U.S. at 496-97. But it did so on the **assumption**, uncontested by the parties, that the SEC Commissioners were not

removable at will by the President, even though the statute does not actually provide any for-cause protections. *Id.* at 487 ("The parties agree that the Commissioners cannot themselves be removed by the President except [for cause], and we decide the case with that understanding."). Although the for-cause protection for SEC Commissioners was a **necessary predicate** of the Court's decision, no one could plausibly claim that the Supreme Court **decided** that the SEC Commissioners were in fact removable only for cause. If the matter were litigated in a future case—by a removed SEC Commissioner, for example—no one would think that *Free Enterprise Fund* established a precedent on the question.

Finally, even if the District Court properly felt bound under the law of precedent as an inferior court—and it was not—**this** Court is not bound by prior decisions that **it** made "without full briefing or argument." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 202-03 (2014) (quoting *Hohn v. United States*, 524 U.S. 236, 251 (1998)). The Supreme Court has specifically stated that a "case cannot be resolved merely by pointing to three sentences [in a prior case] that were written without the benefit of full briefing or argument on [an] issue." *Id.* at 202.

The District Court next relied on the law of the case doctrine. The court stated that the doctrine dictates that "'the duty of a lower court to follow what has been decided at an earlier stage of the case comprehends things decided by necessary implication as well as those decided explicitly.'" ROA.2727 (quoting *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974) (cleaned up)).

Here, too, the District Court made two serious errors.

First, the law of the case does not apply to a **different case**. The Gulf Coast Racing Plaintiffs are different plaintiffs who filed a different lawsuit with different claims in a different court. True, their case was transferred and then consolidated with a prior case. But "consolidation [cannot] prejudice rights to which the parties would have been due had consolidation never occurred." *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018); *see also In re Air Crash Disaster*, 549 F.2d 1006, 1013 n.9 (5th Cir. 1977) (court "must avoid prejudicing the rights of the parties" when consolidating). In other words, if the law of the case were to prejudice the new plaintiffs, then the result of consolidation cannot be that the law of the other case applies to them.

Second, the law of the case again requires that the issue actually be "<u>decided</u>," *Terrell*, 494 F.2d at 19—and the private nature of the Authority, and by extension the Appointments Clause challenge, was not. In the other relevant case the District Court cited, ROA.2727, the Fifth Circuit similarly explained that "the law of the case controls legal claims which <u>were fully litigated and decided</u> in the first appeal." *Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) (emphasis added).

The District Court nevertheless seemed to think that it could not question the private nature of the Authority because its private nature was a "necessary implication," ROA.2727 (quoting *Terrell*), or a "necessary predicate[]," ROA.2728, of this panel's holding. The conclusion does not follow because many things could be "necessary predicates" of the Court's holding, including uncontested, unlitigated assumptions. Yet it is only the necessary implications or predicates that were actually <u>decided</u> that combine to form the law of the case.

Thus, the appointments and removal claims are properly presented here.

II.   **The Authority's Directors are Officers of the United States who must be appointed pursuant to the Appointments Clause.**

HISA violates the Appointments Clause. The Authority exercises government power, and so the clause applies; the District Court erroneously applied cases in which the question was whether an entity exercising **private** power was nevertheless the government for certain constitutional purposes. Those cases have no application here.

Under the apposite cases, the Authority's Directors exercise significant discretion over important functions pursuant to ongoing statutory duties. That makes them officers. And if they are, at a minimum, inferior officers, they must be appointed by and with advice and consent, unless Congress by law vests their appointments in the President or the head of department. U.S. Const. art. II, § 2, para. 2. Here Congress did not provide by law for the Directors' appointment by the FTC, and the Directors were not appointed by and with advice and consent.

A.   **Because its actions alter legal rights and relations, the Authority necessarily exercises government power and the Appointments Clause applies.**

HISA involves a novel arrangement: a group of individuals incorporated themselves as a private entity under Delaware law in

anticipation of a particular statute that vests the entity with government power. The question thus becomes whether this entity is like other private entities that have some relationship to the government but to whom the appointments and removal provisions of the Constitution do not apply—like the Bank of the United States, Amtrak, Washington Reagan National Airport, and the Smithsonian—or whether the nature of the grant of power in HISA makes what otherwise might have been a private entity into a government entity to which these constitutional strictures apply.

1. The answer is the latter. As the Office of Legal Counsel has explained in its analysis of the Appointments Clause, "[A] position, however labeled, is in fact a federal office if (1) it is invested by legal authority **with a portion of the sovereign powers** of the federal Government, and (2) it is 'continuing.'" 31 Op. O.L.C. at 73-74 (emphasis added). This conclusion is rooted in the Constitution's text, which grants to various institutions and individuals legislative, executive, and judicial power. U.S. Const. art. I, § 1; art. II, § 1; art. III, § 1. It then specifies that the President is vested with the executive power and provides that "He shall hold his Office" for a term of four years. *Id.* art. II, § 1. The Opinions

Clause provides that principal officers must report to the President about the duties of their "respective Offices." *Id.* art. II, § 2, para. 1. Judges, who exercise judicial power, are described by the Appointments Clause as being "Officers." *Id.* art. II, § 2, para. 2. And the Necessary and Proper Clause empowers Congress to make laws necessary and proper for carrying into execution their own powers, and also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." *Id.* art. I, § 8, cl. 18. In other words, the Constitution vests three types of power—legislative, executive, and judicial—and it vests those powers in various "officers."

