# United States Court of Appeals for the Fifth Circuit

---

No. 23-10520

---

## NHBPA APPELLANTS' PRINCIPAL BRIEF

---

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, PENNSYLVANIA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, AND WASHINGTON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION,

*Plaintiffs – Appellants,*

and

THE STATE OF TEXAS AND THE TEXAS RACING COMMISSION,

*Intervenors – Plaintiffs – Appellants,*

*versus*

JERRY BLACK; THE HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC.; THE FEDERAL TRADE COMMISSION; LINA M. KHAN, IN HER OFFICIAL CAPACITY AS CHAIR OF THE FEDERAL TRADE COMMISSION; NOAH JOSHUA PHILLIPS; REBECCA KELLY SLAUGHTER; AND CHRISTINE S. WILSON, IN THEIR OFFICIAL CAPACITIES AS COMMISSIONERS OF THE FEDERAL TRADE COMMISSION,

*Defendants – Appellees.*

*consolidated with*

GULF COAST RACING LLC, LRP GROUP LTD., VALLE DE LOS TESOROS LTD.,
GLOBAL GAMING LSP, LLC, AND TEXAS HORSEMEN'S PARTNERSHIP LLP,

*Plaintiffs-Appellants,*

v.

HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC.; THE FEDERAL TRADE
COMMISSION; LISA LAZARUS, in her capacity as the CEO of the Horseracing
Integrity and Safety Authority; STEVE BESHEAR, ADOLPHO BIRCH, LEONARD
S. COLEMAN, JR., ELLEN MCCLAIN, CHARLES SCHEELER, JOSEPH DEFRANCIS,
SUSAN STOVER, BILL THOMASON, AND D.G. VAN CLIEF, in their capacities as
directors of the Horseracing Integrity and Safety Authority; JERRY BLACK,
KATRINA ADAMS, NANCY COX, JOSEPH DUNFORD, FRANK KEATING, AND
KENNETH SCHANZER, in their capacities as members of the Horseracing
Integrity and Safety Authority's Nominating Committee; and  LINA KHAN,
REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, NOAH JOSHUA PHILLIPS, AND
CHRISTINE S. WILSON, in their official capacities as commissioners of the
Federal Trade Commission,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 5:21-cv-00071-H
Honorable James Wesley Hendrix

---

Daniel R. Suhr
National Center for Justice & Liberty
747 N. LaSalle St. Suite 210
Chicago, IL 60654
Telephone (414) 588-1658
danielsuhrncjl@gmail.com

Fernando M. Bustos
Bustos Law Firm, P.C.
1001 Main Street, Suite 501
Lubbock, Texas 79408
Telephone (806) 780-3976
fbustos@bustoslawfirm.com

*Attorneys for Plaintiffs-Appellants*

1

# CERTIFICATE OF INTERESTED PERSONS

1.    Pursuant to Fifth Circuit Rule 28.2.1, Appellants file this Certificate of Interested Persons. The case number, style, and complete case caption of all parties is on the preceding cover pages.

2.    The undersigned counsel of record certifies that the following listed persons and non-governmental entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

a.    National Horsemen's Benevolent and Protective Association

b.    Arizona Horsemen's Benevolent and Protective Association

c.    Arkansas Horsemen's Benevolent and Protective Association

d.    Indiana Horsemen's Benevolent and Protective Association

e.    Illinois Horsemen's Benevolent and Protective Association

f.    Louisiana Horsemen's Benevolent and Protective Association

g.    Mountaineer Park Horsemen's Benevolent and Protective Association

h.    Nebraska Horsemen's Benevolent and Protective Association

i.    Oklahoma Horsemen's Benevolent and Protective Association

j.    Oregon Horsemen's Benevolent and Protective Association

k.    Pennsylvania Horsemen's Benevolent and Protective Association

l.    Tampa Bay Horsemen's Benevolent and Protective Association

m.    Washington Horsemen's Benevolent and Protective Association

p.    Jerry Black

q.    The Horseracing Integrity and Safety Authority, Inc.

r.    Any owner, breeder, trainer, or worker in the thoroughbred

horseracing industry, as well as any owner, operator, or employee of a

thoroughbred horse racetrack.

s.    Gulf Coast Racing, LLC

t.    LRP Group Ltd.

u.    Valle de los Tesoros, Ltd.

v.    Global Gaming LSP, LLC

w.    Texas Horsemen's Partnership, LLP

x.    Lisa Lazarus

y.    Steve Beshear

z.    Adolpho Birch

aa.    Leonard S. Coleman, Jr.

bb.    Ellen McClain

cc.    Charles Scheeler

dd.    Joseph DeFrancis

ee.    Susan Stover

ff.    Bill Thomason

gg.    D.G. Van Clief

hh.    Katrina Adams

ii.    Nancy Cox

jj.    Joseph Dunford

kk.    Frank Keating

ll.    Kenneth Schanzer

3.    Defendants-Appellees Jerry Black and the Horseracing Integrity and Safety Authority, Inc. (collectively, the "Authority") are represented by Pratik A. Shah, Lide E. Paterno, Aileen M. McGrath, and Brennan H. Meier with Akin Gump Strauss Hauer & Feld LLP as well as John C. Roach and David T. Royse with Ransdell Roach & Royse, PLLC.

Defendants-Appellees the Federal Trade Commission; Lina M. Khan, in her official capacity as Chair of the Federal Trade Commission; Noah Joshua Phillips, in his official capacity as Commissioner of the Federal Trade Commission; Rebecca Kelly

Slaughter, in her official capacity as Commissioner of the Federal Trade Commission; and Christine S. Wilson, in her official capacity as Commissioner of the Federal Trade Commission (collectively, the "FTC" or "Commission") are represented by Joseph Busa, Alexander V. Sverdlov, and Stephen Ehrlich with the U.S. Department of Justice.

Intervenors-Plaintiffs-Appellants the State of Texas and the Texas Racing Commission ("Texas") are represented by Lanora Pettit and Taylor Gifford with the Office of the Attorney General of Texas as well as Virginia S. Fields with the Texas Racing Commission.

Consolidated Plaintiffs-Appellants Gulf Coast Racing, LLC, LRP Group Ltd., Valle de los Tesoros, Ltd., Global Gaming LSP, LLC, and the Texas Horsemen's Partnership, LLP ("Gulf Coast") are represented by Gregory P. Sapire of Maynard Nexsen and Ilan Wurman of Arizona State University School of Law.

/s/ Daniel R. Suhr
Attorney of record for NHBPA Appellants

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................ 2

Table of Contents ...................................................................................... 6

Table of Authorities .................................................................................. 7

Issues Presented ...................................................................................... 11

Statement Regarding Oral Argument ...................................................... 11

Jurisdiction .............................................................................................. 12

Introduction (Summary of the Argument) .............................................. 17

Statement of the Case (Procedural History) ........................................... 22

Standard of Review .................................................................................. 24

Argument ................................................................................................. 26

I.      **The FTC does not have pervasive control over the rules for the industry.** ................................................. 26

   i.      *The Authority writes the rules in the first instance, and the FTC cannot modify proposed rules or second-guess their substance.* ............................................. 26

      a. *The Authority still writes the rules in the first instance.* ............................................................. 27

      b. *The FTC still cannot modify proposed rules.* ..... 28

      c. *The FTC cannot second-guess the content of proposed rules but still must approve them on a consistency basis.* ............................................... 29

*d. These constitutionally significant flaws remain* **post-amendment.** ............................................... 30

*e. The SEC-FINRA relationship remains meaningfully different from the FTC-Authority relationship.* ......................................................... 34

*ii. The Authority's guidance power proves the statute gives the Authority the "last word" and "final say" on the governing rules.* ................................................... 35

*iii. The statute grants the Authority legislative power over taxes and spending without pervasive surveillance and authority.* ......................................................... 43

*iv. The Authority wields executive power without pervasive surveillance and authority.* ..................... 46

*v. The precedents of this Court and its sister courts of appeals show the FTC lacks pervasive authority.* .... 52

*vi. An originalist constitutionalist approach also shows HISA cannot delegate these powers to the Authority.* ................................................................. 57

**II. Experience shows the Authority allows economically interested persons to regulate others in their industry** ........................................................... **60**

Conclusion ............................................................... 68

Certificates of Word Count & Service ....................................... 72

# TABLE OF AUTHORITIES

**Cases**

*Arthur J. Gallagher & Co. v. Babcock*, 339 Fed. App'x 384 (5th Cir. 2009) ...............17

*Ass'n of Am. R.R. v. United States DOT*, 721 F.3d 666 (D.C. Cir. 2013) .....................29

*BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ...............................31, 34

*Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523 (1967) .........48

*Carter v. Carter Coal Co.*, 298 U.S. 298 (1936)...................................................passim

*Charter v. USDA*, 230 F. Supp. 2d 1121 (D. Mont. 2002) ................................................45

*Chiglades Farm, Ltd. v. Butz*, 485 F.2d 1125 (5th Cir. 1973) .........................................52

*City of Chicago v. Morales*, 527 U.S. 41 (1999)..........................................................25

*Consumers' Rsch. v. FCC*, 67 F.4th 773 (6th Cir. 2023) .........................................53, 54

*Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43 (2015) ...............................24, 29, 68

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .........................................32

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180 (5th Cir. 2023).............42

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667 (D.C. Cir. 2008)........................................................................................................................70

*Goetz v. Glickman*, 920 F. Supp. 1173 (D. Kan. 1996).....................................................45

*H.K. Porter Co., Inc. v. Metro. Dade Cnty.*, 650 F.2d 778 (5th Cir. 1981)...................17

*Holder v. St. Louis-San Francisco Ry. Co.*, 172 F.2d 217 (6th Cir. 1949) ..................58

*In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571 (5th Cir. 2002)...........14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018)........................................................................................................................49

*Johnson v. Manhattan Ry. Co.*, 289 U.S. 479 (1933).....................................................13

*Laird v. Tatum*, 408 U.S. 1 (1972)....................................................................................43

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ....................................59, 70

*Mamakos v. Town of Huntington*, 715 Fed. App'x 77 (2d Cir. 2018)............................50

*Miami Herald Pub. Co. v. Hallandale*, 734 F.2d 666 (11th Cir.) ...............................44

*Miller v. U.S. Postal Serv.*, 729 F.2d 1033 (5th Cir. 1984)..............................................15

*Morrison v. Olson*, 487 U.S. 654 (1988)..........................................................................47

*Muntaqim v. Coombe*, 449 F.3d 371 (2d Cir. 2006) .......................................................13

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022)..................................................................................................................passim

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 596 F. Supp. 3d 691 (N.D. Tex. 2022).........................................................................................................passim

*Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7 (D.D.C. 1999)............49

*NLRB v. Interbake Foods, LLC*, 637 F.3d 492 (4th Cir. 2011)......................................48

*O'Dwyer v. United States (In re Katrina Canal Breaches Litig.)*, 345 Fed. App'x 1 (5th Cir. 2009) ......................................................................................................13

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023).......................................31, 34

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2001).........................25, 57, 61, 68

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004).........................................56

*Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584 (6th Cir. 2022) .....................................62

*Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479 (9th Cir. 1992) ............................53

