**No. 23-10520**

# United States Court of Appeals for the Fifth Circuit

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; PENNSYLVANIA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; WASHINGTON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; GULF COAST RACING, L.L.C.; LRP GROUP, LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING LSP, L.L.C.; TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.,

*Plaintiffs-Appellants*,

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs-Appellants*,

v.

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH SCHANZER; HORSERACING INTEGRITY AND SAFETY AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE WILSON; LISA LAZARUS; STEVE BESHEAR; ADOLPHO BIRCH; ELLEN MCCLAIN; CHARLES SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER; BILL THOMASON; LINA KHAN, CHAIR; REBECCA SLAUGHTER, COMMISSIONER; ALVARO BEDOYA, COMMISSIONER; D.G. VAN CLIEF,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Texas (No. 5:21-cv-71)

## BRIEF OF THOROUGHBRED INDUSTRY PARTICIPANTS
## AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES

Gregory G. Garre
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-10520, *National Horsemen's Benevolent and Protective Association v. Black*

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to the persons and entities listed in Defendants-Appellees' Certificates of Interested Persons, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Amici Curiae:**

Shannon Arvin
Craig Bandoroff
Gary Barber
Jeffrey Berk
Breeders' Cup Ltd.
Donna Brothers
Mark Casse
Robert Clay
C. Steven Duncker
Terry Finley
Seth Walker Hancock Jr.
Fred W. Hertrich III
Ian Highet
Barry Irwin
Stuart S. Janney III
The Jockey Club
Anthony Manganaro
Christopher McCarron
Daniel Metzger
Chauncey O. Morris
J. Michael O'Farrell Jr.
Thomas J. Rooney

i

George Strawbridge
Vincent Viola

The Jockey Club has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Breeders' Cup Ltd. has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Counsel for Amici Curiae:**

Gregory G. Garre
Blake E. Stafford
LATHAM & WATKINS LLP

Dated:  August 11, 2023

_/s/ Gregory G. Garre_
Gregory G. Garre

*Attorney of record for Amici Curiae*

ii

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

TABLE OF AUTHORITIES ..................................................................................iv

INTEREST OF AMICI CURIAE..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ........................................................................................................6

    A.    HISA Substantially Improves The Regulatory Landscape For Thoroughbred Horseracing ................................................................6

    B.    The Authority Is A Private Entity Not Subject To Article II's Appointment And Removal Requirements ........................................12

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barry v. Barchi*,
443 U.S. 55 (1979)..........................................................................................8

*Buckley v. Valeo*,
424 U.S. 1 (1976)......................................................................................16, 17

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).......................................................................................8

*Financial Oversight & Managment Board for Puerto Rico
v. Aurelius Investment, LLC*,
140 S. Ct. 1649 (2020)..................................................................................13

*Flagg Brothers, Inc. v. Brooks*,
436 U.S. 149 (1978).....................................................................................18

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010).........................................................................12, 14, 18

*Freytag v. Commissioner*,
501 U.S. 868 (1991)................................................................................16, 17

*Hall v. Wisconsin*,
103 U.S. 5 (1880)..........................................................................................13

*Hamlin v. Government of Canal Zone ex rel. Parker*,
26 F.2d 161 (5th Cir. 1928) ..........................................................................13

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017).....................................................................18

*Jackson v. Metropolitan Edison Co.*,
419 U.S. 345 (1974).....................................................................................19

*Jamgotchian v. Kentucky Horse Racing Commission*,
488 S.W.3d 594 (Ky. 2016)............................................................................6

**Page(s)**

*Kerpen v. Metropolitan Washington Airports Authority*,
 907 F.3d 152 (4th Cir. 2018) ........................................................14, 15

*Lebron v. National Railroad Passenger Corp.*,
 513 U.S. 374 (1995)........................................................................14, 18

*Lucia v. SEC*,
 138 S. Ct. 2044 (2018)....................................................................13, 17

*Marsh v. Alabama*,
 326 U.S. 501 (1946)...............................................................................19

*Metcalf & Eddy v. Mitchell*,
 269 U.S. 514 (1926).................................................................................13

*National Horsemen's Benevolent & Protective Association
 v. Black*,
 53 F.4th 869 (5th Cir. 2022) ........................................3, 7, 12, 15, 20

*Nixon v. Condon*,
 286 U.S. 73 (1932).................................................................................19

*Oklahoma v. United States*,
 62 F.4th 221 (6th Cir. 2023) ................................................*passim*

*NB ex rel. Peacock v. District of Columbia*,
 794 F.3d 31 (D.C. Cir. 2015)................................................................19

*Rendell-Baker v. Kohn*,
 457 U.S. 830 (1982)...............................................................................20

