## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; PENNSYLVANIA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; WASHINGTON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; GULF COAST RACING, L.L.C.; LRP GROUP, LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING LSP, L.L.C.; TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.,

*Plaintiffs-Appellants,*

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs-Appellants,*

*v.*

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH SCHANZER; HORSERACING INTEGRITY AND SAFETY AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE WILSON; LISA LAZARUS; STEVE BESHEAR; ADOLPHO BIRCH; ELLEN MCCLAIN; CHARLES SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER; BILL THOMASON; LINA KHAN, CHAIR; REBECCA SLAUGHTER, COMMISSIONER; ALVARO BEDOYA, COMMISSIONER; D. G. VAN CLIEF,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of Texas, Consol. No. 5:21-cv-71

## AUTHORITY DEFENDANTS-APPELLEES' MOTION TO STAY MANDATE PENDING DISPOSITION OF PETITION FOR WRIT OF CERTIORARI

John C. Roach
RANSDELL ROACH & ROYSE, PLLC
176 Pasadena Drive, Building One
Lexington, KY 40503
859-276-6262

Pratik A. Shah
Lide E. Paterno
AKIN GUMP STRAUSS
  HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
202-887-4000
pshah@akingump.com

*Counsel for Authority Defendants-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

No. 23-10520, *National Horsemen's Benevolent and Protective Association v. Black*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## Plaintiffs-Appellants

National Horsemen's Benevolent and Protective Association
Arizona Horsemen's Benevolent and Protective Association
Arkansas Horsemen's Benevolent and Protective Association
Indiana Horsemen's Benevolent and Protective Association
Illinois Horsemen's Benevolent and Protective Association
Louisiana Horsemen's Benevolent and Protective Association
Mountaineer Park Horsemen's Benevolent and Protective Association
Nebraska Horsemen's Benevolent and Protective Association
Oklahoma Horsemen's Benevolent and Protective Association
Oregon Horsemen's Benevolent and Protective Association
Pennsylvania Horsemen's Benevolent and Protective Association
Washington Horsemen's Benevolent and Protective Association
Tampa Bay Horsemen's Benevolent and Protective Association

Gulf Coast Racing LLC
LRP Group Ltd.
Valle de Los Tesoros Ltd.
Global Gaming LSP LLC
Texas Horsemen's Partnership LLP

## Counsel for Plaintiffs-Appellants

Fernando M. Bustos
BUSTOS LAW FIRM, P.C.

Brian K. Kelsey
Reilly Stephens
Jeffrey D. Jennings
LIBERTY JUSTICE CENTER

Daniel R. Suhr (previously with Liberty Justice Center)
NATIONAL CENTER FOR JUSTICE & LIBERTY

Gregory Philip Sapire
Carlos R. Soltero
Stewart R. Jordan
MAYNARD NEXSEN

Autum L. Flores
UNDERWOOD LAW FIRM PC

Ilan Wurman
ARIZONA STATE UNIVERSITY
TULLY BAILEY LLP

Kayla D. Carrick
SOLTERO SAPIRE MURRELL PLLC

**Intervenor Plaintiffs-Appellants**

State of Texas
Texas Racing Commission

**Counsel for Intervenor Plaintiffs-Appellants**

Taylor K. Gifford
Lanora C. Pettit
Beth E. Klusmann
William F. Cole
OFFICE OF THE ATTORNEY GENERAL

Virginia Smith Fields
TEXAS RACING COMMISSION

**Authority Defendants-Appellees**

Jerry Black
Horseracing Integrity and Safety Authority, Inc.
Lisa Lazarus
Steve Beshear
Adolpho Birch
Leonard Coleman
Ellen McClain
Charles Scheeler
Joseph DeFrancis
Susan Stover
Bill Thomason
D.G. Van Clief
Katrina Adams
Nancy Cox
Joseph Dunford
Frank Keating
Kenneth Schanzer

**Counsel for Authority Defendants-Appellees**

Pratik A. Shah
Lide E. Paterno
Brennan H. Meier
AKIN GUMP STRAUSS HAUER & FELD LLP

John C. Roach
David T. Royse
RANSDELL ROACH & ROYSE, PLLC

Benjamin D. Doyle
STOCKARD JOHNSTON BROWN & NETARDUS PC

**Federal Defendants-Appellees**

Federal Trade Commission
Commissioner Rebecca Kelly Slaughter
Former Commissioner Noah Phillips
Former Commissioner Christine Wilson

Chair Lina Khan
Commissioner Alvaro Bedoya

**Counsel for Federal Defendants-Appellees**

Brian Boynton
Leigha Simonton
Mark B. Stern
Alexander V. Sverdlov
Joseph F. Busa
Courtney L. Dixon
Brian W. Stoltz
Stephen Ehrlich
Michael Shih
Caroline W. Tan
U.S. DEPARTMENT OF JUSTICE

<u>*s/ Pratik A. Shah*</u>
Pratik A. Shah

*Counsel for Authority*
*Defendants-Appellees*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................................................i

TABLE OF AUTHORITIES.......................................................................................vi

INTRODUCTION ........................................................................................................1

STATEMENT................................................................................................................2

ARGUMENT .................................................................................................................5

    I.      THERE IS A REASONABLE PROBABILITY THE SUPREME
             COURT WILL GRANT CERTIORARI .................................................6

    II.     THERE IS A FAIR PROSPECT THE SUPREME COURT WILL
             REVERSE THE JUDGMENT .............................................................10

    III.    DEFENDANTS AND THE PUBLIC INTEREST WILL
             SUFFER IRREPARABLE HARM ABSENT A STAY.......................17

CONCLUSION............................................................................................................24

CERTIFICATE OF SERVICE ...................................................................................25

CERTIFICATE OF COMPLIANCE ..........................................................................26

ADDENDUM

Exhibit 1:    Declaration of Lisa Lazarus (Sept. 16, 2024)

Exhibit 2:    Slip Op., *National Horsemen's Benevolent & Protective Assoc. v. Black*,
             No. 23-10520 (5th Cir. July 5, 2024)

# TABLE OF AUTHORITIES

C<small>ASES</small>:

*Allen v. Cooper*,
  589 U.S. 248 (2020) ............................................................. 6

*Baldwin v. Maggio*,
  715 F.2d 152 (5th Cir. 1983) .............................................. 5

*California v. American Stores Co.*,
  492 U.S. 1301 (1989) ......................................................... 10

*Campaign for S. Equality v. Bryant*,
  773 F.3d 55 (5th Cir. 2014) .............................................. 21

*Commissioner v. Bilder*,
  369 U.S. 499 (1962) ........................................................... 9

*Department of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ....................................................... 23

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ........................................................... 5

*In re Calhoun*,
  No. 9430, 2024 WL 2724039 (F.T.C. May 21, 2024) ..................... 12

*Louisiana v. Horseracing Integrity & Safety Auth.*,
  No. 6:22-cv-01934, 2023 WL 6063813 (W.D. La. Sept. 13, 2023) ............... 23

*Maricopa Cnty. v. Lopez-Valenzuela*,
  574 U.S. 1006 (2014) ......................................................... 6

*Moody v. NetChoice*,
  144 S. Ct. 2383 (2024) ............................................. 9, 11, 14

*National Ass'n of Secs. Dealers v. SEC*,
  431 F.3d 803 (D.C. Cir. 2005) ........................................ 10

*National Horsemen's Benevolent & Protective Ass'n v. Black*,
  53 F.4th 869 (5th Cir. 2022) ............................... 3, 4, 13, 17

*Oklahoma v. United States*,
62 F.4th 221 (6th Cir. 2023) .........................................................................*passim*

*Rostker v. Goldberg*,
453 U.S. 57 (1981)..........................................................................7

*Texas v. Commissioner*,
142 S. Ct. 1308 (2022)...................................................................8

*Trump v. Hawaii*,
585 U.S. 667 (2018).....................................................................23

*United States v. Rahimi*,
144 S. Ct. 1889 (2024).................................................11, 12, 13, 16

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) .......................................................23

*Walters v. National Ass'n of Radiation Survivors*,
468 U.S. 1323 (1984)...................................................................24

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008).....................................................................11

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952).....................................................................23

## STATUTES:

7 U.S.C.
§ 21(h)........................................................................................10
§ 21(i).........................................................................................10
§ 21(j).........................................................................................10
§ 21(k)........................................................................................10

15 U.S.C.

§ 43 .................................................................................15
§ 45 .................................................................................15
§ 46 .................................................................................15
§ 49 .................................................................................15
§ 53 .................................................................................15
§ 57b ...............................................................................15
§ 78s(c) ...........................................................................10
§ 78s(d) ...........................................................................10
§ 78s(e) ...........................................................................10
§ 3053(a) .....................................................................3, 13
§ 3053(b) .....................................................................3, 13
§ 3053(c) .....................................................................3, 13
§ 3053(d) .....................................................................3, 13
§ 3053(e) ................................................................*passim*
§ 3054(a) .........................................................................15
§ 3054(b) .........................................................................15
§ 3054(c)(2) .................................................................3, 13
§ 3054(d)(3) .....................................................................15
§ 3054(h) .........................................................................12
§ 3054(j)(1) ......................................................................12
§ 3054(k)(2)(A) .................................................................15
§ 3057(a) .........................................................................13
§ 3057(d) .........................................................................13
§ 3058 ..............................................................................16
§ 3058(b) .....................................................................3, 13
§ 3058(c) .....................................................................3, 13

16 U.S.C.

§ 824*o*(d) .........................................................................10
§ 824*o*(e) .........................................................................10
§ 824*o*(f) ..........................................................................10

**OTHER AUTHORITIES:**

166 CONG. REC. S5514 (Sept. 9, 2020).........................................2

88 Fed. Reg. 18,034 (Mar. 27, 2023).........................................14

FED. R. APP. P. 41(d)(1) ..................................................5, 17

FTC, *Disapproval Order* (Dec. 12, 2022), ................................................9

Hughes, Alicia, *HISA Claiming Rules Bring Horses Consistent
  Protection*, BLOODHORSE (Mar. 11, 2024) ......................................19

Interview of Daniel Suhr, *At the Races with Steve Byk* (July 9, 2024)...............6, 20

Perez, Joe, *Panelists Discuss Impact of HISA on Veterinarians*,
  BLOODHORSE (June 25, 2024)......................................................18, 20

Ross, Dan, *Lucinda Finley Q&A on the Fifth Circuit Bombshell*,
  THOROUGHBRED DAILY NEWS (July 7, 2024)......................................21

SHAPIRO, SUPREME COUT PRACTICE § 4.3 (11th ed. 2019) ......................................7

SUP. CT. R.
  10(a) ................................................................................7
  10(c) ................................................................................8

*Thoroughbred Industry Reiterates Support of HISA*, PAST THE WIRE
  (July 13, 2023) ................................................................................19

Voss, Natalie, *Second Quarter Statistics Reinforce Reality That
  Thoroughbred Racing Fatalities Are Rare – And They're Rarer At
  Tracks Regulated By HISA*, PAULICK REPORT (July 25, 2024), ..................17, 18

**INTRODUCTION**

After high-profile equine deaths and corruption scandals threatened horseracing under the prior patchwork of state-by-state regulation, the federal Horseracing Integrity and Safety Act (HISA) has cut the fatality rate in half and stabilized the sport. Two administrations have supported HISA and two bipartisan Congresses have embraced it—including through an amendment that fortified Federal Trade Commission (FTC) oversight of the private Horseracing Integrity and Safety Authority (Authority). The "constructive exchanges between Congress and the federal courts" that gave rise to that amendment prompted Chief Judge Sutton to observe on behalf of a unanimous Sixth Circuit that "[s]ometimes government works." *Oklahoma v. United States*, 62 F.4th 221, 225 (6th Cir. 2023).

Every other federal court that has resolved a challenge to the amended Act has reached the same conclusion: HISA is constitutional. But this Court recently contradicted that consensus, holding that HISA's enforcement provisions facially violate the private-nondelegation doctrine. Whatever the merits of that outlier decision, it should not trample other courts' considered judgments pending disposition of the Authority's forthcoming petition for a writ of certiorari.

Given the acknowledged circuit split on a question of undisputed legal and practical importance, all agree that Supreme Court review is likely (if not a foregone conclusion). There is at least a "fair prospect" that the Supreme Court will agree

1

with Chief Judge Sutton's view that Congress's amendment to HISA permits the FTC to exercise more than adequate oversight in multiple (if not all) applications to overcome this facial constitutional challenge. And beyond the serious blow to separation-of-powers and comity concerns, allowing the Court's decision to take effect would plunge horseracing back into a confusing web of varying enforcement protocols, disrupt the entrenched expectations of a national industry that has adjusted to the reforms over two-plus years, and endanger the athletes who have been protected by the successful programs Congress directed.

The Court should stay the mandate pending disposition of the certiorari petition, which the Authority will file within 30 days (by October 16). Alternatively, the Court should stay the mandate as to operation of the judgment outside the Fifth Circuit. The Federal Defendants consent to the requested relief; Plaintiffs oppose and intend to file a response.

## STATEMENT

**a.** In 2020, Congress passed and President Trump signed bipartisan legislation to curb the tragic deaths, severe injuries, and diminished public trust that had imperiled horseracing under the prior patchwork of State-based laws. *See* 166 CONG. REC. S5514 (Sept. 9, 2020) (Sen. McConnell) (noting "call[s] for this sport to be abolished altogether"). HISA protects athletes (equine and human), the betting public, and the integrity of the sport through the development and uniform

enforcement of racetrack-safety, medication-control, and anti-doping rules. To effectuate that goal, HISA leverages the expertise and experience of the Authority, a private standards-setting nonprofit organization, subject to the FTC's approval, oversight, and independent power.

That framework purposefully "corresponds in every material respect to the Maloney Act," which has governed the Securities and Exchange Commission's (SEC) relationship with the Financial Industry Regulatory Authority (FINRA) and other self-regulatory organizations for over eight decades. McConnell Amicus Br. 5, Doc. 120. Specifically, HISA vests in the FTC exclusive authority to promulgate (or not) rules, including all those governing enforcement. 15 U.S.C. §§ 3053(a)-(d), 3054(c)(2). HISA confers on the FTC plenary rulemaking power to direct or limit any enforcement. *Id.* § 3053(e). And HISA subjects any sanction to two layers of de novo FTC review, followed by judicial review. *Id.* § 3058(b)-(c).