Thus, what allowed Congress to structure the Bank of the United States such that its officers were not appointed or removable by the President was that the Bank did not exercise sovereign powers. As Chief Justice Marshall explained, "[W]hen a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen." *Bank of U.S. v. Planters' Bank of Ga.*, 22 U.S. 904, 907 (1824). "The government of the Union held shares in the old Bank of the United States; but the privileges of the government were not imparted by that

circumstance to the Bank," Marshall continued. *Id.* at 908. "The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter." *Id.* That explains why it was constitutional that "[o]f the twenty-five directors who led the Bank, the President could appoint and remove only five." *Seila Law v. CFPB*, 140 S. Ct. 2183, 2231 (2020) (Kagan, J., dissenting in part) (citing Act of Apr. 10, 1816, § 8, 3 Stat. 269). The Bank did not exercise sovereign powers, and so the Constitution's structural requirements for appointments and removals did not apply.

That is also why the D.C. Circuit understood the Federal Housing Finance Agency ("**FHFA**") to be exercising private power when that agency merely stepped into the shoes of Fannie Mae, a government-sponsored financing and mortgage company. The D.C. Circuit explained that when the FHFA acts as a conservator, it "step[s] into Fannie Mae's private shoes" and "shed[s] its government character." *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) (quoting *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1103 & n.22 (D.C. Cir. 2017), and *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir.

2017)). The Supreme Court disagreed that the FHFA was purely a private actor, but only because it was governed by a "special statute" that gave it powers that "differ critically from those of most conservators and receivers," including, for example, the power to "issue subpoenas," as well as to put a private company into receivership in the first place. *Collins v. Yellen*, 141 S. Ct. 1761, 1785-86 (2021). The Court therefore made clear that *because* FHFA "exercises executive power," it is subject to the Constitution's provisions for removal, *id.* at 1786, and logically therefore for appointments. Certainly Fannie Mae, although government created, does not exercise government power, which explains why **its** Board of Directors is not appointed according to the Appointments Clause.

This distinction between sovereign and non-sovereign functions is also supported by *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), where the Supreme Court held that the commissioners of the Federal Election Commission were officers and, because they were improperly appointed, could not exercise a variety of governmental functions that the Federal Election Campaign Act had delegated to them. The Court explained that the Commission's powers fell into "three categories": those relating to "information receipt, dissemination, and investigation"; those related to

fleshing out the statute through rulemaking; and those "necessary to ensure compliance with the statute and rules[,] informal procedures, administrative determinations and hearings, and civil suits." 424 U.S. at 137. The Court held that the commissioners could exercise the first set of powers without proper appointments because those were merely in aid of Congress's investigative powers. But the second and third set of powers were clearly "executive power," and "[s]uch functions may be discharged only by persons who are 'Officers of the United States' within the language of that section." *Id.* at 140.

2. The question thus becomes the distinction between sovereign power and private action. Chief Justice Marshall points the way: does the Authority act as a mere private citizen? Private citizens can operate and organize banks, museums, trains, and even airports. But can private citizens impose legislative rules with force and effect of law on other, non-consenting citizens? Can private citizens conduct searches and seizures on otherwise non-consenting citizens? Can they hale other private citizens in front of their own "courts," or in front of Article III courts, to enforce laws against the public?

The answer is no. What distinguishes government power that only the government can exercise, from private acts that anyone can do, flows from the definition of legislative power. Legislative power is the power to alter legal rights and relations. *Chadha*, 462 U.S. at 952 ("action that had the purpose and effect of altering the legal rights, duties and relations of persons" is legislative power). This power includes not only the ability to determine private rights and conduct, but also the ability to establish public rights such as creating a pension program or granting public lands, to establish post roads, to restructure government departments, and to regulate official conduct. All of these actions have "the purpose and effect of altering the legal rights, duties and relations of persons," whether inside the government or out, and therefore constitute legislative power. Executive power is then the power to carry into execution those rules that alter legal rights and relations, and judicial power is the power to adjudicate disputes under such existing legal rules. *See* Ilan Wurman, *Nonexclusive Functions and Separation of Powers Law*, 107 Minn. L. Rev. 735, 761-65, 797-98 (2022) (articulating definitions of judicial and executive power).

The Authority exercises government power. As noted, it exercises executive power by engaging in investigative functions, searches and seizures, and prosecutions. It "carries into execution" HISA. *See, e.g.*, ROA.4622-23 ("[T]he Authority publicly announced to the industry and stakeholders that it would continue to enforce HISA."). And it engages in executive functions by adjudicating disputes under HISA. It does not matter that there is eventual (albeit optional) review by some other body (the FTC), just as an inferior court is still a court that exercises judicial power.

And the Authority makes legislative rules that alter the rights and obligations of private persons, which is the very core of the legislative power. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 70-76 (2015) (Thomas, J., concurring) (explaining that formulating "generally applicable rules of private conduct" was historically "the core of the legislative power"). That does not necessarily make their rules "the legislative power" vested in Congress, but it does make such rules at a minimum executive power—the carrying into execution of Congress's law, which does alter legal rights and relations. And because the Authority exercises government power, the Appointments Clause

applies. "Such functions" can "**only**" be discharged by "Officers of the United States." *Buckley*, 424 U.S. at 140.

3. The District Court failed to apply the Appointments Clause cases, however, because it applied instead a series of cases involving entities that engage in **private** conduct. The District Court cited, principally, *Lebron*, a case involving Amtrak: "[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes." ROA.2731 (quoting *Lebron*, 513 U.S. at 378). But this sentence is entirely about "private entities"—entities engaged in purely private activities. The entire question in the present case is whether an entity **purporting to be private** is in fact not private. What was merely a premise in *Lebron* is the very question here.