*Se. Mich. Surgical Hosp., LLC v. Little*, No. 18-13895, 2023 U.S. Dist. LEXIS 89935, (E.D. Mich. May 23, 2023)..............................................................................................51
*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020)......................47
*Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386 (5th Cir. ...........................14, 15
*Sonnier v. Crain*, 613 F.3d 436 (5th Cir. 2010) .............................................................25
*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940).....................................26
*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ................................................................42
*Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481 (5th Cir. 2013)..............................37
*United States v. Carrasco*, 361 Fed. App'x 230 (2d Cir. 2010) .....................................13
*United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989)........................................45, 51, 53
*United States v. Garcia*, 690 Fed. App'x 575 (10th Cir. 2017) ......................................58
*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ...................................................25
*United States v. Rhynes*, 218 F.3d 310 (4th Cir. 2000) ..................................................13
*United States v. Richardson*, 418 U.S. 166 (1974)........................................................43
*Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009) ...........................................24
*Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442 (2008) ...........................25
*Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) .....................................69
*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................................32, 34, 46
*Whittenburg v. United States*, 100 F.2d 520 (5th Cir. 1938) ..........................................52
*Yaretsky v. Blum*, 592 F.2d 65 (2d Cir. 1979) ...............................................................58

**Statutes**
15 U.S.C. § 3052 ........................................................................................................50, 63
15 U.S.C. § 3052(a)....................................................................................................18, 22
15 U.S.C. § 3052(b)..............................................................................................20, 64, 66
15 U.S.C. § 3052(c)....................................................................................................65, 66
15 U.S.C. § 3052(d)..............................................................................................20, 26, 63
15 U.S.C. § 3052(e)...........................................................................................................67
15 U.S.C. § 3052(f) ....................................................................................................passim
15 U.S.C. § 3053(a)......................................................................................18, 30, 44, 46
15 U.S.C. § 3053(c)....................................................................................................18, 25, 33
15 U.S.C. § 3053(e)....................................................................................................18, 33
15 U.S.C. § 3054(b).............................................................................................................18
15 U.S.C. § 3054(c)....................................................................................................19, 26
15 U.S.C. § 3054(e)............................................................................................................20
15 U.S.C. § 3054(g)...................................................................................................passim
15 U.S.C. § 3054(h)............................................................................................................46
15 U.S.C. § 3054(j)....................................................................................................19, 48
15 U.S.C. § 3054(l)....................................................................................................20, 28
15 U.S.C. § 3055(a)....................................................................................................18, 27
15 U.S.C. § 3056(a)..............................................................................................18, 28, 30
15 U.S.C. § 3056(b)............................................................................................................19
15 U.S.C. § 3057(a)..............................................................................................19, 27, 28
15 U.S.C. § 3057(b)............................................................................................................20
15 U.S.C. § 3057(c)....................................................................................................18, 48

15 U.S.C. § 3057(d). ..........................................................................19, 28
15 U.S.C. § 3058(b)...........................................................................19, 49
15 U.S.C. § 78o(b)...................................................................................35
15 U.S.C. § 78o-3(b) ...............................................................................35
15 U.S.C. § 78o-3(g) ...............................................................................35
15 U.S.C. § 78s(a) ...................................................................................35
15 U.S.C. § 78s(g) ...................................................................................35
15 U.S.C. § 78s(h)...................................................................................35
28 U.S.C. § 1291 .....................................................................................12
28 U.S.C. § 1292 .....................................................................................16
28 U.S.C. § 1331 .....................................................................................12
28 U.S.C. § 1337 .....................................................................................12
28 U.S.C. § 2201 .....................................................................................12
7 U.S.C. § 2904(3) ...................................................................................51
7 U.S.C. § 2904(4) ...................................................................................44
7 U.S.C. § 2904(7) ...................................................................................45
7 U.S.C. § 2904(8) ...................................................................................44
7 U.S.C. § 2904(9) ...................................................................................44
Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022).....................21, 23
Pub. L. No. 116-260 (H.R. 133), §§ 1202-11 ...............................................22

Rules
47 C.F.R. § 54.702(g) ..............................................................................55
47 C.F.R. § 54.704 ...................................................................................55
47 C.F.R. § 54.713(c) ..............................................................................55
47 C.F.R. § 54.717 ...................................................................................55
47 C.F.R. § 54.703(b) ..............................................................................55
47 C.F.R. § 54.715(c) ..............................................................................55
7 C.F.R. § 1260.150 .................................................................................45
7 C.F.R. § 1260.168 .................................................................................45
Authority R. § 282(b) ...............................................................................49
Authority R. § 3010(i) ..............................................................................36
Authority R. § 3010(j) ..............................................................................36
Authority R. § 3112 ..................................................................................36
Authority R. § 5730(b) ............................................................................47
Authority R. § 8100(i) ..............................................................................44
Authority R. § 3040(a) .............................................................................47
Authority R. § 3110(c) ..............................................................................36
*Order Approving the Anti-Doping and Medication Control [ADMC] Rule Proposed by The Horseracing Integrity and Safety Authority*, 2023 WL 2720355, at 1 n.2 (March 27, 2023) ...............................................................28, 29
*Procedures for Oversight of the Horseracing Integrity and Safety Authority's Annual Budget*, 88 Fed. Reg. 18034 (March 27, 2023) ...............................45
*Procedures For Submission of Rules Under the Horseracing Integrity and Safety Act*, 86 Fed. Reg. 54819 (Oct. 5, 2021) ..............................................42

Treatises

"About the Rulemaking Process," Administrative Office of the U.S. Courts..............32
"Federal Rulemaking," Gov't Accountability Office (April 2009) ..................................32
Aditya Bamzai, *Tenure of Office and the Treasury*, 87 Geo. Wash. L. Rev. 1299, 1346 (2019).................................................................................................................................59
Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*, 45 Harv. J.L. & Pub. Pol'y 837, 925 (2022)......................................................................................59
*Tax*, Black's Law Dictionary (6th ed. 1991) ...............................................................44
*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124 (1996)...............................................................................70

# ISSUES PRESENTED

1. On its face, does the Horseracing Integrity and Safety Act violated the private nondelegation doctrine by vesting federal government power in a private corporation without subjecting it to pervasive surveillance and control by a federal agency?

2. As applied, does the Horseracing Integrity and Safety Authority allow interested persons to regulate competitors in violation of the Horsemen's Fifth Amendment due-process rights?

# STATEMENT REGARDING ORAL ARGUMENT

This case has already been scheduled for oral argument, as is appropriate given the constitutional issues presented and its importance for the horseracing industry nationwide.

11

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331 (questions under the U.S. Constitution), 28 U.S.C. § 1337 (regulations of commerce), and 28 U.S.C. §§ 2201-2202 (declaratory judgments). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, providing for appeals of final judgments of district courts.

This Court has asked the parties to brief the question of jurisdiction given the withdrawal of claims by the Gulf Coast Plaintiffs prior to trial. The Horsemen will allow Gulf Coast to explain the Court's jurisdiction over their claims. The Horsemen have two independent reasons this Court has jurisdiction over their claims.

First, the Horsemen and the Gulf Coast Plaintiffs were consolidated for judicial economy and convenience, and thus the Gulf Coast Plaintiffs' jurisdictional issues do not affect this Court's jurisdiction over the Horsemen's appeal. "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933). In other words, though consolidated, there

are still two separate causes, which can be disentangled as easily as they were consolidated.[1]

This Court follows "a general rule" that "suits that are consolidated merely for reasons of convenience and judicial economy retain their separate character for purposes of appeal." *O'Dwyer v. United States* (*In re Katrina Canal Breaches Litig.*), 345 Fed. App'x 1, 3 (5th Cir. 2009) (relying on *In re Transtexas Gas Corp. v. TransTexas Gas*, 303 F.3d 571, 577 (5th Cir. 2002)). This general rule is only set aside when "the suits have essentially merged so as to become a single action." *Id*. When "the cases were consolidated solely for purposes of convenience and judicial economy," the normal rule applies. *Id*. at 4. Indeed, "[t]he Supreme Court and this court . . . have stressed frequently the importance of <u>not</u> intermingling consolidated claims . . ." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 394 (5th Cir.), *opinion clarified*, No. 03-10074, 2004 WL 2107672 (5th Cir. Sept. 17, 2004).

These two matters were consolidated for judicial convenience, and thus the normal rule should govern. As the District Court explained in

---

[1] Cases can be de-consolidated on appeal. *See, e.g., United States v. Carrasco*, 361 Fed. App'x 230, 231 (2d Cir. 2010); *Muntaqim v. Coombe*, 449 F.3d 371, 374 n.2 (2d Cir. 2006); *United States v. Rhynes*, 218 F.3d 310, 313 (4th Cir. 2000).

its final order, the cases were consolidated because of "the substantial overlap of the claims in *Gulf Coast* and *National Horsemen's*, the similarity of the parties, and the likelihood that the evidence involved and objective of the plaintiffs in both cases would be nearly identical." ROA 2717. The District Court gave greater detail in its order of consolidation, saying it did so to "expedite trial and eliminate unnecessary repetition and confusion" and to "conserve judicial resources and help the parties reach a final judgment." ROA 2216. In other words, the two cases were consolidated for purposes of judicial economy and convenience.

That is not to say, however, that the two cases have become a single action. Gulf Coast's main theory is fundamentally incompatible with the Horsemen's main theory. Gulf Coast argues that the Authority is a public entity subject to the Appointments Clause; the Horsemen argue the Authority is a private entity subject to the private nondelegation doctrine. Though they seek the same relief, the two lead claims are incompatible. Both were argued separately by separate counsel and supported by separate evidence. As a result, the two cases may have been

merged for reasons of judicial convenience, but they have not become a single action.

Moreover, the policy reasoning for this rule supports the Horsemen: "This strict segregation of merged cases is necessary to prevent consolidation from 'depriv[ing] a party of any substantial rights that he may have had if the actions had proceeded separately.'" *Shafer*, 376 F.3d at 394 (quoting *Miller v. U.S. Postal Serv.*, 729 F.2d 1033, 1036 (5th Cir. 1984)). That is precisely the position that the Horsemen find themselves in: consolidation, done *sua sponte* by the District Court, may prejudice their substantive rights because of the litigation decisions of other parties. The Horsemen have a clear final judgment as to their three claims. The abandoned claims are exclusive to Gulf Coast. The Horsemen's counsel had no control over the decisions made by Gulf Coast on whether or how to withdraw their claims. Like Texas, the Horsemen were mere spectators to the discussion between Gulf Coast, the Defendants, and the Court on these claims. It would be substantially inequitable to delay resolution of their case—on which they have consistently sought expedited treatment because of the significant

damage they believe HISA is doing to their industry—to send it back to the District Court because of the decisions of others.

Second, the Horsemen first brought their arguments as motions seeking a preliminary injunction. ROA 1829, 1918. This Court always has jurisdiction over the denial of a preliminary injunction. 28 U.S.C. § 1292. Indeed, the District Court's decision notes that the "pending motion" before it from the Horsemen was their motion for a preliminary injunction. ROA 2721. The District Court then denied the Horsemen on the merits. The District Court's decision "effectively rendered a final preliminary-injunction denial." *Arthur J. Gallagher & Co. v. Babcock*, 339 Fed. App'x 384, 387 (5th Cir. 2009). This Court regularly retains jurisdiction when a District Court ruling "effectively" denies a preliminary injunction, *id.*; *H.K. Porter Co., Inc. v. Metro. Dade Cnty.*, 650 F.2d 778, 782 n.7 (5th Cir. 1981), even if that is not the decision technically on appeal. That is the situation the Horsemen find themselves in—the District Court's ruling effectively denied them the preliminary relief they sought. The Horsemen are entitled to prompt review of the District Court's decision effectively denying their request for a preliminary injunction.