*Riley v. St. Luke's Episcopal Hospital*,
 252 F.3d 749 (5th Cir. 2001) ................................................................14

*Rosborough v. Management & Training Corp.*,
 350 F.3d 459 (5th Cir. 2003) ................................................................19

*San Francisco Arts & Athletics, Inc. v. United States Olympic
 Commission*,
 483 U.S. 522 (1987)...............................................................................20

**Page(s)**

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ..................................................................15

*Terry v. Adams*,
    345 U.S. 461 (1953) ..................................................................19

*United States v. Hartwell*,
    73 U.S. (6 Wall.) 385 (1868) ...................................................13

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823) .........................................13

*United States v. McCrory*,
    91 F. 295 (5th Cir. 1899) .........................................................13

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

U.S. Const. art. II, § 2, cl. 2 ...............................................................12, 13

15 U.S.C. § 3051(4)-(8) ........................................................................3

15 U.S.C. § 3052(a) ...............................................................................9

15 U.S.C. § 3052(b)(1)...........................................................................9

15 U.S.C. § 3052(d) ..............................................................................15

15 U.S.C. § 3053 ....................................................................................9

15 U.S.C. § 3053(b)-(e) .......................................................................8, 9

15 U.S.C. § 3055 ....................................................................................9

15 U.S.C. § 3055(c)(1)............................................................................7

15 U.S.C. § 3056 ....................................................................................9

15 U.S.C. § 3056(b)(2)............................................................................8

15 U.S.C. § 3056(b)(4)............................................................................8

15 U.S.C. § 3057 ....................................................................................9

**Page(s)**

15 U.S.C. § 3057(b)(1)...................................................................................7

15 U.S.C. § 3057(c)(1)(B) .............................................................................8

15 U.S.C. § 3057(c)(2)...............................................................................8, 9

15 U.S.C. § 3057(c)(3)...................................................................................9

15 U.S.C. § 3057(d)(1)...................................................................................8

15 U.S.C. § 3058.......................................................................................8, 9

Pub. L. No. 116-260, §§ 1201-1212, 134 Stat. 1182, 3252-75 (2020)
   (codified as amended at 15 U.S.C. §§ 3051-3060)................................3

16 C.F.R. § 1.142(f) ..................................................................................8, 9

## LEGISTATIVE MATERIALS

166 Cong. Rec. H4981 (daily ed. Sept. 29, 2020) ...................................6, 7

*Legislation to Promote the Health and Safety of Racehorses:*
   *Hearing Before the Subcommittee on Consumer Protection &*
   *Commerce of the House Committee on Energy & Commerce,*
   116th Cong. (2020), https://bit.ly/3s3g4HY ......................................6, 7

H.R. Rep. No. 116-554 (2020).......................................................................6

## OTHER AUTHORITIES

*The Constitutional Separation of Powers Between the President and*
   *Congress,* 20 Op. O.L.C. 124 (1996)............................................16, 17

Jody Freeman, *The Private Role in the Public Governance,*
   75 N.Y.U. L. Rev. 543 (2000) .............................................................10

FTC, *Order Approving the Anti-Doping and Medication Control Rule*
   *Proposed by the Horseracing Integrity and Safety Authority*
   (Mar. 27, 2023), https://perma.cc/2SJ3-MBA9 ....................................11

**Page(s)**

FTC, *Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Authority's Rules* (Jan. 3, 2023), https://perma.cc/6NKY-DRUV ...................................................................11

*Horseracing Integrity and Safety Act: Anti-Doping and Medication Control Rule*, 88 Fed. Reg. 27,894 (May 3, 2023)................................11

Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 Stan. L. Rev. 443 (2018).......................................................13, 17

Douglas C. Michael, *Federal Agency Use of Audited Self-Regulation as a Regulatory Technique*, 47 Admin. L. Rev. 171 (1995) ...............10

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007)........................................16

Press Release, Horseracing Integrity & Safety Authority, *HISA Makes Significant Strides in First Year of Implementation* (July 11, 2023), https://bit.ly/3Qwv5wa .......................................................11

Press Release, National Thoroughbred Racing Association, *Thoroughbred Industry Reiterates Support of HISA* (July 12, 2023), https://bit.ly/3qjYcrZ .......................................................11

## INTEREST OF AMICI CURIAE[1]

Amici curiae are owners, breeders, trainers, jockeys, and other participants in the Thoroughbred horseracing industry. With decades of collective experience among them, amici have had the privilege of working with some of the finest Thoroughbreds in the world, often at the pinnacle of the sport. While amici's connections to Thoroughbred horseracing are diverse, they all share an unyielding commitment to the sport's integrity and continued success—including the health and safety of the horses on which the sport depends. Amici are as follows:

- **Shannon Arvin**, President and CEO, Keeneland Association.