**b.** HISA rules have been successfully implemented since July 2022, governing over 67,000 horses and 35,000 people competing across 19 states. Although most industry members have embraced HISA and adjusted to its rules, a faction long opposed to any reforms has brought a series of challenges. In November 2022, this Court held that HISA violated the private-nondelegation doctrine. Under the version of the Act then considered, only the Authority "wr[o]te[] the regulations and the FTC c[ould] not modify them." *National Horsemen's Benevolent &*

3

*Protective Ass'n v. Black*, 53 F.4th 869, 887 (5th Cir. 2022). Because the FTC lacked "the final word," the Authority did not "function subordinately to the agency." *Id.*

"Not so anymore." *Oklahoma*, 62 F.3d at 231. In direct response to that ruling, in December 2022, Congress enacted bipartisan legislation authorizing the FTC to "abrogate, add to, and modify" HISA rules as the FTC "finds necessary or appropriate" to further the Act's purposes. 15 U.S.C. § 3053(e). That language, drawn directly from the Maloney Act, "eliminates" "the 'key distinction'" this Court previously identified with the SEC-FINRA statute. *Oklahoma*, 62 F.3d at 232 (quoting *Black*, 53 F.4th at 887). Indeed, the Sixth Circuit had suggested this specific remedy at oral argument in a parallel challenge. Oral Arg. 33:00-33:13, *Oklahoma*, No. 22-5487 (6th Cir. Dec. 7, 2022) (Sutton, C.J.) ("Why not just say to [Congress,] this is easy, this was bipartisan, just put the modification power straight in, it'll be just like FINRA and the SEC, problem solved?").

The Sixth Circuit subsequently rejected the private-nondelegation challenge. Congress's amendment, Chief Judge Sutton wrote, made the Authority "subordinate to the agency." *Oklahoma*, 62 F.4th at 225, 229. "The Authority wields materially different power from the FTC, yields to FTC supervision, and lacks the final say over the content and enforcement of the law—all tried and true hallmarks of an inferior body." *Id.* at 229.

**c.** Following trial here, the district court reached the same conclusion: "Congress answered [this Court's] call" and "cured the constitutional issues." ROA.2739, 2747. This Court agreed that "the amendment solved the nondelegation problem with the Authority's rulemaking power," as well as that HISA does not offend the Due Process Clause or Appointments Clause. Op. 3. But the Court concluded, on a facial basis, that "HISA's enforcement provisions violate the private nondelegation doctrine." *Id.*

On September 9, the Court denied timely petitions for rehearing en banc by the Federal Defendants and the Authority Defendants, who intend to seek certiorari review forthwith.

## ARGUMENT

"A party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court" by "show[ing] that the petition would present a substantial question and that there is good cause for a stay." FED. R. APP. P. 41(d)(1). That standard is satisfied here because there is "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *see Baldwin v. Maggio*, 715 F.2d 152, 153 (5th Cir. 1983) (adopting standard for Rule 41 motions).

## I. THERE IS A REASONABLE PROBABILITY THE SUPREME COURT WILL GRANT CERTIORARI

Plaintiffs' counsel agrees with "the obvious answer here": this case presents "natural circumstances for the Supreme Court to review" this Court's opinion and "issue a decision that governs the whole country." Tr. 33:30-34:30, Interview of Daniel Suhr, *At the Races with Steve Byk* (July 9, 2024).[1]

**a.** The opinion declares categorically that the enforcement provisions of a federal statute governing an entire industry are "facially unconstitutional." Op. 3. That outcome alone triggers the "strong presumption in favor of granting writs of certiorari to review decisions of lower courts holding federal statutes unconstitutional." *Maricopa Cnty. v. Lopez-Valenzuela*, 574 U.S. 1006 (2014) (Thomas, J., respecting denial); *see, e.g.*, *Allen v. Cooper*, 589 U.S. 248, 254 (2020) ("Because the Court of Appeals held a federal statute invalid, this Court granted certiorari."). The separation-of-powers interests motivating that presumption carry particular force here given the remarkable interplay among the branches—which prompted Chief Judge Sutton to observe that "[s]ometimes government works." *Oklahoma*, 62 F.4th at 225. In direct response to this Court's prior private-nondelegation ruling, Congress amended HISA by embracing a Sixth Circuit panel's recommended remedy. "The customary deference accorded the judgments of

---

[1]     https://stevebyk.com/broadcast/tuesday-amwager-atr-part-1-ft-july-w-nicole-russo-nhbpa-lead-council-daniel-suhr/.

Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality," *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981)—and revised the statute accordingly.

**b.** The undisputed circuit conflict this Court's decision creates also supplies "[a] well-established ground for granting certiorari." SHAPIRO, SUPREME COUT PRACTICE § 4.3 (11th ed. 2019); *see* SUP. CT. R. 10(a). In two key respects, this Court expressly "part[ed] ways" with the Sixth Circuit. Op. 3.

First, the decision contradicts the Sixth Circuit's approach to the facial constitutional challenge. Chief Judge Sutton concluded that the "potential" that "the FTC *could* subordinate every aspect of the Authority's enforcement" through the plenary rulemaking power Congress conferred "suffices to defeat a facial challenge." *Oklahoma*, 62 F.4th at 231. But to the extent that "potent answer" leaves any doubt, its resolution should await a case "when the Authority's actions and the FTC's oversight appear in concrete detail, presumably in the context of an actual enforcement action." *Id.* at 233.

By contrast, this Court rejected concern that resolution of the constitutionality of the enforcement provisions is "premature," viewing Plaintiffs' "purely legal challenge" as turning on "HISA's clear delineation of enforcement power." Op. 13, 26 (citation omitted). The Court analyzed "*where* the enforcement power is lodged" rather than "*how* the Authority exercises its enforcement power" or how the FTC

exercises its oversight in any particular circumstances. Op. 25-26 (citing *Oklahoma*, 62 F.4th at 231).

Second, this Court's decision rejects the premises underlying the Sixth Circuit's conclusion that HISA's enforcement provisions are constitutional. The Court was "not convinced" by Chief Judge Sutton's reasoning that the FTC's independent rulemaking power "can save the Authority's enforcement powers." Op. 22 (citing *Oklahoma*, 62 F.4th at 231). The Court set aside the significance the Sixth Circuit attached to the FTC's "full authority to review the Horseracing Authority's enforcement actions," *Oklahoma*, 62 F.4th at 231, holding that such de novo review and factfinding "is no answer," Op. 21. And the Court took issue with "[t]he Sixth Circuit['s] reli[ance] on several cases upholding the constitutionality of FINRA" and other self-regulatory organizations that "enforc[e] securities laws." Op. 26 & n.18 (citing *Oklahoma*, 62 F.4th at 229, 232).

**c.** The case presents "an important question of federal law that has not been, but should be, settled by th[e] [Supreme] Court." SUP. CT. R. 10(c). In Plaintiffs' own words, "[t]he question of the limits of private delegations is a live concern *** in the Supreme Court[.]" NHBPA Mot. 13-14, *Black*, No. 22-10387, Doc. 10. Indeed, several Justices have identified the "need to clarify the private non-delegation doctrine." *Texas v. Commissioner*, 142 S. Ct. 1308 (2022) (Alito, J., joined by Thomas & Gorsuch, JJ., respecting denial).

8

The significance of that question is amplified here by "the dangers of bringing a facial challenge." *Moody v. NetChoice*, 144 S. Ct. 2383, 2409 (2024) (Barrett, J., concurring). While at least one member of the Supreme Court has signaled that it is "high time the Court reconsiders its facial challenge doctrine," *id.* at 2412 (Thomas, J., concurring), all agree that there are "a host of good reasons" to police courts' "facial analysis," *id.* at 2397-2398 (majority op.).

The practical implications, Plaintiffs have acknowledged, stretch far "beyond just the immediate parties." NHBPA Mot. 12, 14, Doc. 25. The Sixth Circuit challengers recently told the Supreme Court that if the circuit split persists, "members of the nationwide horseracing industry will be subject to the private Authority's investigations and enforcement actions in Kentucky, Michigan, Ohio, and Tennessee, but not in Texas, Louisiana, or Mississippi, where the industry will be subject only to the state racing commissions that have traditionally regulated horseracing." Rehearing Pet. 7, *Oklahoma v. United States*, No. 23-402 (U.S. July 18, 2024). "[T]he need for a uniform rule" is likely to compel the Supreme Court to "grant[] certiorari to resolve the conflict," *Commissioner v. Bilder*, 369 U.S. 499, 501 (1962)—particularly given that "[t]he bedrock principle of [HISA] is the need for uniformity," FTC, *Disapproval Order* 1-2 (Dec. 12, 2022).[2]

_____

[2] https://www.ftc.gov/system/files/ftc_gov/pdf/order_re_hisa_anti-doping_disapprove_without_prejudice_0.pdf.

Moreover, as Senator McConnell explained, the "well-established model" for HISA governs several other "important areas of our economy." McConnell Amicus Br. 4, Doc. 120. Most obviously, Congress has repeatedly reaffirmed "its commitment" to a parallel agency-oversight framework in the financial sector based on "the SEC's review of disciplinary actions" by self-regulatory organizations like FINRA and around two dozen national security exchanges like NASDAQ. *National Ass'n of Secs. Dealers v. SEC*, 431 F.3d 803, 807-808 (D.C. Cir. 2005); *see, e.g.*, 15 U.S.C. § 78s(c)-(e). A similar model guides other industries, from the Commodity Futures Trading Commission's oversight of the private National Futures Association, 7 U.S.C. § 21(h)-(k), to the Federal Energy Regulatory Commission's oversight of the private North American Electric Reliability Corporation, 16 U.S.C. § 824*o*(d)-(f). The Court's decision calls into question these longstanding and effective relationships.

## II. THERE IS A FAIR PROSPECT THE SUPREME COURT WILL REVERSE THE JUDGMENT

"Given the conflict" with the unanimous Sixth Circuit and every other federal court that has resolved a constitutional challenge to HISA, there is at least a "fair prospect" the Supreme Court will reverse the judgment. *California v. American Stores Co.*, 492 U.S. 1301, 1306 (1989) (O'Connor, J., in chambers).

**a.** As a threshold matter, this Court's "maximalist approach" to declaring invalid all HISA enforcement provisions—even "novel, never-before-enforced"

ones—improperly extends its holding far beyond the concrete facts and parties before it. *NetChoice*, 144 S. Ct. at 2412-2418 (Thomas, J., concurring); *see id.* at 2428 (Alito, J., concurring, joined by Thomas & Gorsuch, J.J.) ("Facial challenges *** strain the limits of the federal courts' constitutional authority to decide only actual 'Cases' and 'Controversies.'").

A Supreme Court majority is likely to conclude that this Court "did not correctly apply [its] precedents governing facial challenges." *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024). The Supreme Court has "made facial challenges hard to win." *NetChoice*, 144 S. Ct. at 2397. This case illustrates why: This Court's ruling about abstract enforcement activities "'rest[s] on speculation' about the law's coverage and its future enforcement" and "'short circuit[s] the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (citations omitted).

The record on this facial challenge—developed through trial—lacks evidence of specific enforcement activity against Plaintiffs' members. Rather, the Court's conclusion that "the Authority does not 'function subordinately' to the FTC when enforcing HISA" is based on a smattering of "hypothetical[s]" and "[s]uppos[itions]" about activities that might occur in some future circumstances. Op. 19, 20-21, 26 n.17 (citation omitted); *contra Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008) ("In determining

whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

The Court did not "consider the circumstances in which [HISA's enforcement] was most likely to be constitutional." *Rahimi*, 144 S. Ct. at 1903. For example, a straightforward application of the crop rule—the "vast majority" of infractions, ROA.3897—involves a steward's nondiscretionary assessment of the number of strikes to a horse in a public race, according to an FTC-approved limit and subject to de novo FTC review of the same video recording. Instead, the Court embraced the most dramatic assumptions about the Authority's potential actions and the most constrained reading of the FTC's oversight. *E.g.*, Op. 20 & n.12 (reciting "[c]ontested" allegations regarding "coercive interrogation" and "search" of facilities, and assuming FTC will not exercise "its discretion to implement a stay"); *compare, e.g.*, *In re Calhoun*, No. 9430, 2024 WL 2724039, at *3 (F.T.C. May 21, 2024) (granting stay allowing challenge "to be fully considered before enforcement").

Worse still, the Court relied heavily on provisions never invoked against anyone. The Authority has not, for example, filed a single "suit to enjoin violations" or issued a single "subpoena." Op. 23-24 (citing 15 U.S.C. § 3054(h), (j)(1)). The focus on these inoperative (and easily severable) activities "left the panel slaying a

12

straw man" to declare all HISA enforcement provisions facially invalid. *Rahimi*, 144 S. Ct. at 1903.

**b.** This Court's failure to exercise the required judicial restraint contributed to its mistakes on the merits.

All agree on the governing private-nondelegation test: Congress's decision to confer on the Authority a role in HISA's enforcement is constitutional if "the Authority 'functions subordinately' to an agency with 'authority and surveillance' over it." Op. 15 (quoting *Black*, 53 F.4th at 881). HISA easily meets that standard in the three key ways the Authority-FTC relationship mirrors the FINRA-SEC relationship: (i) the Authority may only implement standards and follow procedures the FTC has approved, 15 U.S.C. §§ 3053(a)-(d), 3054(c)(2), 3057(a), (d); (ii) the FTC wields plenary rulemaking power to steer or restrict any enforcement activity, *id.* § 3053(e); and (iii) all sanctions are subject to two layers of de novo FTC review, followed by judicial review, *id.* § 3058(b)-(c).

That comprehensive oversight refutes the categorical conclusion that "the FTC lacks *any* tools to ensure that the law is properly enforced." Op. 29 (emphasis added). Specifically, the FTC's power "to modify *any* rules for any reason at all" to "ensure[] that the FTC retains ultimate[] authority over the implementation of the Horseracing Act," Op. 11 (quoting *Oklahoma*, 62 F.4th at 231), necessarily encompasses the Act's enforcement. Thus, beyond requiring the FTC to approve

13

every rule guiding investigatory and disciplinary activity on the front end, Congress's amendment to HISA confirms that the agency has "the tools to step in" at any point to further "control the Authority's enforcement activities." *Oklahoma,* 62 F.4th at 231 (citing 15 U.S.C. § 3053(e)). For example, in addition to a prospective rule "governing *how* the Authority" may exercise its (never utilized) subpoena power, Op. 25, the FTC could issue a rule *barring* unapproved subpoenas or *quashing* particular ones. Or the FTC could wield the rule it promulgated that controls the Authority's budget—including by "modify[ing] any line item" and withholding necessary "approval," 88 Fed. Reg. 18,034, 18034-18,036 (Mar. 27, 2023)—to prevent a civil action.