The District Court stated that *Lebron* "teaches that to be considered a government entity for constitutional purposes, a corporation must be created by the government." ROA.2732 (citing *Lebron*, 513 U.S. at 394). And it cited *Herron*—the case involving Fannie Mae—for the proposition that "[a] corporation is part of the government for constitutional purposes when (1) the government creates the corporation by special law, (2) for the furtherance of governmental objectives, and (3) retains for itself

35

permanent authority to appoint a majority of the directors of that corporation." ROA.2732-33 (quoting *Herron*, 861 F.3d at 167).

Both of these cases applied, however, to "corporations" that in no way exercised government power. That is the only way to explain why the other factors mattered. After all, whether the officials are in fact appointed cannot answer the question of whether they **must** be appointed. And yet the District Court relied on the third *Lebron–Herron* factor to beg the very question at issue. The District Court stated that the Appointments Clause does not apply because the Authority's Directors are not appointed by the government. ROA.2725 ("[T]he Authority is a private entity under *Lebron* . . . because it is not government created, and its directors are not government appointed."); ROA.2731 ("[T]he Authority is a private entity because it is neither government-created nor government-appointed."). An analysis that requires a court to beg the very question at issue cannot be right.

*Lebron* and *Herron* only make sense, then, in the context of a corporation that does not exercise government power, but which was nevertheless created by the government. The question in those cases is **not** whether the Appointments Clause applies—the officials aren't

officers—but rather whether **other** constitutional provisions, like the First Amendment or a *Bivens* cause of action, still apply. *See Lebron*, 513 U.S. at 383 (addressing whether Amtrak "must be regarded as a Government entity for First Amendment purposes"); *Herron*, 861 F.3d at 169 (Fannie Mae not the government for purposes of *Bivens* cause of action).

In any event, the Court in *Lebron* nowhere indicated that the three factors it identified and applied represented the *only* way in which a corporation can be found to be a function of government. Rather, the Court merely identified **one way** that some corporations—*i.e.*, those that are created by but do not exercise powers characteristic of government— can be found to be "part of the Government." *See* 513 U.S. at 399. *Lebron*'s larger point is that any "agency selected by Government to accomplish purely governmental purposes" is an instrument of government, regardless of the particularities of its precise form. *Id.* at 395 (quotation omitted). Thus, the Court held, "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron*, 513 U.S. at 397. Yet that is exactly what Congress attempted to do here.

True, the Fourth Circuit in *Kerpen v. Metropolitan Washington Airports Authority* concluded under *Lebron* that the airport authority in charge of Dulles and Reagan airports was not part of the federal government, citing the *Lebron* factors. 907 F.3d 152, 158-60 (4th Cir. 2018). It then found this analysis fatal to the Appointments Clause challenge because the authority was not a "federal entity," *id.* at 160—thus begging the very question, as the District Court did here. That leap was wrong, but in any event it did not matter: the Fourth Circuit made clear in the next part of its opinion that the airport authority **did not exercise government power**. *Id.* at 162 (rejecting the proposition that the authority was exercising "federal power" and describing it as operating a "commercial airport").

In sum, here the very question is whether the Authority is "part of the government" because it exercises government power, rather than private power. In none of the cases cited by the District Court—not *Lebron*, not *Herron*, not *Kerpen*—did the corporation exercise governmental powers.

## B.    The Authority's Directors are at a minimum inferior officers.

Recognizing that the Appointments Clause applies makes this an

easy case. That is because the Authority exercises the exact same powers, if not more powers, than did the ALJs and PCAOB members in *Lucia* and *Free Enterprise Fund*, where the Supreme Court found those officials to be officers of the United States.

The two criteria that characterize an officer are that the individual occupies "a 'continuing' position established by law" and exercises "significant authority pursuant to the laws of the United States," that is, "'significant discretion' when carrying out . . . 'important functions.'" *Lucia*, 138 S. Ct. at 2051-53 (2018) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)). The Authority and its Directors meet those criteria.

1. The Directors occupy a "continuing position established by law." HISA establishes that "[t]he Authority shall be governed by a board of directors." 15 U.S.C. § 3052(b)(1). The Authority itself, as directed by the Board, engages in numerous statutory duties, including "developing and implementing" and "establish[ing]" a horseracing anti-doping and medication control program and a racetrack safety program with punishments for violations. *Id.* §§ 3052(a), 3055(a)(1), 3056(a)(1), 3057(a)(1), (c), (d). The Act bestows "powers and responsibilities under this chapter" upon the "Authority." *Id.* § 3054(a). It authorizes the Board

to make rules for accessing documents, issuing subpoenas, and engaging in investigations. *Id.* § 3054(c). It grants the Directors "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction." *Id.* § 3054(h). It grants the Authority power to "commence a civil action against a covered person or racetrack" that has violated the Act. *Id.* § 3054(j)(1).

In the District Court, the Authority argued that the Directors' offices are not established by law, but rather by the Authority's own incorporation documents. But if Defendants were correct that the Authority escaped the Appointments Clause by self-incorporating before HISA was enacted, then every government agency could escape the clause that same way. Congress, in coordination with industry members, could encourage a group of "private" individuals to create the "environmental protection authority" as a nonprofit organization that drafts environmental regulations with which members of the coal industry must comply. It could collude with "private" individuals to create the "federal communication authority," a private non-profit organization that regulates anyone who wants to transmit over the airwaves. That cannot be right.

Moreover, even if one could plausibly believe that the Authority was incorporated by mere coincidence, and independently of its enabling legislation,[7] what matters is that HISA in fact imbues the Authority with power. If the government empowered the Yale School of the Environment to promulgate environmental regulations binding on private parties and to adjudicate violations, it would not matter one bit that the school had long been established as a department of Yale University. It would now be a government agency—at least to the extent that it exercised **those** powers.