Whether viewed as appeals that maintain "their separate character" or as an appeal from the effective denial of a preliminary injunction, under either framework the Horsemen's appeal should proceed regardless of this Court's decision on the Gulf Coast Plaintiffs' appeal.

## INTRODUCTION

Imagine if this Court was considering the following statute just enacted for the first time by Congress. The statute recognized a private corporation charged with "developing and implementing" a set of rules for an industry nationwide.[2] Congress sets some big-picture goals, and then the private corporation "shall establish" the various regulatory programs to actualize those goals, which means both writing and implementing the specific rules for the industry.[3] The private corporation writes the first draft of all substantive rules, which a government agency then reviews merely for consistency with the broad goals of the act.[4] The private corporation also writes the first draft of all procedural rules for investigating and punishing violations of the substantive rules, which

---

[2] 15 U.S.C. § 3052(a).
[3] 15 U.S.C. §§ 3055(a)(1), 3056(a)(1).
[4] 15 U.S.C. §§ 3053(a), (c)(2).

are also only reviewed for consistency by the agency.[5] If the agency finds a proposed rule is not consistent with the statute's goals, it can decline to adopt it, but can only "recommend" changes to the private corporation, which the private corporation may choose to incorporate and resubmit.[6] The agency can modify or amend the rules once they are in force, but has to accept proposed rules as a whole.[7] Congress gave the rules blanket preemptive effect over all state laws.[8] The private corporation can also issue guidance and protocols interpreting the rules or setting enforcement policies, with zero oversight from the agency.[9]

Once the rules are written, the private corporation is responsible for conducting all investigations of violations, and is given the power to issue subpoenas and to search and seize private property without a warrant.[10] The private corporation then has its own administrative law judges (ALJs) review evidence, decide violations, and assign sanctions.[11] Anyone found guilty by the private corporation's ALJs can appeal those

---

[5] 15 U.S.C. § 3057(c)(1).
[6] 15 U.S.C. § 3053(c)(3).
[7] 15 U.S.C. § 3053(e).
[8] 15 U.S.C. § 3054(b).
[9] 15 U.S.C. §§ 3054(g), 3055(c)(4)(a).
[10] 15 U.S.C. §§ 3054(c)(1)(a),(h), 3056(b)(6), 3057(a)(2)(G)-(H).
[11] 15 U.S.C. § 3057(d).

convictions to an agency ALJ.[12] If the private corporation declines to prosecute anyone, the agency has no independent authority to investigate and prosecute. Separately, without any agency oversight, the private corporation can bring injunction actions in federal district court to stop possible or ongoing violations of the rules, and the corporation is exempt from posting a bond, just like an agency of the government.[13]

Finally, the private corporation chooses its own leaders and officers, and the agency has zero role in selecting, appointing, or removing these policymakers.[14] The private corporation's boards and committees police themselves for compliance with the statute's designations as to who among them represents "industry" viewpoints and who among them is "independent," and for compliance with the statute's conflict-of-interest policy.[15] The statute authorizes the private corporation to set its own budget, which it funds through assessments on state governments or on industry participants, again with no role for the agency.[16] Also, though originally limited to one industry, the private corporation and a private

---

[12] 15 U.S.C. § 3058(b).
[13] 15 U.S.C. § 3054(j).
[14] 15 U.S.C. § 3052(d).
[15] 15 U.S.C. §§ 3052(b)-(e).
[16] 15 U.S.C. § 3052(f).

organization representing another, similar industry may voluntarily agree to have that other industry come under these regulations, a decision again made with no agency oversight.[17] The private corporation is also charged by statute to enter into agreements with various experts, service providers, and state governments, but the agency has no role in reviewing those agreements.[18]

Is there any doubt, looking at such a law in the first instance, that the agency does not have "pervasive surveillance and authority" over the private corporation? The private corporation establishes the regulatory programs and drafts the initial rules; investigates violations; and then adjudicates and sanctions those violations, combining in itself all of the functions of the government. It also appoints its own officers, sets its own fees, and decides its own budget. Far from pervasive surveillance and control, such a scheme, even with the power to amend the rules once enacted, is abysmally little surveillance and control.

Of course, we are not here for the first time looking at a brand-new statute. This Court has already struck down the Horseracing Integrity

---

[17] 15 U.S.C. § 3054(l)(1).
[18] 15 U.S.C. §§ 3054(e)(1), (e)(2)(A)(i)-(ii), 3057(b)(4), 3060(a).

and Safety Act (HISA) once before. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022) (*NHBPA II*). Then Congress tweaked the law in one respect, giving the Federal Trade Commission a modicum of additional power over the original design. Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022). Though it is understandable to desire to applaud "a productive dialogue" between the branches (ROA 2747), this Court's job is not to reward Congress for passing a marginally less unconstitutional law by declaring it constitutional. Laws do not get passing grades for improved effort. Nor is constitutional analysis like horseshoes or hand grenades, where close—or even just slightly closer—is good enough.

Rather, this Court should approach the amended statute with a clean slate and hold it up to the high bar set for a delegation of government power to a private actor, as enunciated in its prior opinion. If this Court does so, it will see that the act again fails. Even as amended, the statute does not give the Federal Trade Commission (FTC) pervasive surveillance and control over the Horseracing Integrity and Safety Authority ("the Authority").

## STATEMENT OF THE CASE (PROCEDURAL HISTORY)

On December 27, 2020, Congress passed HISA as part of the 2,000-page Consolidated Appropriations Act. Pub. L. No. 116-260 (H.R. 133), §§ 1202-11. HISA nationalized regulation of the horseracing industry, which states had regulated for over a century. Congress charged a private corporation, the Authority, with "developing and implementing" new rules for the horseracing industry nationwide. 15 U.S.C. § 3052(a). Thus, the legislative power to write rules and the executive power to implement them were vested not in a federal agency, but in a private corporation.

The Horsemen filed suit shortly thereafter, which led to Judge Hendrix's first decision against the Horsemen, *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 596 F. Supp. 3d 691 (N.D. Tex. 2022) (*NHBPA I*), delivered even after observing that the Act was "novel," "unconventional," "uncommon," "unique," "breaks new ground," and "pushes the boundaries." *Id.* at 695, 696, 719, 723, 696, 728. This Court reversed Judge Hendrix and found the Act unconstitutional. *NHBPA II*, 53 F.4th at 836

After that decision was announced but before the mandate was issued, Congress tweaked the law in yet another omnibus bill. Consolidated

Appropriations Act, 2023, div. O, tit. VII, § 701 (2022). This Court remanded the case to Judge Hendrix, who *sua sponte* consolidated it with a case transferred from another division of the Northern District of Texas ("the Gulf Coast Plaintiffs"). ROA 2213. The District Court also consolidated the Horsemen's request for a preliminary injunction into a full, immediate trial on the merits. *Id*. On May 4, the District Court issued its order and judgment for the Defendants. ROA 2706. The Horsemen timely filed their notice of appeal. ROA 2825.

## STANDARD OF REVIEW

The District Court's conclusions of law issues following a bench trial are reviewed *de novo* by this Court, while findings of fact are reviewed for clear error. *Villafranca v. United States,* 587 F.3d 257, 260 (5th Cir. 2009).[19] In looking at a question of private delegation generally, this

---

[19] The Horsemen only dispute one finding of fact: "The Authority is funded by private parties." Finding E. ROA 2712. The Authority is not funded by private parties. State government agencies are the payers of first priority under the Act. 15 U.S.C. § 3052(f)(2). If they decline to pay, then private parties are forced to pay the Authority as a condition of pursuing their living. 15 U.S.C. § 3052(f)(3). To say that the Authority is funded by private parties is wrong, as to the states, and even in the states that elect not to remit, it's still like saying the federal government is funded by private parties: it's technically accurate, but it skips over the reality of coercive taxation. Separately, the Horsemen dispute several "findings of fact" that are actually conclusions of law, such as findings C and D, as explained below.

Court should recall that the Supreme Court "has set its face against giving public power to private bodies." *NHBPA II*, 53 F.4th at 880. "'When it comes to private entities, . . . there is not even a fig leaf of constitutional justification' for delegation." *Id*. (quoting *Dep't of Transp. v. Ass'n of Am. R.R.*s, 575 U.S. 43, 62 (2015) (Alito, J., concurring)). In looking at this question of private delegation specifically, this Court should further remember that "[a]ny delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2001) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 298, 311 (1936)).

The District Court erroneously invoked two principles regarding the standard of review. First, the District Court's reliance on the "no set of circumstances" test for a facial challenge (ROA 2723) is "out of step with a large and growing body of authoritative caselaw to the contrary." *Sonnier v. Crain*, 613 F.3d 436, 469 (5th Cir. 2010) (Dennis, J., dissenting). The U.S. Supreme Court has disclaimed this phrasing, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999), and this Circuit went straight to the constitutional text and history without any such reference

in a recent facial challenge. *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). Regardless, the "no set of circumstances" test means "that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008). Here, the statute *is* unconstitutional in all of its applications.[20]

Second, the "constitutional-doubt canon: '[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" ROA 2724. However, this principle has minimal relevance here, because the parties are not arguing over the interpretation of the statute. This is not a situation where the statute is "susceptible of two constructions." The parties generally agree on the statute's construction—the question is whether the statute as written meets the constitutional standard of "'pervasive surveillance and

---

[20] *All* proposed rules are rubber-stamped on consistency review. 15 U.S.C. § 3053(c). *All* proposed rules are adopted as a whole, without modification. *Id. All* "guidance" documents rewriting rules are beyond the FTC's authority to veto and go into effect immediately. 15 U.S.C. § 3054(g). *All* dollars brought into and spent by the Authority do not pass through the congressional revenue and appropriations process, and HISA's text provides for the dollars to come and go without FTC oversight. 15 U.S.C. § 3052(f). *All* inspections of documents or places or persons and all seizures of materials are undertaken without prior review by the FTC or another magistrate. 15 U.S.C. § 3054(c)(1)(a). *All* board members are selected without presidential, Senate, or FTC involvement. 15 U.S.C. § 3052(d).

authority.'" *NHBPA II*, 53 F.4th at 884 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)).

## ARGUMENT

This Court declared in its prior opinion that the Authority enjoyed "sweeping" powers to "make 'myriad' rules for the horseracing industry." *NHBPA II*, 53 F.4th at 882 (quoting *NHBPA I*, 596 F. Supp. 3d at 717). Even after the amendment, the Authority still "shall establish" the racetrack safety and medication control programs, 15 U.S.C. §§ 3055(a)(1), 3056(a)(1), it still enforces the rules, 15 U.S.C. §§ 3054(c)(1)(a) & (h), 3057(a)(2)(G)-(H), and it still punishes violators, 15 U.S.C. § 3057(a). Its powers are still "sweeping."