- **Craig Bandoroff**, Thoroughbred owner and breeder.

- **Gary Barber**, Thoroughbred owner and breeder.

- **Dr. Jeffrey Berk**, Thoroughbred veterinarian; former Chairman of the American Association of Equine Practitioners.

- **Breeders' Cup Ltd.**, operator of the Breeders' Cup World Championships series of Thoroughbred races.

- **Donna Brothers**, NBC Sports commentator; Thoroughbred jockey (retired).

- **Mark Casse**, Thoroughbred trainer; inductee of the U.S. National Museum of Racing Hall of Fame.

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity other than amici curiae and their counsel made a monetary contribution to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

- **Robert Clay**, Thoroughbred owner and breeder.

- **C. Steven Duncker**, Thoroughbred owner and breeder.

- **Terry Finley**, Thoroughbred owner and breeder.

- **Seth Walker Hancock Jr.**, Thoroughbred owner and breeder.

- **Fred W. Hertrich III**, Thoroughbred owner and breeder.

- **Ian Highet**, Thoroughbred owner and breeder.

- **Barry Irwin**, Thoroughbred owner and breeder.

- **Stuart S. Janney III**, Chairman, The Jockey Club; Thoroughbred owner and breeder.

- **The Jockey Club**, leading Thoroughbred breeding and racing organization in the United States.

- **Anthony Manganaro**, Thoroughbred owner and breeder.

- **Christopher McCarron**, Thoroughbred jockey (retired); inductee of the U.S. National Museum of Racing Hall of Fame.

- **Daniel Metzger**, President, Thoroughbred Owners and Breeders Association.

- **Chauncey O. Morris**, Executive Director, Kentucky Thoroughbred Association.

- **J. Michael O'Farrell Jr.**, Thoroughbred owner and breeder.

- **Thomas J. Rooney**, President and CEO, National Thoroughbred Racing Association; former member of the U.S. House of Representatives (2009-2019).

- **George Strawbridge**, Thoroughbred owner and breeder.

- **Vincent Viola**, Thoroughbred owner and breeder.

2

In this case, the Court is being asked to resolve constitutional challenges to the Horseracing Integrity and Safety Act of 2020, Pub. L. No. 116-260, §§ 1201-1212, 134 Stat. 1182, 3252-75 (2020) (codified as amended at 15 U.S.C. §§ 3051-3060) (HISA or Act). Because amici have been "engaged in the care, training, or racing of" "Thoroughbred horse[s]," 15 U.S.C. § 3051(4)-(8), they have a substantial interest in the Court's resolution of HISA's constitutionality.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In an era marked by legislative gridlock, HISA truly stands out. Passed with bipartisan support in Congress and signed into law by the President in 2020, HISA reflects a landmark achievement for the sport of Thoroughbred horseracing, bringing nationwide regulatory reform to a national sport that desperately needs it. And when this Court concluded that HISA impermissibly gave a "private entity" (the Horseracing Integrity and Safety Authority) the "final word on the substance of the rules," *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 887 (5th Cir. 2022), the political branches swiftly responded: Congress passed and the President signed an amendment to HISA making clear that the federal agency charged with executing HISA's regime—the Federal Trade Commission—has the final word. This type of "constructive exchange[]" among the branches of the federal government is "anticipate[d]" by the Constitution. *Oklahoma v. United*

3

*States*, 62 F.4th 221, 225 (6th Cir. 2023).  But it is rarely achieved in today's political climate.

Congress's alacrity with respect to this legislation is a testament to its importance to the Thoroughbred horseracing industry.  Before HISA, Thoroughbred horseracing was a national sport laboring under a patchwork of state-by-state regulations governing medication control and racetrack safety.  As amici have previously detailed, that patchwork was unsustainable.  *See* 30 Thoroughbred Industry Participants Amici Br. 10-17, *Black*, *supra* (No. 22-10387), 2022 WL 3227824 (2022 Industry Participants Br.).  Not only did it leave industry participants at the mercy of arcane and often conflicting regulations passed by 38 different racing jurisdictions, but it prevented an industry-wide response to a series of highly publicized controversies that threatened to tarnish the sport's reputation.

HISA addresses that Balkanized situation by calling for nationally uniform medication-control and racetrack-safety regulations to be promulgated and enforced by the FTC.  HISA also tasks the Authority—a private entity composed of well-respected experts and industry leaders—with proposing those rules and liaising with industry participants.  And after just one year of implementation, the industry is already starting to reap the benefits of this regime.