On a facial challenge, those examples (among others) "suffice[]" to show that HISA does not lack the potential for agency supervision in at least certain (if not all) applications. *Oklahoma*, 62 F.4th at 231; *see NetChoice*, 144 S. Ct. at 2397 (choice to litigate facially "comes at a cost"). Perhaps that is why even Texas suggested that section 3053(e) provides "oversight over the manner in which the Authority exercises its *enforcement* authority," and instead focused its private-nondelegation attack on whether the Authority "may make rules." Texas Br. 28, Doc. 74.

The Court dismissed that reality by saying such FTC supervision would interfere with "HISA's clear delineation of enforcement power." Op. 26. But Congress amended HISA specifically to reinforce "Federal Trade Commission

oversight" in response to private-nondelegation challenges. 15 U.S.C. § 3053(e). The amendment confers independent power on the FTC not only "to conform the rules of the Authority" to statutory requirements, but also to "ensure the fair administration of the Authority" and take supervisory action "otherwise in furtherance of the [Act's] purposes" of "implement[ing] and enforc[ing] the horseracing anti-doping and medication control program and the racetrack safety program." *Id.* §§ 3053(e), 3054(a). "Congress does not ordinarily write statutes to be unconstitutional, particularly in cases of an amendment in direct response to a successful constitutional challenge." ROA.2742.

The Court incorrectly assumed that by empowering the Authority, HISA impliedly strips the FTC of all enforcement powers. That negative inference contradicts Congress's clear instruction that "[n]othing [in HISA] shall be construed to limit the authority of the Commission under any other provision of law," 15 U.S.C. § 3054(b)—including laws authorizing the FTC to, for example, "investigate," issue "subpoenas," and "bring suit in a district court," *id.* §§ 43, 45-46, 49, 53, 57b. Moreover, the Court's reliance on "what HISA does not say" (Op. 19) simply overlooks HISA provisions contemplating the FTC's direct involvement in enforcement activities. *E.g.,* 15 U.S.C. § 3054(d)(3) (covered person shall "cooperate with the Commission *** during any civil investigation" and "respond truthfully *** if questioned by the Commission"); *id.* § 3054(k)(2)(A) ("The

Authority and the Commission may not investigate, prosecute, adjudicate, or penalize conduct in violation of [HISA programs] that occurs before the program effective date."). After all, preventing cheating in horseracing and the attendant harms on the betting public "fit[s] neatly into the overall mission of the FTC." ROA.1535.

That statutory text, enactment history, and context underscore the best interpretation of HISA: "the FTC's rulemaking and rule revision power gives it 'pervasive' oversight and control of the Authority's enforcement activities, just as it does in the rulemaking context." *Oklahoma*, 62 F.4th at 231. At a minimum, that construction—which the Sixth Circuit endorsed and which avoids the constitutional problems raised by this Court's strict "division of enforcement" view (Op. 29)—is at least plausible. And "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." *Rahimi*, 144 S. Ct. at 1903 (alterations and citation omitted).

Finally, the Court erred in disregarding the FTC's "full authority to review the Horseracing Authority's enforcement actions." *Oklahoma,* 62 F.4th at 231. Before any Authority decision has final legal effect, it is subject to two layers of de novo FTC review, whereby the agency may "affirm, reverse, modify, set aside, or remand for further proceedings," and "make any finding or conclusion that, in the judgment of the [FTC], is proper and based on the record." 15 U.S.C. § 3058. Such

independent review "is even more substantial than the SEC's review of FINRA decisions," ROA.1547, as "HISA, unlike the Maloney Act, unambiguously empowers the FTC to obtain additional evidence not in the record below," *Oklahoma,* 62 F.4th at 244 (Cole, J., concurring).

"In case after case, the courts have upheld this arrangement" under the Maloney Act, "reasoning that the SEC's ultimate control over the rules and their enforcement makes [FINRA and other self-regulatory organizations] permissible aides and advisors." *Oklahoma*, 62 F.4th at 229. The Supreme Court is likely to uphold the "remarkably similar" HISA, too. *Id.* at 240 (Cole, J., concurring).

## III. DEFENDANTS AND THE PUBLIC INTEREST WILL SUFFER IRREPARABLE HARM ABSENT A STAY

Ample "good cause" exists to stay the mandate. FED. R. APP. P. 41(d)(1).

**a.** Congress enacted (and amended) HISA because it was "[a]larmed" by the "spate of doping scandals and racetrack fatalities" jeopardizing the sport and endangering equine and human lives. *Black*, 53 F.4th at 873; *see* McConnell Amicus Brief 6-7 ("Before HISA, horseracing verged on collapse."). "Whether it's the risk of pushing horses past their limits or the risks associated with unsafe tracks and doping, *** no one doubts the imperative for oversight." *Oklahoma*, 62 F.4th at 226.

HISA's successful implementation over the last two-plus years—governing over 100,000 industry participants (horses and people)—has already yielded "significant improvement." Natalie Voss, *Second Quarter Statistics Reinforce*

*Reality That Thoroughbred Racing Fatalities Are Rare – And They're Rarer At Tracks Regulated By HISA*, PAULICK REPORT (July 25, 2024).[3] Specifically, racing-related equine fatality rates are "50 percent lower" than pre-HISA numbers—and substantially "lower than [the rate] at any non-HISA track." *Id.* For example, in the first half of 2024, the overall rate of racing-related equine fatalities at Thoroughbred tracks in HISA-covered jurisdictions was less than a third of the rates in West Virginia, where the law is enjoined, and in Texas, which (as its counsel explained) has "opted to stop *** the simulcast export" that triggers HISA's applicability. ROA.3086-3087; *see* Lazarus Decl. ¶ 8. These dramatic advances reflect "the safest *** period on record since the inception" of nationwide data-keeping. ROA.3918.

It is thus little surprise that, notwithstanding some initial "[t]repidation and apprehension" prior to HISA's implementation, many "horsemen have embraced it, as it levels the playing field" and makes enforcement across jurisdictions "predictable now" that it is the settled status quo. Joe Perez, *Panelists Discuss Impact of HISA on Veterinarians*, BLOODHORSE (June 25, 2024).[4] Horse owners, trainers, and veterinarians have found that, in addition to having "made our horses

---

[3]        https://paulickreport.com/horse-care-category/second-quarter-statisticsreinforce-reality-that-thoroughbred-racing-fatalities-are-rare-and-theyre-rarer-attracks-regulated-by-hisa.

[4]        https://www.bloodhorse.com/horse-racing/articles/277825/panelists-discuss-impact-of-hisa-on-veterinarians.

safer," *id.*, HISA's uniform enforcement has made participation in horseracing across states more "fair, transparent, efficient and economically sound," *Thoroughbred Industry Reiterates Support of HISA*, PAST THE WIRE (July 13, 2023);[5] *see, e.g.*, Alicia Hughes, *HISA Claiming Rules Bring Horses Consistent Protection*, BLOODHORSE (Mar. 11, 2024) (contrasting "arbitrariness of enforcement" that bred "confus[ion]" pre-HISA with HISA's "consistent nationwide standards" that ensure vital practices "like the transfer of information with recordkeeping");[6] ROA.3918, 3936-3941. HISA's reforms have increased "confidence in the sport among industry participants and [their] customers whose wagering dollars fuel every aspect" of horseracing. PAST THE WIRE, *supra*. Paid purse amounts increased from 2021 to 2023 in almost all States in which covered horseraces were held—reversing the prior downward trend. ROA.3918-3919; Lazarus Decl. ¶ 10.

Since HISA was enacted nearly four years ago, the Authority and its partners have dedicated substantial time and resources to complete the transition to this enforcement regime—including hiring and training staff, educating the industry, developing a budget for FTC consideration and approval, establishing extensive new technological infrastructure, entering into contracts with drug-testing laboratories

---

[5] https://pastthewire.com/thoroughbred-industry-reiterates-support-of-hisa/.

[6] https://www.bloodhorse.com/horse-racing/articles/275508/hisa-claiming-rules-bring-horses-consistent-protection.

and States, and collecting and responding to participants' feedback.  Lazarus Decl. ¶ 3; ROA.3895-3897, 3903-3905.  So too has the industry.  *See, e.g.*, Perez, *supra* (quoting veterinarians explaining "it's been a process" that was "long overdue").  Virtually all national horseracing participants have, after more than two years of racing under HISA rules, adjusted fully to the reforms.  Lazarus Decl. ¶ 4.

**b.**  The panel decision threatens to reverse that progress and upend the industry's entrenched reliance interests.  In Plaintiffs' counsel's words, "the enforcement infrastructure is essential" to HISA as "a key pillar of the overall scheme" Congress intended. Tr. 38:00-39:00, Interview of Daniel Suhr, *At the Races with Steve Byk* (July 9, 2024).[7]  According to him, "this scheme simply won't work under the decision."  *Id.*  If Plaintiffs are right, the ramifications would be massively disruptive and dangerous: wiping out the effective federal program even for some period of time would not only threaten the Authority's existence, but also (and more importantly) imperil horses, the human athletes who ride them, and the industry that cherishes them.  Lazarus Decl. ¶¶ 11-16.

At a minimum, issuance of the mandate would sow chaos and confusion as State racing commissions (or the FTC) scramble to step in to enforce the governing HISA rules while racing occurs across the country.  In transitioning to the long-

---

[7]    https://stevebyk.com/broadcast/tuesday-amwager-atr-part-1-ft-july-wnicole-russo-nhbpa-lead-council-daniel-suhr/.

anticipated rollout of the now two-year-old regime, many States underwent substantial operational (and legal) changes—*e.g.*, reducing their staff who worked on racetrack-safety and anti-doping issues; eliminating contracts with drug-testing laboratories; and reallocating funding. Lazarus Decl. ¶¶ 12-13. The Authority and its partners absorbed many of these personnel and duties. *Id.* Accordingly, multiple States simply would not be in a position to take over enforcement of the critical HISA rules—or would refuse. *Id.* The resulting "Wild West" vacuum would communicate a perilous reality to would-be cheaters: "nobody can enforce the rules, so go dope your horses to your heart's content," at least until the States undergo massive transformations to fill the gap. Dan Ross, *Lucinda Finley Q&A on the Fifth Circuit Bombshell*, THOROUGHBRED DAILY NEWS (July 7, 2024).[8]

"The inevitable disruption that would arise from a lack of continuity and stability in this important area of law presents a potential harm not just to [the Authority and the federal government] but to the Plaintiffs themselves and to the public interest at large." *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014). That is why regulated parties themselves have warned that the Court's decision, if not stayed, will at best plunge the horseracing industry back into an unsafe "patchwork of different state, private, and federal regulators, whose

---

[8] https://www.thoroughbreddailynews.com/lucinda-finley-qa-on-the-fifth-circuit-bombshell/.

respective allocations of power will differ based on the jurisdictions in which covered parties operate." Rehearing Pet. 8, *Oklahoma*. The industry could even face the untenable prospect that rules may be enforced only as to certain participants *in the same race* depending on whether the trainers, owners, or jockeys claim membership in the Plaintiff associations. Lazarus Decl. ¶ 15.

**c.** Staying the mandate is also necessary to protect important comity concerns. Plaintiffs have made clear, in this and other cases, that they seek to bring down HISA *nationwide*. *See, e.g.*, ROA.2773; Mot. 3-4, *Louisiana v. Horseracing Integrity & Safety Auth.*, No. 6:22-cv-01934 (W.D. La. Feb. 6, 2023), Doc. 78-1. As Plaintiffs have confirmed, it is already the case that HISA rules do not govern horseracing in any jurisdiction in this Circuit. ROA.2768 ("Mississippi does not have a racetrack" that runs covered Thoroughbred races; "Texas is not running covered races"; and Louisiana races are "already exempted by federal court order" based on a stayed APA challenge). Instead, Plaintiffs seek to halt implementation of the regulatory program in all *other* circuits—including in the Sixth Circuit, where a unanimous panel rejected the same constitutional challenge, and in other circuits where the same claims are pending.

Plaintiffs' endgame, which they will pursue on remand if the mandate issues, implicates the growing warnings that nationwide relief "prevent[s] legal questions from percolating through the federal courts, encourag[es] forum shopping, and

mak[es] every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring). Allowing this Court's opinion to effectively veto the Sixth Circuit's (and any other courts') contrary ruling would work the very "asymmetr[y]" the Supreme Court has cautioned against. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in stay). And it would bless the "gamesmanship" that has fueled Plaintiffs' strategy. *Id.*; *see Louisiana*, 2023 WL 6063813, at *6 & n.7 (W.D. La. Sept. 13, 2023) (report & recommendation) (Plaintiffs have "leapfrog[ed] from one case to another in different district and circuit courts in the wake of unfavorable rulings," in a "deliberate strategy" of "shuffling of plaintiffs" in search of a forum to take down HISA nationwide.).

**d.** Finally, "the [government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). That public injury is particularly acute here because, as explained, the invalidation of HISA's enforcement provisions would displace the "productive dialogue" that occurred between the courts and Congress, and thwart the "'interdependence' and 'reciprocity' [that] should characterize the relationship between the[m]." *Oklahoma*, 62 F.4th at 225 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). The "presumption of constitutionality" resulting from that exchange "is not merely a

factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. National Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

## CONCLUSION

Pending disposition of a certiorari petition to be filed by October 16, the Court should stay its mandate in full or at least as to operation of the judgment outside the Fifth Circuit. In the alternative, the Court should enter an administrative stay for at least 21 days to permit the Authority to seek stay relief from the Supreme Court and to allow for the Circuit Justice's consideration before the mandate issues.

September 16, 2024

Respectfully submitted,

*s/ Pratik A. Shah*

John C. Roach
RANSDELL ROACH & ROYSE, PLLC
176 Pasadena Drive, Building One
Lexington, KY 40503
859-276-6262

Pratik A. Shah
Lide E. Paterno
AKIN GUMP STRAUSS
   HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
202-887-4000
pshah@akingump.com

*Counsel for Authority Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d) because it contains 5,198 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

*s/ Pratik A. Shah*
Pratik A. Shah

September 16, 2024

**ADDENDUM**

Exhibit 1:    Declaration of Lisa Lazarus (Sept. 16, 2024)

Exhibit 2:    Slip Op., *National Horsemen's Benevolent & Protective Assoc. v. Black*, No. 23-10520 (5th Cir. July 5, 2024)

# EXHIBIT 1

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, *et al.*,<br>    *Plaintiffs-Appellants*,<br><br>STATE OF TEXAS; TEXAS RACING COMMISSION,<br>    *Intervenor Plaintiffs-Appellants*,<br><br>    v.<br><br>JERRY BLACK, *et al.*,<br>    *Defendants-Appellees*. | No. 23-10520 |

## <u>DECLARATION OF LISA LAZARUS</u>

I, Lisa Lazarus, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a resident of New Jersey, over the age of majority, and the following declarations are based upon my personal knowledge.