That, indeed, is what the Office of Legal Counsel concluded. "[F]ederal employment is not necessary for the Appointments Clause to apply" and "the applicability of the Clause does not depend on whether Congress has formally and directly created an 'office.'" 31 Op. O.L.C. at

---

[7] This is implausible for many reasons, including because in three of the Authority's own documents, it stated that it was "created" or "established" by HISA. *See, e.g.*, ROA.4711 ("The 2020 Horseracing Integrity and Safety Act ('HISA') created the Authority as the independent governing structure charged with proposing and enforcing health-and-safety standards."); *see also* ROA.4480, 4482 (same). Moreover, the Authority's Directors were not empaneled and did not meet until May 27, 2021. ROA.4718. In other words, until half a year into HISA's enactment, the Authority did not *do* anything. The only activities the Authority ever did was those activities that HISA required and empowered it to do.

78. "Congress may not, for example, resort to the corporate form as an 'artifice' to evade the solemn obligations of the doctrine of separation of powers." *Id.* at 75 (quotation omitted). "[T]he fact that **the powers in question** are created and conferred by law, is [the] important criterion." *Id.* at 118 (quotation omitted). Although this Court is not bound by the considered opinion of a coordinate branch of government, that considered opinion is nevertheless entitled to some weight. And it helps that the opinion is obviously correct.

To be sure, private *qui tam* relators sometimes appear to exercise executive power. But the Appointments Clause, anyway, is no bar to their existence. That is because the clause applies to **ongoing** statutory duties. *Lucia*, 138 S. Ct. at 2051-53; *see also* 31 Op. O.L.C. at 77 ("[F]or a position to be a federal office, it also must be 'continuing' . . . . *[Q]ui tam* relators, and many others in positions that have authority on an *ad hoc* or temporary basis[,] do not hold offices.").

2. The Directors also exercise significant authority. As in *Lucia* and *Freytag*, the Board can "take testimony," "receive evidence," and "examine witnesses at hearings"; it can "conduct trials" (hearings), and specifically "administer oaths, rule on motions, and generally regulate

the course of a hearing, as well as the conduct of parties and counsel";
and it can "rule on the admissibility of evidence" and "thus critically
shape the administrative record (as they also do when issuing document
subpoenas)." *Lucia*, 138 S. Ct. at 2053 (cleaned up); *see* 15 U.S.C.
§§ 3057(c)(2)(A)-(F), 3058(a)-(b); Rule 8340(a), (c)-(i), 87 Fed. Reg. at
4029-30. The Directors' adjudicatory powers are the same as the ALJ's
powers in *Lucia*. The fact that **another** adjudicator—an FTC ALJ—later
can review the Directors' work does not make them any less officers, just
as SEC review did not make the SEC ALJ any less an officer. Indeed, the
SEC had **more** power of review in *Lucia* because it could always take a
case away from an ALJ altogether and hear it in the first instance. *Lucia*,
138 S. Ct. at 2049 ("By law, the Commission may itself preside over such
a proceeding."). Under HISA, the FTC has no mechanism whatsoever to
do so. The Authority always gets to adjudicate. 15 U.S.C. § 3058.

The Authority is also identical in many respects to the PCAOB in
*Free Enterprise Fund*, and the Supreme Court held that the PCAOB
exercised "significant executive power," 561 U.S. at 514, and that its
members were officers, *id.* at 486, despite Congress having declared it a
private entity. Just as "[e]very accounting firm" had to "register with the

Board, pay it an annual fee, and comply with its rules and oversight," *id.* at 485, so too here every covered person and racetrack must register with the Board, pay it an annual fee, and comply with its rules and oversight. 15 U.S.C. §§ 3054(d) (registration and compliance requirement); 3052(f)(3) (funding). Just as the PCAOB "is charged with enforcing the Sarbanes–Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards," 561 U.S. at 485, the Authority is charged with enforcing HISA, the Commission's rules, and its own rules. *E.g.*, 15 U.S.C. §§ 3054(e)-(f), (h)-(j).

Just as the PCAOB "may regulate every detail of an accounting firm's practice," 561 U.S. at 485, the Authority here regulates essentially every detail of horseracing. And just as the PCAOB "promulgates auditing and ethics standards, performs routine inspections of all accounting firms, demands documents and testimony, and initiates formal investigations and disciplinary proceedings," *id.*, the Authority "promulgates [racetrack safety and medication control] standards, performs routine inspections of all [racetracks and covered persons], demands documents and testimony, and initiates formal investigations and disciplinary proceedings." 15 U.S.C. §§ 3054(c), (h), 3057(a)(1), (c).

And just as PCAOB "can issue severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of . . . $750,000 for a natural person," 561 U.S. at 485, here the Authority "can issue severe sanctions in its disciplinary proceedings, up to and including [lifetime bans on horseracing], and money penalties" at the Authority's own discretion (which it has currently set at $50,000-$100,000 per violation). 15 U.S.C. § 3057(d)(3)(A); Rule 8200(b)(2), 87 Fed. Reg. at 4028. To that we can add even more power than the PCAOB had: the Authority commences public prosecutions in district court, 15 U.S.C. § 3054(j), a core executive power. 1 William Blackstone, Commentaries on the Laws of England *257-59 (1765).