### I.   The FTC does not have pervasive control over the rules for the industry.

> *i.   The Authority writes the rules in the first instance, and the FTC cannot modify proposed rules or second-guess their substance.*

This Court has said that "[a]n agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance." *NHBPA II,* 53 F.4th at 872. The amendment does not fix these problems. The Authority still writes the

rules, and at least on the front-end, the FTC cannot change them and cannot second-guess their substance.

*a. The Authority still writes the rules in the first instance.*

The Authority still writes the rules. The Act "itself does not create anti-doping, medication, or racetrack safety programs." *Id.* at 882. "HISA delegates the task of creating such programs to the Authority." *Id.* Those statutory provisions did not change with the amendment. The Authority still "shall establish" the anti-doping and medication program and the racetrack safety program. *Id.* (citing §§ 3055(a)(1), 3056(a)(1)). The Authority still "approv[es]' a request (by a state racing commission or breed governing organization) to include breeds other than Thoroughbreds and that 'consider[s]' how to adapt its programs to those breeds." *Id.* (citing §§ 3054(l)(1), 3055(a)(2)). It is still "'the Authority'— not the FTC—that 'shall issue' descriptions of rule violations, § 3057(a)(1), and 'shall establish' sanctions for them." *Id.* (citing § 3057(d)(1)). The amendment did not change any of these provisions—the Act continues its "generous grant of authority" to the Authority "to craft entire industry 'programs'" such that "it is the Authority, not the FTC, that is in the saddle." *Id.* at 883.

*b. The FTC still cannot modify proposed rules.*

The FTC acknowledged in its recent order approving the medication rule: the revised act "does not allow the Commission to modify a proposed rule." F.T.C., *Order Approving the Anti-Doping and Medication Control [ADMC] Rule Proposed by The Horseracing Integrity and Safety Authority*, 2023 WL 2720355, at 1 n.2 (March 27, 2023). The first time around, this Court said it was "damning" that "the FTC cannot unilaterally change the Authority's *proposed* rules." *NHBPA II*, 53 F.4th at 889 (emphasis added). That draws on the Supreme Court's decision in *Adkins. Id.* ("the agency in *Adkins* could 'unilaterally change' *proposed* rules[.]") (emphasis added).[21] *Accord id.* at 881 ("'Congress may formalize the role of private parties in *proposing* regulations so long as that role is merely as an aid to a government agency that retains the discretion to approve, disapprove, or modify them.'") (emphasis added) (quoting *Ass'n of Am. R.R. v. United States DOT,* 721 F.3d 666, 671 (D.C. Cir. 2013) (*Amtrak I*), *vacated by* 575 U.S. 43 (2015)). The problem remains: the FTC cannot change the Authority's proposed rules.

---

[21] Discussing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940).

*c. The FTC cannot second-guess the content of proposed rules but still must approve them on a consistency basis.*

The District Court acknowledges in its opinion, "the FTC is limited to reviewing the Authority's proposed rules for consistency with HISA." ROA 2715. The FTC similarly acknowledged this in its ADMC order. F.T.C., *Order* (March 27, 2023), at 1. "If [proposed] rules are 'consistent' with HISA's broad principles, the FTC *must* approve them." *NHBPA II*, 53 F.4th at 872. When the Authority proposes rules to the FTC, they are not suggestions or recommendations to be accepted or rejected at the FTC's pleasure—they *must* be approved if they pass "high-altitude," "arms-length," "open-ended,", "next to nothing" consistency review. *Id*. And this is by design: "it is the Authority, not the agency, that is tasked with weighing policies that go into formulating rules." *Id*. at 883. This review "is too limited to ensure the Authority 'function[s] subordinately' to the agency." *Id*. at 884.

*d. These constitutionally significant flaws remain* **post-amendment.**

These are fatal flaws, and the District Court ties itself in jurisprudential knots trying to answer them.[22] With the power to modify

---

[22] Before reaching these problems, the District Court makes a predicate holding that the FTC can "initiate rulemaking" to modify "the entire body of Authority rules," not only to initiate rulemaking to modify existing rules. ROA 2740. This doesn't matter.

now in place, the District Court (echoing the Sixth Circuit in its consideration of Oklahoma's challenge to HISA) says the problems now are really just ones of timing.

First, there's the timing problem that the consistency-reviewed rules are in place until the FTC can modify them. The District Court questions whether this is a problem at all—what's a brief "timing gap" between friends? (ROA 2746) The District Court is willing to accept the "short-term applicability of a rule approved under consistency review." ROA 2745. It should not be. "[T]he loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). For these Horsemen, regulation by constitutionally defective rules for even minimal periods of time is a violation of their constitutional freedoms.

---

The parties below argued over whether the FTC could initiate rulemaking to modify or amend only existing rules, or the body of rules as a whole (such that the FTC could make rules on new topics not covered by existing rules). But it's a distinction without a difference, because the statute itself sets the limits of what the FTC and Authority can regulate—racetrack safety and medication control, and the procedures, assessments, and enforcement associated with those two topics. 15 U.S.C. § 3053(a)(1)-(11). Even if the FTC wished to initiate a brand-new rule for the Authority to enforce on pricing for horse sales, for example, the Act would not allow it, because the Act limits the FTC and Authority to the specific substantive topics of racetrack safety and medication control. And the Act is clear that the Authority, not the FTC, "shall establish" the programs for those two topics. 15 U.S.C. §§ 3055(a)(1), 3056(a)(1). So even if the FTC has the power to initiate rulemaking on new topics, there are no new topics the Act allows it to write rules on.

Chief Judge Sutton, writing for the Sixth Circuit, at least recognizes the timing gap is a problem, and he has a solution: the FTC could adopt a procedural rule delaying the effective date of the Authority's proposed rules for 180 days so it can undertake a rulemaking to amend any rule it wishes. *Oklahoma v. United States,* 62 F.4th 221, 232 (6th Cir. 2023). *See* ROA 2746 ("the FTC's ability . . . to promulgate rules concerning the effective date of rules approved under consistency review resolves the issue."). First, 180 days is hardly sufficient when rulemaking usually takes years. *See* "About the Rulemaking Process," Administrative Office of the U.S. Courts[23] ("The federal rulemaking process usually takes two to three years for a suggestion to be enacted as a rule."); "Federal Rulemaking," Gov't Accountability Office (April 2009)[24], 1 ("the average time needed to complete a rulemaking across our 16 case-study rules was about 4 years"). More importantly, the test for facial challenges does not require courts to engage in such gymnastics. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).[25] If there is an obvious

---

[23]                        https://www.uscourts.gov/rules-policies/about-rulemaking-process#:~:text=The%20federal%20rulemaking%20process%20usually,be%20enacted%20as%20a%20rule.

[24] https://www.gao.gov/assets/gao-09-205.pdf.

[25] "The proper framework to apply in a facial challenge is not to require the challenger to disprove every possible hypothetical situation in which the restriction might be

constitutional flaw in a statute, the proper response is not to hypothesize a jury-rigged way around it—the proper response is to declare the statute unconstitutional. The agency cannot voluntarily wiggle its way into constitutionality. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute. . . . Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.").

The District Court's other answer is that the FTC could use its new § 3053(e) power to issue an interim final rule (IFR) to put a rule modification into effect immediately. ROA 2746 ("the FTC's ability to initiate rulemaking on an expedited basis"). Basically, the FTC could approve an Authority proposal on a consistency basis, and at the same time modify it using its IFR authority. However, this is no solution at all, because IFRs are limited to occasions of "good cause." This Court has said before "the narrowness of that emergency power made it not much of an

---

validly applied, but whether to apply the appropriate constitutional text to determine whether the challenged restriction is invalid on its fact (and thus incapable of any valid application)."

answer to the Horsemen's concerns." *NHBPA II*, 53 F.4th at 877. So too here. At a minimum, the FTC can only act in emergency situations, and the rest of the time the Authority's rules will govern while the FTC goes through years of traditional rulemaking.

Finally, the District Court and Chief Judge Sutton simply accept a second timing problem. New rules must be consistent with the statute and the existing rules. 15 U.S.C. § 3053(c)(2). So over time, as the FTC exercises its newfound power to modify, they say the existing rules will come to reflect the FTC's policy preferences rather than the Authority, and then when the Authority sends rules that are inconsistent with the FTC's policy preferences, as embodied in the amended rules, the FTC can reject them as inconsistent. ROA 2744 ("substantive analysis to ensure the proposed rule is consistent with the FTC's view of the proper national horseracing policy"); *Oklahoma,* 62 F.4th at 232.

Again, the gymnastics necessary to augur this answer betray the fundamental flaw in the statute. *See Whitman*, 531 U.S. at 472. It is not "pervasive authority" for the FTC to promise horsemen that if they are just patient, over the course of the next decade, eventually there will be democratic accountability for the regulations governing their industry.

Again, our constitutional freedoms deserve immediate protection. *BST Holdings*, 17 F.4th at 618.

   *e. The SEC-FINRA relationship remains meaningfully different from the FTC-Authority relationship.*[26]

   The Securities & Exchange Commission (SEC) continues to exercise significantly more power over the Financial Industry Regulatory Authority (FINRA) than the FTC exercises over the Authority, even after the amendment. The SEC has the power to remove FINRA board members for cause, 15 U.S.C. § 78s(h)(4); remove any individual FINRA member, 15 U.S.C. § 78s(h)(2); bar any person from associating with FINRA, 15 U.S.C. § 78o-3(g)(2); remove FINRA's power to enforce a particular rule, 15 U.S.C. § 78s(g)(2); or step in and enforce the rule as written on its own. 15 U.S.C. § 78o(b)(4). Also, brokers are registered directly with the SEC, not with FINRA. 15 U.S.C. § 78o(b). The SEC can

---

[26] At trial, the District Court asked the Horsemen's counsel several times whether his argument would label the SEC-FINRA relationship unconstitutional. ROA 3057-58. Counsel responded that the court was not bound by those opinions, as they came from other circuits. *Id*. Asked again, counsel responded that there were numerous meaningful distinctions. *Id*. Asked once more, counsel followed the age-old rule: when a court asks you a direct question, answer it. Under the Horsemen's view of the original meaning of the vesting clauses, explained below, which they believe is reflected in much of this Court's *NHBPA II* opinion, the SEC-FINRA relationship is not constitutional. (*See infra* section *vi*). But, as the Horsemen pointed out in their initial answer to the District Court and reiterate here, the Court need not reach that point to decide this case, given these other points of distinction.

also derecognize FINRA's regulatory role entirely. 15 U.S.C. §§ 78s(a)(3), (h)(1).[27] The FTC lacks these powers over the Authority, such that "the FTC" still "has less supervisory power than the SEC." *NHBPA II*, 53 F.4th at 887.[28]

> ii. *The Authority's guidance power proves the statute gives the Authority the "last word" and "final say" on the governing rules.*

Not only does the Authority write the rules in the first instance, but it also rewrites the rules after FTC approval. HISA allows the Authority to submit "guidance" to the Commission but does not give the FTC any power to veto this guidance. 15 U.S.C. § 3054(g). Indeed, such guidance "'shall take effect' upon submission." *NHBPA II*, 53 F.4th at 874. The Authority also sets policy through even more informal means such as press releases and industry newsletters (as shown on the next page).