Nevertheless, the three sets of Plaintiffs in this appeal continue to oppose the Authority's role in this scheme, although they cannot even agree on why.  To the

contrary, they have asserted constitutional objections that are "fundamentally incompatible" with one another. NHBPA Br. 14. NHBPA and Texas still believe that, despite the recent amendment to HISA, the Authority's involvement as a private entity violates the private non-delegation doctrine. As explained by Defendants and Chief Judge Sutton for a unanimous Sixth Circuit panel, these arguments are unavailing in light of the amendment. *See* Authority Br. 18-35; FTC Br. 17-37; *Oklahoma*, 62 F.4th at 228-33. Amici do not belabor those points here.

Gulf Coast, by contrast, offers a novel theory, claiming that the Authority is in fact *not* a private entity; it is a federal entity whose members are "Officers of the United States" subject to Article II's appointment and removal requirements. This attempt to contradict this Court's prior decision and expand the scope of the federal government is groundless. The Authority is a private entity—it was not created by the federal government, and it is not controlled by the federal government. Its members are thus not part of the federal government. As a result, under the constitutional text as well as binding precedent, Article II's constraints do not apply. Although Gulf Coast and its amici search for ways around that straightforward conclusion, their efforts go nowhere. This argument, like the others offered by Plaintiffs, provides no basis for upending this widely supported legislation. The district court correctly rejected it, and its judgment should be affirmed.

## ARGUMENT

### A.    HISA Substantially Improves The Regulatory Landscape For Thoroughbred Horseracing

1.    "[U]niquely among the country's major sports," Thoroughbred horseracing has historically lacked a "uniform" set of national regulations. *Jamgotchian v. Kentucky Horse Racing Comm'n*, 488 S.W.3d 594, 616 (Ky. 2016). Instead, major aspects of Thoroughbred horseracing—including medication usage and racetrack safety—were "regulated independently by each of the 38 States in which the sport is legal." H.R. Rep. No. 116-554, at 18-19 (2020). Without a national regulatory body, this national sport labored under a "patchwork of conflicting and inconsistent State-based rules governing prohibited substances, lab accreditation, testing, and penalties for violations." 166 Cong. Rec. H4982 (daily ed. Sept. 29, 2020) (statement of Rep. Barr).

This patchwork left industry participants to navigate an opaque and frequently unfair regulatory minefield as their horses traveled across the country from race to race. Particularly with respect to the regulation of medications and other substances, the States simply could not agree on basic questions about whether and how to regulate the use of certain substances. *See* 2022 Industry Participants Br. 10-17. Industry participants who "ship[ped] horses across state lines" were forced to expend significant time and energy merely to avoid "running afoul of another state's arcane"—and often unpredictable—"doping requirements." *Legislation to Promote*

6

*the Health and Safety of Racehorses: Hearing Before the Subcomm. on Consumer Prot. & Com. of the H. Comm. on Energy & Com.*, 116th Cong. 31 (2020) (*2020 House Hearing*) (statement of Joe De Francis, Chairman, National Horseracing Advisory Council of the Humane Society of the United States), https://bit.ly/3s3g4HY. And the regulatory patchwork made it virtually impossible for the industry to quickly and effectively respond to a series of highly publicized, national controversies involving "doping scandals and racetrack fatalities." *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 873 (5th Cir. 2022); *see* 2022 Industry Participants Br. 4-5. Ultimately, without uniform regulation, the sport of Thoroughbred horseracing—a centuries-old tradition enjoyed by equine enthusiasts across the country—faced an "existential threat." *2020 House Hearing* 16 (statement of William M. Lear, Jr., Vice Chairman, The Jockey Club).

2.    Enter HISA. Enacted with bipartisan support in Congress and "the support of the overwhelming majority of . . . the horseracing industry," 166 Cong. Rec. H4981 (daily ed. Sept. 29, 2020) (statement of Rep. Tonko), HISA ushers in a regulatory regime helmed by the FTC that provides much-needed centralization and uniformity in medication-control and racetrack-safety governance. Specifically, HISA calls for "uniform standards" regarding medications, 15 U.S.C. § 3055(c)(1); uniform standards regarding testing protocols and laboratory accreditation, *id.*

7

§ 3057(b)(1); and a "uniform set" of standards regarding "training and racing safety" and "track safety," *id.* § 3056(b)(2), (b)(4). These standards are promulgated through a uniform rulemaking process. *Id.* § 3053(b). And as to enforcement, HISA requires the creation of a uniform "disciplinary process" for enforcing "safety, performance, and anti-doping and medication control rule[s]," *id.* § 3057(c)(1)(B); uniform rules within the enforcement proceedings, *id.* § 3057(c)(2); "uniform rules" regarding "sanctions," *id.* § 3057(d)(1); and a uniform review process, *id.* § 3058. This uniformity eliminates much of the unfairness and unpredictability inherent in the state-by-state regulatory approach to horseracing.