2.    I have been Chief Executive Officer of the Horseracing Integrity and Safety Authority, Inc. ("Authority") since February 15, 2022. In that role, I am involved in and have knowledge of the Authority's operations, including implementation of FTC-approved rules as promulgated pursuant to the amended Horseracing Integrity and Safety Act of 2020 ("HISA"), communication with horseracing industry participants and other key stakeholders to ensure broad

1

engagement across constituencies, and education concerning the regulatory regime, among other responsibilities.

3.    The Authority's congressionally mandated mission is to propose to the FTC and implement (if approved) national rules to enhance the health and safety of horses and jockeys, promote integrity and consistency in the sport, and instill confidence in its fans and the betting public.  The Authority and its partners, including the Horseracing Integrity and Welfare Unit, have devoted immeasurable time and resources toward carrying out that mission by planning, communicating, and successfully implementing the Racetrack Safety Program and the Anti-Doping and Medication Control ("ADMC") Program.  Over the past several years, the Authority and its partners have, for example, expended substantial resources hiring and training staff, creating resources to educate the industry, developing a budget for FTC consideration and approval, establishing extensive new technological infrastructure and collecting and responding to participants' feedback. Additionally, the Authority has entered into contracts with drug-testing laboratories to process and analyze samples collected under the ADMC Program, requiring some laboratories to hire additional staff and acquire new equipment in response to the increased volume and complexity of testing samples under the new regime. Moreover, laboratories have expended resources in preparation for

applying and receiving HISA Equine Analytical Laboratory accreditation status, which will be required under the ADMC Program beginning January 1, 2025.

4.　　As a result of the Authority's engagement with stakeholders over several years, more than 67,000 Thoroughbred horses and 35,000 people are registered with the Authority. These covered persons—the vast majority of Thoroughbred jockeys, trainers, and owners around the country—compete in HISA-covered races across 19 states. Virtually all national horseracing participants have adjusted to the congressionally mandated reforms—and many of them have expended considerable resources in reliance on the successful transition to the HISA programs. As just one example, most equine veterinarians across the country have overhauled their recordkeeping systems and practices, which has involved hiring additional personnel, acquiring new technology, and undergoing training, among other things.

5.　　HISA rules governing racetrack safety, registration, assessments, and enforcement have been in effect since July 2022. There have been over 2,000 enforcement rulings for violations of those rules, subject to FTC review, in the last two-plus years. The ADMC Program has been effective since May 2023. The Authority (via the Horseracing Integrity and Welfare Unit) has taken over 375 enforcement actions, subject to FTC review, for violations of anti-doping or medication-control rules since the inception of the ADMC Program.

6.    The Authority has never issued an investigative subpoena or filed a civil action in federal court.

7.    Thoroughbred racing is getting increasingly safer because of the Authority's enforcement of the Act, together with the commitment of our racing stakeholders, especially the horsemen and veterinarians who work so diligently under HISA to protect horses.  Specifically, the racing-related equine fatality rate has declined over the four consecutive quarters since HISA has been fully implemented, including an approximate 49% decrease in the second quarter of 2024 compared to the second quarter of 2023.  Racetracks operating under HISA rules and running races in that quarter reported 0.76 racing-related equine fatalities per 1,000 starts, compared to 1.48 racing-related equine fatalities per 1,000 starts in the second quarter of 2023.

8.    That 0.76 racing-related equine fatality rate for HISA-covered jurisdictions in the second quarter of 2024 compares to a rate of 2.66 racing-related equine fatalities per 1,000 starts in Texas over the same period; a rate of 2.64 racing-related equine fatalities per 1,000 starts in West Virginia; and a rate of 1.82 racing-related equine fatalities per 1,000 starts in Louisiana.  Those figures are based on information received from the respective State racing commissions. HISA rules are not operative in those three states.

9.    Beyond protecting equine athletes and the humans who ride them, the uniform and consistent enforcement of HISA rules is helping to restore integrity to the sport of horseracing and promote confidence in the wagering public that competitions will be safe and fair.  I hear regularly from stakeholders who are grateful that horseracing finally has national oversight, like other sports leagues, to prevent the health-and-safety tragedies and doping and corruption scandals that gripped the sport for too many years.

10.    Paid purse amounts have increased since 2021 (*i.e.*, before HISA's implementation) in almost every state in which covered races were hosted in 2023—reversing the downward trend from prior years.  Overall, in States in which HISA rules applied to horseraces in 2023, the total purse amount paid in 2023 was more than 20% greater than the total purse amount paid in 2021.

11.    Halting enforcement of the Racetrack Safety Program and ADMC Program under HISA would disrupt the industry's settled reliance interests and cause real harm to the safety of horses and horseracing participants.  It would imperil the Racetrack Safety Program's implementation of expanded veterinary oversight; surface maintenance and measurement standards; enhanced reporting requirements; fair and effective riding crop rules; collection and analysis of data relating to medications, treatments, injuries, and fatalities; a voided claim rule that removes incentives to race compromised horses; and the transfer of claimed

horses' medical information. And it would thwart the ADMC Program's uniform implementation of a national set of medication rules, testing protocols, adjudication procedures, investigative operations, and laboratory standards. As the fatality data confirm, more horses would die if HISA were not enforced.

12. Multiple States would not be in a position to step in to enforce HISA rules if the Act's enforcement provisions were enjoined. Multiple States responded to HISA's enactment by reducing their own responsibilities over racetrack-safety, anti-doping, and medication-control issues relating to Thoroughbred racing. For example, multiple States eliminated staff who worked on those issues, reallocated funding that had been appropriated for those issues, and eliminated contracts with drug-testing laboratories. In fact, the State of Florida closed its laboratory. In turn, in States that did not enter into voluntary implementation agreements under HISA, the Authority and its partners took on many of the duties the States had carried out, hired qualified personnel (including former State employees), and entered into contracts with drug-testing laboratories.

13. Accordingly, if the Authority were enjoined from enforcing HISA, there would be multiple jurisdictions where the Racetrack Safety Program and ADMC Program would not be enforced in any sense. For example, for at least some period of time, multiple jurisdictions would (a) simply refuse to enforce violations of critical safety rules, such as those protecting horses from harmful

6

equipment and misuse of riding crops; (b) lack personnel who could collect drug samples; (c) have no arrangements with labs to test the samples, allowing doping to occur without detection or punishment; and/or (d) be without regulatory veterinarians to prevent unfit horses from competing or to examine horses after claiming races to deter potential abuses of claiming races.

14. At a minimum, issuance of the Fifth Circuit's mandate would cause mass chaos and confusion. Virtually every day, races around the country operate under HISA rules subject to the Act's enforcement provisions. Covered persons who participate in races across the nation would be subject to an unsafe and inefficient patchwork of different enforcement regimes. And given Plaintiffs' stated intent to obtain a nationwide implementation of the Fifth Circuit's judgment wherever their members race across the country, issuance of the mandate clouds enforcement of critical HISA rules within key horseracing States like Kentucky and Arkansas—even though the Sixth Circuit has rejected an identical facial challenge to the Act's enforcement provisions and the Eighth Circuit is now considering a parallel challenge.

15. Plaintiffs' endgame of a nationwide injunction for their members regardless of geographic jurisdiction ultimately threatens to impose different enforcement regimes for different participants in the same race. That outcome would undermine the integrity of racing in several respects: (i) the betting public

would not be aware of which horseracing participants feel compelled to follow the rules and which are effectively immune from the rules based on their membership in Plaintiffs' organizations; (ii) the goal of creating a level playing field for all competitors would be lost, and participants would conclude that some of their fellow competitors have been given an unfair advantage; and (iii) the general public would soon become aware that the sport has two sets of rules depending on membership in Plaintiffs' organizations. Imagine if the NFL enforced rules against helmet-to-helmet hits only with respect to one team and not the other, or if the NBA determined whether to charge a player for a rule violation depending on whether a player was a member of the players' union. That scenario would wreak havoc on the sport. This outcome would necessarily lead to a decrease in betting by the public, which is the economic driver of the entire thoroughbred horseracing industry, including a significant factor in determining the amount of purse money paid to participants.

16.     Virtually every day of the year, Thoroughbred racing occurs in HISA-covered races across the country. If the Fifth Circuit's mandate issues, these races would be threatened by the harms set forth in this Declaration. In addition, the uncertainty and chaos that would result from issuance of the mandate now threatens one of the biggest weekends of racing on the Thoroughbred calendar. Each year, Breeders' Cup Limited administers the Breeders' Cup World

Championships, Thoroughbred racing's year-end championships, as well as the Breeders' Cup Challenge Series: "Win and You're In," which provides automatic starting positions into the Championships races through an 82-race series hosted by 12 countries, and the U.S.-based Dirt Dozen Bonus Series. Since its founding in 1982, Breeders' Cup Limited has allocated more than $1 billion in purses and awards to the Thoroughbred industry. In addition, two of the Championships races—the Longines Breeders' Cup Classic and Longines Breeders' Cup Turf— continually rank among the top races in the world. The 2024 Breeders' Cup World Championships, featuring 14 Grade 1 Championship races run during a two-day festival worth more than $34 million in purses and awards, will be held November 1-2 in Del Mar, California. Horses from all over the globe compete in the Breeders' Cup. The enactment and implementation of HISA brought North American racing in line with international standards through uniform rules and regulations, fair and efficient adjudication protocols, and a robust ADMC program. Disrupting the status quo now would wreak havoc for one of the biggest racing weekends on the planet. Compromising this signature events that draws participants from all over the world would severely injure America's stature in global racing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2024.

_____
Lisa Lazarus
Chief Executive Officer
Horseracing Integrity and Safety Authority

# EXHIBIT 2

# United States Court of Appeals for the Fifth Circuit

––––––––––––––––

No. 23-10520

––––––––––––––––

United States Court of Appeals
Fifth Circuit

**FILED**

July 5, 2024

Lyle W. Cayce
Clerk

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; ARIZONA HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; ARKANSAS HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; INDIANA
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; LOUISIANA HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; MOUNTAINEER PARK HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; NEBRASKA
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; PENNSYLVANIA HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; WASHINGTON
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; GULF COAST RACING, L.L.C.; LRP GROUP,
LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING
LSP, L.L.C.; TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.,

*Plaintiffs—Appellants*,

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs—Appellants*,

*versus*

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD
NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH

Schanzer; Horseracing Integrity and Safety Authority, Incorporated; Federal Trade Commission; Commissioner Noah Phillips; Commissioner Christine Wilson; Lisa Lazarus; Steve Beshear; Adolpho Birch; Ellen McClain; Charles Scheeler; Joseph DeFrancis; Susan Stover; Bill Thomason; Lina Khan, *Chair*; Rebecca Slaughter, *Commissioner*; Alvaro Bedoya, *Commissioner*; D. G. Van Clief,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 5:21-CV-71, 5:23-CV-77

---

Before King, Duncan, and Engelhardt, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

We again consider constitutional challenges to the Horseracing Integrity and Safety Act of 2020 ("HISA"). In HISA, Congress empowered a private corporation—the Horseracing Integrity and Safety Authority ("Authority")—to create and enforce nationwide rules for thoroughbred horseracing. Last time, we held HISA facially unconstitutional under the private nondelegation doctrine because the Authority's rulemaking was not subordinate to the Federal Trade Commission ("FTC"). *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Horsemen's I*), 53 F.4th 869 (5th Cir. 2022). At the time, we did not consider a separate nondelegation challenge to the Authority's enforcement power. Congress responded to our decision by amending HISA, giving the FTC power to abrogate, add to, or modify the Authority's rules.

On remand, the district court held the amendment cured HISA's constitutional deficiencies because the FTC now has general rulemaking power over the Authority's activities. It also rejected claims raised by a new

No. 23-10520

plaintiff, Gulf Coast Racing LLC ("Gulf Coast"), that HISA violates the Constitution's Appointments Clause because the Authority wields significant governmental authority. The plaintiffs all appealed, arguing HISA is still constitutionally deficient under the private nondelegation doctrine, the Due Process Clause, the Appointments Clause, and the Tenth Amendment.

We agree with nearly all of the district court's well-crafted opinion. Specifically, we agree that the FTC's new rulemaking oversight means the agency is no longer bound by the Authority's policy choices. In other words, the amendment solved the nondelegation problem with the Authority's rulemaking power. We also agree that HISA does not violate the Due Process Clause by putting financially interested private individuals in charge of competitors. Further, we agree that, under current Supreme Court precedent, *see Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Authority does not qualify as a government entity subject to the Appointments Clause. Finally, we agree that plaintiff Gulf Coast lacks standing to bring its Tenth Amendment challenge.

We disagree with the district court in one important respect, however: HISA's enforcement provisions violate the private nondelegation doctrine. The statute empowers the Authority to investigate, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the FTC's say-so. That is forbidden by the Constitution. We therefore DECLARE that HISA's enforcement provisions are facially unconstitutional on that ground. In doing so, we part ways with our esteemed colleagues on the Sixth Circuit. *See Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) (rejecting nondelegation challenge to HISA's enforcement provisions).

Accordingly, the district court's judgment is AFFIRMED in part and REVERSED in part.

No. 23-10520

## I. Background

### A. HISA Framework

In 2020, HISA created a framework for enacting and enforcing nationwide rules governing doping, medication control, and racetrack safety in the thoroughbred horseracing industry. *See* 15 U.S.C. § 3054(a). *See generally Horsemen's I*, 53 F.4th at 873–75. To "develop[] and implement[]" these rules, HISA empowers a "private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority,'" subject to the "oversight" of the FTC. §§ 3052(a), 3053.

Under HISA, the Authority writes all the rules—that is, rules fleshing out the substantive areas covered by HISA, as well as rules governing investigation, adjudication, and sanctions.[1] The Authority submits proposed rules to the FTC, which publishes them for public comment. § 3053(b)(1), (c)(1). Rules take effect only after FTC approval, which must occur within 60 days of publication. The FTC "shall approve" a proposed rule if it finds the rule "consistent" with the Act and with "applicable rules approved by the [FTC]." § 3053(c)(2). Originally, this "consistency review" did not allow the FTC to reject a proposed rule based on its disagreement with the Authority's policy choices. *Horsemen's I*, 53 F.4th at 884–87. In *Horsemen's I*, we held that this arrangement violated the private nondelegation doctrine by making a private entity superior to a government

---

[1] *See* § 3057(a)(1), (c)(1) (power to establish substantive rules governing medication controls); § 3056(a)(1) (power to establish racetrack safety rules); §§ 3054(c), 3057(c) (power to "develop uniform procedures and rules" governing investigations and adjudications that afford due process); § 3057(d) (power to establish civil sanctions); §§ 3054(c), 3054(c), (h) (investigatory and subpoena powers).