Moreover, although the Supreme Court in *Lucia* seized on *Buckley*'s language that individuals must exercise "significant discretion" to be officers, the historical cases on which *Buckley* relied provided that any person exercising ongoing government functions is an officer. *See, e.g.*, *In re Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839) (district court clerk an officer); *United States v. Moore*, 95 U.S. 760, 762 (1877) (assistant

surgeon); *United States v. Germaine*, 99 U.S. 508, 511 (1878) (department clerks); *United States v. Perkins*, 116 U.S. 483, 484-85 (1886) (cadet engineer); *Myers v. United States*, 272 U.S. 52, 106-08 (1926) (postmaster first class). It does not appear to have been the intent of the Court in *Buckley* to overturn these cases. 31 Op. O.L.C. at 86 ("[N]othing in the Court's opinion [about 'significant authority'] suggests any intention to break with the longstanding understanding" that the Clause applies also to "insignificant positions."); *cf. Collins*, 141 S. Ct. at 1784-85 (rejecting a "significant executive power" limitation to the removal power, holding that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "that the constitutionality of removal restrictions" does not "hinge[] on such an inquiry"). In short, the Authority exercises significant discretion over important functions within the meaning of *Buckley* and *Lucia* and its Directors are therefore officers.

3. Crucially, subordination does not matter to this analysis. Under the Appointments Clause, subordination determines whether an officer is a **principal** or **inferior** officer—not whether an individual is an officer

at all. *Edmond v. United States*, 520 U.S. 651, 663 (1997). Thus, in *Lucia*, the Supreme Court held that the SEC ALJ was an officer even though the ALJ's decisions had to be approved by the SEC, and the SEC could reverse the ALJ, or could even take a case away from the ALJ.

Even more telling, the review structure in the Sarbanes-Oxley Act, at issue in *Free Enterprise Fund*, is **identical** to the review structure of HISA. No rule of the PCAOB can "become effective without prior approval of the Commission [SEC]." 15 U.S.C. § 7217(b)(2). The SEC "**shall** approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act." *Id.* § 7217(b)(3) (emphasis added). And the SEC can "abrogat[e], delet[e], or add[ ]" to the rules of the PCAOB. *Id.* § 7217(b)(5). Yet the PCAOB members are still officers.

The Authority's position in the District Court—that its Directors are not officers because they do not have final authority—was the position of the dissent in *Lucia*. Justice Sotomayor, joined by Justice Ginsburg, would have held "that one requisite component of 'significant authority' is the ability to make final, binding decisions on behalf of the Government," and "a person who merely advises and provides recommendations to an officer would not herself qualify as an officer."

138 S. Ct. at 2065 (Sotomayor, J., dissenting). As the majority responded, *Freytag* "explicitly rejects" that theory. *Id.* at 2052 & n.4 (majority opinion); *see also* 31 Op. O.L.C. at 95 ("The question . . . is simply whether a position possesses delegated sovereign authority to act in the first instance, whether or not that act may be subject to direction or review by superior officers."); *cf. also* 5 U.S.C. § 551(1) ("[A]gency means each authority of the Government of the United States, *whether or not it is within or subject to review by another agency*.") (emphasis added).

4. For that reason, the Authority and FTC's defense in the District Court that the FTC "ratifies" the Authority's actions also does not work. By definition a principal officer controls and directs an inferior officer. If the principal officer could "ratify" the inferior officer's actions, then all Appointments Clause challenges to inferior officers would be moot. If that were right, the Supreme Court in *Lucia* could have saved itself a lot of trouble: it could have simply held that the SEC's approval of the ALJ's ruling ratified the ALJ's actions. Instead, it sent the case back to a new ALJ. *Lucia*, 138 S. Ct. at 2055.

The D.C. Circuit has confirmed that a principal officer cannot moot an appointments challenge by purportedly ratifying the inferior officer's

decisions. *Landry*, 204 F.3d at 1132 ("If the process of final *de novo* review could cleanse the violation of its harmful impact, then all such arrangements would escape judicial review."); *Guedes*, 920 F.3d at 13-14 (courts must "resolve[] the merits of an Appointments Clause challenge" to any "purely decision recommending" officers/employees, "notwithstanding the subsequent *de novo* review and affirmance of that decision by the agency itself"). Many cases do say that a properly appointed officer can ratify the decisions of an improperly appointed **predecessor** to that **same office**—but that is another matter entirely. *See, e.g.*, *NLRB v. Newark Electric Corp.*, 14 F.4th 152, 160-63 (2d Cir. 2021); *Kajmowicz v. Whitaker*, 42 F.4th 138, 144 (3d Cir. 2022); *CFPB v. Gordon*, 819 F.3d 1179, 1190-92 (9th Cir. 2016); *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118 (D.C. Cir. 2015).

In sum, the Authority's Directors exercise ongoing statutory duties and significant discretion over important functions. They are therefore, at a minimum, inferior officers. Because Congress did not vest by law their appointments in the President or the FTC, they must be appointed by and with advice and consent of the Senate. U.S. Const. art. II, § 2,

para. 2. They were not, and so they cannot constitutionally exercise the government functions that HISA bestows on them.

### C. The Authority's Directors are non-inferior officers who must be appointed by and with advice and consent.

Not only are the Authority's Directors officers, they are principal officers, or at least non-inferior officers, who must be appointed by and with advice and consent of the Senate. The Opinions Clause suggests that there is a "principal officer" in each executive department. U.S. Const. art. II, § 2, para. 1. And the Appointments Clause provides that Congress may by law vest the appointment of **inferior** officers in the President, a principal officer, or a court. *Id.* art. II, § 2, para. 2. Therefore, the Constitution plausibly recognizes three kinds of officers: the principal officer of a department, non-inferior officers who are not the principal, and inferior officers. That comports with what James Madison said in the Constitutional Convention, where he suggested there were heads of departments, superior officers, and inferior officers. 2 Records of the Federal Convention of 1787, at 627 (M. Farrand ed. 1911) ("Superior Officers below Heads of Departments ought in some cases to have the appointment of lesser offices").