Similarly, HISA charges the Authority's anti-doping agency to "develop and recommend anti-doping and medication control rules, protocols, policies, and guidelines for approval by the Authority." 15

---

[27] Also, FINRA's members are guaranteed a representative role in its governance, and always retain the right to exit FINRA and start a competitor association. 15 U.S.C. §§ 78o-3(b)(4), (a).

[28] Additionally, this Court declared that it is not bound by the out-of-circuit SEC cases, *NHBPA II*, 53 F.4th at 888 n.34, and in all events, the foundational cases in this area predate modern Vesting Clauses jurisprudence.

U.S.C. § 3055(c)(4)(a).[29] In other words, HISA contemplates sub-rule "protocols, policies, and guidelines" that are approved not by the FTC, but by the Authority. And indeed, the Authority's rules provide for "technical documents" that provide "guidance" as a "supplement" to the FTC-approved anti-doping rule with specifics on particular substances. Authority R. §§ 3110(c), 3112.

The Authority frequently wields its guidance power to rewrite rules:

| Rule | Document Type | Policy Change |
|------|---------------|---------------|
| The Act | Guidance (ROA 3687) | State law will govern ADMC temporarily because the Authority cannot meet the statutory deadline (July 1, 2022). |
| ADMC | Press Release (ROA 3668) | Effective date of ADMC provisions governing supplements and vitamins changed from March 27 to April 30. |
| ADMC | Guidance (ROA 3672) | The screening limit for Phenylbutazone changed from 0.2 mcg/ml set forth in the Technical Document to 0.3 mcg/ml. |
| ADMC | Authority Newsletter[30] | Even though the complaint in the *Louisiana* case is an A.P.A. challenge to the racetrack safety |

---

[29] *C.f.* Authority R. §§ 3010(i) ("In accordance with section 3055(c)(4) of the Act, the Agency may develop further rules, protocols, policies, and guidelines for approval by the Authority to support the implementation of the Protocol."); 3010(j)(1) ("Nothing in the Protocol or in any of its associated rules, protocols, policies, and guidelines: (1) is intended to constrain or limit in any way the powers of the Authority or the Agency under the Act.").

[30] Ben Mosier, HIWU Newsletter (Jan. 10, 2023).

| | | |
|---|---|---|
| | | rule, the Authority will not enforce the ADMC in the plaintiff states, Louisiana and West Virginia. |
| ADMC | Operations Bulletin[31] | Rule bans "Intra-articular injections." For violations from the rule's effective date (May 22, 2023) to July 15, 2023, the rule will only be enforced against covered horses, not trainers, owners, or veterinarians. |
| Racetrack | Announcement (ROA 3674) | Rule bans use of "electrical medical therapeutic devices" "within 48 hours of a training activity or of the start of the published post time." The Authority will only enforce that ban before races, not before training activities. |
| Racetrack | Announcement (ROA 3675) | "HISA will not enforce the requirement under HISA rule 2272(a) that Shock Wave Therapy must be disclosed to the Regulatory Veterinarian no less than 48 hours prior to use." |
| Racetrack | Announcement (ROA 3675) | "HISA will not enforce the requirements in Rule 2272(a)(1) that shockwave therapy may only be performed with machines that are registered and approved for use by the State Racing Commission, and that the machines must be used at a previously disclosed |

---

[31] This "operations bulletin" was issued by the Authority on June 23, 2023, after the District Court trial. However, it can be found on the Authority's website (https://hisaus.org/news/announcement-concerning-intra-articular-injections) and is appropriate for judicial notice. *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 490 n.12 (5th Cir. 2013) (approving district court taking judicial notice of material on a party's official website).

| | | location that is approved by the State Racing Commission." |
|---|---|---|
| Racetrack | Guidance (ROA 3678) | "Rule 2143(a) states in part: 'All Horses, including stable ponies, entering the Racetrack grounds must have proof of health certificate and required vaccinations....' as enumerated in the rule. This requirement shall not be enforced by HISA for Horses, including stable ponies, that enter Racetrack grounds directly from a licensed training or licensed racing facility within the same state." |
| Racetrack | Guidance (ROA 3678) | "Rule 2143(a)(4) requires '[v]erification of Negative Equine Infectious Anemia (Coggins) Test within the calendar year . . . The requirement for verification of a Negative Equine Infectious Anemia (Coggins) Test shall not be enforced if the test was administered within the last 365 days prior to entering Racetrack grounds." So "the calendar year" is rewritten to "the last 12 months." |
| Racetrack | Guidance (ROA 3682) | The effective date of vaccine requirements is rewritten from July 1, 2022, to January 1, 2023. |
| Racetrack | Guidance (ROA 3680) | Rule 2276 governing toe grabs "shall not be enforced" on dirt tracks as long as the horse is shod with "a full outer rim shoe (up to 4 mm in height) or a toe grab (up to 4 mm in height)." |
| Racetrack | Guidance (ROA 3682) | The riding crop shaft specification in Rule 2281(4) shall not be enforced. |

| Racetrack | Announcement (ROA 3682) | Effective date for Rule 2276 governing horseshoes rewritten from July 1 to August 1. |
| Racetrack | Announcement (ROA 3682) | Effective date for Rule 2281 governing riding crops rewritten from July 1 to August 1. |
| Racetrack | Announcement (ROA 3682) | "Trainer records" for claimed horses, a term undefined in the rule, is defined only to mean "medical, therapeutic, and surgical treatments and procedures" and not any other records held by the trainer concerning the claimed horse. |
| Racetrack | Voluntary State Agreement (ROA 3228) | Race Day Agency-Authorized Collection Personnel defined to require, at a minimum, 1 Veterinarian, 1 Veterinarian Tech, 1 Test Barn Supervisor, 5 assistants, and 1 security officer, a staffing level far exceeding the persons specified in the rule. |
| Assessment | Guidance (ROA 3685) | Standards for determining whether an agreement between a racetrack and horsemen to cover HISA fees will be considered "equitable." |
| Registration | Press Release (ROA 3676) | Unregistered covered persons and their horses will be scratched from racing through a flagging process nowhere mentioned in the rule. |

Plaintiffs do not recite the foregoing to make an as-applied challenge to any individual policy, but rather "to show that the agency is applying

39

HISA exactly as written." *NHBPA II*, 53 F.4th at 886 n.32.[32] HISA allows the Authority to use "guidance," "protocols," and "guidelines" to rewrite the rules approved by the FTC without FTC oversight. These Authority actions haven't made their way into proposed rules for the FTC to even do a consistency review. The Authority is acting as a law unto itself.

Asked about a press release that delayed the effective date of a provision of the ADMC by 30 days, counsel for the Authority explained, "[T]hat's an exercise of enforcement discretion. . . What the Authority is saying is, . . . we're going to exercise enforcement discretion. . . we're not going to prosecute. We're not going to enforce that limitation for 30 days. Agencies do that all the time." ROA 3142-43. Did James Madison, in his wildest dreams, contemplate that a private corporation would exercise "enforcement discretion" as to when to "prosecute" rule violators? The Horsemen doubt it. Counsel's statement perfectly encapsulates the whole problem.

---

[32] The District Court dismisses this argument in a single sentence by saying these are "better asserted through as-applied challenges." ROA 2749. But a score of examples show the Authority is simply reading the Act as written: it allows the Authority to issue "guidance," "protocols," "policies," and "technical documents" that interpret and apply—*i.e.*, make—the law without FTC approval.

The Authority responded further at trial by saying the guidance is not "legally binding." ROA 3141.[33] This is an old trick by agencies, and this Court has seen through the charade many times before. "Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations[.]" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Where a guidance document uses mandatory language, produces legal consequences, or where an agency voluntarily binds itself to follow its own guidance, that guidance document practically has the force of law. *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 200 (5th Cir. 2023). That is obviously the case here, where the Authority binds itself to follow its own guidance, and where that guidance has legal consequences (for instance, you can use toe grabs that the rules say are illegal but the Authority guidance says are legal). In order to know what is *actually* permissible and *actually* problematic, the horseman has to

---

[33] *See* 15 U.S.C. § 3054(g)(1)(A) ("Guidance" either sets forth "an interpretation of an existing rule, standard, or procedure" or sets "a policy or practice with respect to the administration or enforcement of such an existing rule, standard, or procedure."); *Procedures For Submission of Rules Under the Horseracing Integrity and Safety Act*, 86 Fed. Reg. 54819 (Oct. 5, 2021) (to be codified at 16 C.F.R. pt. 1).

check the Authority's website, not the Federal Register. Such rulemaking defies all concepts of transparency and democratic accountability.

And when the Authority rewrites the rules in this way, the statute renders the FTC powerless to do anything about it. HISA requires the Authority to notify the FTC of any guidance but does not give the FTC power to revoke or veto or override the guidance. 15 U.S.C. § 3054(g)(2). The guidance process proves the statute gives the Authority "final say over horseracing rules." *NHBPA II*, 53 F.4th at 890. "The Authority, not the FTC, determines the rules" on the ground. *Id.* at 887. "The end result is that Congress has given a private entity the last word over what rules govern our nation's thoroughbred horseracing industry." *Id.* at 872.

      *iii.*   *The statute grants the Authority legislative power over taxes and spending without pervasive surveillance and authority.*

The powers to set taxes and spend tax funds are legislative powers. *See United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974); *Laird v. Tatum*, 408 U.S. 1, 15 (1972). The Authority has the power to tax—it is empowered by HISA to set a mandatory assessment that either states pay, or if states decline to pay, then covered persons must pay directly. 15 U.S.C. § 3052(f). This is a tax. *See Tax*, Black's Law Dictionary (6th ed. 1991). *See also Miami Herald Pub. Co. v. Hallandale*, 734 F.2d 666,

671 (11th Cir.), *opinion clarified*, 742 F.2d 590 (11th Cir. 1984) (a "revenue raising" "occupational license" "fee" is a "tax"). The statute says that the FTC must approve the methodology rule by which the assessments are allocated across various states or covered persons, but the Authority sets the actual amount assessed without FTC oversight. 15 U.S.C. §§ 3052(f), 3053(a)(11).

These funds are not voluntary or charitable contributions from covered persons and states—these are mandatory, obligatory fees levied by law. Failure to pay them can result in fines and suspension from racing. *See* Authority R. § 8100(i). Once these funds are collected, HISA allows the Authority to spend them without any FTC oversight.

This stands in stark contrast to the U.S. Department of Agriculture's ("USDA") oversight of the Cattlemen's Board, which run the USDA's beef marketing program. Congress itself set the annual assessment amount by statute.[34] The statute says the USDA must approve the board's annual budget[35] and investments,[36] and the USDA can conduct audits and inspections of the board's books.[37] The implementing regulations from the

---

[34] 7 U.S.C. § 2904(8)(C).
[35] 7 U.S.C. § 2904(4)(C).
[36] 7 U.S.C. § 2904(9)
[37] 7 U.S.C. § 2904(7)(A)-(B).