HISA also dramatically improves the due process protections afforded to regulated parties. Those improvements begin with the uniformity described above, which promotes nationwide clarity and consistency—two fundamental pillars of due process. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). And HISA installs several "procedural mechanism[s]" that safeguard the due process rights of regulated parties. *Barry v. Barchi*, 443 U.S. 55, 68 (1979). To begin, HISA provides interested parties multiple opportunities to comment on proposed rules. *See* 15 U.S.C. § 3053(b); 16 C.F.R. § 1.142(f). With respect to enforcement, HISA requires "rules and process[es]" that guarantee "adequate due process, including impartial hearing officers or tribunals commensurate with the seriousness of the alleged safety, performance, or anti-doping and medication control rule violation

and the possible civil sanctions for such violation," 15 U.S.C. § 3057(c)(2)-(3), followed by multiple layers of review, *id.* § 3058.

To ensure widespread adoption of uniform standards and enrich the regulatory scheme with industry experience, HISA leverages the expertise of the Horseracing Integrity and Safety Authority, Inc.—a "private, independent, self-regulatory, nonprofit corporation." 15 U.S.C. § 3052(a). Incorporated in Delaware in September 2020, the Authority is a standard-setting body composed of both independent individuals and industry experts that represent various equine constituencies. *See id.* § 3052(b)(1); ROA.2711, 2733. Under HISA and the FTC's implementing regulations, the Authority is tasked with proposing draft rules to the FTC on racetrack-safety and medication-control matters following consultation with industry participants. *See* 15 U.S.C. §§ 3053, 3055-3057; 16 C.F.R. § 1.142(f). The Authority's role is completely "subordinate" to the FTC, which may adopt the Authority's proposals (or not) after conducting its own notice-and-comment proceedings. *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023); *see* 15 U.S.C. § 3053(b)-(e). Thus, rather than acting as a regulator, the Authority simply lends its technical expertise and on-the-ground experience to the regulatory process, enabling the actual regulating entity—the FTC—to more swiftly and intelligently respond to the issues facing the horseracing industry.

9

This type of public-private relationship—modeled on the longstanding relationship between the SEC and private, self-regulatory organizations such as FINRA, *see Oklahoma*, 62 F.4th at 229—has several important benefits. For instance, because private entities like the Authority "are by their nature composed of individuals or groups with an interest in and knowledge of the subject area around which they are organized," they offer "useful repositories of expertise to which government regulators can turn" without having to inefficiently reproduce that expertise within the agency itself. Douglas C. Michael, *Federal Agency Use of Audited Self-Regulation as a Regulatory Technique*, 47 Admin. L. Rev. 171, 181-82 (1995).

Moreover, giving industry experts a role in the regulatory apparatus provides "greater incentives for compliance," as industry participants have more faith that the rules they must follow are reasonably "tailored to the conditions of the particular industry" in a way that will not "impair[] or oppose[]" their goals but to enhance them. *Id.* at 183-84; *see* Jody Freeman, *The Private Role in the Public Governance*, 75 N.Y.U. L. Rev. 543, 652 (2000). And private, industry-specific entities are especially well-equipped to perceive and study "subtle changes" in the industry that may warrant regulatory action. Michael, *supra*, at 182.

3. In its first year of implementation, HISA is on track to restore Thoroughbred horseracing's once-celebrated reputation. The FTC has approved

10

several regulations proposed by the Authority that establish—for the first time ever—a national, uniform regulatory regime governing racetrack safety and anti-doping and medication control.[2]  And the Authority has set up the infrastructure necessary for this regime to operate smoothly while also implementing tools to keep up with developments in the sport, including multiple databases to capture nationwide health and safety data for horses and jockeys, science-informed health and safety protocols grounded in national data, and an array of online and on-the-track initiatives designed to facilitate an open dialogue with industry participants. *See* Press Release, Horseracing Integrity & Safety Auth., *HISA Makes Significant Strides in First Year of Implementation* (July 11, 2023), https://bit.ly/3Qwv5wa.

Given the widespread success of HISA's first year, it is no surprise that the legislation continues to enjoy widespread industry support.  *See* Press Release, Nat'l Thoroughbred Racing Ass'n, *Thoroughbred Industry Reiterates Support of HISA* (July 12, 2023), https://bit.ly/3qjYcrZ.

---

[2]  *See Horseracing Integrity and Safety Act: Anti-Doping and Medication Control Rule*, 88 Fed. Reg. 27,894 (May 3, 2023); FTC, *Order Approving the Anti-Doping and Medication Control Rule Proposed by the Horseracing Integrity and Safety Authority* (Mar. 27, 2023), https://perma.cc/2SJ3-MBA9; FTC, *Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Authority's Rules* (Jan. 3, 2023), https://perma.cc/6NKY-DRUV.