No. 23-10520

agency. *Ibid.* In response, Congress amended HISA to give the FTC power to "abrogate, add to, and modify" the Authority's rules. § 3053(e).

The Authority also has the power to enforce HISA. It does so by (1) exercising "subpoena and investigatory authority," § 3054(h); (2) imposing civil sanctions, §§ 3054(i), 3057; and (3) filing civil actions seeking injunctions or enforcement of sanctions, § 3054(j). The actual work of enforcing HISA involves a further delegation to other entities, however. For instance, HISA directs the Authority to contract enforcement of doping and medication rules to a private non-profit, the U.S. Anti-Doping Agency ("USADA"), or other comparable entity. § 3054(e)(1)(A), (B).[2] USADA then acts as "the independent . . . enforcement organization" for those rules, "implement[s]" HISA's anti-doping programs, and exercises related powers "including independent investigations, charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations." § 3054(e)(1)(E)(i), (iii), (iv); § 3055(c)(4)(B).[3] USADA's decisions on such matters "shall be the final decision or civil sanction of the Authority," subject to *de novo* review by an administrative law judge ("ALJ") and the FTC. § 3055(c)(4)(B); § 3058.

## B. Procedural History

*Horsemen's I* concluded that HISA's delegation of rulemaking power was facially unconstitutional. HISA delegated rulemaking power to a private

---

[2] *See* *Frequently* *Asked* *Questions*, USADA, https://www.USADA.org/resources/faq (last visited June 13, 2024) ("USADA is an independent, non-profit organization. It is not a branch or office of the federal government.").

[3] Similarly, the Authority may contract out enforcement of the racetrack safety program to "State racing commissions" or "other State regulatory agencies." § 3054(e)(2), (3); *see also* § 3056 (discussing racetrack safety program).

organization (the Authority) whose policy choices could not be second-guessed by the agency (FTC). The Authority's rulemaking powers were therefore not subordinate to the FTC, meaning HISA facially violated the private nondelegation doctrine. *Horsemen's I*, 53 F.4th at 872. We did not consider the plaintiffs' distinct nondelegation challenges to the Authority's investigative and enforcement powers nor their due process claims. *Id.* at 890 n.37. Finally, as noted, Congress responded to *Horsemen's I* by empowering the FTC to "abrogate, add to, and modify" the Authority's rules. § 3053(e).

On remand, the National Horsemen's Association ("Horsemen") and Texas continued to press their private nondelegation claims, arguing Congress's amendment did not actually subordinate Authority rulemaking to the FTC. They also continued to press their nondelegation challenge to the Authority's enforcement powers (as well as their due process claims). In addition, a new plaintiff, Gulf Coast Racing ("Gulf Coast"), raised separate challenges to HISA in a different division of the same district. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Black*), 672 F. Supp. 3d 220, 224 (N.D. Tex. 2023). Gulf Coast claimed (1) HISA's directors qualify as "officers of the United States" and are therefore subject to Article II's appointment and removal requirements; and (2) HISA commandeers Texas in violation of the Tenth Amendment. Gulf Coast's suit was consolidated with the remanded *Horsemen's I* case. *Id.* at 230–31. Following a one-day bench trial, the district court rejected all the plaintiffs' claims.

As to private nondelegation, the district court followed the Sixth Circuit's decision in *Oklahoma*, 62 F.4th 221. That court reasoned that Congress's amendment empowering the FTC to "abrogate, add to, and modify" proposed rules "cured the constitutional issues identified by [*Horsemen's I*]" by making the Authority's rulemaking power "subordinate" to the FTC. *Black*, 672 F. Supp. 3d at 241, 243 (citing *Oklahoma*, 62 F.4th at 230, 232). As to the separate challenge to the Authority's enforcement

No. 23-10520

powers, the district court largely relied on its previous order rejecting the claim because those powers "comport with due process." *See id.* at 248. The court also relied on the fact that the FTC could review civil sanctions and control enforcement through rulemaking. *Id.* at 248–49; *see also Oklahoma*, 62 F.4th at 231. Finally, the court rejected the due process claims because the Horsemen failed to show the Authority's directors have financial interests in regulating competitors. *Black*, 672 F. Supp. 3d at 252.

As to Gulf Coast's claims, the district court concluded that our *Horsemen's I* decision required it to reject them. Specifically, the court reasoned that *Horsemen's I* necessarily decided the Authority was a private entity, and so its directors were not subject to the Appointments Clause. *Id.* at 234–37. Alternatively, the court reasoned that the Authority is private because "it is not government created, and its directors are not government appointed." *Id.* at 234 (citing *Lebron*, 513 U.S. 374). Finally, the court rejected the Tenth Amendment commandeering argument for lack of standing. *Id.* at 250.

Accordingly, the district court entered final judgment dismissing all claims. The Horsemen, Texas, and Gulf Coast timely appealed.

## II. Standard of Review

We review the district court's legal conclusions following a bench trial *de novo. Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 606 (5th Cir. 2020). To prevail on their facial challenge, the plaintiffs "must show that no set of circumstances exists under which [HISA] would be valid." *Horsemen's I*, 53 F.4th at 878 (cleaned up) (citations omitted).

## III. Discussion

The various plaintiffs raise these issues on appeal:

No. 23-10520

(A) Did Congress's amendment to HISA cure the private nondelegation problem with the Authority's rulemaking powers?

(B) Do the Authority's enforcement powers separately violate the private nondelegation doctrine?

(C) Does HISA violate due process by permitting self-interested industry participants to regulate their competitors?

(D) Are the Authority's directors subject to the Appointments Clause?

(E) Does HISA violate the Tenth Amendment's anti-commandeering rule by forcing States to administer a federal program?

We consider each issue in turn.

## A. Private Nondelegation Challenge to Authority's Rulemaking.

We previously discussed the origins of the private nondelegation doctrine in *Horsemen's I. See id.* at 880–81. In essence, the doctrine teaches that "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 881 & n.21 (citing *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021)); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989)).[4] Or, as our sister circuit has explained: "Congress may formalize the role of private parties in proposing regulations so long as that role is merely as an aid to a government agency that retains the discretion to approve, disapprove, or modify them." *Ass'n of Am. R.R.s v. U.S. Dep't of Transp. (Amtrak I)*, 721 F.3d 666, 671 (D.C. Cir. 2013) (cleaned

---

[4] *See also generally A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

No. 23-10520

up) (quoting *Adkins*, 310 U.S. at 388), *vacated and remanded on other grounds*, *U.S. Dep't of Transp. v. Ass'n of Am. R.R.s* (*Amtrak II*), 575 U.S. 43 (2015).

In *Horsemen's I*, we ruled the Authority's rulemaking power was an unconstitutional private delegation. Our analysis focused on the fact that the Authority's proposed rules were subject only to the FTC's limited "consistency review," which did not permit the agency to second-guess the Authority's policy choices. *See Horsemen's I*, 53 F.4th at 882–87. In response, Congress amended HISA to provide that:

> [the FTC], by rule in accordance with section 553 of title 5, may abrogate, add to, and modify the rules of the Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter.

15 U.S.C. § 3053(e). This new provision was borrowed from the Maloney Act, which allocates authority between the SEC and private, self-regulatory organizations (such as the Financial Industry Regulatory Authority ("FINRA")). *See Oklahoma*, 62 F.4th at 231–32. Although HISA was originally modeled on the Maloney Act, it lacked this provision until the recent amendment. *See* Consolidated Appropriations Act, 2023, Pub. L. 117-328, div. O, tit. VII, § 701, 136 Stat. 4459, 5231–32. As noted, the district court followed the Sixth Circuit in ruling that the amendment cured the nondelegation problem with the Authority's rulemaking power. *See Black*, 672 F. Supp. 3d at 241 (citing *Oklahoma*, 62 F.4th at 230, 232).

We agree with the district court and the Sixth Circuit that the amendment cured the nondelegation defect identified in *Horsemen's I*. That defect lay in the agency's being at the mercy of the Authority's policy choices. *See Horsemen's I*, 53 F.4th at 872 ("[T]he FTC concedes it cannot

review the Authority's policy choices."). For instance, when the Authority issued rules on the kinds of horseshoes permitted during races, the FTC told objecting commenters it lacked the power to question the Authority's views. *See id.* at 885 (discussing *Order Approving the Enforcement Rule Proposed by the Horseracing Integrity and Safety Authority*, 26, Fed. Trade Comm'n (Mar. 25, 2022)). The amendment has corrected that imbalance. Now, the FTC may "abrogate, add to, and modify" the Authority's rules. § 3053(e). So, unlike before, if the FTC now disagrees with the policies reflected in the Authority's rules, it may change them. *See Oklahoma*, 62 F.4th at 230 (noting recent rule explaining that FTC's "new 'rulemaking power' allows it to 'exercise its own policy choices'" (quoting *Order Ratifying Previous Commission Orders* 3, Fed. Trade Comm'n (Jan. 3, 2023))). As the Sixth Circuit correctly observed, "§ 3053(e)'s amended text gives the FTC ultimate discretion over the content of the rules," which "makes the FTC the primary rule-maker, and leaves the Authority as the secondary, the inferior, the subordinate one." *Ibid.* (citing *Adkins*, 310 U.S. at 388).

Appellants' arguments to the contrary do not persuade us.

First, the Horsemen argue the Authority remains superior because it continues to write the rules in the first place and the agency must approve them if they hurdle the low bar of consistency review. We disagree. The problem was never that the private entity proposed the rules; the problem was that the agency lacked power to second-guess them once they were proposed. *See Horsemen's I*, 53 F.4th at 884 ("The FTC's oversight is too limited to ensure the Authority functions subordinately to the agency." (cleaned up) (quoting *Adkins*, 310 U.S. at 399)). Now the FTC has been given that power: it can "abrogate" or "modify" Authority rules it disagrees with. § 3053(e). And that new power gives consistency review new bite. Previously, consistency review "*exclude[d]* . . . the Authority's policy choices in formulating rules." *Id.* at 885. Now it implicitly includes review of those

No. 23-10520

choices. The FTC must approve only those rules "consistent with . . . applicable rules approved by the [FTC]," and, thanks to the amendment, it is the FTC that has final word over what those rules are. § 3053(c)(2); *see also Oklahoma*, 62 F.4th at 231 (explaining that "the FTC's later authority to modify *any* rules for any reason at all, including policy disagreements, ensures that the FTC retains ultimate[] authority over the implementation of the Horseracing Act").[5]

Next, the Horsemen argue the FTC's new review power creates a timing problem. Because the FTC may alter only rules "promulgated" by the Authority, § 3053(e), regulated entities may end up being subject to the Authority's rules until the FTC can intervene and fix them. We disagree. The FTC has 60 days to approve or disapprove a proposed rule. § 3053(c)(1). If the FTC is concerned about a proposed rule going into effect, then it can intervene and create safeguards to prevent that from happening. *See* § 3053(a) (requiring Authority to submit proposed rules to FTC "in accordance with such rules as the [FTC] may prescribe"). For instance, the agency could adopt a rule postponing the effective date of a newly enacted rule. *See Oklahoma*, 62 F.4th at 232 (suggesting this). Or the agency could engage in emergency rulemaking to delay the effective date of a rule. In any event, these are hypothetical problems that, if they arise, can be addressed in as-applied challenges. *See Hersh v. United States ex rel. Mukasey*, 553 F.3d 743,

---

[5] Texas contends § 3053(e) does not solve the nondelegation problem because it gives the FTC only limited rulemaking authority—*i.e.*, "to ensure the fair administration of the Authority." Because the FTC lacks plenary rulemaking authority, Texas argues, the Authority still effectively calls the shots. We disagree. Section 3053(e) empowers the FTC to engage in rulemaking, not only for specified purposes, but also "otherwise in furtherance of the purposes of [HISA]." This language, borrowed from the Maloney Act, gives the agency "broad authority to oversee and to regulate the rules adopted by the [Authority] . . . , including the power to mandate the adoption of any rules it deems necessary." *Shearson/Am. Express, Inc. v McMahon*, 482 U.S. 220, 233–34 (1987).

No. 23-10520

762 (5th Cir. 2008) (holding that "as-applied challenges are preferred"). This is a facial challenge, however, and we cannot say that a potential timing gap in FTC's § 3053(e) review makes HISA unconstitutional in all its applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (holding that a facial challenger "must establish that no set of circumstances exists under which the Act would be valid").[6]

Finally, the Horsemen point to the SEC's supervisory authority over private self-regulatory organizations like FINRA. They argue that, notwithstanding § 3053(e), the FTC still has less sway over the Authority than the SEC does over FINRA. We again disagree. We previously pointed out that the "key distinction" between the FTC and the SEC was the FTC's lack of general rulemaking power. *See Horsemen's I*, 53 F.4th at 887–88. "The SEC itself," we explained, "can make changes to FINRA rules, but the FTC can only recommend changes to the Authority's rules." *Id.* at 888 (citation omitted). But Congress has now amended HISA to give the FTC the same general rulemaking authority that the SEC has with respect to FINRA. *See Oklahoma*, 62 F.4th at 225 (reaching this conclusion).

In sum, we agree with the district court and the Sixth Circuit that, in light of Congress's amendment to HISA in § 3053(e), the Authority's rulemaking power is subordinate to the FTC's. Because the FTC has ultimate say on what the rules are, the Authority's power to propose horseracing rules does not violate the private nondelegation doctrine.

---

[6] The Horsemen also argue that the Authority can circumvent the FTC by issuing unreviewable guidance documents, such as dear colleague letters. We disagree. The Authority admits such guidance would not have the force of law and, even if it did, the FTC has authority to review guidance documents, § 3054(g)(2), and to promulgate a rule overruling guidance it disagrees with.