The Authority's Directors are good candidates for this class of officers. Because the Authority's legislative rules and policy choices become federal law—the FTC can choose to, but need not, modify those rules, and if it does so choose it can only do so through a new rulemaking that takes effect later in time—the Authority's Directors are not inferior officers because they are not subject to continuous and ongoing direction and control of other officers. And their rules have the force and effect of law for at least some period of time, even if the FTC disagrees with the policy merits of those rules. Additionally, the Authority's investigative and adjudicative functions are subject to almost no control from the FTC, again rendering the Authority's Directors non-inferior officers.

Because they are "non-inferior," the Directors are also principal officers under modern doctrine. That is because, although the FTC can promulgate different rules, it ultimately does not "direct" the decisions of the Authority, which operates independently of the FTC. *See United States v. Arthrex*, 141 S. Ct. 1970, 1983 (2021) ("Since the founding, principal officers have directed the decisions of inferior officers on matters of law as well as policy.").

Even if Congress amended HISA to provide for FTC appointments, therefore, that would still be unconstitutional because the Authority's Directors would have to be appointed by and with advice and consent because they are either principal officers, or non-inferior officers.

### D. The so-called private nondelegation cases are consistent with the Appointments Clause framework.

The so-called private nondelegation doctrine cases are consistent with the Appointments Clause analysis.

1. As an initial matter, the cases from which the private nondelegation doctrine supposedly arises have no applicability here. These are due process cases involving municipal corporations delegating power to private residents of particular neighborhoods to make decisions that affect those neighborhoods.[8] *See Eubank v. City of Richmond*, 226 U.S. 137, 143-44 (1912) (a municipal government delegating to property owners the right to impose new and additional restrictions on street, if two thirds agree, without any standards governing the decision, and no obvious relation to health or welfare, was not a reasonable exercise of the

---

[8] The Supreme Court cited these cases as authority for a federal private nondelegation doctrine in *Carter v. Carter Coal Co.*, 298 U.S. 238, 311-12 (1936).

police power); *Cusack Co. v. City of Chicago*, 242 U.S. 526, 530 (1917) (allowing a majority of residents in neighborhood to waive a general prohibition on billboards upheld as reasonable exercise of the police power because the residents would be giving more rights to the business than would otherwise exist); *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121 (1928) (a general prohibition on houses for the poor and aged that could be waived only by two-thirds of nearby residents invalidated as unreasonable exercise of police power because such homes not a threat to health or safety).

2. As for the so-called private nondelegation cases involving the federal separation of powers, these are entirely consistent with the Appointments Clause framework. The Authority relies on *Texas v. Rettig*, *Sunshine Anthracite Coal Co. v. Adkins*, and the various circuit court cases upholding the Maloney Act of 1938. None contradicts the Appointments Clause analysis: *Rettig* involved episodic contractors, not officers; *Adkins* involved coal boards that could make recommendations that the statute provided the government agency "may" consider, and so did not involve the exercise of government power; and the Maloney Act

involves private power because the regulated parties participate in self-governance and there is a right of exit.

a. In *Rettig*, this Court confronted a regulatory framework for the Medicaid program in which States receive reimbursement from the federal government for some percentage of the monthly premium each Medicaid recipient pays to a third-party Managed Care Organization ("<u>MCO</u>") "so long as the underlying MCO contract [with the State] is 'actuarially sound.'" 987 F.3d at 524. To implement this statutory requirement, the Department of Health and Human Services promulgated a rule in 2002 according to which the State's MCO contracts would have to be "certified" as meeting this requirement "by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board." *Id.* at 525. In 2015, the Actuarial Standards Board published a "Standard of Practice" to guide its actuaries in assessing the soundness of these State-MCO contracts under the Medicaid Program. *Id.* at 525-26. The question thus became whether the Board exercised "legislative power."

This Court soundly rejected the proposition that there had been any delegation of authority at all, holding that "[c]ertification by a qualified actuary who applies the Board's standards is reasonably connected to ensuring actuarially sound rates because the Board and a qualified actuary have institutional expertise in actuarial principles and practices," and that incorporating the standards of a professional standard-setting body is "a common and accepted practice by federal agencies." *Id.* at 531-32. It only then addressed the private nondelegation claim in the alternative. *Id.* at 532-33.

The Court had the first part right. The reason there was no delegation of power in *Rettig* is because the actuaries who make the determination of actuarial soundness are contractors with episodic duties, rather than officers with ongoing statutory duties. For example, in *United States v. Germaine*, a leading case on the Appointments Clause, a surgeon was hired to evaluate the medical condition of pensioners. 99 U.S. 508 (1878). The Supreme Court held he was not an officer because "[t]he surgeon is only to act when called on by the Commissioner of Pensions in some special case, as when some pensioner or claimant of a pension presents himself for examination," and "[h]e may

make fifty of these examinations in a year, or none." *Id.* at 511-12. His duties were "occasional and temporary" and he therefore did not hold an office. *Id.* at 512.

Similarly, Congress enacted a statute in 1790 providing in certain circumstances that the customs collectors "shall procure an appraisement" of certain goods "by two or more reputable merchants." 1 Stat. 145, 165 (1790). A similar statute was brought into question in *Auffmordt v. Hedden*, and the Court held that a merchant under the statute was not an officer because "[t]he merchant appraiser is an expert, selected as an emergency arises"; he "has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case"; and his "position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily." 137 U.S. 310, 326-27 (1890).