USDA require an annual audit,[38] and USDA approves all projects and contracts.[39] The USDA regularly uses these powers to decline proposals from the Board. *Charter v. USDA*, 230 F. Supp. 2d 1121, 1138 (D. Mont. 2002), *vacated on other grounds*, 412 F.3d 1017 (9th Cir. 2005). "Congress has set the amount of the assessments and the Secretary ultimately decides how the funds will be spent." *Goetz v. Glickman*, 920 F. Supp. 1173, 1181 (D. Kan. 1996), *aff'd*, 149 F.3d 1131 (10th Cir. 1998). These tools render "the Board subject to the Secretary's pervasive surveillance and authority." *United States v. Frame*, 885 F.2d 1119, 1128-29 (3d Cir. 1989). And that's for an organization running a marketing program, not regulating a nationwide industry.

Two weeks after the Appellants first made this argument, the FTC *sua sponte* adopted a rule claiming oversight of the Authority's budget. *Procedures for Oversight of the Horseracing Integrity and Safety Authority's Annual Budget*, 88 Fed. Reg. 18034 (March 27, 2023) (to be codified in 16 C.F.R. pt. 1). However, that rule is contrary to the statute's plain text. 15 U.S.C. § 3052(f)(1) (granting the Authority spending and

---

[38] 7 C.F.R. § 1260.150(l).
[39] 7 C.F.R. § 1260.168(e)-(f).

fee-setting authority without mentioning any role for the FTC). Indeed, the FTC even admits in the rule preamble that the Authority's budget and fees are not among the eleven enumerated items Congress has empowered it to supervise. 88 Fed. Reg. at 18035 (citing 15 U.S.C. § 3053(a)). A rule that was adopted without notice-and-comment during litigation, can be repealed without notice-and-comment, and is clearly contrary to the text of the statute, cannot save the statute. *See Whitman*, 531 U.S. at 472. This is a facial challenge, and so this Court should limit its consideration to the statute on its face. The FTC's manufactured rule just highlights how unconstitutional the statute is.

> iv.    *The Authority wields executive power without pervasive surveillance and authority.*

"The Constitution commits no executive power to private entities" any more than it vests them with legislative powers. *NHBPA I*, 596 F. Supp. 3d at 709 n.16.[40] Yet HISA says "[t]he Authority shall have subpoena and investigatory authority with respect to civil violations committed under its jurisdiction." 15 U.S.C. § 3054(h). *See* 15 U.S.C. §§ 3055(c)(4)(B), 3056(b)(6)-(7). *See also NHBPA II*, 53 F.4th at 874. These are core

---

[40] This Court did not address the Authority's executive functions in its first decision. *NHBPA II*, 53 F.4th at 890 n.37.

executive powers. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2200 (2020) (power "to initiate criminal investigations and prosecutions" "core executive power"); *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting) ("the President's constitutionally assigned duties include *complete* control over investigation and prosecution of violations of the law").

The Authority has the power to search and inspect "offices, racetrack facilities, other places of business, books, records, and personal property of covered persons that are used in the care, treatment, training, and racing of covered horses,"[41] to issue subpoenas,[42] to compel truthful and complete answers to inquiries,[43] to undertake urine and blood tests without advance notice,[44] and to exercise "other investigatory powers of the nature and scope exercised by State racing commissions,"[45] which the Authority has apparently defined to include the power to seize evidence.[46] The Authority may also initiate injunction actions against any "covered person or racetrack that has engaged, is engaged, or is about to engage,

---

[41] 15 U.S.C. § 3054(c)(1)(A)(i).
[42] 15 U.S.C. § 3054(c)(1)(A)(ii).
[43] 15 U.S.C. §§ 3054(c)(3)(B), 3057(a)(2)(F)-(I).
[44] 15 U.S.C. § 3055(c)(4)(C).
[45] 15 U.S.C. § 3054(c)(1)(A)(iii).
[46] Authority R. §§ 3040(a)(2)(iii)(D), 5730(b)(2)-(3).

in acts or practices constituting a violation." 15 U.S.C. § 3054(j)(1). By contrast, if the FTC wanted to conduct a search or seize evidence, it would need a warrant from a magistrate. *See Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523 (1967). For the Authority to conduct a search or seize evidence, it doesn't even have to let the FTC know, little less secure the advance approval of a federal magistrate. This is an unconstitutional mutation of executive power.

The Authority also has the power to hold administrative hearings, weigh evidence, decide guilt, and issue sanctions.[47] These are also executive powers. *See NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 497 (4th Cir. 2011) ("the administrative authority to conduct hearings and issue orders").

As a result of the statute's grant of the power to investigate and enforce, "people outside government . . . wield the government's power." *NHBPA II,* 53 F.4th at 880. The Authority is basically a private police department—the government has given a private corporation the power to investigate, search, seize, and charge. And the FTC has no role overseeing these investigations—the statute only grants it a role when

---

[47] 15 U.S.C. §§ 3055(c)(4)(B), 3056(b)(7)-(9), 3057(c).

investigations end in administrative convictions. 15 U.S.C. § 3058(b). As a result, under the terms of the statute, horsemen are investigated and subpoenaed and their property is seized with zero pre-clearance from a federal official, little less an independent magistrate. This is not pervasive surveillance and authority. Rather, it is oligarchic tyranny.

Horsemen may appeal their convictions by the Authority to the FTC. 15 U.S.C. § 3058(b).[48] But in many instances, horsemen do not even have the option of seeking FTC review, if no charges are filed, if the ALJ finds against the Authority, if the Authority delays on filing charges, or if the Authority imposes informal discipline. The lack of oversight for agency "inaction" can be just as problematic from a constitutional perspective. *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 9 (D.D.C. 1999). And even where charges are pursued, preclearance of invasive investigative techniques is still essential. *Mamakos v. Town of*

---

[48] The possibility of meaningful FTC review is also largely a hollow promise. Horsemen "face a daunting and expensive task if they wish to challenge" the Authority's adjudication. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2482 (2018). Horsemen "must still pay for the attorneys and experts needed to mount a serious challenge" to the Authority's judgment. *Id.* "And the attorney's fees incurred in such a proceeding can be substantial." *Id.* Practically, the expense of hiring a lawyer and litigating a riding crop sanction, for instance, far exceeds the value of the sanction ($250 for 1 to 3 strikes over the 6-strike cap for a first-time offender, Authority R. § 282(b)(1)(i)), such that very few will appeal to the FTC.

*Huntington*, 715 Fed. App'x 77, 79 (2d Cir. 2018) ("The minor and infrequent inconvenience which a warrant requirement may create cannot overshadow the substantial benefits which will result to the individual's dignity and liberty through the preservation of his right to privacy") (cleaned up).

The president also has the ultimate executive power—to hire and fire those whom he pleases to execute his will. Cabinet secretaries are subject to the president's pervasive surveillance and authority because in the final event he can fire them. However, the president and the FTC lack any power over the Authority's leadership. The Authority's leadership is a self-perpetuating presidium with no outside input or public accountability. 15 U.S.C. § 3052. The statute gives the FTC zero role in the Authority's appointments, and the statute leaves the FTC unable "to strip the private organization's power altogether." *NHBPA II*, 53 F.4th at 888.[49] Again, compare this to *Frame*, where the statute states that the

---

[49] The District Court sees the power to modify rules as the silver bullet that gives the FTC "the ultimate authority to control the Horseracing Authority's implementation of the rules" and "the tools to step in" if the Authority goes awry. ROA 2749. That is wrong. First, the power to derecognize the Authority is the ultimate authority, and the FTC lacks that power. Second, the solution to the Authority's brazen defiance of FTC-approved rules cannot be for the FTC to modify more rules. "As Albert Einstein would say—'the definition of insanity is doing the same thing over and over again and expecting different results.'" *Se. Mich. Surgical Hosp., LLC v. Little*, No. 18-

USDA Secretary shall appoint members of the Cattleman's Board, and the statute limits members to no more than two consecutive three-year terms. *Frame,* 885 F.2d at 1129; 7 U.S.C. § 2904(3).

The District Court dismisses this entire claim by saying "the Authority's non-legislative regulatory functions did not violate the private-nondelegation doctrine because these functions . . . comport with due process." ROA 2752. This utterly misses the point. This is not a Fifth Amendment due-process claim. It is an Article II vesting claim. ROA 1824 (second amended complaint).

The executive power is vested solely in the president. If Congress can delegate such sovereign powers as investigation and enforcement at all (the Horsemen argue below it cannot), at minimum Congress may not give the president's executive powers to a private corporation without giving the president or his appointees pervasive surveillance and authority over that private corporation. Whether the private corporation promises to operate its private police department and private ALJ hearings in line with constitutional principles of due process is irrelevant

---

13895, 2023 U.S. Dist. LEXIS 89935, *2 (E.D. Mich. May 23, 2023). Pervasive authority requires additional tools of control, like the ability to remove board members, to appoint new board members, to fire the CEO, etc.

to this claim—the fact that the private police department is being run without sufficient governmental oversight makes it unconstitutional.

>    v.    *The precedents of this Court and its sister courts of appeals show the FTC lacks pervasive authority.*

Two earlier decisions of this circuit also support the Horsemen. In the first, this Court upheld an agricultural marketing order where industry representatives made "recommendations" to the USDA. The Secretary appointed the committee members, heard the recommendations (and opposing views), issued the final order and any other regulations, and heard all appeals. *Chiglades Farm, Ltd. v. Butz*, 485 F.2d 1125, 1134 (5th Cir. 1973). On that basis, this Court concluded "the checks on the Committee's powers are effective[.]" *Id. Chiglades Farm* relied on an earlier opinion, wherein "the [citrus industry] committees who recommend regulations are not given any legislative power. . . . Action taken is always that of the Secretary. These others gather and present information to give him a broader view of the situation. Their concurrence gives his action support and tends to assure its enforcement. But they have no actual power." *Whittenburg v. United States*, 100 F.2d 520, 522-23 (5th Cir. 1938). The Third and Ninth Circuits have similar decisions regarding agricultural marketing committees. *Frame*, 885 F.2d

at 1129; *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1488 (9th Cir. 1992).

HISA gives the FTC not one of these powers. The FTC does not appoint the Authority board. The FTC does not consider recommendations from the Authority—it is legally compelled to approve its rule proposals. For those who have to check its website to know the rules of the racetrack, or find themselves on the receiving end of its investigations, the Authority wields "actual power."

The Sixth Circuit, in a recent private non-delegation challenge to the Universal Service Administrative Company (USAC), held that "[p]rivate entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection, gather facts for the agency, or advise on or make policy recommendations to the agency." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 795 (6th Cir. 2023).[50] However,

---

[50] The Fifth Circuit heard an identical challenge recently, but the Court voted to take the case *en banc*, thus vacating the panel opinion. *Consumers Research v. FCC*, 63 F.4th 441 (5th Cir. 2023), *vacated* No. 22-60008, 2023 WL 4241690 (5th Cir. June 29, 2023). Though vacated, the opinion illustrates the extreme nature of HISA. The opinion identifies four key differences. First, USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress." *Id.* at 451 (quoting 47 C.F.R. § 54.702(c)).[50] Under HISA, by contrast, the Authority is charged to make policy, to interpret provisions of the statutes or rules through guidance, and to interpret the intent of Congress. *See, e.g.*, 15 U.S.C. § 3054(g). Second, USAC recommends a proposal to the FCC, which is free to disregard the proposal and substitute its own preferred final order. 63 F.4th at 451. *See* 47 C.F.R.

the Horseracing Authority does not advise or propose regulations—it makes regulations the FTC is bound to adopt. It does not undertake a ministerial function like fee collection—it sets fees, and its other powers are sovereign responsibilities like investigation and enforcement. It does not simply gather facts, advise, or make recommendations—it establishes the programs, sets the policy, and writes rules the FTC shall approve after a rubber-stamp review.