**B.      The Authority Is A Private Entity Not Subject To Article II's Appointment And Removal Requirements**

The three sets of Plaintiffs in this case nevertheless continue their crusade to unravel this legislation.  As noted above, amici agree with Defendants that NHBPA's and Texas's non-delegation arguments are no longer viable in the wake of HISA's amendment.  *See supra* at 5.  This brief focuses on the novel argument advanced by the Gulf Coast plaintiffs, which contend that—although this Court referred to the Authority as a "*private* entity" dozens of times in the course of applying the "*private* non-delegation*" doctrine, *Black*, 53 F.4th at 872-90 (emphasis added)—the Authority "is in fact not private" at all and, as a result, is subject to Article II's appointment and removal requirements.  Gulf Coast Br. 35.  Amici supporting Gulf Coast take an even more radical position, arguing that the Authority is subject to Article II's constraints regardless of whether it is "private."  Reason Found. et al. Amici Br. 4 (Reason Br.).  These novel arguments are meritless.

1.      The Appointments Clause applies to "Officers of the United States" holding offices "established by Law."  U.S. Const. art. II, § 2, cl. 2.  And the Article II removal power is similarly limited to "executive officers," whom the President is "empower[ed]" to hold "accountabl[e] by removing them from office."  *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

Whatever the reach of Article II's requirements, one thing is clear—members of private entities are not "Officers of the United States."  Since the days of Chief

Justice Marshall, an "officer" has been understood to mean a person "who performs the duties of [an] office," *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.), and "[a]n office is a public station, or employment, conferred by the appointment of government," *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868).[3]  The rest of the phrase—"of the United States"—is "a descriptive phrase indicating that the officers are federal, and not state or private, actors."  Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 Stan. L. Rev. 443, 471 (2018); *see Financial Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1658 (2020) (distinguishing between "federal officers" and "nonfederal officers"); *Lucia v. SEC*, 138 S. Ct. 2044, 2056 (2018) (Thomas, J., concurring) (noting that "the phrase 'of the United States' was merely a synonym for 'federal'").  An "Officer *of the United States*," U.S. Const. art. II, § 2, cl. 2 (emphasis added), is thus a person who, "at a minimum," performs duties in "a continuing and formalized relationship of employment *with the United States*

---

[3]  *Hartwell*'s description of an "office" has been reiterated in several decisions by the Supreme Court and this Court.  *See, e.g.*, *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926); *Hall v. Wisconsin*, 103 U.S. 5, 7 (1880); *Hamlin v. Government of Canal Zone ex rel. Parker*, 26 F.2d 161, 163 (5th Cir. 1928); *United States v. McCrory*, 91 F. 295, 296 (5th Cir. 1899).  And it reflects the Founding-era understanding of that term.  *See* Jennifer L. Mascott, *Who Are 'Officers of the United States'?*, 70 Stan. L. Rev. 443, 485 (2018) ("Founding-era dictionaries and commentaries suggest than an 'officer' was a public official responsible for a governmental duty of any level of significance.").

Government," *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc) (emphasis added).

The threshold question for determining whether the Authority's members are "Officers of the United States" is therefore determining whether the Authority itself "is 'part of the [United States] Government.'" *Free Enter. Fund*, 561 U.S. at 486 (quoting *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)). And as *Free Enterprise Fund* confirms, the proper test for making that determination is set forth in *Lebron*. There, the Supreme Court explained that an entity is properly deemed "part of the Government" if it is (1) "created" by the federal government through a federal statute, and (2) "controlled" by "federal governmental appointees." *Lebron*, 513 U.S. at 397-98. Such "Government-created, Government-appointed" entities are distinct from "private self-regulatory organizations"—only the former are "'part of the Government' for constitutional purposes," including for purposes of Article II's requirements. *Free Enter. Fund*, 561 U.S. at 484-86 (quoting *Lebron*, 513 U.S. at 397); *see also, e.g.*, *Kerpen v. Metropolitan Wash. Airports Auth.*, 907 F.3d 152, 158-59 (4th Cir. 2018) (Wilkinson, J.) (explaining that "[o]nly those entities that satisfy both conditions [from *Lebron*] may be considered federal entities" subject to the Appointments Clause).

Under this test, the Authority is plainly not part of the federal government. The Authority was not "created by the government"; it is a "private corporation

14

incorporated under Delaware law." ROA.2733. Nor is the Authority controlled by "'governmental appointees'"; the Authority's directors are appointed by the Authority itself. ROA.2732-33; *see* 15 U.S.C. § 3052(d).[4] Gulf Coast's "failure to meet the threshold of establishing [the Authority] as a federal entity" under *Lebron* is "fatal" to its "Appointments Clause" and removability claims. *Kerpen*, 907 F.3d at 160.