No. 23-10520

**B. Private Nondelegation Challenge to Authority's Enforcement.**

Appellants next argue that, apart from its rulemaking powers, the Authority's enforcement powers violate the private nondelegation doctrine. Recall that the Authority enforces HISA by levying sanctions, which are ultimately subject to FTC review, and by bringing lawsuits. The Authority also has power to investigate potential violations, although the actual investigatory work is contracted to other private organizations, such as USADA in the case of doping rules, or to state racing commissions in the case of racetrack safety rules. *See supra* I.A. Our *Horsemen's I* decision did not address this challenge to the Authority's enforcement powers, *see* 53 F.4th at 890 n.37, and on remand the district court treated it as a due process claim and rejected it. *See Black*, 672 F. Supp. 3d at 248–49. Appellants now bring the claim to us, arguing that the Authority's enforcement power is not subordinate to FTC oversight.

### 1.

Before addressing the merits of this claim, we must address the Authority's argument that it is premature. Arguing both in terms of standing and ripeness, the Authority contends that it has not yet tried to enforce HISA against the Horsemen and that any challenge to the Authority's enforcement power can be raised if and when it does. We disagree for several reasons.

First, the Authority misunderstands the Horsemen's claim. They do not challenge some particular enforcement action undertaken by the Authority—claiming, for instance, that the Authority issued an overbroad subpoena for medical records or lacked probable cause to search a racetrack. Instead, the Horsemen argue that HISA, on its face, vests the Authority with enforcement power that is effectively unreviewable by the agency. When a regulated entity raises "a purely legal challenge" like this one, "it is

No. 23-10520

unnecessary to wait for the Regulation to be applied in order to determine its legality." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 267 (5th Cir. 2015) (cleaned up) (citations omitted); *see also Nat'l Env't Developmental Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014) ("Petitioner's challenge in this case presents a purely legal question . . . It is unnecessary to wait for the [statute] to be applied in order to determine its legality."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

Second, the Horsemen have a cognizable injury for standing purposes. Pursuant to HISA, they have already had to agree "to be subject to and comply with [Authority's] rules, standards, and procedures"—including rules requiring they cooperate with investigations, consent to searches, and comply with subpoenas. *See* 15 U.S.C. § 3054(c)–(f). In other words, the Horsemen are themselves "objects of the Regulation," and so "there is ordinarily little question" that they have standing to challenge it. *Contender Farms*, 779 F.3d at 264–65 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). And courts typically do not require a regulated party to "bet the farm" by violating a regulation before allowing it to test its validity. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010); *see also, e.g., Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991) (explaining that a separation-of-powers challenge to a board's veto powers was "ripe even if the veto power ha[d] not been exercised to respondents' detriment").

Finally, the record shows several instances in which the Authority has enforced HISA against the Horsemen. For example, the Authority has threatened one of the Horsemen's members with sanctions if it did not repair a racetrack railing. Additionally, the Authority has both threatened and

actually barred member racetracks in Texas from broadcasting races out of state because they failed to register with the Authority. More generally, the Horsemen represent some 30,000 members and, when the parties filed their briefs, the Authority's website already listed hundreds of enforcement actions—and that number has now grown to over 1,500.[7] So, at a minimum, the Horsemen have shown a credible threat that the Authority will bring enforcement actions against their members in the future. *See Driehaus*, 573 U.S. at 164.

In sum, the Horsemen have standing to challenge the Authority's enforcement powers and that challenge is ripe. We proceed to the merits.

### 2.

The Horsemen's (as well as Texas's) basic contention is that HISA grants the Authority enforcement power that is effectively unreviewable by the FTC. That claim turns on the same standard as the challenge to the Authority's rulemaking addressed in *Horsemen's I*: the delegation is constitutional if, when enforcing HISA, the Authority "'functions subordinately' to an agency with 'authority and surveillance' over it." 53 F.4th at 881 (quoting *Rettig*, 987 F.3d at 532). In other words, the Authority may constitutionally enforce HISA only if it acts "as an aid" to the FTC, which "retains the discretion to approve, disapprove, or modify" the private entity's enforcement actions. *Ibid.* (cleaned up) (quoting *Amtrak I*, 721 F.3d at 671).[8]

---

[7] *See generally Rulings*, Horseracing Integrity & Safety Auth., https://portal.hisausapps.org/public-rulings (last visited June 12, 2024) (listing 1,772 enforcement rulings).

[8] As explained in *Horsemen's I*, the D.C. Circuit's *Amtrak I* decision was vacated only because the Supreme Court found Amtrak was a governmental, as opposed to private,

No. 23-10520

While the constitutional standard is the same, the nature of the delegated authority is different this time around. *Horsemen's I* addressed delegation of legislative authority—the power to make rules. *See Myers v. United States*, 272 U.S. 52, 186 (1926) ("The essence of the legislative authority is to . . . prescribe rules for the regulation of the society[.]"). Logically, we focused on which actor—government agency or private entity?—had final say over the content of those rules. *See Horsemen's I*, 53 F.4th at 884–87 (analyzing FTC's lack of authority over the Authority's policy choices). Today, by contrast, we address delegation of executive authority. The power to launch an investigation, to search for evidence, to sanction, to sue—these are all quintessentially executive functions.[9] And

---

entity. 53 F.4th at 881 n.22 (citing *Amtrak II*, 575 U.S. at 46, 50–55). The D.C. Circuit's private nondelegation analysis, however, remains sound and has been approved by our court. *See ibid.* (explaining that *Amtrak I* "expressed the [private nondelegation doctrine] more precisely" than prior formulations).

[9] *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."); *Morrison v. Olson*, 487 U.S. 654, 696 (1988) (reasoning "the power to initiate an investigation" is executive power that must be subject to the Attorney General's "unreviewable discretion"); *Buckley v. Valeo*, 424 U.S. 1, 138, 140 (1976) (per curiam) (concluding the "discretionary power to seek judicial relief" and "conduct[] civil litigation in the courts of the United States for vindicating public rights" are exercises of Article II executive power); *Seila L. LLC v. CFPB*, 591 U.S. 197, 225 (2020) (holding the CFPB director unconstitutionally exercised "executive power" to "set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties"); *id.* at 219 (holding the "power to seek daunting monetary penalties against private parties . . . [is] a quintessentially executive power"); *Free Enter. Fund*, 561 U.S. at 504 (holding the "power to start, stop, or alter individual Board investigations" is part of the executive power); *Collins v. Yellen*, 594 U.S. ---, 141 S. Ct. 1761, 1786 (2021) (holding the power "to issue subpoenas" is an "executive power"); *id.* at 1806 (Sotomayor, J., concurring in part and dissenting in part) (noting "the power to impose fines" is an "executive power"); *id.* at 1805 (Sotomayor, J. concurring in part and dissenting in part) (arguing the FTC had significant executive power because it had "wide powers of investigation" and "broad authority to issue complaints and cease-and-desist orders" (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 620–21 (1935))); *United States v. Grubbs*, 547 U.S. 90, 98

No. 23-10520

they have been considered so from our Nation's founding.[10] As much as legislative power, the private nondelegation doctrine forbids unaccountable delegations of executive power. *See, e.g.*, *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("Private entities are not vested with 'legislative powers.' Art. I, § 1. Nor are they vested with the 'executive Power,' Art. II, § 1, cl. 1, which belongs to the President."). Accordingly, we must determine whether HISA delegates enforcement power to private entities and, if so, whether that power is subordinate to the FTC.

HISA divides enforcement authority among the FTC, the Authority, and USADA, "each within the scope of their powers and responsibilities under this chapter." § 3054(a). Recall that USADA is the private non-profit to whom the Authority must delegate anti-doping and medication enforcement. *See* § 3054(e)(1)(A).[11] So, the answer to the question before us

---

(2006) (describing a search as an "exercise of executive power"); *California v. Acevedo*, 500 U.S. 565, 586 (1991) (Stevens, J., dissenting) ("The Fourth Amendment is a restraint on Executive power.").

[10] *See generally* Dina Mishra, *An Executive-Power Non-Delegation Doctrine for the Private Administration of Federal Law*, 68 Vand. L. Rev. 1509, 1545 (2015) (discussing "[c]ertain types of tasks that seem quintessentially executive," including "the tasks of law enforcement—that is, of forcing compliance with the law"); *id.* at 1546 ("Ratification-era history further supports the understanding that law enforcement consists of forcing compliance or imposing sanctions on law violators" (citing The Federalist No. 21, at 134–35 (Alexander Hamilton) (Clinton Rossiter ed. 1961))); Aditya Bamzai & Saikrishna B. Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1764 (2023) ("Law execution was the executive power's principal component."); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 737 (2003) ("Executive officers investigate, apprehend, and prosecute potential lawbreakers. As the wielder of the executive power, the president is the chief of these law enforcement executives."); Ilan Wurman, *In Search of Prerogative*, 70 Duke L.J. 93, 146–47 (2020) (arguing that law enforcement and prosecution powers have been considered core executive functions since the Founding).

[11] The Authority also "may enter into agreements" with State racing commissions to enforce the racetrack safety program. *See* § 3054(e)(2)(A)(i), (3); § 3056(c). The

turns on what "powers and responsibilities" each of these three entities has under HISA. Although HISA somewhat confusingly disperses the relevant provisions throughout the Act, we can discern the following division of labor.

First, the Authority has responsibility for (1) investigating potential violations, including by issuing subpoenas (§ 3054(h)); (2) levying sanctions (§§ 3054(j)(1), 3057, 3058(a)); and (3) bringing suit against violators for injunctive relief or to enforce sanctions (§ 3054(j)(1)–(2)). Second, actual enforcement of doping and medication rules is done by USADA, which "implements" those rules "on behalf of the Authority." § 3054(e)(1)(E)(i). In this regard, USADA's responsibilities include "independent investigations, charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations." § 3055(c)(4)(B); *see also* § 3054(e)(1)(E)(iv). Third, the FTC may ask an ALJ to review any sanction *de novo*, § 3058(b)(1), and the FTC may itself review the ALJ's decision *de novo*, either on its own motion or upon petition by an aggrieved party. § 3058(c).

The Act's plain terms permit only one conclusion: HISA is enforced by a private entity, the Authority. The Authority decides whether to investigate a covered entity for violating HISA's rules. The Authority decides whether to subpoena the entity's records or search its premises. The Authority decides whether to sanction it. And the Authority decides whether to sue the entity for an injunction or to enforce a sanction it has imposed. To be sure, the Authority does not perform these functions itself. Rather, HISA requires the Authority to contract with another private entity, USADA, which undertakes enforcement "on behalf of the Authority."

---

Authority remains in charge, however, and dictates the "scope of work, performance metrics, reporting obligations, budgets, and any other matter [it] considers appropriate." § 3054(e)(2)(B).

No. 23-10520

§ 3054(e)(1)(E)(i). The bottom line, though, is that a private entity, not the agency, is in charge of enforcing HISA.

Consider also what HISA does not say. It does not empower the FTC to decide whether to investigate a covered entity, whether to subpoena its records, whether to search its premises, whether to charge it with a violation, or whether to sanction or sue it. Nor does the Act empower the FTC to countermand any of the Authority's investigatory or charging decisions (or, more precisely, USADA's decisions). Nor does it require the Authority or USADA to seek the FTC's approval before investigating, searching, charging, sanctioning, or suing. All these actions are enforcement actions, and, by the plain terms of the Act, they can be done by the private entities without the FTC's involvement.

The inescapable conclusion is that the Authority does not "function subordinately" to the FTC when enforcing HISA. *Horsemen's I*, 53 F.4th at 881. That is not permitted under the private nondelegation doctrine. A private entity that can investigate potential violations, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the say-so of the agency—does not operate under that agency's "authority and surveillance." *Ibid.* Put another way, with respect to enforcement, HISA's plain terms show that the Authority does not merely act "as an aid" to the FTC because the FTC does not "retain[] the discretion to approve, disapprove, or modify" the Authority's enforcement actions. *Ibid.* (cleaned up) (quoting *Amtrak I*, 721 F.3d at 671).

### 3.

One might counter, though, that the FTC at least partially supervises the Authority because it can review sanctions at the back end, after ALJ review. *See* §§ 3055(c)(4)(B), 3058(b)(3)–(c)(3). That is true, and it is the

No. 23-10520

Authority's best argument for why its enforcement power is subordinate to the FTC.

The argument nonetheless fails. Suppose the Authority sanctions a horse owner for a doping violation, but the sanction is later reversed by the FTC. Does that make the Authority's enforcement power subordinate to the agency? No, it does not. Consider everything the Authority was permitted to do up to that point: launch an investigation into the owner, subpoena his records, search his facilities, charge him with a violation, adjudicate it, and fine him.[12] Each and every one of those actions is "enforcement" of HISA. Each can occur under HISA without any supervision by the FTC. Moreover, penalties imposed by the Authority are not automatically stayed pending appeal. *See* 16 C.F.R. § 1.148(a). So, any penalty goes into effect as soon as the Authority makes its decision, unless the ALJ or FTC exercises its discretion to implement a stay pending appeal. *See* § 3058(d).

---

[12] Not only does HISA facially permit that, but it has already happened. For example, in one currently active and undecided FTC appeal, it is uncontested that three private Authority investigators showed up at the appellant's residence and served her with a notice of an alleged doping violation (there is no personal service requirement under the statute). The investigators then "subjected [the appellant] to a coercive interrogation in a small room" and searched "her barn and . . . her mother's car" for banned substances. Statement of Contested Facts and Specification of Additional Evidence, *In re Lynch*, 9423 F.T.C. 1, 3–4 (Mar. 1, 2024). She was then fined $55,000 and banned from racing for 48 months. *Id.* at 5–6. Authority investigators have also searched defendants' property and extracted fines under HISA's strict liability regime for possession of banned substances. For example, one veterinarian forgot to clean out his trailer and still had two buckets of a newly banned substance two weeks after the effective date. Private Authority investigators searched his trailer, found the buckets, fined him $5,000, and banned him from practice for 14 months. The ALJ affirmed on appeal. All this despite the fact that the Authority and the ALJ conceded that the appellant purchased the substance long before it was banned, forgot it was in his trailer, and did not even attempt to use it on a horse. *In re Perez*, 9420 F.T.C. 1, 5–6 (Mar. 18, 2024); *see also In re Poole*, 9417 F.T.C. 1, 5–6, 10 (Nov. 13, 2023) (affirming an $18,000 fine and banning him from practice for 22 months for a similar inadvertent possession of a newly banned substance).

No. 23-10520

It is no answer to say that the FTC can come in at the tail-end of this adversarial process and review the sanction. As far as enforcement goes, the horse was already out of the barn. (You knew that was coming.) Besides, what if the sanctioned owner, instead of fighting the process, opts to settle for a lower fine? In that case, according to the Authority's logic, *no one* has enforced HISA. That is obviously not true. To the contrary, the settlement scenario—which will likely happen often—only underscores that it is the private entity that acts as HISA's enforcer in any meaningful sense.