Put another way, just like the surgeon or merchant, the actuary in *Rettig* is not an officer, but a contractor. *See also United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.) (distinguishing between contractors with episodic duties and officers

with ongoing statutory duties). Congress can require these contractors to follow applicable standards for their professions, just as Congress could require a professional engineer to rely on the latest professional engineering standards to certify that a bridge built with federal highway monies is structurally sound. And if these contractors are not officers, then hiring such contractors in no way converts the rules of their professional standard-setting bodies into laws.

b. As for *Adkins*, the case upon which the Authority most relies, the coal boards had no more power than any private person, and so the Appointments Clause would not have applied. The underlying statute in *Adkins* provided:

> The [Bituminous Coal] Commission shall have power to prescribe for code members minimum and maximum prices, and marketing rules and regulations. . . .
> Each [private] district board shall, from time to time on its own motion or when directed by the Commission, propose minimum prices . . . . Said prices shall be proposed so as to yield a return per net ton for each district in a minimum price area . . . equal as nearly as may be to the weighted average of the total costs, per net ton, determined as hereinafter provided, of the tonnage of such minimum price area. . . .
> [S]uch proposed minimum prices, **together with the data upon which they are computed**, . . . shall be submitted by the district board to the Commission, which **may** approve, disapprove, or modify such proposed minimum prices to conform to the requirements of this subsection.

50 Stat. at 77-79. The Supreme Court in *Adkins* upheld this arrangement in a short paragraph. *Adkins*, 310 U.S. at 399. That makes sense. The statute empowered the Commission itself to prescribe prices on the basis of a detailed formula, and merely required the private coal boards to submit information to the Commission proposing what prices they thought in their districts would comply with the statutory formula, along with the underlying data supporting those proposals. The Commission could then take or leave them, cognizant of its own statutory duty to prescribe a satisfactory price. That is no different than private citizens petitioning the EPA as to how it should implement the Clean Air Act. *See Massachusetts v. EPA*, 549 U.S. 497, 510 (2007) (a group of 19 private organizations filed a rulemaking petition asking EPA to regulate greenhouse gas emissions from new motor vehicles under the Clean Air Act, and the Supreme Court concluded that EPA was in fact required to do so).

In contrast, HISA empowers the **Authority** to prescribe various rules, which the FTC **shall** approve if in conformity with the broad statute. That makes all the difference. In *Adkins*, the private boards had

no government power; here, the Authority does. For that reason, its Directors are officers, even if the members of the coal boards were not.

c. Finally, in the District Court, the Authority argued that HISA was modeled after the Maloney Act, which requires securities brokers to be members of SROs. 15 U.S.C. §§ 78o, 78s. To the extent it is constitutional at all, the Maloney Act represents an outer marker in Congress's experimentations in cloaking other entities with government authority. In any event, the Authority's structure plainly and impermissibly outstrips the Maloney Act in two relevant ways.

First, SROs are plausibly private and not government actors because the regulated entities participate in self-governance. The bylaws of the Financial Industry Regulatory Authority, currently the sole SRO in the securities industry, provide for an annual meeting of members at which the board of directors is elected. *See* ROA.4059-60 (providing for election of board by members); ROA.4069-70 (providing for annual meeting of members). Second, there is a right of exit: a group of brokers can always break off and form their own associations. *See* 15 U.S.C. § 78s (not specifying any particular SRO for the securities industry, and providing for the creation of any number of them).

Here, nothing in HISA or the Authority's bylaws allow any of the Plaintiffs to participate in governance. Plaintiffs never received any notices of annual meetings, and never cast their votes or their proxies to elect the Board of Directors. The Authority is not self-regulatory at all, but rather is an **other**-regulatory organization. That means it is just a government agency. Worse still, there is no right of exit. The Texas Horsemen's Partnership—one of the Gulf Coast Racing Plaintiffs—could not form a competing self-regulatory organization if it wanted. Nothing in the statute authorizes it to do so. Certainly, the Partnership asked the FTC whether it could form an SRO in competition with the Authority. ROA.4089-90. It received no response.

That makes all the difference. It is true that there is currently only one SRO in the securities industry. But the **right** of exit at least gives plausibility to the official story that the SRO merely exercises private power, for if there is no compulsion, there is no government power in the relevant sense. But Plaintiffs here have no choice but to submit to the

Authority and its rules. That means the Authority is exercising government power, and so its Directors must be properly appointed.[9]

## III.   Because the Authority's Directors are officers, they must be removable by the President or the Federal Trade Commission.

Because the Authority's Directors are officers, they must also be subject to the President's removal power. The Supreme Court has held that two layers of for-cause removal are unconstitutional. *Free Enter. Fund*, 561 U.S. at 496-97. Here, the President cannot remove the FTC commissioners without cause. 15 U.S.C. § 41. And the Authority's Directors cannot be removed by the FTC Commissioners at all, as the statute provides that their removals are to be governed by their own bylaws. 15 U.S.C. § 3052(b)(3)(D) ("The Board of the Authority shall be governed by bylaws for the operation of the Authority with respect to . . . term limits for members and termination of membership."). Although the content of the particular removal provisions in the Authority's bylaws are irrelevant, the bylaws provide for for-cause removal by the Directors themselves. ROA.4236 ("Directors shall be removable, for cause, by the affirmative vote of all Directors then in office.").

---

[9] In the alternative, the Gulf Coast Racing Plaintiffs join in the National Horsemen Plaintiffs' private nondelegation argument.