The Sixth Circuit upheld the USAC-FCC arrangement because "[t]he FCC has not afforded USAC any authority to make actual decisions or establish or define standards." *Id*. at 796. By contrast, the Authority makes all sorts of actual decisions—annual assessment amounts, for

---

§ 54.709 (a)(3). The Horseracing Authority does not make recommendations of rules to the FTC—its submissions must be approved as long as they are consistent with the broad purposes of the act, and the FTC is barred from substituting its own policy judgments on this initial review. *NHBPA II*, 53 F.4th at 885. Third, "the FCC permits telecommunications carriers to challenge USAC proposals directly to the agency and often grants relief to those challenges." 63 F.4th at 451. Again, the FTC is statutorily bound to ignore public comments during its review of proposed rules. *NHBPA II*, 53 F.4th at 883-84. Fourth, "the FCC dictates how USAC calculates the USF contribution factor and subsequently reviews the calculation method after USAC makes a proposal." 63 F.4th at 452. The FTC does not dictate to the Authority what must be in its rule proposals—under HISA, the agency "recommends" changes to the private organization, not vice versa. 15 U.S.C. § 3053(c)(3)(A). And though the FTC reviews the Authority's proposals, its review is legally limited to a rubber stamp. 53 F.4th at 883. *Consumers' Research* concluded, "Ultimately, the FCC only uses USAC's proposals after independent consideration of the collected data and other relevant information." 63 F.4th at 452. The FTC still cannot make an "independent consideration" of the Authority's rules proposals or relevant information provided during the public-comment process. *NHBPA II*, 53 F.4th at 883-84.

example—and establishes and defines numerous standards—in the programs it establishes, the rules it drafts, the guidance it adopts, and the protocols it issues. USAC makes recommendations to the FCC, but "[c]ritically, the FCC is not bound by USAC's projections." *Id*. Rather, the FCC holds a public comment period and then decides whether to approve the recommendation. *Id*. The FTC, on the other hand, is bound to approve the Authority's rule proposals, and it ignores any public comments that relate to the policy at issue. *NHBPA II*, 53 F.4th at 883-84.

The *Consumers Research* case contains critical distinctions between the USAC statute and HISA that show once again that even the amended HISA is at the extreme edge in the lack of oversight given to the federal agency. Moreover, the Sixth Circuit could have considered further differences between HISA and the USAC. USAC board seats are allocated by industry constituency, those constituencies must submit nominees "by consensus," and the FCC chairman must approve and appoint all nominees to the board.[51] The FCC chairman also approves the board's nominee for CEO of USAC.[52] All USAC board meetings "shall be

---

[51] 47 C.F.R. §§ 54.703(b); 54.703(c)(3).
[52] 47 C.F.R. § 54.704(a)(2)-(3).

open to the public."[53] USAC must maintain financial transparency before the FCC and public.[54] The FCC also approves USAC's projected budget for every quarter and requires and reviews an annual audit of USAC.[55] Finally, the FCC, not USAC, pursues enforcement actions against any company that is delinquent in making its USF contribution.[56] This is what pervasive authority looks like. None of it is present in HISA.

The contrast is further confirmed by *Pittston Co.* from the Fourth Circuit. The Coal Act recognizes a private fund to administer benefits under the supervision of the Social Security Commissioner. "[T]he Coal Act or the Social Security Commissioner defines the nature of the Combined Fund and who must contribute to it; specifies the amount of each premium payable by a coal operator to the Combined Fund; specifies with particularity each beneficiary who is entitled to receive benefits from the Combined Fund; and designates the nature and amount of the benefits." *Pittston Co. v. United States*, 368 F.3d 385, 396 (4th Cir. 2004).

More specifically, "the Combined Fund has no power to determine the premium payments owed by each coal operator to the Combined Fund[,]"

---

[53] 47 C.F.R. § 54.704(e).
[54] 47 C.F.R. § 54.702(g) & (n).
[55] 47 C.F.R. §§ 54.715(c); 54.717.
[56] 47 C.F.R. § 54.713(c).

and any fines for failure to make such payments are administered by the
Secretary of the Treasury. *Id.* at 395-96. All the Combined Fund does is
collect, invest, and pay out the premiums, ministerial tasks because all
policy decisions are made by Congress, and any specifics are handled by
the Social Security Commissioner.

Again, compare this to HISA. The Authority determines the fees to be
paid by the states and covered persons without oversight. The Authority
engages not in administrative tasks like paperwork processing, but
substantive tasks like investigation, enforcement, and sanctions. The
Authority makes numerous policy decisions, not Congress or the FTC.

These cases all prove wrong the District Court's claim that the "power
to abrogate, add to, and modify the rules of the Authority amounts to
pervasive surveillance and control." ROA 2751. *Consumer's Research*,
*Frame*, *Chiglades Farm*, and *Pittston Co.* show that pervasive
surveillance and control requires far more than just the power to modify
rules after their enactment.[57]

---

[57] This is especially so if one bears in mind that the power to modify does not include
the power to make wholesale changes, but only minor tinkering on the edges of the
rules. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512
U. S. 218, 225 (1994) ("modify" means "to change moderately or in minor fashion.").

> **vi.** *An originalist constitutionalist approach also shows HISA cannot delegate these powers to the Authority.[58]*

An alternative way to think about private nondelegation is not to ask about the *quantity* of supervision authorized, but the *quality* of the powers delegated. This question is not how much surveillance and authority the FTC has, but what type of power the Authority wields. Indeed, the Fourth Circuit called it "the central inquiry" to determine "whether the function of the" delegated entity "is governmental in nature." *Pittston Co.*, 368 F.3d at 398.[59]

Others have drawn "the familiar distinction between discretionary, managerial, and policy-making tasks, which clearly cannot be delegated, and ministerial tasks, involving little or no exercise of discretionary judgment, which just as clearly can be delegated." *Yaretsky v. Blum*, 592 F.2d 65, 69 (2d Cir. 1979) (Lumbard, J., dissenting).[60] *Accord United States v. Garcia*, 690 Fed. App'x 575, 587 (10th Cir. 2017) (A court may delegate to a private corporation "ministerial acts or support services

---

[58] The Sixth Circuit specifically noted that the parties did not argue an originalist or historical perspective in *Oklahoma*. 62 F.4th at 233.

[59] In that case, the Court determined that "[t]he function of investing money. . . is not essentially governmental in nature." 368 F.3d at 397.

[60] *See also Holder v. St. Louis-San Francisco Ry. Co.*, 172 F.2d 217, 219 (6th Cir. 1949) (considering but not deciding the difference between delegating to a private party ministerial functions and "powers involving the exercise of judgment and discretion").

related to the punishment imposed" [sex offender treatment] but not discretion to "to decide the nature or extent of the defendant's punishment.").[61]

In asking about the type of power exercised, the Fourth Circuit asked the same question that scholars suggest occupied the Founding Fathers. Recent research by Professors Jennifer Mascott of George Mason University and Aditya Bamzai of the University of Virginia demonstrates that in the founding era, private actors were contracted "to perform outside empirical services, such as weighing imported goods, evaluating the technical similarity of patent claims, or completing expert medical exams."[62] These private parties could "conduct ministerial tasks" but not

---

[61] At the start of its opinion, the District Court insinuates the Horsemen merely sought more FTC oversight in their first round of the case, and that on remand they now "admit their true view: that there is nothing Congress could do to bring the HISA—Authority arrangement within constitutional bounds." ROA 2707. In some sense, that is false: the power to modify or amend rules was an important part of the Horsemen's arguments in the first round, but it was hardly the only argument they made. But in some sense, it is true: as long as Congress wants the Authority to regulate, investigate, and enforce, that cannot be done within constitutional bounds. On the Horsemen's view of the original meaning of the Constitution, these sovereign functions could not be delegated to private actors. Thus, the Authority is fundamentally and fatally flawed *ab initio*. This is why the Horsemen's counsel said the SEC-FINRA relationship was also unconstitutional.

[62] Jennifer L. Mascott, *Private Delegation Outside of Executive Supervision*, 45 Harv. J.L. & Pub. Pol'y 837, 925 (2022). *See* Aditya Bamzai, *Tenure of Office and the Treasury*, 87 Geo. Wash. L. Rev. 1299, 1346 (2019).

"engage in the exercise of delegated authority to bind third parties" or exercise "sovereign authority."[63]

Their conclusion is reinforced by Justice Scalia's comprehensive review of other private corporations recognized by Congress or executive agencies in the past—all of them exercised proprietary roles, primarily making or guaranteeing loans or building or running infrastructure. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 387-91 (1995). None of them exercised "sovereign authority" like regulation, prosecution, and administrative adjudication.[64]

Yet sovereign authority is exactly what the Authority exercises—authority to draft rules, to investigate and enforce rules, to decide when to exercise enforcement discretion, to administratively adjudicate violations of rules, to set and spend taxes—with minimal FTC oversight. Even after the amendment, "the FTC needs the Authority to function as

---

[63] *Id.*

[64] Indeed, the District Court misguidedly invokes *Lebron* in support of its decision—the Horsemen's "argument ignores the long history of the executive branch leveraging—with court approval—expertise from private industry so long as the industry remains subordinate to a supervisory federal agency," citing *Lebron*, ROA 2707-08—but misses the common thread in all of the *Lebron* examples: that they undertook proprietary, non-sovereign activities (banks, railroads, spruce production, war finance, loans, loan guarantees, energy, satellite launches, the Saint Lawrence Seaway). None combined in themselves the functions of rule-writing, a private police department, and private ALJs to regulate an entire industry.

a typical regulator," *NHBPA II*, 53 F.4th at 887, because it is still the Authority that does all these things. Such an almost complete vesting of legislative and executive power in the Authority is breathtaking in its scope, and patently unconstitutional.

HISA is directly contrary to the historical understanding of private delegation. Ultimately the corporation is named the Horseracing Integrity and Safety *Authority*, and not Advisors or Administrators, because its purpose is not to advise the FTC or perform ministerial tasks. Its purpose is to exercise sovereign national authority: "a truly nationwide, comprehensive regulatory scheme for racetrack safety and ADMC." ROA 2711. Giving such governmental authority to a private corporation was and remains "delegation in its most obnoxious form." *Carter Coal Co.*, 298 U.S. at 311.

## II. Experience shows the Authority allows economically interested persons to regulate others in their industry.

In *Carter Coal*, "[t]he Court found that the law improperly delegated governmental power to the majority, enabling it to 'regulate the affairs of an unwilling minority[.]'" *Pittston Co.*, 368 F.3d at 394. Here we have an even more extreme problem: a self-appointed but politically influential

*minority* within the industry has used its influence with Congress to get itself recognized to regulate the rest of its industry. This is not like FINRA where there are elections to board seats. The Authority board is a self-perpetuating cabal, with zero statutory process for input and zero promise to reflect the will of the majority of the industry. Indeed, no one expects that the current Authority oligarchs would win any such election, given that HISA has been opposed by the national organizations representing horsemen and veterinarians.