2.      Rather than follow *Lebron*, Gulf Coast claims that the proper test is whether the Authority "exercises government power" as opposed to "private" power—if the Authority's actions are not "private acts that anyone can do," then it "is in fact not private" and Article II's requirements apply, "full stop." Gulf Coast Br. 6, 32-35.

This theory is impossible to reconcile with the private non-delegation doctrine, which rests on the premise that "a *private* entity may wield government power" as long as "it 'function[s] subordinately' to an agency with 'authority and surveillance' over it." *Black*, 53 F.4th at 881 (emphasis added) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). These cases do not

---

[4]   In suggesting that this element is "[e]ntirely circular," Gulf Coast conflates two concepts: (1) determining whether an entity is controlled by individuals who "are in fact appointed" by the government, and (2) determining whether those federally appointed individuals "must be appointed" pursuant to the Appointments Clause. Gulf Coast Br. 6, 36 (emphasis omitted). The first inquiry is a logical predicate to the second.

suggest that a private entity ceases to be private in that context, and they certainly do not suggest that directors of such entities become "Officers of the United States" for purposes of Article II. Gulf Coast's argument confuses non-delegation questions for Appointments Clause questions—the very "confusi[on]" addressed by the Department of Justice's Office of Legal Counsel more than 25 years ago. *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 145-47 & nn.60, 62 (1996).[5]

To support its argument, Gulf Coast primarily relies (Br. 31-32, 39) on *Buckley v. Valeo*, 424 U.S. 1 (1976), and two of its progeny, *Lucia* and *Freytag v. Commissioner*, 501 U.S. 868 (1991). Indeed, amici supporting Gulf Coast contend that the entire inquiry should be "governed" by the "simple test" from *Buckley*, under which "Officers of the United States are those who 'exercis[e] significant authority pursuant to the laws of the United States.'" Reason Br. 4, 7 (alteration in original) (quoting *Buckley*, 424 U.S. at 126).

---

[5] The 2007 OLC opinion cited by Gulf Coast (Br. 28), by contrast, "does not address" or account for the private non-delegation doctrine at all. *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 76 n.1 (2007). That opinion also takes the view that entities possessing "advisory, investigative, [or] informative" powers "do not actually have delegated sovereign authority" if their actions "assist the government" and "have no legal effect on third parties or the government absent subsequent sanction." *Id.* at 98. That would be an apt description of the Authority, which "operates as an aid to the FTC," "subject to [its] pervasive surveillance and authority." *Oklahoma*, 62 F.4th at 231 (citation and internal alterations omitted).

*Buckley*'s "significant authority" test is anything but simple; it is, in fact, infamously "tough to apply." Mascott, *supra*, at 459-60. What *is* simple is the fact that *Buckley* is irrelevant to this case: The test articulated in *Buckley* (and applied in *Freytag* and *Lucia*) is explicitly cabined to determining the officer status of federal government personnel—i.e., federal "*appointee*[*s*] exercising significant authority pursuant to the laws of the United States." 424 U.S. at 126 (emphasis added). Thus, *Buckley*'s "significant authority" test serves to distinguish between "Officers of the United States" and the "non-officer" "employees of the Federal Government" who are "part of the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley*, 424 U.S. at 126 n.162); *see Freytag*, 501 U.S. at 880-81 (applying *Buckley* to distinguish between "Officers" and "employees" of the federal government). The Supreme Court has accordingly applied it only in cases involving indisputably federal personnel, such as the commissioners of the Federal Election Commission, *Buckley*, 424 U.S. at 124-26; the administrative law judges of the SEC, *Lucia*, 138 S. Ct. at 2051; and the special trial judges of the United States Tax Court, *Freytag*, 501 U.S. at 878.

When it comes to "non-federal actors," however, *Buckley*'s test "simply is not implicated," no matter how "significant" their supposed authority. *Separation of Powers*, 20 Op. O.L.C. at 145. Indeed, that is precisely why the Supreme Court in *Free Enterprise Fund* referenced *Buckley*'s "'significant authority'" test only *after*

17

observing that the Public Company Accounting Oversight Board itself was "'part of the Government' for constitutional purposes" under *Lebron*. *Free Enter. Fund*, 561 U.S. at 485-86 (citations omitted).

3.     Amici supporting Gulf Coast also point to cases considering whether "a private party's acts" amount to "state action," focusing on cases "where a private party has exercised 'powers traditionally exclusively reserved to the [government].'" Reason Br. 17-24 (alteration in original) (citation omitted).   These cases are inapposite here.