Consider a hypothetical. Suppose a city structures its speeding laws to let a group of private car enthusiasts monitor speeds with their own radar guns, pull speeders over, and ticket them. Fines are reviewed by the police department and, ultimately, the mayor. Who *enforces* the speeding laws? Anyone would say the private group. After all, consider how many cases we decide concerning whether the police have wrongly stopped someone or used excessive force during the stop. *See, e.g.*, *Terrell v. Town of Woodworth*, No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024) (per curiam). All would agree that the police were "enforcing" the law when they stopped the person. The same goes for the private entity in the hypothetical.

The Authority's argument, moreover, does not work even on its own terms. In addition to levying fines, HISA empowers the Authority to sue people and racetracks to enjoin past, present, or impending violations. *See* § 3054(j)(1) (providing "the Authority may commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation of this chapter . . . to enjoin such acts or practices"); § 3054(j)(2) (allowing issuance of "a permanent or temporary injunction or restraining order . . . without bond"). HISA gives the FTC no role in this process, either before or after the fact. So, even assuming the Authority is correct (and it is not) that the agency's after-the-fact supervision of sanctions makes the Authority subordinate, the

No. 23-10520

Authority is demonstrably *not* subordinate when it comes to suing violators for injunctions. That is plainly an unsupervised delegation of executive power that the Constitution does not tolerate. *See Buckley*, 424 U.S. at 138 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts [this] responsibility[.]").

**4.**

The Authority next argues that the FTC could use its new rulemaking authority to rein in the Authority's enforcement actions or even require the Authority to preclear lawsuits with the agency. *See* § 3053(e) (empowering FTC to "abrogate, add to, and modify" the Authority's rules). This argument persuaded the Sixth Circuit that at least a *facial* challenge to the Authority's enforcement powers should fail. *See Oklahoma*, 62 F.4th at 231 (through § 3053(e) rulemaking, "the FTC *could* subordinate every aspect of the Authority's enforcement," which "suffices to defeat a facial challenge"). And we have already found that the FTC's rulemaking power has some purchase in turning back a facial challenge to the Authority's *rulemaking* power: as explained, the agency could ensure via rulemaking that no Authority rule could go into effect until the agency had time to review it. *See supra* III.A. With great respect to our colleagues on the Sixth Circuit, however, we are not convinced that this rulemaking argument can save the Authority's enforcement powers.

The Authority's rulemaking argument would let the agency rewrite the statute. In HISA, Congress set out a definite enforcement scheme, dividing responsibilities among the FTC, the Authority, and USADA. *See* §§ 3054(e)(2), 3054(c)(1), 3054(e). HISA is quite clear about this: it provides that those three entities "implement and enforce" the Act, "*each within the scope of their powers and responsibilities under this chapter.*" § 3054(a)(1) (emphasis added). A mere agency cannot alter that statutory

No. 23-10520

division of labor. *See, e.g.*, *Gulf Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) ("We will not defer to 'an agency interpretation that is inconsistent with the design and structure of the statute as a whole.'" (quoting *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014))); 5 U.S.C. § 706(2)(C) (authorizing courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations").[13] As the Supreme Court recently reiterated, even "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." *Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355, 2368 (2023) (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). Yet that is just what the Authority says the FTC could do through rulemaking.

Take the Authority's power to seek injunctions. HISA empowers the Authority to file suit to enjoin violations, while saying nothing about FTC involvement in the process. *See* § 3054(j)(1). Yet the Authority suggests the FTC could, by rule, require the Authority to preclear any such action with

---

[13] *See also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001) (holding that agency rulemaking "has no bearing upon" whether a statutory delegation is constitutional); *Hartford Underwriters Ins. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6–7 (2000) ("Where a statute names the parties granted the right to invoke its provisions, such parties only may act." (cleaned up) (citation omitted)); *Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084–85 (11th Cir. 2013) (holding it "axiomatic that an agency's power to promulgate legislative regulations is limited to the authority delegate[d] to it by Congress" and that courts cannot "locate . . . power in one agency where it had been specifically and expressly delegated by Congress to a different agency"); *Union Pac. R.R. v. Surface Transp. Bd.*, 863 F.3d 816, 823 (8th Cir. 2017) (finding express delegation to the Federal Railroad Administration precluded implied authority claimed by the private Board); *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) (per curiam) ("We agree with the general proposition that when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor[.]"); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (relying on the statute's "plain text and structure [to] establish a clear chronology of federal and State responsibilities").

the agency. We disagree. That would let the agency amend the enforcement scheme delineated by statute.[14] The same goes for investigatory and subpoena power: HISA unqualifiedly gives that power to the Authority, *see* § 3054(h), and then requires the Authority to delegate it to USADA, *see* §§ 3054(e)(1)(E)(iv), 3055(c)(4) (the Authority "shall" contract with USADA to "conduct and oversee" anti-doping and medication enforcement "including independent investigations"). And the same goes for charging and adjudicating violations and levying sanctions. *See ibid.* (the Authority "shall" contract with USADA to "conduct and oversee . . . charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations"); § 3054(j) (recognizing Authority's power to impose "civil sanctions"). Congress enacted this reticulated scheme. The agency cannot amend it by promulgating a rule.

Furthermore, when Congress wanted to put the FTC in charge of enforcement, it knew how. Section 3059, for instance, is a separate part of HISA targeting certain "unfair or deceptive" practices in selling horses.[15] With respect to *that* section, the Authority can only "recommend" that the

---

[14] Nor could the Authority claim that the statute is merely silent about FTC pre-approval and that gap could be filled by rulemaking. Our circuit has repeatedly rejected this "nothing-equals-something argument" for conjuring agency authority out of thin air. *Gulf Fishermen's*, 968 F.3d at 460–61 (citing *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by equally divided court*, 579 U.S. 547 (2016) (per curiam)).

[15] *See* § 3059 (deeming it an unfair or deceptive practice under 15 U.S.C. § 45(c) to fail to disclose to a buyer that a horse was administered "a bisphosphonate" before its fourth birthday or any other prohibited substance).

FTC "commence an enforcement action."[16] § 3054(c)(1)(B). In other words, only here did Congress limit the Authority's enforcement discretion to "recommending" agency enforcement. *Cf.* § 3054(j)(1) (providing "the Authority may commence a civil action" seeking an injunction). Yet the Authority contends that the agency could, by rulemaking, make *every* enforcement action subject to similar FTC approval. That would rewrite the enforcement scheme Congress enacted. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up) (citation omitted)).

Additionally, the Sixth Circuit believed the FTC could supervise the Authority through a slightly different kind of rulemaking—that is, by issuing rules governing *how* the Authority enforces HISA. *See Oklahoma*, 62 F.4th at 231. For instance, the agency could issue rules against "overbroad subpoenas or onerous searches" or "provid[ing] a suspect with a full adversary proceeding and with free counsel." *Ibid.* Unhappily, we again disagree with our sister circuit.

The Horsemen are not complaining about *how* the Authority exercises its enforcement power. They are complaining about *where* the enforcement power is lodged: on its face, HISA empowers private entities to enforce it and permits agency oversight only after the enforcement process is over and done with (and then only with respect to fines, not injunctions). If the Horsemen were objecting only to overbroad subpoenas, unwarranted

---

[16] *See* § 3054(c)(1)(B) (providing the "Authority . . . with respect to an unfair or deceptive act or practice described in section 3059 of this title, may recommend that the Commission commence an enforcement action").

searches, or lack of free counsel, perhaps those complaints could be addressed through rulemaking or as-applied challenges. But their complaint is different. They contend that HISA facially delegates unsupervised enforcement power to private actors. They are right.[17]

In sum, HISA's clear delineation of enforcement power between the FTC, the Authority, and USADA cannot be altered through rulemaking.

### 5.

Finally, the Authority defends its enforcement role by analogizing it to the role of self-regulatory organizations ("SROs")—specifically, FINRA—which assist the SEC in enforcing securities laws. The Authority seeks support in circuit cases concluding that FINRA's enforcement role presents no private nondelegation problem. *See, e.g.*, *Oklahoma*, 62 F.4th at 229, 232 (gathering cases).[18] For their part, the Horsemen argue that, for

---

[17] Moreover, consider the revealing premise of this line of argument. Suppose the FTC issued a rule saying, "The Authority can search racetracks only if it has probable cause." Well and good, but that rule still presupposes *the Authority* is the one doing the search. Merely because the Authority would have to obey the Fourth Amendment does not change the fact that a private entity is searching your racetrack without agency say-so. And it is no answer to say that the agency could issue a rule saying, "The Authority can search racetracks only if the FTC approves the search." That rule, as explained, would amend the statute's division of authority. *See* § 3054(h) ("The Authority shall have subpoena and investigatory authority with respect to civil violations committed under its jurisdiction.").

[18] The Sixth Circuit relied on several cases upholding the constitutionality of FINRA to hold that "[i]n case after case, the courts have upheld [the Maloney Act's] arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma*, 62 F.4th at 229. We do not read those cases quite so broadly. They relied largely on the grounds that the SEC ultimately approves any proposed rules and has its own generalized rulemaking power. *See, e.g.*, *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 696 (2d Cir. 1952) (considering only whether the SEC abused its discretion); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977) (considering only a nondelegation challenge to the SEC's legislative rulemaking authority); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979) (same); *Sorrell*

No. 23-10520

enforcement purposes, the FTC-Authority relationship is meaningfully different from the SEC-FINRA relationship. As we have before noted, HISA was modeled on the Maloney Act, which created FINRA. *See Horsemen's I*, 53 F.4th at 887; *supra* III.A. Moreover, we concluded in *Horsemen's I* that HISA lacked a key feature of the Maloney Act empowering the SEC to "abrogate, add to, and delete" rules proposed by FINRA. *Horsemen's I*, 53 F.4th at 887. As discussed, Congress added a similar provision to HISA, which remedied the nondelegation problem with the Authority's rulemaking powers. *Supra* III.A.

We agree with the Horsemen that, for enforcement purposes, HISA gives the Authority an enforcement role meaningfully different from FINRA's. Unlike the SEC-FINRA relationship, HISA does not give the FTC potent oversight power over the Authority's enforcement such as the power to enforce HISA itself, deregister the Authority as the enforcing entity, or remove its directors.

To begin with, Congress empowered the SEC to enforce FINRA's rules if needed. The SEC can "in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate" the Maloney Act. 15 U.S.C. § 78u(a)(1). The SEC can also, on its own accord, seek criminal sanctions, injunctive relief, or disgorgement. § 78u(c), (d), (d)(4). The FTC cannot. *See* § 3054(c)(iii) (granting the Authority investigatory power); § 3054(e) (granting the Authority and USADA enforcement responsibility). The SEC has power to issue subpoenas, *see* §§ 77s(c), 78u(c), while HISA gives the Authority that power, § 3054(h), (c)(ii). The SEC can also revoke FINRA's ability to

---

*v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982) (same). But none addressed a nondelegation challenge to executive power.

No. 23-10520

enforce its rules, § 78s(g)(2), and step in and enforce any written rule itself, § 78o(b)(4). HISA gives the FTC none of these tools.

Moreover, HISA diverges radically from the Maloney Act in empowering the Authority to sue. The SEC alone has the power to bring civil suits, §§ 78u-1(a), 78u(d)(1), while HISA gives that power exclusively to the Authority, § 3054(j)(1). Giving a private entity the sole power to sue in federal court to enforce a statute cuts to the core of executive power. *See Buckley*, 424 U.S. at 138 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts [this] responsibility[.]").[19]

Finally, the SEC "retains formidable oversight power to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007). The FTC does not. This "formidable" power is manifest in the SEC's ability to derecognize FINRA's regulatory role entirely, §§ 78s(a)(3), (h)(1); remove FINRA board members for cause, § 78s(h)(4); remove any individual FINRA member, § 78s(h)(2); and bar any person from associating with FINRA, § 78o-3(g)(2). HISA, on the other hand,

---

[19] One may reasonably ask whether HISA's delegation of enforcement authority is supported by an analogous delegation in qui tam statutes. We think not. The Horsemen note our decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (en banc), where we held that the False Claims Act ("FCA") does not violate Article I's Take Care Clause. They argue that *Riley* does not support HISA's delegation because qui tam relators are episodic and do not have a continuing relationship with the government. That is true, but we see a more fundamental distinction between the two statutes: under the FCA, the executive branch has substantial power over qui tam relators that the FTC does not have over the Authority. For example, the United States can intervene in any qui tam litigation, take control of the litigation, veto settlement agreements, and dismiss the suit "notwithstanding the objections of the [relator]." *Id.* at 753–54. HISA gives the FTC none of those powers.

No. 23-10520

"recognize[s] for purposes of developing and implementing" the Act only "[t]he private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority.'" § 3052(a). And only the Authority's Board can remove members: directors by a two-thirds vote and committee members for any reason.[20]

\* \* \*

In sum, we agree with the Horsemen that the FTC lacks adequate oversight and control over the Authority's enforcement power. HISA's explicit division of enforcement responsibility empowers the Authority with quintessential executive functions and gives the FTC scant oversight until enforcement has already occurred. Such backend review by the FTC does not subordinate the Authority. And the FTC's general rulemaking power provides no answer because executive rulemaking cannot amend the plain division of enforcement power laid out in HISA's text. Such a radical delegation differs materially from the SEC-FINRA relationship because the FTC lacks any tools to ensure that the law is properly enforced. HISA's enforcement provisions thus violate the private nondelegation doctrine.

## C. Due Process Challenge

We turn next to the Horsemen's challenge based on the Fifth Amendment's Due Process Clause. They argue that HISA, both facially and as-applied, deprives them of due process by permitting economically self-interested actors to regulate their competitors. *See Carter Coal*, 298 U.S. at 311 (government violates due process by allowing regulation by "private persons whose interests may be and often are adverse to the interests of

———————————

[20] In saying all this, we express no opinion on whether the SEC-FINRA relationship poses any constitutional issues under the private nondelegation doctrine (or any other doctrine). Such questions are not posed by this case.

No. 23-10520

others in the same business"). Specifically, the Horsemen contend that *Carter Coal* does not require proof of economic self-interest, only that the private person "may be" adverse to those he regulates. They then argue that several members of the Board and standing committees violate the conflict of interest provisions due to their professions and prior financial interests. Finally, the Horsemen contend that the statute fails to properly protect against self-interested actors because it does not cover financial interests other than interests in a covered horse, as opposed to a racetrack or other facility.