HISA therefore violates Article II, Section 1 of the Constitution, which vests the executive power in the President.

## IV.  HISA commandeers the states by forcing them to administer the program on threat of preemption.

Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). Congress must "exercise its legislative authority directly over individuals rather than over States." *New York v. United States*, 505 U.S. 144, 165, 188 (1992). Here, HISA violates the anti-commandeering doctrine because it deputizes state officers by requiring states (via their racing commissions) to remit state monies to fund the Authority's operations. 15 U.S.C. § 3052(f). If the states refuse, the Authority will directly collect the fees from covered persons, but then HISA prohibits the state from imposing or collecting taxes or fees to finance the state's **own** legislative programs related to horseracing. *Id.* § 3052(f)(3)(D) (prohibiting state racing commission in that circumstance from "impos[ing] or collect[ing] from any person a fee or tax relating to anti-doping and medication control or racetrack safety matters for covered horseraces").

The Sixth Circuit upheld this scheme, noting that "[i]nstead of preempting state law altogether, Congress may offer States a regulatory role contingent on following federal standards," which allows the state a choice to keep some "discretion in how it implements the program," or to be preempted. *Oklahoma*, 62 F.4th at 234. With all due respect to the Sixth Circuit, no one denies the validity of conditional preemption where Congress may otherwise regulate according to the Commerce Clause; Congress can offer the states the opportunity to legislate and administer their own programs in accordance with federal standards, or let the federal government step in. More still, Congress can use its **spending power** to induce the states to take certain actions, as long as the states have a genuine choice. *See South Dakota v. Dole*, 483 U.S. 203 (1987); *NFIB v. Sebelius*, 567 U.S. 519, 580-81 (2012).

But Congress has done neither here. HISA is not an exercise in Congress's spending power. And HISA does not allow the states to operate their own horseracing programs (consistent with federal standards) lest the federal government step in. Instead, HISA forces the states to **administer** the **federal** program—collect our fees for us—on penalty of preemption. The Sixth Circuit missed the novelty of this

arrangement; Plaintiffs know of no analogous situation. The question, they presume, is therefore whether the state has a genuine choice under this arrangement.

*Dole* and *Sebelius* hold that threatening to take away five percent of highway safety fundings is not coercive, but threatening to take away ten to twenty percent of a state's total budget is coercive. Where does threatening preemption—even if preemption, as in *Sebelius*, would be perfectly constitutional—fall? No court has addressed that question. Plaintiffs believe that threatening to disable the legislative power of the state lest they agree to **administer** the federal program (as opposed to running their own program that complies with federal standards) is not a minor inducement; it is a "gun to the head." *Sebelius*, 567 U.S. at 581.

The District Court here ignored all of this, concluding that the Gulf Coast Racing Plaintiffs did not have standing to bring this claim, even though it recognized that individuals can bring Tenth Amendment claims. ROA.2753-56; *see also Bond v. United States*, 564 U.S. 211, 223 (2011). The District Court reasoned that the harm to plaintiffs is merely a "generally available grievance" about the government. ROA.2755 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 (1992)).

But that is not so. Plaintiffs prefer the State of Texas's regulations, and by commandeering the states HISA puts a gun to the head of Texas, forcing it administer the relevant federal programs instead. Thus, either Texas will be disabled from raising fees for its own programs, or it will administer the federal one; in either case, Plaintiffs are now subject to a new set of unwanted (federal) regulations. As the regulated party under that federal program, they have standing—just as they have standing to challenge any federal regulation that requires their compliance. *See Contender Farms, LLP v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'") (quoting *Lujan*, 504 U.S. at 561-62).

## CONCLUSION

HISA is a wolf in sheep's clothing, and without precedent. Never before has Congress created a new regulatory agency that it pretended was a private nonprofit corporation. This Court should not let Congress evade the separation of powers so easily. HISA violates the Appointments Clause and the vesting of executive power in the President. And it

unconstitutionally commandeers the states. This Court accordingly should confirm that HISA is repugnant to the Constitution and must be enjoined.

Respectfully submitted,

/s/ Gregory Sapire

Gregory Sapire
   *Counsel of Record*
Travis Maples
Maynard Nexsen PC
2500 Bee Caves Road
Building 1, Suite 150
Austin, Texas 78746
(512) 431-9518
GSapire@maynardnexsen.com

S. Reeves Jordan
Maynard Nexsen PC
1901 Sixth Ave., Suite 1700
Birmingham, Alabama 35203
(205) 415-4907
rejordan@maynardnexsen.com

Ilan Wurman
Sandra Day O'Connor College of Law*
Arizona State University
111 E. Taylor St.
Phoenix, Arizona 85004
(480) 965-2245
ilan.wurman@asu.edu

*Counsel for Plaintiffs-Appellants Gulf Coast Racing LLC et al.*

*Affiliation included for identification purposes only.

67

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2023, I filed the foregoing

**OPENING BRIEF OF PLAINTIFFS – APPELLANTS**

**GULF COAST RACING, L.L.C.; LRP GROUP, LIMITED; VALLE DE**

**LOS TESOROS, LIMITED; GLOBAL GAMING LSP, L.L.C.; AND**

**TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.**, and caused it to be

served electronically on all registered counsel of record via the Court's

ECF filing system.

DATED:  JULY 5, 2023

*/s/ Gregory P. Sapire*
GREGORY P. SAPIRE

*Counsel of Record for Plaintiffs-Appellants Gulf Coast Racing LLC et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) because it contains 12,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century 14-point font, a proportionally spaced typeface.


DATED:  JULY 5, 2023          */s/ Gregory P. Sapire*
                              GREGORY P. SAPIRE