The District Court avoids the real issue by saying, "the Authority is not a self-interested industry competitor creating a constitutional violation." ROA 2708. Of course that is true—the Authority does not own and race horses against the members of the NHBPA. Nor does it own racetracks. But that is not the legal standard. In *Carter Coal*, no one thought that the coal district boards themselves owned coal mines. Rather, it was that the district board members were coal producers. *Carter Coal Co.*, 298 U.S. at 281-82.

Later, the District Court says, "there is no evidence of actual, unconstitutional self-dealing that has harmed industry." ROA 2708. That is not the legal standard either. The question framed by the Supreme

Court is whether the regulating is being done by "private persons whose interests *may be* and often are adverse to the interests of others in the same business"? *Carter Coal*, 298 U.S. at 311 (emphasis added). Again, in *Carter Coal* the plaintiffs did not have to adduce proof of price fixing—the regulation by competitors was the due-process problem, even if in practice the competitors had acted as angels who set prices solely in the public interest. The demand is not proof of actual self-dealing; the concern is for a "delegee whose own interests *may be* affected by the proceedings [and thus] *might* act for 'selfish' or 'arbitrary' reasons." *Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 590 (6th Cir. 2022) (emphases added).

The District Court's answer is that "HISA explicitly protects against self-interest [for individual members] through structural safeguards while preserving industry representation in the Authority." ROA 2708. This answer is insufficient, because this second complaint invokes an as-applied challenge. The Horsemen do not argue that HISA on its face requires "independent" members in certain policy-making roles, and that HISA has a conflict-of-interest policy. 15 U.S.C. § 3052. Rather, the Horsemen argue that in reality the "independent" members are not

actually "independent," and that experience has shown the HISA "conflict of interest" policy only prevents some conflicts but others with self-interest actually hold leadership positions within the Authority.

These are *legal* points, not factual conclusions. No one disputes the veracity of the Horsemen's factual statements and exhibits, most of which are drawn straight from the Authority's website. The District Court made a legal error in applying the wrong test to these facts.

HISA requires that *all seven* of the nominating committee members be "independent," *i.e.*, "from outside the equine industry." 15 U.S.C. § 3052(d). The co-chair, Nancy Cox, is dean of Agriculture at the University of Kentucky. ROA 3784. UK's website describes her as a "renowned animal/equine physiologist," and says she is active in the Kentucky Thoroughbred Farm Managers' Club and Equine Policy Council. ROA 3785. She is also "the founding administrator for the UK Equine Initiative." ROA 3781. The Jockey Club says "Cox has worked extensively with equine organizations to help advance and support the industry." ROA 3793. Her colleague on the nominating committee, Jerry Black, is a professor of veterinary medicine at Texas Tech, specializing in horses. ROA 3804. In fact, the man who is supposed to be "from outside the

equine industry" was heralded as a "titan of the equine industry" by the Texas Tech press release announcing his hire. ROA 3766. Bill Squadron, also on the nominating committee, is a "senior advisor" at Pramana Labs, which the Authority calls "a data technology firm with expertise in horse racing." ROA 3798. In fact, it is a company that uses artificial intelligence to facilitate wagering on horseracing. ROA 3759. Thus, although all seven of the nominating committee members were supposed to be independent of the industry, three of them are industry insiders. The deck was stacked from the Authority's founding.

The same problems are evident on the Authority board. Five of the nine directors must be "independent," while four of the nine should be from inside the industry. 15 U.S.C. § 3052(b)(1)(A). Yet "independent" director Leonard Coleman is a former member of the board of Churchill Downs, Inc. (ROA 3776), the racetrack that the Authority is investigating following a spate of recent horse deaths.[65] He previously "own[ed] several horses in partnerships." ROA 3776. Ellen McClain, "independent" director, is the former president of the entity which owns and operates

---

[65] "HISA Recommends Racing be Temporarily Suspended at Churchill Downs," Authority press release (June 2, 2023), https://hisaus.org/news/hisa-recommends-racing-be-temporarily-suspended-at-churchill-downs#hisa-recommends-racing-be-temporarily-suspended-at-churchill-downs.

three thoroughbred racetracks in New York. ROA 3773. In other words, two of the five "independent" directors are in fact steeped in the horseracing industry.[66]

The problems extend to the two policy-making committees as well. The ADMC Committee must include four independent members among its seven members. 15 U.S.C. § 3052(c)(1)(B)(i). Yet Dr. Jerry Yon, "independent" member, formerly served on the Kentucky Horse Racing Commission, and chaired Kentucky's Equine Drug Research Council. ROA 3805. "Independent" member Stephen Schumacher is an equine veterinarian and Chief Administrator, Drugs & Medication, for the U.S. Equestrian Federation. ROA 3810. Of the Racetrack Committee's four "independent" members, three are professors at veterinary schools who specialize in horses. ROA 3809, 3806, 3795 (Cohen, Fortier, and Reilly). Thus, the Authority exercises a specious definition of "independence" from the industry, and yet there is nothing the FTC can do under HISA to police this flagrant violation of the statute.

---

[66] The answer cannot be that they are "former" members of the industry but have since moved on and are therefore "independent." Bill Thomason is the former president of Keeneland racetrack (ROA 3799), Joe De Francis is the former chief of the Maryland Jockey Club (which owns racetracks) (ROA 3816), and DG Van Clief is the retired president of the Breeders Cup (ROA 3801). All three are labeled "industry" members of the board, notwithstanding their "former" status.

One can also see the Authority consistently fails to follow the statute's mandate that no more than one representative from any individual industry constituency sit on the board or AMDC committee. 15 U.S.C. §§ 3052(b)(1)(B)(ii), (c) (1)(b)(ii). Of the board's four "industry" directors, two are former racetrack executives. ROA 3756, 3799 (De Francis, Thomason). On the AMDC, one of the independent directors and two of the industry directors are veterinarians. ROA 3710, 3803, 3807 (Schumacher, Blea, and Hovda). In sum, across the board and all three committees, the Authority frequently and flagrantly flaunts the "independent" and "industry" rules written into the statute. This is not a facial problem with the statute: it is an as-applied problem—the Authority is not following the statute, and the result is that economically self-interested industry players are regulating their competitors. *Carter Coal Co.*, 298 U.S. at 311.

The "conflict-of-interest" provisions are not sufficient to save this regime. 15 U.S.C. § 3052(e). That section "precludes any person 'who has a financial interest in, or provides goods or services to, covered horses,' as well as that person's family members, from serving as a member of the 'Board or as an independent member of a nominating or standing

committee.' Commercial relationships to those with financial interests in covered horses are likewise barred." *NHBPA I*, 596 F. Supp. 3d at 726. The obvious problem with this provision is that it does not cover persons with interests in the industry besides in covered horses. The most obvious example is a person with an interest in racetracks (Mr. Kozak, on the racetrack safety committee, is vice president of a racetrack operator, ROA 3814) regulating in the interests of racetracks against the interests of horse owners or trainers. The Horsemen have consistently argued that one of the unspoken goals of HISA is to benefit high-end racetracks to the detriment of economically marginal racetracks and horse owners and trainers (because fewer tracks will mean fewer race days). ROA 3837, 3841-42. Similarly, persons like Mr. Squadron who have an interest in the gaming side of the horseracing industry are free to act in their self-interest without violating the conflict-of-interest provision.

In sum, the Act's guarantee of independent majority control, which "explicitly protects against self-interest," *NHBPA I*, 596 F. Supp. 3d at 726, has turned out to be only a parchment promise. The reality has been that far from being "outside the equine industry," many supposedly

"independent" appointees have spent a lifetime in the equine industry.[67] This violates the due process principle that decisions must be made by "an official or an official body, presumptively disinterested," *Carter Coal*, 298 U.S. at 311, rather than an "economically self-interested competitor."

## CONCLUSION

Speaking of a private nondelegation challenge, the Fourth Circuit struck the heart of the problem: "core governmental power . . . must not be delegated to others in a manner that frustrates the constitutional design." *Pittston Co.*, 368 F.3d at 394. This is the consistent concern of the Supreme Court's justices as well. *Dept. Of Transp.*, 575 U.S. at 61 (Alito, J., concurring) ("Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints. It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints."); *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 701

---

[67] In addition to the as-applied claim, this section also reinforces the facial challenge. The Authority is flagrantly disobeying the statute's text, and the FTC is powerless to do anything about it because the statute gives the FTC zero power to appoint, veto, or remove Authority policy-makers. 15 U.S.C. § 3052. The FTC's lack of pervasive authority on the face of the statute is seen in the sharpest relief when experience shows the Authority disobeying the statute without consequence. *NHBPA II*, 53 F.4th at 886 n.32.

(2015) (Roberts, C.J., dissenting) (Private "delegations threaten liberty and thwart accountability by empowering entities that lack the structural protections the Framers carefully devised").

That is exactly what we have here: the intentional delegation of government power to evade the safeguards of constitutional design. *NHBPA I*, 596 F. Supp. 3d at 696 (As a private corporation, "the Authority avoids some of the strictures of governmental entities, just as other private, self-regulatory organizations that operate nationwide do."). The Authority establishes the programs, drafts the rules, makes policy decisions, exercises enforcement discretion, investigates individuals, seizes evidence, prosecutes industry participants, sits in judgment on them, issues sanctions, decides how much it wants to spend, and then decides how much it will take in taxes to fund that spending. It does all of this without appointment of its board members by the president, confirmation of those board members by the Senate, appropriation of its funds or authorization of its fees by Congress, review of its investigatory requests by a federal magistrate, or transparency to the industry and the public through accountability laws like the Freedom

of Information Act, Federal Advisory Committees Act, or Government in the Sunshine Act.

That is patently unconstitutional. "Congress may not evade the solemn obligations of the doctrine of separation of powers by resorting to the corporate form." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 713 n.28 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part*, 561 U.S. 477 (2010).[68] That is what Congress has attempted—twice now—to do to horseracing. "Congress defies this basic safeguard by vesting government power in a private entity not accountable to the people. That is what it has done in HISA." *NHBPA II*, 53 F.4th at 872-73. This Court's job is to again tell Congress—"No."

Respectfully submitted,

/s/ Daniel R. Suhr

*Counsel for the Horsemen*

Daniel R. Suhr
National Center for Justice & Liberty
747 N. LaSalle St. Suite 210
Chicago, IL 60654
Telephone (414) 588-1658
danielsuhrncjl@gmail.com

Fernando M. Bustos
Bustos Law Firm, P.C.
1001 Main Street, Suite 501
Lubbock, Texas 79408
Telephone (806) 780-3976
fbustos@bustoslawfirm.com

---

[68] Quoting *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 148 n.70 (1996) (itself quoting *Lebron*, 513 U.S. at 397).

## CERTIFICATE OF COMPLIANCE

The body of the brief is 12,999 words, excluding certificates, tables,

and statements. /s/ Daniel R. Suhr

## CERTIFICATE OF SERVICE

Served on all parties via ECF. /s/ Daniel R. Suhr