For starters, the state action doctrine has not been raised by Gulf Coast in this case.  Rather than arguing that a private entity's actions "are properly attributable" to the federal government, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978), Gulf Coast's position is that the Authority *is* the federal government.  *See* Gulf Coast Br. 65 ("Congress created a new regulatory agency that it pretended was a private nonprofit corporation.").  Because Gulf Coast's claim "is based on [its] contention that [the Authority] 'is not a private entity but Government itself,'" the Court "need not 'traverse the difficult terrain' of the state action doctrine." *Herron v. Fannie Mae*, 861 F.3d 160, 167 (D.C. Cir. 2017) (internal alteration omitted) (quoting *Lebron*, 513 U.S. at 378).

Gulf Coast has likely avoided the state action doctrine because it does not fit the Article II claims here.  The state action doctrine focuses on a private entity's

18

"particular conduct" to determine whether that "conduct is 'private'" or instead "'state action'" governed by certain constitutional provisions.  *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349-50 (1974) (citation omitted).  But the entities themselves are still private, so their officers and directors remain outside the scope of Article II's appointment and removal restrictions.  Thus, for example, when the D.C. Circuit held that Xerox's administration of Medicaid amounted to "state action for due process purposes," *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 43 (D.C. Cir. 2015), that holding did not transform Xerox into an agency of the United States, such that the company's board members and officers had to be constitutionally appointed and removable.[6]

Applying the conduct-specific state action doctrine in this context would be entirely unworkable, as it would require a private entity's directors to be appointed and removable by the federal government for some actions but not others.  Nothing

---

[6]  The same would be true for the examples cited by amici, although these examples are even further afield as they involve private entities engaged in state action *as a State*, not the federal government.  Reason Br. 23-24 (citing *Nixon v. Condon*, 286 U.S. 73, 84 (1932) (state political parties); *Terry v. Adams*, 345 U.S. 461, 468-70 (1953) (same); *Marsh v. Alabama*, 326 U.S. 501, 504-07 (1946) (municipal corporations); *Rosborough v. Management & Training Corp.*, 350 F.3d 459, 460-61 (5th Cir. 2003) (state private prison firm)).  But the same principle would apply:  Concluding, for instance, that a "private company" is engaged in state action when it "administer[s]" a "corrections facility," *Rosborough*, 350 F.3d at 461, would not transform that private entity into a federal agency whose directors are subject to Article II's appointment and removal requirements.

in law or logic compels that result. The Constitution's appointments and removal requirements do not switch on and off depending on whether a private party's conduct qualifies as state action. An entity is either subject to Article II's constraints (because it is a federal government entity), or it is not (because it is a private entity). And the proper test for making that determination is *Lebron*.

Finally, even if the state action doctrine were relevant here, the Authority's conduct would not necessarily satisfy the supposedly "relevant test" identified by Gulf Coast's amici. Reason Br. 22-24. Under that test, the question is whether "the challenged entity performs functions that have been 'traditionally the *exclusive* prerogative' of the Federal Government." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544-45 (1987) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)). Until HISA's enactment in 2020, however, Thoroughbred "horseracing [was] regulated by the States, local communities, and private organizations"—not the federal government. *Black*, 53 F.4th at 873. Thus, while the amici joining this brief do not take a position on whether the Authority's conduct may qualify as state action in other constitutional contexts, the fact that Gulf Coast's amici misstate their own test is yet another reason to disregard that test here.

\* \* \* \* \*

HISA is proof that "[s]ometimes government works." *Oklahoma*, 62 F.4th at 225. This legislation is the culmination of a widely supported, bipartisan effort to

20

bring national uniformity and transparency to the national sport of Thoroughbred horseracing, and Congress has taken great care to ensure that the regulatory scheme is constitutionally sound. If the first year of HISA's implementation is any indication, the sport is stronger, and will survive, as a result. Plaintiffs' persistent attempts to dismantle HISA are meritless, and this Court should reject them.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: August 11, 2023

Respectfully submitted,

/s/ Gregory G. Garre
Gregory G. Garre
Blake E. Stafford
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

*Counsel for Amici Curiae*

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, the foregoing brief was electronically filed with the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system.  All parties represented by registered CM/ECF users will be served by the CM/ECF system.

/s/ Gregory G. Garre
Gregory G. Garre

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to Rule 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to Rule 25.2.1; and (iii) the document has been scanned for viruses using Microsoft Defender and is free of viruses.

Dated:  August 11, 2023

/s/ Gregory G. Garre
Gregory G. Garre

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,729 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  August 11, 2023                          */s/ Gregory G. Garre*
                                                                  Gregory G. Garre