The district court correctly rejected these claims. As to the Horsemen's facial challenge, the court concluded it was defeated by HISA's conflict-of-interest provisions. *See Black*, 672 F. Supp. 3d at 252. Those provisions prohibit a range of individuals from serving as Board or independent committee members, § 3052(e), including individuals with financial interests in, or who provide goods or services to, covered horses; officials, officers, or policy makers for an equine industry; and employees, contractors, or immediate family members of the prior individuals. § 3052(e)(1)–(4).

As to the as-applied challenge, the district court rejected it on the facts. Following a bench trial, the court found the Horsemen relied only on the committee members' biographical information but adduced no other evidence showing their adverse interests, financial or otherwise. *See Black*, 672 F. Supp. 3d at 252 ("HISA affords sufficient protection through its conflicts-of-interest provisions, and the plaintiffs have not met their burden to show unconstitutional self-dealing by directors, committee members, or others associated with the Authority."). At most, the court observed that the biographical information may show the members do not qualify as "independent members." *Ibid.*; § 3052(b)(1)(A) ("[I]ndependent members [must be] selected from outside the equine industry."). But, as the court

pointed out, even assuming that to be true, it says nothing about the members' financial interests. *Black*, 672 F. Supp. 3d at 252. On appeal, the Horsemen fail to show any error by the district court here.

## D. Appointments Clause Challenge

A separate plaintiff, Gulf Coast, challenges the Authority's structure under the Appointments Clause of Article II.[21] Recall that Gulf Coast raised this distinct challenge in a suit later consolidated with the Horsemen's. *See id.* at 230. Gulf Coast argues that, for constitutional purposes, the Authority is governmental, not private, and so is subject to the Appointments Clause. This means the Authority's directors, if they are principal officers, must be appointed by the President with Senate confirmation or, if they are inferior officers, by the President, courts, or department heads according to law. *See Free Enter. Fund*, 561 U.S. at 487–88; *Cochran v. SEC*, 20 F.4th 194, 198 (5th Cir. 2021) (en banc). The Authority's directors are not appointed in any of these ways,[22] and so, if Gulf Coast is right, their appointment would violate Article II.

The Authority and the FTC first respond that we previously decided this question in *Horsemen's I*. By applying the *private* nondelegation doctrine to the Authority, they argue we necessarily determined the Authority is not governmental for constitutional purposes. The district court took this view

_____

[21] The Appointments Clause reads "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for" but provides "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

[22] The directors are appointed by the Authority itself. *See* § 3052(d)(3) (Board members are selected by the Authority's nominating committee).

No. 23-10520

as well. *See Black*, 672 F. Supp. 3d at 234. That is understandable. Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive. For constitutional purposes, an entity is either governmental or not. *See, e.g.*, *Lebron*, 513 U.S. at 378–79; *Amtrak II*, 575 U.S. at 50–51. That is why the Horsemen themselves call Gulf Coast's claim "fundamentally incompatible" with their private nondelegation challenge. Texas seems to agree, noting that Gulf Coast's Appointments Clause theory would apply only if "the Court disagree[s]" with its assumption that the Authority is private.

That said, however, we cannot agree that we decided this question in *Horsemen's I*. The Appointments Clause question was never posed. Party presentation is a fundamental constraint on appellate decision-making. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) ("Courts . . . wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." (cleaned up) (citation omitted)). The fact is that in *Horsemen's I*, all parties proceeded on the assumption that the Authority is private for constitutional purposes. *See Horsemen's I*, 53 F.4th at 875 n.11 ("The Horsemen also claimed HISA was unconstitutional under the . . . Appointments Clause. The district court did not rule on those claims and so they are not before us."). No one suggested that the Authority might qualify as a government entity or that its directors were subject to the Appointments Clause. So, because we did not settle the question previously, we can address it now. *See Companion Prop. & Cas. Ins. v. Palermo*, 723 F.3d 557, 561 (5th Cir. 2013) ("Appellate powers are limited to reviewing issues raised in, *and decided by*, the district court." (cleaned up) (citation omitted)); *Alpha/Omega Ins. Servs. v. Prudential Ins. of Am.*, 272 F.3d 276, 281 (5th Cir. 2001) ("[T]he law of the case doctrine only applies to issues we actually decided[.]").

No. 23-10520

The basic premise of Gulf Coast's argument is that the Authority is part of the federal government for Appointments Clause purposes. *See Amtrak II*, 575 U.S. at 50–51. We of course recognize that HISA calls the Authority private, as does the Authority's own charter. *See* § 3052(a) ("The private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority' is recognized for purposes of developing and implementing [HISA]."); HISA Charter ("The Corporation is organized and shall be operated as a nonprofit business league[.]"). But deeming an entity "private" does not settle whether it is legally part of the federal government. Otherwise, the government could evade constitutional restrictions by mere labeling. *See Lebron*, 513 U.S. at 397 ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."). So, we must determine whether the Authority qualifies as part of the federal government for constitutional purposes.

The analysis guiding that inquiry comes from *Lebron*. In that case, the Supreme Court examined "the long history of corporations created and participated in by the United States for the achievement of governmental objectives." *Id.* at 386.[23] The specific question before the Court was whether "Amtrak, though nominally a private corporation, must be regarded as a Government entity for First Amendment purposes." *Id.* at 383. The answer was yes. That was so, the Court held, because "the Government create[d] [the Amtrak] corporation by special law, for the furtherance of governmental

---

[23] *See also id.* at 386–91 (discussing corporations such as the first and second Banks of the United States, the Panama Railroad Company, the United States Grain Corporation, the Reconstruction Finance Corporation, the Federal Deposit Insurance Corporation, the Communications Satellite Corporation, the Corporation for Public Broadcasting, and the Legal Services Corporation).

No. 23-10520

objectives, and retain[ed] for itself permanent authority to appoint a majority of the directors of that corporation." *Id.* at 399. The Supreme Court and circuit courts have since used *Lebron*'s analysis to discern whether corporations are part of the government for constitutional purposes.[24] Applying *Lebron*, we conclude that the Authority is not a federal instrumentality for purposes of the Appointments Clause.

First, the Authority was not created by the federal government "by special law," *ibid.*, but was incorporated under Delaware law shortly before HISA's passage. Contrast this with Amtrak, which "Congress established" by enacting the Rail Passenger Service Act of 1970. *Id.* at 383–84; *see also Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 454 (1985) (observing "Congress established the National Railroad Passenger Corporation, a private, for-profit corporation that has come to be known as Amtrak").

Second, the Authority was not created to further "governmental objectives," *Lebron*, 513 U.S. at 399, but instead as a private association to address doping, medication, and safety issues in the thoroughbred racing

---

[24] *See Nebraska*, 143 S. Ct. at 2366–67 (applying *Lebron* to conclude that the Missouri Higher Education Loan Authority is "an instrumentality of Missouri"); *Free Enter. Fund*, 561 U.S. at 486 (citing *Lebron* when referencing parties' agreement that the Public Company Accounting Oversight Board ("PCAOB") "is 'part of the Government' for constitutional purposes"); *Amtrak II*, 575 U.S. at 54–55 (explaining *Lebron* "provides necessary instruction" and "teaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status"); *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 158–59 (4th Cir. 2018) (applying *Lebron* to conclude that the Metropolitan Washington Airports Authority ("MWAA") is not "a federal entity" because "MWAA was not created by the federal government" and "is not controlled by the federal government"); *Montilla v. Fed. Nat'l Mortg. Ass'n*, 999 F.3d 751, 759–61 (1st Cir. 2021) (applying *Lebron* to conclude that Fannie Mae and Freddie Mac are not government actors).

industry. Again, contrast this with Amtrak, which Congress created "to avert the threatened extinction of passenger trains in the United States" and for other goals Congress itself "establish[ed]." *Id.* at 383.

Third, the federal government does not "control[] the operation of the [Authority]," nor has it "retain[ed] for itself permanent authority to appoint a majority of the [Authority's] directors." *Ibid.* To the contrary, the government has no role in appointing the Authority's Board. Once again, contrast this with Amtrak—where a majority of its directors was appointed by the President. *Id.* at 397–98; *see also Amtrak II*, 575 U.S. at 51 (observing that seven of nine Amtrak board members "are appointed by the President and confirmed by the Senate"); *cf. Free Enter. Fund*, 561 U.S. at 484, 484–85 (noting the PCAOB—despite being statutorily deemed "private"—is a "Government-created, Government-appointed entity," whose five members are "appointed . . . by the [SEC]").

Instead of engaging with *Lebron*, Gulf Coast argues that *Lebron*'s analysis is not "the *only* way" to tell whether a corporation is a government instrumentality. That takes too narrow a view of precedent, however. *Lebron* canvassed "the long history of corporations created and participated in by the United States" and set out a detailed analysis to determine whether a particular corporation—despite its designation as "private"—counts as a government instrument for constitutional purposes. *See* 513 U.S. at 386, 386–91. That is precisely the question we must answer with respect to the Authority. How can we, as an inferior court, simply bypass *Lebron*? We cannot.

Gulf Coast tries to offer us a way around *Lebron*, but it is a dead end. Gulf Coast argues that *Lebron* addressed only government-created corporations "that in no way exercised government power." But *Lebron* did not limit itself in that way—to the contrary, it relied on cases where Congress

turned to private corporations to "accomplish purely governmental purposes." 513 U.S. at 395 (quoting *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946)).[25] Furthermore, the corporation actually addressed in *Lebron*—Amtrak—itself exercised regulatory power, as the Supreme Court, the D.C. Circuit, and our court have all recognized. *See Amtrak II*, 575 U.S. at 51 ("Amtrak . . . cannot constitutionally be granted the regulatory power[.]" (citation and quotation omitted)); *Amtrak I*, 721 F.3d at 671 ("No case prefigures the unprecedented regulatory powers delegated to Amtrak."); *Horsemen's I*, 53 F.4th at 889 (discussing how Congress gave "regulatory power to the 'economically self-interested Amtrak'" (citation omitted)).

Gulf Coast also argues that, to determine whether directors of a private entity are "Officers of the United States," we should focus on their duration in office and the nature of the entity's power. We disagree. The two principal cases Gulf Coast relies on for this argument addressed whether individuals *already part* of the government should be considered "Officers." So, *Buckley* examined whether Federal Election Commission appointees wielded "significant authority pursuant to the laws of the United States." 424 U.S. at 126. And *Lucia v. SEC* applied this same test to SEC ALJs. 585 U.S. 237, 244–45 (2018). Gulf Coast urges us to extend *Buckley* and *Lucia* well beyond their facts to analyze whether persons in a *private* entity are "Officers." Even if we were inclined to take that step, however, *Lebron* would remain an insuperable hurdle. As explained, *Lebron* addressed when a private entity qualifies as part of the government for constitutional purposes.

---

[25] *See also Inland Waterways Corp. v. Young*, 309 U.S. 517, 524 n.4 (1940) ("The corporations, of course, perform 'governmental' functions." (citation omitted)); *id.* at 522 ("The banking system which Congress thus established embodied a blend of governmental and private purposes.").

No. 23-10520

That is precisely the question before us. Post-*Lebron*, no case has applied *Buckley* to private actors. Instead, the Supreme Court has repeatedly applied *Lebron* for three decades. *See supra* note 23. We are not at liberty to displace the Supreme Court's governing framework.[26]

Finally, Gulf Coast argues that if *Lebron* is the test, then the federal government can simply vest all executive power in a private corporation and avoid the Appointments Clause. This argument ignores the role of the private nondelegation doctrine. The government cannot delegate core governmental powers to unsupervised private parties. *Pittston*, 368 F.3d at 394. A private entity can only act "subordinately to an agency with authority and surveillance over it." *Horsemen's I*, 53 F.4th at 881 (quotations omitted). The private nondelegation doctrine thus corrals any attempts to evade *Lebron* by giving unaccountable governmental power to a pre-existing private entity.

In sum, *Lebron* is the governing test to determine whether an entity is private or public and, under that test, the Authority is a private entity not subject to Article II's Appointments Clause.

## E. Anti-Commandeering Challenge

Finally, we turn to Gulf Coast's argument that HISA unconstitutionally commandeers state officials. The Constitution forbids Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*

---

[26] That principle also answers Gulf Coast's reliance on a 2007 Office of Legal Counsel ("OLC") opinion. The opinion argued that the Appointments Clause applies to someone with significant and continuing government authority, whether he is a private or a government employee. *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 121–22 (2007). If the opinion was suggesting its analysis as an alternative to *Lebron* (a decision, it should be noted, the opinion cited, *see id.* at 121), that is a suggestion only the Supreme Court could act upon, not a circuit court bound by *Lebron*.

No. 23-10520

*v. United States*, 521 U.S. 898, 935 (1997); *see also New York v. United States*, 505 U.S. 144, 165, 188 (1992). Gulf Coast argues HISA violates that principle by coercing state racing commissions to remit fees to fund the Authority's operations. If state officials refuse, the Authority collects fees directly from covered persons—but, in that event, HISA prohibits the state from imposing taxes or fees to finance the state's own horseracing programs. *See* § 3052(f). This scheme, argues Gulf Coast, "puts a gun to the head of Texas" by coercing state officials to administer a federal program rather than a state program.

The problem with this claim, as the district court pointed out, is that Gulf Coast lacks standing to raise it. Specifically, Gulf Coast's alleged injury—that it prefers Texas's racetrack safety rules to HISA's—is "no injury at all." *Black*, 672 F. Supp. 3d at 250. As the district court correctly reasoned, "[a] party cannot establish constitutional injury by suggesting that he may be subject to rules he does not prefer." *Ibid.*; *see also, e.g., Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024) (holding that "merely being subject to . . . regulations, in the abstract, does not create an injury").

On appeal, Gulf Coast fails to explain how the district court erred. It merely argues that the coercive pressure the funding scheme allegedly places on Texas will lead it to implement HISA's rules rather than the current Texas regulations, which makes Gulf Coast subject to "a new set of unwanted (federal) regulations." Again, though, this does not explain why Gulf Coast experiences an injury sufficient to assert an anti-commandeering challenge to HISA.

## IV. Conclusion

In sum, we affirm the district court's judgment that (1) Congress's recent amendment to HISA cured the private nondelegation flaw in the

No. 23-10520

Authority's rulemaking power; (2) HISA does not violate due process; (3) the Authority's directors are not subject to the Appointments Clause under *Lebron*; and (4) Gulf Coast lacks standing to challenge HISA on anti-commandeering grounds.

We reverse the district court's judgment in one respect. Insofar as HISA is enforced by private entities that are not subordinate to the FTC, we DECLARE that HISA violates the private nondelegation doctrine.

Accordingly, the district court's judgment is AFFIRMED in part and REVERSED in part.