No. 23-10520

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; PENNSYLVANIA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; WASHINGTON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION; GULF COAST RACING, L.L.C.; LRP GROUP, LIMITED; VALLE DE LOS TESOROS, LIMITED; GLOBAL GAMING LSP, L.L.C.; TEXAS HORSEMEN'S PARTNERSHIP, L.L.P.,

*Plaintiffs-Appellants,*

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs-Appellants,*

*v.*

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH SCHANZER; HORSERACING INTEGRITY AND SAFETY AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE WILSON; LISA LAZARUS; STEVE BESHEAR; ADOLPHO BIRCH; ELLEN MCCLAIN; CHARLES SCHEELER; JOSEPH DEFRANCIS; SUSAN STOVER; BILL THOMASON; LINA KHAN, CHAIR; REBECCA SLAUGHTER, COMMISSIONER; ALVARO BEDOYA, COMMISSIONER; D. G. VAN CLIEF,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of Texas, Consol. No. 5:21-cv-71

## UNOPPOSED AND EXPEDITED MOTION TO STAY MANDATE PENDING FILING AND DISPOSITION OF PETITION FOR WRIT OF CERTIORARI BY AUTHORITY DEFENDANTS-APPELLEES

John C. Roach
RANSDELL ROACH & ROYSE, PLLC
176 Pasadena Drive, Building One
Lexington, KY 40503
859-276-6262

Pratik A. Shah
Lide E. Paterno
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
202-887-4000
pshah@akingump.com

*Counsel for Authority Defendants-Appellees*

**AMENDED CERTIFICATE OF INTERESTED PERSONS**

No. 23-10520, *National Horsemen's Benevolent and Protective Association v. Black*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants**

National Horsemen's Benevolent and Protective Association
Arizona Horsemen's Benevolent and Protective Association
Arkansas Horsemen's Benevolent and Protective Association
Indiana Horsemen's Benevolent and Protective Association
Illinois Horsemen's Benevolent and Protective Association
Louisiana Horsemen's Benevolent and Protective Association
Mountaineer Park Horsemen's Benevolent and Protective Association
Nebraska Horsemen's Benevolent and Protective Association
Oklahoma Horsemen's Benevolent and Protective Association
Oregon Horsemen's Benevolent and Protective Association
Pennsylvania Horsemen's Benevolent and Protective Association
Washington Horsemen's Benevolent and Protective Association
Tampa Bay Horsemen's Benevolent and Protective Association

Gulf Coast Racing LLC
LRP Group Ltd.
Valle de Los Tesoros Ltd.
Global Gaming LSP LLC
Texas Horsemen's Partnership LLP

**Counsel for Plaintiffs-Appellants**

Fernando M. Bustos
BUSTOS LAW FIRM, P.C.

Brian K. Kelsey
Reilly Stephens
Jeffrey D. Jennings
LIBERTY JUSTICE CENTER

Daniel R. Suhr (previously with Liberty Justice Center)
NATIONAL CENTER FOR JUSTICE & LIBERTY

Gregory Philip Sapire
Carlos R. Soltero
Stewart R. Jordan
MAYNARD NEXSEN

Autum L. Flores
UNDERWOOD LAW FIRM PC

Ilan Wurman
ARIZONA STATE UNIVERSITY
TULLY BAILEY LLP

Kayla D. Carrick
SOLTERO SAPIRE MURRELL PLLC

**Intervenor Plaintiffs-Appellants**

State of Texas
Texas Racing Commission

**Counsel for Intervenor Plaintiffs-Appellants**

Taylor K. Gifford
Lanora C. Pettit
Beth E. Klusmann
William F. Cole
OFFICE OF THE ATTORNEY GENERAL

Virginia Smith Fields
TEXAS RACING COMMISSION

**Authority Defendants-Appellees**

Jerry Black
Horseracing Integrity and Safety Authority, Inc.
Lisa Lazarus
Steve Beshear
Adolpho Birch
Leonard Coleman
Ellen McClain
Charles Scheeler
Joseph DeFrancis
Susan Stover
Bill Thomason
D.G. Van Clief
Katrina Adams
Nancy Cox
Joseph Dunford
Frank Keating
Kenneth Schanzer

**Counsel for Authority Defendants-Appellees**

Pratik A. Shah
Lide E. Paterno
Brennan H. Meier
AKIN GUMP STRAUSS HAUER & FELD LLP

John C. Roach
David T. Royse
RANSDELL ROACH & ROYSE, PLLC

Benjamin D. Doyle
STOCKARD JOHNSTON BROWN & NETARDUS PC

**Federal Defendants-Appellees**

Federal Trade Commission
Commissioner Rebecca Kelly Slaughter (former)
Commissioner Noah Phillips (former)
Commissioner Christine Wilson (former)

iii

Chair Lina Khan (former)
Commissioner Alvaro Bedoya (former)
Chair Andrew N. Ferguson
Commissioner Mark R. Meador

**Counsel for Federal Defendants-Appellees**

Brian Boynton
Leigha Simonton
Mark B. Stern
Alexander V. Sverdlov
Joseph F. Busa
Courtney L. Dixon
Brian W. Stoltz
Stephen Ehrlich
Michael Shih
Caroline W. Tan
U.S. DEPARTMENT OF JUSTICE

**Amici Curiae**

North American Association of Racetrack Veterinarians

American Quarter Horse Association

Reason Foundation
Cato Institute
Competitive Enterprise Institute
Goldwater Institute
Manhattan Institute for Policy Research
Niskanen Center

Senator Mitch McConnell
Representative Paul Tonko
Representative Andy Barr

Thoroughbred Industry Participants

Financial Industry Regulatory Authority, Incorporated

**Counsel for Amici Curiae**

Peter J. Sacopulos
SACOPULOS JOHNSON & SACOPULOS

Autum Flores
UNDERWOOD LAW FIRM, P.C.

Raffi Melkonian
WRIGHT CLOSE BARGER & GUZMAN, L.L.P.

Adam Clay Reeves
STOLL KEENON OGDEN, P.L.L.C.

Paul Emmanuel Salamanca

Gregory George Garre
Blake E. Stafford
LATHAM & WATKINS, L.L.P.

Aaron Michael Streett
BAKER BOTTS, L.L.P.

Elisabeth Catherine Butler
BECK REDDEN, L.L.P.

*s/ Pratik A. Shah*
Pratik A. Shah

*Counsel for Authority
Defendants-Appellees*

**TABLE OF CONTENTS**

AMENDED CERTIFICATE OF INTERESTED PERSONS ....................................i

TABLE OF AUTHORITIES................................................................ vii

INTRODUCTION ..................................................................................1

STATEMENT......................................................................................2

ARGUMENT ......................................................................................5

    I.    THERE IS A REASONABLE PROBABILITY THE SUPREME COURT WILL GRANT CERTIORARI AND A FAIR PROSPECT THE SUPREME COURT WILL REVERSE THIS COURT'S JUDGMENT ................................................................5

    II.    DEFENDANTS AND THE PUBLIC INTEREST WILL SUFFER IRREPARABLE HARM ABSENT A STAY.........................9

CONCLUSION....................................................................................13

CERTIFICATE OF SERVICE ..............................................................14

CERTIFICATE OF COMPLIANCE........................................................15

ADDENDUM

Exhibit 1:    Slip Op., *National Horsemen's Benevolent & Protective Assoc. v. Black*, No. 23-10520 (5th Cir. June 11, 2026)

**TABLE OF AUTHORITIES**

<u>C</u><u>ASES</u>:

*Baldwin v. Maggio*,
   715 F.2d 152 (5th Cir. 1983) ..................................................................5

*Campaign for S. Equality v. Bryant*,
   773 F.3d 55 (5th Cir. 2014) ..................................................................11

*FCC v. Consumers' Research*,
   606 U.S. 656 (2025) ..................................................................2, 3, 4, 8

*Hollingsworth v. Perry*,
   558 U.S. 183 (2010) ..................................................................5, 6, 9

*Maricopa Cnty. v. Lopez-Valenzuela*,
   574 U.S. 1006 (2014) ..................................................................7

*Maryland v. King*,
   567 U.S. 1301 (2012) ..................................................................7

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ..................................................................8

*Murphy v. Collier*,
   942 F.3d 704 (5th Cir. 2019) ..................................................................6

*National Horsemen's Benevolent & Protective Ass'n v. Black*,
   107 F.4th 415 (5th Cir. 2024) ..................................................................1, 2, 3
   145 S. Ct. 8 (2024) ..................................................................2
   145 S. Ct. 2837 (2025) ..................................................................3
   178 F.4th 224 (5th Cir. 2026) ..................................................................4, 7, 8

*National Insts. of Health v. American Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) ..................................................................6

*Noem v. National TPS All.*,
   No. 25A326, 2025 WL 2812732 (U.S. Oct. 3, 2025) ..................................................................1

*Noem v. Vasquez Perdomo*,
   No. 25A169, 2025 WL 2585637 (U.S. Sep. 8, 2025) ..................................................................6

*Oklahoma v. United States,*
    62 F.4th 221 (6th Cir. 2023) ........................................................2, 3, 12
    145 S. Ct. 2836 (2025)...................................................................3
    163 F.4th 294 (6th Cir. 2025) .................................................*passim*

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940)......................................................................3

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025)...................................................................6

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)......................................................................12

*United States v. Rahimi,*
    602 U.S. 680 ................................................................................8

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) ........................................................12

*Walmsley v. FTC,*
    117 F.4th 1032 (8th Cir. 2024) ...............................................2, 3, 7
    145 S. Ct. 2870 (2025)...................................................................3

*Walters v. National Ass'n of Radiation Survivors,*
    468 U.S. 1323 (1984).....................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952).......................................................................12

**OTHER AUTHORITIES:**

47 C.F.R.
    § 54.702(c) ....................................................................................3

Angst, Frank, *HISA Believes Big Data Provides Path Forward on
    Safety*, BLOODHORSE (Feb. 4, 2025) ............................................9

FED. R. APP. P. 41(d)(1) ........................................................................5, 9

*HISA 2025 Benchmarks: Sustained Reductions In Fatalities From
    Pre-HISA Numbers*, THOROUGHBRED DAILY NEWS (Mar. 24, 2026) .................9

Ross, Dan, *Lucinda Finley Q&A on the Fifth Circuit Bombshell*, THOROUGHBRED DAILY NEWS (July 7, 2024)......................................................11

SHAPIRO, STEPHEN M., SUPREME COURT PRACTICE § 4.3 (11th ed. 2019) ..................................................................................................7

SUP. CT. R. 10(a) ........................................................................................7

**INTRODUCTION**

This Court should stay the issuance of the mandate in this case pending the filing and disposition of the Authority's petition for a writ of certiorari—relief that none of the parties oppose. The propriety of such a stay is beyond doubt. The Supreme Court already issued an emergency stay of this Court's virtually identical decision in *National Horsemen's Benevolent & Protective Association v. Black* (*Black II*), 107 F.4th 415 (5th Cir. 2024). That stay order necessarily reflected the Supreme Court's conclusions that it is likely to grant certiorari on the private nondelegation question; that there is a fair prospect that a majority of the Supreme Court would reverse this Court's judgment; and that the equities weigh in favor of the status quo. And, like before, the panel's decision remains in conflict with the decision of the Sixth Circuit. "Although the posture of the case has changed, the parties' legal arguments and relative harms generally have not," so "[t]he same result" that the Supreme Court reached in October 2024 "is appropriate here." *Noem v. National TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025) (Mem.).

Consistent with the Supreme Court's prior stay, and to avoid unnecessary emergency motion practice, this Court should stay the mandate **by July 24** pending the filing and disposition of the forthcoming certiorari petition. **Counsel for all**

1

**parties to this litigation have confirmed that they do not oppose the requested relief and that they do not plan to file a response to this motion**.

## STATEMENT

This Court's prior decision in *Black II*—holding that the Act's enforcement provisions facially violate the private nondelegation doctrine—created a circuit split with the Sixth Circuit's decision upholding the same provisions in *Oklahoma v. United States* (*Oklahoma I*), 62 F.4th 221 (6th Cir. 2023). Defendants thus made clear at the time that they intended to seek certiorari from the Supreme Court, and requested this Court stay the mandate in *Black II* pending disposition of Defendants' petition. *See* Mot. to Stay Mandate at 17-24 (Sep. 16, 2024), Doc. 214. This Court denied that request. *See* Order Denying Stay (Sep. 17, 2024), Doc. 222.

Defendants turned to the Supreme Court for emergency relief, requesting that it stay this Court's mandate until it disposed of Defendants' certiorari petition. *See* App. for Stay, *Horseracing Integrity & Safety Authority, Inc. v. National Horsemen's Benevolent & Protective Ass'n*, No. 24A287 (Sep. 19, 2024). The Supreme Court granted that application. *See* 145 S. Ct. 8 (2024) (Mem.). The Supreme Court held Defendants' petitions for certiorari—alongside Plaintiffs' cross-petitions and similar petitions in *Oklahoma I* and *Walmsley v. FTC*, 117 F.4th 1032 (8th Cir. 2024)—until June 2025.

2

That month, the Supreme Court issued its decision in *FCC v. Consumers'*
*Research*, 606 U.S. 656 (2025). The Supreme Court confirmed that the private
nondelegation doctrine is not offended so long as a private delegee "functions
subordinately" to a government agency. *Id.* at 692 (quoting *Sunshine Anthracite*
*Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)) (cleaned up). Under that standard,
the Court rejected a private nondelegation challenge against the FCC and the private
Administrator that assisted the agency in implementing its universal service
program. The Court explained that, among other requirements, the Administrator
had to "carry out all its tasks 'consistent with' the FCC's rules," and that "anyone
aggrieved by an action of the Administrator may seek *de novo* review by the
Commission." *Id.* at 693 (quoting 47 C.F.R. § 54.702(c)). So, the Court reasoned,
"in the relationship between the two, the Commission dominates." *Id.*

In light of *Consumers' Research*, the Supreme Court granted certiorari,
vacated, and remanded *Black II* (alongside *Oklahoma I* and *Walmsley*) for
reconsideration. *See* 145 S. Ct. 2837 (2025) (Mem.); 145 S. Ct. 2836 (2025) (Mem.);
145 S. Ct. 2870 (2025) (Mem.).

The Sixth Circuit was the first to issue a reconsidered decision. On its view,
*Consumers' Research* only confirmed its prior conclusion that the Act's enforcement
provisions are facially valid. *See Oklahoma v. United States* (*Oklahoma II*), 163
F.4th 294 (6th Cir. 2025). That is so because "[n]o sanction *** goes into final effect

3

without the FTC's 'say-so,'" given the FTC's "two layers of review, and the existence of [its] stay authority." *Id.* at 311 (quoting *Consumers' Rsch.*, 606 U.S. at 695). Further, the Sixth Circuit explained that the FTC's rulemaking power "gives the FTC tools to bring an overzealous Horseracing Authority to heel." *Id.* at 312. Not only can the FTC make rules governing *how* the Authority enforces the Act and *who* it enforces the Act against, but it can also "micromanage every particularized decision the Authority makes in an investigation." *Id.* Interpreting the Act to restrict the FTC's rulemaking authority in the enforcement context, the Sixth Circuit said, would contradict the Supreme Court's directive in *Consumers' Research* that "[s]tatutes should not be read 'extravagantly, the better to create a constitutional problem.'" *Id.* at 313 (quoting *Consumers' Rsch.*, 606 U.S. at 690).

This Court, however, disagreed. On its view, nothing in the Supreme Court's reasoning "change[d] [its] analysis of the private nondelegation question presented in this case." *National Horsemen's Benevolent & Protective Ass'n v. Black* (*Black III*), 178 F.4th 224, 230 (5th Cir. 2026). This Court thus "reissue[d]" its decision in *Black II*. *Id.* It again held that the FTC's *de novo* review of Authority enforcement actions "comes far too late to constitute genuine oversight of the Authority's wide-ranging enforcement powers." *Id.* at 247 n.22. And it reaffirmed its belief that the FTC's rulemaking power does not allow the agency to constrain the Authority's enforcement activities. *Id.*

4

Absent any rehearing petition, the mandate is scheduled to issue on August 3, 2026. *See* CA5 Docket (June 11, 2026). Assuming this Court grants the requested stay before the July 26 rehearing deadline, Defendants would forgo rehearing petitions and proceed directly to filing a certiorari petition to minimize delay.

## ARGUMENT

"A party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court" by "show[ing] that the petition would present a substantial question and that there is good cause for a stay." FED. R. APP. P. 41(d)(1). That standard is satisfied here because—as the Supreme Court's October 2024 stay necessarily established—there is "(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *see Baldwin v. Maggio*, 715 F.2d 152, 153 (5th Cir. 1983) (adopting standard for Rule 41 motions).

## I. THERE IS A REASONABLE PROBABILITY THE SUPREME COURT WILL GRANT CERTIORARI AND A FAIR PROSPECT THE SUPREME COURT WILL REVERSE THIS COURT'S JUDGMENT

**a.** There can be no question that certiorari petitions "would present a substantial question." FED. R. APP. P. 41(d)(1).

5

To issue its October 2024 stay of this Court's mandate, the Supreme Court necessarily concluded that the Authority had established not only "a reasonable probability that four Justices will consider the issue [of the facial validity of the Act's enforcement provisions] sufficiently meritorious to grant certiorari," but also "a fair prospect that a majority of the Court will vote to reverse the judgment below." *Hollingsworth*, 558 U.S. at 190; *see Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *2 (U.S. Sep. 8, 2025) (Mem.) (Kavanaugh, J., concurring in grant of application for stay) ("To obtain a stay from this Court, the moving party must demonstrate a fair prospect that *** this Court would grant certiorari and reverse.").

That decision "carries precedential weight." *National Insts. of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Mem.) (Gorsuch, J., concurring in part, joined by Kavanaugh, J.) (explaining that order granting stay pending certiorari "constitutes a precedent that commands respect in lower courts"). Defendants' stay request presents "the same legal question" as the Supreme Court's October 2024 stay order. As a result, the Supreme Court's October 2024 order should control. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (explaining "interim orders" must "inform how a court should exercise its equitable discretion in like cases"); *Murphy v. Collier*, 942 F.3d 704, 708-709 (5th Cir. 2019) (explaining that Supreme Court's prior stay order provides "strong direction" for this Court's consideration of subsequent stay motion).

6

The Supreme Court's October 2024 conclusion that at least four Justices will likely take up the private nondelegation question presented here is reinforced by the clear conflict this Court's decision creates with the Sixth Circuit's decision in *Oklahoma II* (and the prior Eighth Circuit decision in *Walmsley*[1]). *See* STEPHEN M. SHAPIRO, SUPREME COURT PRACTICE § 4.3 (11th ed. 2019); SUP. CT. R. 10(a); *see also Maricopa Cnty. v. Lopez-Valenzuela,* 574 U.S. 1006, 1006 (2014) (Mem.) (Thomas, J., respecting denial) (describing "strong presumption in favor of granting writs of certiorari to review decisions of lower courts holding federal statutes unconstitutional").

Likewise, the Sixth Circuit's "considered analysis" explains why the Supreme Court was right to conclude, in October 2024, that there is "a fair prospect that [a majority] will vote to reverse" this Court's judgment. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). As *Oklahoma II* laid bare, this Court's analysis is wrong in at least three ways.

*First*, this Court failed to appreciate that the FTC's rulemaking powers grant the agency significant control over the Authority's enforcement activities. *See*

---

[1] The Eighth Circuit previously "agree[d] with the Sixth Circuit that the statute is not unconstitutional on its face," thereby "reach[ing] [a] differing conclusion[] on the constitutional question" than this Court had reached. *Walmsley*, 117 F.4th at 1039. "The Eighth Circuit has not yet issued a decision on remand." *Black III*, 178 F.4th at 243 n.17.

*Oklahoma II*, 163 F.4th at 312. This Court's interpretation of the Act to "vest exclusive enforcement power in the Horseracing Authority \*\*\* maximizes constitutional risks rather than minimizing them." *Id.* at 313; *see Black III*, 178 F.4th at 241-244.

*Second*, this Court misapplied *Consumers' Research*. Like in *Consumers' Research,* the FTC's *de novo* review of sanctions means "[n]o sanction \*\*\* goes into final effect without the FTC's 'say-so.'" *Oklahoma II*, 163 F. 4th at 311 (quoting *Consumers' Rsch.*, 606 U.S. at 695); *see also id.* ("If the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction."). In combination with the agency's rulemaking power, the FTC's ability to stay and review Authority enforcement actions confirms that "'in the relationship between the two' \*\*\* the FTC 'dominates.'" *Id.* at 310 (quoting *Consumers' Rsch.*, 606 U.S. at 693).

*Third*, a majority of the Supreme Court is likely to conclude that this Court "did not correctly apply [its] precedents governing facial challenges." *United States v. Rahimi*, 602 U.S. 680, 701 (2024). The Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC,* 603 U.S. 707, 723 (2024). This case illustrates why: This Court's ruling about abstract enforcement activities "'rest[s] on speculation' about the law's coverage and its future enforcement" and "'short circuit[s] the democratic process' by preventing duly enacted laws from

being implemented in constitutional ways." *Id.* (citations omitted); *see Oklahoma II*, 163 F.4th at 316 (a court "may not invalidate a statute based on hypothetical applications that have yet to occur").

## II. DEFENDANTS AND THE PUBLIC INTEREST WILL SUFFER IRREPARABLE HARM ABSENT A STAY

The Supreme Court's prior order also underscores the "likelihood that irreparable harm will result from the denial of a stay," *Hollingsworth*, 558 U.S. at 190, leaving no doubt that "good cause" supports staying issuance of the mandate here, FED R. APP. P. 41(d)(1). As the Authority explained previously, the successful implementation of the Act's programs—now fully established for over three years—has brought tremendous improvements to the sport and entrenched reliance interests across the industry. *See* Mot. to Stay Mandate at 17-24 (Sep. 16, 2024), Doc. 214. Simply put, consistent with Congress's aim under the Act, "horses have never been safer racing in the U.S." Frank Angst, *HISA Believes Big Data Provides Path Forward on Safety*, BLOODHORSE (Feb. 4, 2025);[2] *see, e.g.*, *HISA 2025 Benchmarks: Sustained Reductions In Fatalities From Pre-HISA Numbers*, THOROUGHBRED DAILY NEWS (Mar. 24, 2026) (noting "nearly 50% decline [in racing-related equine

---

[2] https://www.bloodhorse.com/horse-racing/articles/282536/hisa-believes-big-data-provides-path-forward-on-safety.

fatalities] since reporting began nationally" and "continued gap between HISA and non-HISA racetracks").[3]

Since HISA was enacted nearly six years ago, the Authority and its partners have dedicated substantial time and resources to complete the transition to this enforcement regime—including hiring and training staff, educating the industry, developing a budget for FTC consideration and approval, establishing extensive new technological infrastructure, entering into contracts with drug-testing laboratories and States, and collecting and responding to participants' feedback. Mot. to Stay Mandate Exh. 1 ¶ 3 (Sep. 16, 2024), Doc. 214; ROA.3895-3897, 3903-3905. So too has the industry. Mot. to Stay Mandate Exh. 1 ¶ 4 (Sep. 16, 2024), Doc. 214. The panel decision again threatens to reverse that progress and upend the industry's entrenched reliance interests.

At a minimum, issuance of the mandate would sow chaos and confusion as State racing commissions (or the FTC) scramble to step in to enforce the governing HISA rules while racing occurs across the country. In transitioning to the long-anticipated rollout of the now three-year-old regime, many States underwent substantial operational (and legal) changes—*e.g.,* reducing their staff who worked on racetrack-safety and anti-doping issues; eliminating contracts with drug-testing

---

[3] https://www.thoroughbreddailynews.com/hisa-2025-benchmarks-sustained-reductions-in-fatalities-from-pre-hisa-numbers/.

laboratories; and reallocating funding. Mot. to Stay Mandate Exh. 1 ¶¶ 12-13 (Sep. 16, 2024), Doc. 214. The Authority and its partners absorbed many of these personnel and duties. *Id.* Accordingly, multiple States simply would not be in a position to take over enforcement of critical HISA rules—or would refuse. *Id.* The resulting "Wild West" vacuum would communicate a perilous reality to would-be cheaters: "nobody can enforce the rules, so go dope your horses to your heart's content," at least until the States undergo massive transformations to fill the gap. Dan Ross, *Lucinda Finley Q&A on the Fifth Circuit Bombshell*, THOROUGHBRED DAILY NEWS (July 7, 2024).[4]

"The inevitable disruption that would arise from a lack of continuity and stability in this important area of law presents a potential harm not just to [the Authority and the federal government] but to the Plaintiffs themselves and to the public interest at large." *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014). That is why regulated parties themselves have warned that the Court's decision, if not stayed, would at best plunge the horseracing industry back into an unsafe "patchwork of different state, private, and federal regulators, whose respective allocations of power will differ based on the jurisdictions in which

---

[4] https://www.thoroughbreddailynews.com/lucinda-finley-qa-on-the-fifth-circuit-bombshell/.

covered parties operate." Rehearing Pet. 8, *Oklahoma v. United States*, No. 23-402 (U.S. July 18, 2024).

Staying the mandate is also necessary to protect important comity concerns. Plaintiffs have made clear, in this and other cases, that they seek to bring down HISA *nationwide*. *E.g.*, ROA.2773. As Plaintiffs have confirmed, it is already the case that HISA rules do not govern horseracing in any jurisdiction in this Circuit. ROA.2768 ("Mississippi does not have a racetrack" that runs covered Thoroughbred races; "Texas is not running covered races"; and Louisiana races are "already exempted by federal court order" based on a stayed APA challenge). Allowing this Court's opinion to effectively veto the Sixth Circuit's (and any other courts') contrary ruling would work the very "asymmetr[y]" Justices have cautioned against, and that the Supreme Court rejected in *Trump v. CASA, Inc.*, 606 U.S. 831, 855 (2025).

Finally, "the [government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). That public injury is particularly acute here because, as explained, the invalidation of HISA's enforcement provisions would displace the "productive dialogue" that occurred between the courts and Congress, and thwart the "'interdependence' and 'reciprocity' [that] should characterize the relationship between the[m]." *Oklahoma I*, 62 F.4th at 225 (quoting *Youngstown Sheet & Tube*

*Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)); *see also Oklahoma II*, 163 F.4th at 300.  The "presumption of constitutionality" resulting from that exchange "is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. National Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

**CONCLUSION**

The Court should stay its mandate by July 24 (before expiration of the time for seeking rehearing) pending the filing and disposition of the Authority's forthcoming certiorari petition.  All parties to this litigation have confirmed that they do not oppose entry of the requested stay.

July 13, 2026

Respectfully submitted,

*s/ Pratik A. Shah*

| | |
|---|---|
| John C. Roach | Pratik A. Shah |
| RANSDELL ROACH & ROYSE, PLLC | Lide E. Paterno |
| 176 Pasadena Drive, Building One | AKIN GUMP STRAUSS |
| Lexington, KY 40503 |   HAUER & FELD LLP |
| 859-276-6262 | 2001 K Street NW |
| | Washington, DC 20006 |
| | 202-887-4000 |
| | pshah@akingump.com |

*Counsel for Authority Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2026, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d) because it contains 2,814 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

*s/ Pratik A. Shah*
Pratik A. Shah

July 13, 2026

**ADDENDUM**

Exhibit 1:     Slip Op., *National Horsemen's Benevolent & Protective Assoc. v. Black*, No. 23-10520 (5th Cir. June 11, 2026)

# EXHIBIT 1

# United States Court of Appeals for the Fifth Circuit

———————————

No. 23-10520

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2026

Lyle W. Cayce
Clerk

National Horsemen's Benevolent and Protective Association; Arizona Horsemen's Benevolent and Protective Association; Arkansas Horsemen's Benevolent and Protective Association; Indiana Horsemen's Benevolent and Protective Association; Illinois Horsemen's Benevolent and Protective Association; Louisiana Horsemen's Benevolent and Protective Association; Mountaineer Park Horsemen's Benevolent and Protective Association; Nebraska Horsemen's Benevolent and Protective Association; Oklahoma Horsemen's Benevolent and Protective Association; Oregon Horsemen's Benevolent and Protective Association; Pennsylvania Horsemen's Benevolent and Protective Association; Washington Horsemen's Benevolent and Protective Association; Tampa Bay Horsemen's Benevolent and Protective Association; Gulf Coast Racing, L.L.C.; LRP Group, Limited; Valle de Los Tesoros, Limited; Global Gaming LSP, L.L.C.; Texas Horsemen's Partnership, L.L.P.,

*Plaintiffs—Appellants*,

State of Texas; Texas Racing Commission,

*Intervenor Plaintiffs—Appellants*,

*versus*

Jerry Black; Katrina Adams; Leonard Coleman; MD Nancy Cox; Joseph Dunford; Frank Keating; Kenneth

SCHANZER; HORSERACING INTEGRITY AND SAFETY
AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION;
COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE
WILSON; LISA LAZARUS; STEVE BESHEAR; ADOLPHO BIRCH;
ELLEN MCCLAIN; CHARLES SCHEELER; JOSEPH DEFRANCIS;
SUSAN STOVER; BILL THOMASON; LINA KHAN, *Chair*; REBECCA
SLAUGHTER, *Commissioner*; ALVARO BEDOYA, *Commissioner*; D. G.
VAN CLIEF,

*Defendants—Appellees.*

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 5:21-CV-71, 5:23-CV-77

———————————————————

ON REMAND FROM THE
SUPREME COURT OF THE UNITED STATES

Before KING, DUNCAN, and ENGELHARDT, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

Last year, the Supreme Court vacated our decision in *National Horsemen's Benevolent & Protective Association v. Black* (*Horsemen's II*), 107 F.4th 415 (5th Cir. 2024), and remanded "for further consideration in light of *FCC v. Consumers' Research*, 606 U.S. [656] (2025)." *Horseracing Integrity & Safety Auth., Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, 145 S. Ct. 2837 (2025) (mem.). The parties have filed supplemental briefs helpfully addressing this question.

We conclude *Consumers' Research* does not affect our prior decision, which we reissue below.[1] In a new section, *infra* Part III(B)(6), we explain

———————————————

[1] We add a handful of footnotes to clarify a few matters and also to discuss sister-circuit decisions issued after *Horsemen's II*. *See infra* nn. 7, 12, 17, 19, 22, 23.

why *Consumers' Research* does not change our analysis of the private nondelegation question presented in this case.

## INTRODUCTION

We again consider constitutional challenges to the Horseracing Integrity and Safety Act of 2020 ("HISA" or the "Act"). In HISA, Congress empowered a private corporation—the Horseracing Integrity and Safety Authority ("Authority")—to create and enforce nationwide rules for thoroughbred horseracing. In our first foray into HISA, we held the Act facially unconstitutional under the private nondelegation doctrine because the Authority's rulemaking was not subordinate to the Federal Trade Commission ("FTC"). *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Horsemen's I*), 53 F.4th 869 (5th Cir. 2022). At the time, we did not consider a separate nondelegation challenge to the Authority's enforcement power. Congress responded to our decision by amending HISA, giving the FTC power to abrogate, add to, or modify the Authority's rules.

On remand, the district court held the amendment cured HISA's constitutional deficiencies because the FTC now has general rulemaking power over the Authority's activities. It also rejected claims raised by a new plaintiff, Gulf Coast Racing LLC ("Gulf Coast"), that HISA violates the Constitution's Appointments Clause because the Authority wields significant governmental authority. The plaintiffs all appealed, arguing HISA is still constitutionally deficient under the private nondelegation doctrine, the Due Process Clause, the Appointments Clause, and the Tenth Amendment.

Just as we concluded in our now-vacated *Horsemen's II* opinion, we agree with nearly all of the district court's well-crafted opinion. Specifically, we agree that the FTC's new rulemaking oversight means the agency is no longer bound by the Authority's policy choices. In other words, the

amendment solved the nondelegation problem with the Authority's rulemaking power. We also agree that HISA does not violate the Due Process Clause by putting financially interested private individuals in charge of competitors. Further, we agree that, under current Supreme Court precedent, *see Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), the Authority does not qualify as a government entity subject to the Appointments Clause. Finally, we agree that plaintiff Gulf Coast lacks standing to bring its Tenth Amendment challenge.

After the Supreme Court's remand, we still disagree with the district court in one important respect, however: HISA's enforcement provisions violate the private nondelegation doctrine. The statute empowers the Authority to investigate, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the FTC's say-so. That is forbidden by the Constitution. We therefore DECLARE that HISA's enforcement provisions are facially unconstitutional on that ground. In doing so, we part ways with our esteemed colleagues on the Sixth Circuit. *See Oklahoma v. United States* (*Oklahoma I*), 62 F.4th 221 (6th Cir. 2023); *Oklahoma v. United States* (*Oklahoma II*), 163 F.4th 294 (6th Cir. 2025) (both rejecting nondelegation challenge to HISA's enforcement provisions).

Accordingly, the district court's judgment is AFFIRMED in part and REVERSED in part.

## I. Background

### A. HISA Framework

In 2020, HISA created a framework for enacting and enforcing nationwide rules governing doping, medication control, and racetrack safety in the thoroughbred horseracing industry. *See* 15 U.S.C. § 3054(a). *See generally Horsemen's I*, 53 F.4th at 873–75. To "develop[] and implement[]" these rules, HISA empowers a "private, independent, self-regulatory,

nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority,'" subject to the "oversight" of the FTC. §§ 3052(a), 3053.

Under HISA, the Authority writes all the rules—that is, rules fleshing out the substantive areas covered by HISA, as well as rules governing investigation, adjudication, and sanctions.[2] The Authority submits proposed rules to the FTC, which publishes them for public comment. § 3053(b)(1), (c)(1). Rules take effect only after FTC approval, which must occur within 60 days of publication. § 3053(c)(1). The FTC "shall approve" a proposed rule if it finds the rule "consistent" with the Act and with "applicable rules approved by the [FTC]." § 3053(c)(2). Originally, this "consistency review" did not allow the FTC to reject a proposed rule based on its disagreement with the Authority's policy choices. *Horsemen's I*, 53 F.4th at 884–87. In *Horsemen's I*, we held that this arrangement violated the private nondelegation doctrine by making a private entity superior to a government agency. *Ibid.* In response, Congress amended HISA to give the FTC power to "abrogate, add to, and modify" the Authority's rules. § 3053(e).

The Authority also has the power to enforce HISA. It does so by (1) exercising "subpoena and investigatory authority," § 3054(h); (2) imposing civil sanctions, §§ 3054(i), 3057; and (3) filing civil actions seeking injunctions or enforcement of sanctions, § 3054(j). The actual work of enforcing HISA involves a further delegation to other entities, however. For instance, HISA directs the Authority to contract enforcement of doping

---

[2] *See* § 3057(a)(1), (c)(1) (power to establish substantive rules governing medication controls); § 3056(a)(1) (power to establish racetrack safety rules); §§ 3054(c), 3057(c) (power to "develop uniform procedures and rules" governing investigations and adjudications that afford due process); § 3057(d) (power to establish civil sanctions); § 3054(c), (h) (investigatory and subpoena powers).

and medication rules to a private non-profit, the U.S. Anti-Doping Agency ("USADA"), or other comparable entity. § 3054(e)(1)(A), (B). The Authority's proposed partnership with USADA ultimately did not pan out. Instead, the Authority partnered with Drug Free Sport International, which operates as the Horseracing Integrity and Welfare Unit ("HIWU").

HIWU then acts as "the independent . . . enforcement organization" for those rules, "implement[s]" HISA's anti-doping programs, and exercises related powers "including independent investigations, charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations." § 3054(e)(1)(E)(i), (iii), (iv); § 3055(c)(4)(B).[3] HIWU's decisions on such matters "shall be the final decision or civil sanction of the Authority," subject to *de novo* review by an administrative law judge ("ALJ") and the FTC. § 3055(c)(4)(B); § 3058.

## B. Procedural History

*Horsemen's I* concluded that HISA's delegation of rulemaking power was facially unconstitutional. HISA delegated rulemaking power to a private organization (the Authority) whose policy choices could not be second-guessed by the agency (FTC). The Authority's rulemaking powers were therefore not subordinate to the FTC, meaning HISA facially violated the private nondelegation doctrine. *Horsemen's I*, 53 F.4th at 872. We did not consider the plaintiffs' distinct nondelegation challenges to the Authority's investigative and enforcement powers nor their due process claims. *Id.* at 890 n.37. Finally, as noted, Congress responded to *Horsemen's I* by empowering the FTC to "abrogate, add to, and modify" the Authority's rules. § 3053(e).

---

[3] Similarly, the Authority may contract out enforcement of the racetrack safety program to "State racing commissions" or "other State regulatory agencies." § 3054(e)(2), (3); *see also* § 3056 (discussing racetrack safety program).

On remand, the National Horsemen's Association ("Horsemen") and Texas continued to press their private nondelegation claims, arguing Congress's amendment did not actually subordinate Authority rulemaking to the FTC. They also continued to press their nondelegation challenge to the Authority's enforcement powers (as well as their due process claims). In addition, a new plaintiff, Gulf Coast Racing LLC ("Gulf Coast"), raised separate challenges to HISA in a different division of the same district. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Black II*), 672 F. Supp. 3d 220, 224–25 (N.D. Tex. 2023). Gulf Coast claimed (1) HISA's directors qualify as "officers of the United States" and are therefore subject to Article II's appointment and removal requirements; and (2) HISA commandeers Texas in violation of the Tenth Amendment. Gulf Coast's suit was consolidated with the remanded *Horsemen's I* case. *Id.* at 230–31. Following a one-day bench trial, the district court rejected all the plaintiffs' claims.

As to private nondelegation, the district court followed the Sixth Circuit's decision in *Oklahoma I*, 62 F.4th 221. The district court reasoned that Congress's amendment empowering the FTC to "abrogate, add to, and modify" proposed rules "cured the constitutional issues identified by [*Horsemen's I*]" by making the Authority's rulemaking power "subordinate" to the FTC. *Black II*, 672 F. Supp. 3d at 241, 243–44 (citing *Oklahoma I*, 62 F.4th at 230, 232). As to the separate challenge to the Authority's enforcement powers, the district court largely relied on its previous order rejecting the claim because those powers "comport with due process." *See id.* at 248 (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* (*Black I*), 596 F. Supp. 3d 691, 725 (N.D. Tex. 2022)). The court also relied on the fact that the FTC could review civil sanctions and control enforcement through rulemaking. *Id.* at 248–49 (citing *Black I*, 596 F. Supp. 3d at 725–26); *see also Oklahoma I*, 62 F.4th at 231. Finally, the court rejected

the due process claims because the Horsemen failed to show the Authority's directors have financial interests in regulating competitors. *Black II*, 672 F. Supp. 3d at 252.

As to Gulf Coast's claims, the district court concluded that our *Horsemen's I* decision required it to reject them. Specifically, the court reasoned that *Horsemen's I* necessarily decided the Authority was a private entity, and so its directors were not subject to the Appointments Clause. *Id.* at 234–37. Alternatively, the court reasoned that the Authority is private because "it is not government created, and its directors are not government appointed." *Id.* at 234 (citing *Lebron*, 513 U.S. 374). Finally, the court rejected the Tenth Amendment anti-commandeering argument for lack of standing. *Id.* at 249–50.

Accordingly, the district court entered final judgment dismissing all claims. The Horsemen, Texas, and Gulf Coast timely appealed.

## II. Standard of Review

We review the district court's legal conclusions following a bench trial *de novo*. *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 606 (5th Cir. 2020). To prevail on their facial challenge, the plaintiffs "must show that no set of circumstances exists under which [HISA] would be valid." *Horsemen's I*, 53 F.4th at 878 (cleaned up).

## III. Discussion

The various plaintiffs raise these issues on appeal:

(A) Did Congress's amendment to HISA cure the private nondelegation problem with the Authority's rulemaking powers?

(B) Do the Authority's enforcement powers separately violate the private nondelegation doctrine?

(C) Does HISA violate due process by permitting self-interested industry participants to regulate their competitors?

(D) Are the Authority's directors subject to the Appointments Clause?

(E) Does HISA violate the Tenth Amendment's anti-commandeering rule by forcing States to administer a federal program?

We consider each issue in turn.

## A. Private Nondelegation Challenge to Authority's Rulemaking

We previously discussed the origins of the private nondelegation doctrine in *Horsemen's I. See id.* at 880–81. In essence, the doctrine teaches that "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 881 & n.21 (citing *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021)); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128 (3d Cir. 1989).[4] Or, as our sister circuit has explained: "Congress may formalize the role of private parties in proposing regulations so long as that role is merely as an aid to a government agency that retains the discretion to approve, disapprove, or modify them." *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.* (*Amtrak I*), 721 F.3d 666, 671 (D.C. Cir. 2013) (cleaned up) (quoting *Adkins*, 310 U.S. at 388), *vacated and remanded on other grounds*, *Dep't of Transp. v. Ass'n of Am. R.Rs.* (*Amtrak II*), 575 U.S. 43 (2015).

In *Horsemen's I*, we ruled the Authority's rulemaking power was an unconstitutional private delegation. Our analysis focused on the fact that the Authority's proposed rules were subject only to the FTC's limited

---

[4] *See also generally A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

"consistency review," which did not permit the agency to second-guess the Authority's policy choices. *See Horsemen's I*, 53 F.4th at 882–87. In response, Congress amended HISA to provide that:

> The [FTC], by rule in accordance with section 553 of Title 5, may abrogate, add to, and modify the rules of the Authority promulgated in accordance with this chapter as the Commission finds necessary or appropriate to ensure the fair administration of the Authority, to conform the rules of the Authority to requirements of this chapter and applicable rules approved by the Commission, or otherwise in furtherance of the purposes of this chapter.

15 U.S.C. § 3053(e). This new provision was borrowed from the Maloney Act, which allocates authority between the Securities and Exchange Commission ("SEC") and private, self-regulatory organizations (such as the Financial Industry Regulatory Authority ("FINRA")). *See Oklahoma I*, 62 F.4th at 231–32. Although HISA was originally modeled on the Maloney Act, it lacked this provision until the recent amendment. *See* Consolidated Appropriations Act, Pub. L. No. 117-328, div. O, tit. VII, § 701, 136 Stat. 4459, 5231–32 (2023). As noted, the district court followed the Sixth Circuit in ruling that the amendment cured the nondelegation problem with the Authority's rulemaking power. *See Black II*, 672 F. Supp. 3d at 241–45 (citing *Oklahoma I*, 62 F.4th at 230, 232).

We agree with the district court and the Sixth Circuit that the amendment cured the nondelegation defect identified in *Horsemen's I*. That defect lay in the agency's being at the mercy of the Authority's policy choices. *See Horsemen's I*, 53 F.4th at 872 ("[T]he FTC concedes it cannot review the Authority's policy choices."). For instance, when the Authority issued rules on the kinds of horseshoes permitted during races, the FTC told objecting commenters it lacked the power to question the Authority's views. *See id.* at 885 & n.29 (discussing Fed. Trade Comm'n, Order

Approving the Enforcement Rule Proposed by the Horseracing Integrity and Safety Authority 26 (Mar. 25, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P222100HISA OrderRacetrackSafety.pdf [https://perma.cc/G3VQ-JPJR]). The amendment has corrected that imbalance. Now, the FTC may "abrogate, add to, and modify" the Authority's rules. § 3053(e). So, unlike before, if the FTC now disagrees with the policies reflected in the Authority's rules, it may change them. *See Oklahoma I*, 62 F.4th at 230 (noting recent rule explaining that FTC's "new 'rulemaking power' allows it to 'exercise its own policy choices'" (quoting Fed. Trade Comm'n, Order Ratifying Previous Commission Orders as to Horseracing Integrity and Safety Authority's Rules 3 (Jan. 3, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/ HISA%20Order%20re%20Ratification%20of%20Previous%20Orders%20-%20 Final%20not%20signed.pdf [https://perma.cc/44BK-37A9])). As the Sixth Circuit correctly observed, "§ 3053(e)'s amended text gives the FTC ultimate discretion over the content of the rules," which "makes the FTC the primary rule-maker, and leaves the Authority as the secondary, the inferior, the subordinate one." *Ibid.* (citing *Adkins*, 310 U.S. at 388).

Appellants' arguments to the contrary do not persuade us.

First, the Horsemen argue the Authority remains superior because it continues to write the rules in the first place and the agency must approve them if they hurdle the low bar of consistency review. We disagree. The problem was never that the private entity proposed the rules; the problem was that the agency lacked power to second-guess them once they were proposed. *See Horsemen's I*, 53 F.4th at 884 ("The FTC's oversight is too limited to ensure the Authority functions subordinately to the agency." (cleaned up) (quoting *Adkins*, 310 U.S. at 399)). Now the FTC has been given that power: it can "abrogate" or "modify" Authority rules it disagrees

with. § 3053(e). And that new power gives consistency review new bite. Previously, consistency review "*exclude[d]* . . . the Authority's policy choices in formulating rules." *Horsemen's I*, 53 F.4th at 885. Now it implicitly includes review of those choices. The FTC must approve only those rules "consistent with . . . applicable rules approved by the [FTC]," and, thanks to the amendment, it is the FTC that has final word over what those rules are. § 3053(c)(2); *see also Oklahoma I*, 62 F.4th at 231 (explaining that "the FTC's later authority to modify *any* rules for any reason at all, including policy disagreements, ensures that the FTC retains ultimate[] authority over the implementation of the Horseracing Act").[5]

Next, the Horsemen argue the FTC's new review power creates a timing problem. Because the FTC may alter only rules "promulgated" by the Authority, § 3053(e), regulated entities may end up being subject to the Authority's rules until the FTC can intervene and fix them. We disagree. The FTC has 60 days to approve or disapprove a proposed rule. § 3053(c)(1). If the FTC is concerned about a proposed rule going into effect, then it can intervene and create safeguards to prevent that from happening. *See* § 3053(a) (requiring Authority to submit proposed rules to the FTC "in accordance with such rules as the [FTC] may prescribe"). For instance, the agency could adopt a rule postponing the effective date of a newly enacted rule. *See Oklahoma I*, 62 F.4th at 232 (suggesting this). Or the agency could

---

[5] Texas contends § 3053(e) does not solve the nondelegation problem because it gives the FTC only limited rulemaking authority—*i.e.*, "to ensure the fair administration of the Authority." Because the FTC lacks plenary rulemaking authority, Texas argues, the Authority still effectively calls the shots. We disagree. Section 3053(e) empowers the FTC to engage in rulemaking, not only for specified purposes, but also "otherwise in furtherance of the purposes of [HISA]." This language, borrowed from the Maloney Act, gives the agency "broad authority to oversee and to regulate the rules adopted by the [Authority] . . . , including the power to mandate the adoption of any rules it deems necessary[.]" *Shearson/Am. Express, Inc. v McMahon*, 482 U.S. 220, 233–34 (1987).

engage in emergency rulemaking to delay the effective date of a rule. In any event, these are hypothetical problems that, if they arise, can be addressed in as-applied challenges. *See Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (holding that "as-applied challenges are preferred"). This is a facial challenge, however, and we cannot say that a potential timing gap in FTC's § 3053(e) review makes HISA unconstitutional in all its applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (holding that a facial challenger "must establish that no set of circumstances exists under which the Act would be valid").[6]

Finally, the Horsemen point to the SEC's supervisory authority over private self-regulatory organizations like FINRA. They argue that, notwithstanding § 3053(e), the FTC still has less sway over the Authority than the SEC does over FINRA. We again disagree. We previously pointed out that the "key distinction" between the FTC and the SEC was the FTC's lack of general rulemaking power. *See Horsemen's I*, 53 F.4th at 887–88. "The SEC itself," we explained, "can make changes to FINRA rules, but the FTC can only recommend changes to the Authority's rules." *Id.* at 888 (citation omitted). But Congress has now amended HISA to give the FTC the same general rulemaking authority that the SEC has with respect to FINRA. *See Oklahoma I*, 62 F.4th at 225, 229 (reaching this conclusion).

In sum, we agree with the district court and the Sixth Circuit that, in light of Congress's amendment to HISA in § 3053(e), the Authority's

---

[6] The Horsemen also argue that the Authority can circumvent the FTC by issuing unreviewable guidance documents, such as dear colleague letters. We disagree. The Authority admits such guidance would not have the force of law and, even if it did, the FTC has authority to review guidance documents, § 3054(g)(2), and to promulgate a rule overruling guidance it disagrees with.

rulemaking power is subordinate to the FTC's. Because the FTC has ultimate say on what the rules are, the Authority's power to propose horseracing rules does not violate the private nondelegation doctrine.

## B. Private Nondelegation Challenge to Authority's Enforcement

Appellants next argue that, apart from its rulemaking powers, the Authority's enforcement powers violate the private nondelegation doctrine. Recall that the Authority enforces HISA by levying sanctions, which are ultimately subject to FTC review, and by bringing lawsuits. The Authority also has power to investigate potential violations, although the actual investigatory work is contracted to other private organizations, such as HIWU in the case of doping rules, or to state racing commissions in the case of racetrack safety rules. *See supra* Part I(A). Our *Horsemen's I* decision did not address this challenge to the Authority's enforcement powers, *see* 53 F.4th at 890 n.37, and on remand the district court treated it as a due process claim and rejected it, *see Black II*, 672 F. Supp. 3d at 248–49. Appellants now bring the claim to us, arguing that the Authority's enforcement power is not subordinate to FTC oversight.

### 1.

Before addressing the merits of this claim, we must address the Authority's argument that it is premature. Arguing both in terms of standing and ripeness, the Authority contends that it has not yet tried to enforce HISA against the Horsemen and that any challenge to the Authority's enforcement power can be raised if and when it does. We disagree for several reasons.

First, the Authority misunderstands the Horsemen's claim. They do not challenge some particular enforcement action undertaken by the Authority—claiming, for instance, that the Authority issued an overbroad subpoena for medical records or lacked probable cause to search a racetrack.

Instead, the Horsemen argue that HISA, on its face, vests the Authority with enforcement power that is effectively unreviewable by the agency. When a regulated entity raises "a purely legal challenge" like this one, "it is unnecessary to wait for the Regulation to be applied in order to determine its legality." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 267 (5th Cir. 2015) (cleaned up); *see also Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014) ("Petitioner's challenge in this case presents a purely legal question . . . . It is unnecessary to wait for the [statute] to be applied in order to determine its legality."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.").

Second, the Horsemen have a cognizable injury for standing purposes. Pursuant to HISA, they have already had to agree "to be subject to and comply with the [Authority's] rules, standards, and procedures"—including rules requiring they cooperate with investigations, consent to searches, and comply with subpoenas. *See* 15 U.S.C. § 3054(c)–(f). In other words, the Horsemen are themselves "objects of the Regulation," and so "there is ordinarily little question" that they have standing to challenge it. *Contender Farms*, 779 F.3d at 264–65 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). And courts typically do not require a regulated party to "bet the farm" by violating a regulation before allowing it to test its validity. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010); *see also, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991) (explaining that a separation-of-powers challenge to a board's veto powers was "ripe even if the veto power ha[d] not been exercised to respondents' detriment").

Finally, the record shows several instances in which the Authority has enforced HISA against the Horsemen. For example, the Authority has

threatened one of the Horsemen's members with sanctions if it did not repair a racetrack railing. Additionally, the Authority has both threatened and actually barred member racetracks in Texas from broadcasting races out of state because they failed to register with the Authority. More generally, the Horsemen represent some 30,000 members and, when the parties filed their briefs, the Authority's website already listed hundreds of enforcement actions—and that number has now grown to over 3,000.[7] So, at a minimum, the Horsemen have shown a credible threat that the Authority will bring enforcement actions against their members in the future. *See Driehaus*, 573 U.S. at 164.

In sum, the Horsemen have standing to challenge the Authority's enforcement powers and that challenge is ripe. We proceed to the merits.

**2.**

The Horsemen's (as well as Texas's) basic contention is that HISA grants the Authority enforcement power that is effectively unreviewable by the FTC. That claim turns on the same standard as the challenge to the Authority's rulemaking addressed in *Horsemen's I*: the delegation is constitutional if, when enforcing HISA, the Authority "'functions subordinately' to an agency with 'authority and surveillance' over it." 53 F.4th at 881 (quoting *Rettig*, 987 F.3d at 532). In other words, the Authority may constitutionally enforce HISA only if it acts "as an aid" to the FTC, which "retains the discretion to approve, disapprove, or modify" the private

---

[7] *See generally Rulings*, Horseracing Integrity & Safety Auth., https://portal.hisausapps.org/public-rulings [https://perma.cc/24TV-7NV3] (last visited June 3, 2026) (listing 3,307 enforcement rulings)

entity's enforcement actions. *Ibid.* (cleaned up) (quoting *Amtrak I*, 721 F.3d at 671).[8]

While the constitutional standard is the same, the nature of the delegated authority is different this time around. *Horsemen's I* addressed delegation of legislative authority—the power to make rules. *See Myers v. United States*, 272 U.S. 52, 186 (1926) (McReynolds, J., dissenting) ("The essence of the legislative authority is to . . . prescribe rules for the regulation of the society[.]"). Logically, we focused on which actor—government agency or private entity?—had final say over the content of those rules. *See Horsemen's I*, 53 F.4th at 884–87 (analyzing FTC's lack of authority over the Authority's policy choices). Today, by contrast, we address delegation of executive authority. The power to launch an investigation, to search for evidence, to sanction, to sue—these are all quintessentially executive functions.[9] And they have been considered so from

---

[8] As explained in *Horsemen's I*, the D.C. Circuit's *Amtrak I* decision was vacated only because the Supreme Court found Amtrak was a governmental, as opposed to private, entity. 53 F.4th at 881 n.22 (citing *Amtrak II*, 575 U.S. at 46, 50–55). The D.C. Circuit's private nondelegation analysis, however, remains sound and has been approved by our court. *See id.* at 881 (explaining that *Amtrak I* "expressed the [private nondelegation doctrine] more precisely" than prior formulations).

[9] *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."); *Morrison v. Olson*, 487 U.S. 654, 696 (1988) (reasoning "the power to initiate an investigation" is executive power that must be subject to the Attorney General's "unreviewable discretion"); *Buckley v. Valeo*, 424 U.S. 1, 138, 140 (1976) (per curiam) (concluding the "discretionary power to seek judicial relief" and "conduct[] civil litigation in the courts of the United States for vindicating public rights" are exercises of Article II executive power); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 225 (2020) (holding the CFPB director unconstitutionally exercised "executive power" to "set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties"); *id.* at 219 (holding the "power to seek daunting monetary penalties against private parties . . . [is] a quintessentially executive power"); *Free Enter. Fund*, 561 U.S. at 504 (holding the "power to start, stop, or alter individual Board investigations" is

our Nation's founding.[10] As much as legislative power, the private nondelegation doctrine forbids unaccountable delegations of executive power. *See, e.g.*, *Amtrak II*, 575 U.S. at 62 (ALITO, J., concurring) ("Private entities are not vested with 'legislative Powers.' Art. I, § 1. Nor are they vested with the 'executive Power,' Art. II, § 1, cl. 1, which belongs to the President."). Accordingly, we must determine whether HISA delegates enforcement power to private entities and, if so, whether that power is subordinate to the FTC.

HISA divides enforcement authority among the FTC, the Authority, and HIWU, "each within the scope of their powers and responsibilities

---

part of the executive power); *Collins v. Yellen*, 594 U.S. 220, 254 (2021) (holding the power "to issue subpoenas" is an "executive power"); *id.* at 289 (SOTOMAYOR, J., concurring in part and dissenting in part) (noting "the power to impose fines" is an "executive power"); *id.* at 287 (arguing the FTC had significant executive power because it had "wide powers of investigation" and "broad authority to issue complaints and cease-and-desist orders" (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 620–21 (1935))); *United States v. Grubbs*, 547 U.S. 90, 98 (2006) (describing a search as an "exercise of executive power"); *California v. Acevedo*, 500 U.S. 565, 586 (1991) (STEVENS, J., dissenting) ("The Fourth Amendment is a restraint on Executive power.").

[10] *See generally* Dina Mishra, *An Executive-Power Non-Delegation Doctrine for the Private Administration of Federal Law*, 68 VAND. L. REV. 1509, 1545 (2015) (discussing "[c]ertain types of tasks that seem quintessentially executive," including "the tasks of law enforcement—that is, of forcing compliance with the law"); *id.* at 1546 ("Ratification-era history further supports the understanding that law enforcement consists of forcing compliance or imposing sanctions on law violators." (citing THE FEDERALIST No. 21, at 134–35 (Alexander Hamilton) (Clinton Rossiter ed., 1961))); Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 HARV. L. REV. 1756, 1764 (2023) ("Law execution was the executive power's principal component."); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. ILL. L. REV. 701, 737 ("Executive officers investigate, apprehend, and prosecute potential lawbreakers. As the wielder of the executive power, the president is the chief of these law enforcement executives."); Ilan Wurman, *In Search of Prerogative*, 70 DUKE L.J. 93, 146–47 (2020) (arguing that law enforcement and prosecution powers have been considered core executive functions since the Founding).

under this chapter." § 3054(a). Recall that HIWU is the private non-profit to whom the Authority must delegate anti-doping and medication enforcement. *See* § 3054(e)(1)(B).[11] So, the answer to the question before us turns on what "powers and responsibilities" each of these three entities has under HISA. Although HISA somewhat confusingly disperses the relevant provisions throughout the Act, we can discern the following division of labor.

First, the Authority has responsibility for (1) investigating potential violations, including by issuing subpoenas (§ 3054(h)); (2) levying sanctions (§§ 3054(j)(1), 3057, 3058(a)); and (3) bringing suit against violators for injunctive relief or to enforce sanctions (§ 3054(j)(1)–(2)). Second, actual enforcement of doping and medication rules is done by HIWU, which "implement[s]" those rules "on behalf of the Authority." § 3054(e)(1)(E)(i). In this regard, HIWU's responsibilities include "independent investigations, charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations." § 3055(c)(4)(B); *see also* § 3054(e)(1)(E)(iv). Third, the FTC may ask an ALJ to review any sanction *de novo*, § 3058(b)(1), and the FTC may itself review the ALJ's decision *de novo*, either on its own motion or upon petition by an aggrieved party, § 3058(c).

The Act's plain terms permit only one conclusion: HISA is enforced by a private entity, the Authority. The Authority decides whether to investigate a covered entity for violating HISA's rules. The Authority decides whether to subpoena the entity's records or search its premises. The

---

[11] The Authority also "may enter into agreements" with State racing commissions to enforce the racetrack safety program. *See* § 3054(e)(2)(A)(i), (3); § 3056(c). The Authority remains in charge, however, and dictates the "scope of work, performance metrics, reporting obligations, budgets, and any other matter [it] considers appropriate." § 3054(e)(2)(B).

Authority decides whether to sanction it. And the Authority decides whether to sue the entity for an injunction or to enforce a sanction it has imposed. To be sure, the Authority does not perform these functions itself. Rather, HISA requires the Authority to contract with another private entity, HIWU, which undertakes enforcement "on behalf of the Authority." § 3054(e)(1)(E)(i). The bottom line, though, is that a private entity, not the agency, is in charge of enforcing HISA.

Consider also what HISA does not say. It does not empower the FTC to decide whether to investigate a covered entity, whether to subpoena its records, whether to search its premises, whether to charge it with a violation, or whether to sanction or sue it. Nor does the Act empower the FTC to countermand any of the Authority's investigatory or charging decisions (or, more precisely, HIWU's decisions). Nor does it require the Authority or HIWU to seek the FTC's approval before investigating, searching, charging, sanctioning, or suing. All these actions are enforcement actions, and, by the plain terms of the Act, they can be done by the private entities without the FTC's involvement.

The inescapable conclusion is that the Authority does not "function subordinately" to the FTC when enforcing HISA. *Horsemen's I*, 53 F.4th at 881. That is not permitted under the private nondelegation doctrine. A private entity that can investigate potential violations, issue subpoenas, conduct searches, levy fines, and seek injunctions—all without the say-so of the agency—does not operate under that agency's "authority and surveillance." *Ibid.* Put another way, with respect to enforcement, HISA's plain terms show that the Authority does not merely act "as an aid" to the FTC because the FTC does not "retain[] the discretion to approve, disapprove, or modify" the Authority's enforcement actions. *Ibid.* (cleaned up) (quoting *Amtrak I*, 721 F.3d at 671).

**3.**

One might counter, though, that the FTC at least partially supervises the Authority because it can review sanctions at the back end, after ALJ review. *See* §§ 3055(c)(4)(B), 3058(b)(3)–(c)(3). That is true, and it is the Authority's best argument for why its enforcement power is subordinate to the FTC.

The argument nonetheless fails. Suppose the Authority sanctions a horse owner for a doping violation, but the sanction is later reversed by the FTC. Does that make the Authority's enforcement power subordinate to the agency? No, it does not. Consider everything the Authority was permitted to do up to that point: launch an investigation into the owner, subpoena his records, search his facilities, charge him with a violation, adjudicate it, and fine him.[12] Each and every one of those actions is "enforcement" of HISA.

---

[12] Not only does HISA facially permit that, but it has already happened. For example, in one FTC appeal, it is uncontested that three private Authority investigators showed up at the appellant's residence and served her with a notice of an alleged doping violation (there is no personal service requirement under the statute). The investigators then "subjected [the appellant] to a coercive interrogation in a small room" and searched "her barn and . . . her mother's car" for banned substances. Statement of Contested Facts and Specification of Additional Evidence, *In re Lynch*, 2024 WL 1111724 (F.T.C.), at *2, Dkt. No. 9423. She was then fined $55,000 and banned from racing for 48 months. *Id.* at *3. She later settled with the Authority, and the case was dismissed. Order of Withdrawal from Review by the Administrative Law Judge, *In re Lynch*, 2024 WL 4298917 (F.T.C.), Dkt. No. 9423. Authority investigators have also searched defendants' property and extracted fines under HISA's strict liability regime for possession of banned substances. For example, one veterinarian forgot to clean out his trailer and still had two buckets of a newly banned substance two weeks after the effective date. Private Authority investigators searched his trailer, found the buckets, fined him $5,000, and banned him from practice for 14 months. The ALJ affirmed on appeal. All this despite the fact that the Authority and the ALJ conceded that the appellant purchased the substance long before it was banned, forgot it was in his trailer, and did not even attempt to use it on a horse. The appellant petitioned the FTC to review the decision. That petition was denied. Decision of the Commission on Application for Review Under 15 U.S.C. § 3058, *In re Perez*, 2024 WL 3824065 (F.T.C.), Dkt. No. 9420; *see also* Administrative Law Judge Decision on Application for Review, *In*

No. 23-10520

Each can occur under HISA without any supervision by the FTC. Moreover, penalties imposed by the Authority are not automatically stayed pending appeal. *See* 16 C.F.R. § 1.148(a) (2022). So, any penalty goes into effect as soon as the Authority makes its decision, unless the ALJ or FTC exercises its discretion to implement a stay pending appeal. *See* § 3058(d).

It is no answer to say that the FTC can come in at the tail-end of this adversarial process and review the sanction. As far as enforcement goes, the horse was already out of the barn. (You knew that was coming.) Besides, what if the sanctioned owner, instead of fighting the process, opts to settle for a lower fine? *See, e.g.*, *In re Lynch*, 2024 WL 4298917 (F.T.C.), Dkt. No. 9423 (dismissing case due to settlement). In that case, according to the Authority's logic, *no one* has enforced HISA. That is obviously not true. To the contrary, the settlement scenario—which will likely happen often—only underscores that it is the private entity that acts as HISA's enforcer in any meaningful sense.

Consider a hypothetical. Suppose a city structures its speeding laws to let a group of private car enthusiasts monitor speeds with their own radar guns, pull speeders over, and ticket them. Fines are reviewed by the police department and, ultimately, the mayor. Who *enforces* the speeding laws? Anyone would say the private group. After all, consider how many cases we decide concerning whether the police have wrongly stopped someone or used excessive force during the stop. *See, e.g.*, *Terrell v. Town of Woodworth*, No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024) (per curiam). All would

_____

*re Poole*, 2023 WL 8435860 (F.T.C.), Dkt. No. 9417 (affirming an $18,000 fine and banning him from practice for 22 months for a similar inadvertent possession of a newly banned substance).

agree that the police were "enforcing" the law when they stopped the person. The same goes for the private entity in the hypothetical.

The Authority's argument, moreover, does not work even on its own terms. In addition to levying fines, HISA empowers the Authority to sue people and racetracks to enjoin past, present, or impending violations. *See* § 3054(j)(1) (providing "the Authority may commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation of this chapter . . . to enjoin such acts or practices"); § 3054(j)(2) (allowing issuance of "a permanent or temporary injunction or restraining order . . . without bond"). HISA gives the FTC no role in this process, either before or after the fact. So, even assuming the Authority is correct (and it is not) that the agency's after-the-fact supervision of sanctions makes the Authority subordinate, the Authority is demonstrably *not* subordinate when it comes to suing violators for injunctions. That is plainly an unsupervised delegation of executive power that the Constitution does not tolerate. *See Buckley*, 424 U.S. at 138 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts [this] responsibility[.]").

**4.**

The Authority next argues that the FTC could use its new rulemaking authority to rein in the Authority's enforcement actions or even require the Authority to preclear lawsuits with the agency. *See* § 3053(e) (empowering FTC to "abrogate, add to, and modify" the Authority's rules). This argument persuaded the Sixth Circuit that at least a *facial* challenge to the Authority's enforcement powers should fail. *See Oklahoma I*, 62 F.4th at 231 (through § 3053(e) rulemaking, "the FTC *could* subordinate every aspect of the Authority's enforcement," which "suffices to defeat a facial challenge"). And we have already found that the FTC's rulemaking power has some

purchase in turning back a facial challenge to the Authority's *rulemaking* power: as explained, the agency could ensure via rulemaking that no Authority rule could go into effect until the agency had time to review it. *See supra* Part III(A). With great respect to our colleagues on the Sixth Circuit, however, we are not convinced that this rulemaking argument can save the Authority's enforcement powers.

The Authority's rulemaking argument would let the agency rewrite the statute. In HISA, Congress set out a definite enforcement scheme, dividing responsibilities among the FTC, the Authority, and HIWU. *See* § 3054(c)(1), (e). HISA is quite clear about this: it provides that those three entities "implement and enforce" the Act, "*each within the scope of their powers and responsibilities under this chapter*." § 3054(a)(1) (emphasis added). A mere agency cannot alter that statutory division of labor. *See*, *e.g.*, *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) ("We will not defer to 'an agency interpretation that is inconsistent with the design and structure of the statute as a whole.'" (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014))); 5 U.S.C. § 706(2)(C) (authorizing courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations").[13] As the Supreme Court recently

---

[13] *See also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001) (holding that agency rulemaking "has no bearing upon" whether a statutory delegation is constitutional); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6–7 (2000) ("Where a statute names the parties granted the right to invoke its provisions, such parties only may act." (cleaned up)); *Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084–85 (11th Cir. 2013) (holding it "axiomatic that an agency's power to promulgate legislative regulations is limited to the authority delegate[d] to it by Congress" and that courts cannot "locate . . . power in one agency where it had been specifically and expressly delegated by Congress to a different agency"); *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 823 (8th Cir. 2017) (finding express delegation to the Federal Railroad Administration precluded implied authority claimed by the private Board); *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) (per curiam) ("We agree with the general proposition that when Congress has specifically vested an agency with the authority to

reiterated, even "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." *Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). Yet that is just what the Authority says the FTC could do through rulemaking.

Take the Authority's power to seek injunctions. HISA empowers the Authority to file suit to enjoin violations, while saying nothing about FTC involvement in the process. *See* § 3054(j)(1). Yet the Authority suggests the FTC could, by rule, require the Authority to preclear any such action with the agency. We disagree. That would let the agency amend the enforcement scheme delineated by statute.[14] The same goes for investigatory and subpoena power: HISA unqualifiedly gives that power to the Authority, *see* § 3054(h), and then requires the Authority to delegate it to HIWU, *see* §§ 3054(e)(1)(E)(iv), 3055(c)(4)(B) (the Authority "shall" contract with HIWU to "conduct and oversee" anti-doping and medication enforcement "including independent investigations"). And the same goes for charging and adjudicating violations and levying sanctions. *See ibid.* (the Authority "shall" contract with HIWU to "conduct and oversee . . . charging and adjudication of potential medication control rule violations, and the enforcement of any civil sanctions for such violations"); § 3054(j) (recognizing the Authority's power to impose "civil sanctions"). Congress

---

administer a statute, it may not shift that responsibility to a private actor[.]"); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (relying on the statute's "plain text and structure [to] establish a clear chronology of federal and State responsibilities" (quotation omitted)).

[14] Nor could the Authority claim that the statute is merely silent about FTC pre-approval and that gap could be filled by rulemaking. Our circuit has repeatedly rejected this "nothing-equals-something argument" for conjuring agency authority out of thin air. *Gulf Fishermens*, 968 F.3d at 460–61 (citing *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (per curiam)).

enacted this reticulated scheme. The agency cannot amend it by promulgating a rule.

Furthermore, when Congress wanted to put the FTC in charge of enforcement, it knew how. Section 3059, for instance, is a separate part of HISA targeting certain "unfair or deceptive" practices in selling horses.[15] With respect to *that* section, the Authority can only "recommend" that the FTC "commence an enforcement action."[16] § 3054(c)(1)(B). In other words, only here did Congress limit the Authority's enforcement discretion to "recommending" agency enforcement. *Cf.* § 3054(j)(1) (providing "the Authority may commence a civil action" seeking an injunction). Yet the Authority contends that the agency could, by rulemaking, make *every* enforcement action subject to similar FTC approval. That would rewrite the enforcement scheme Congress enacted. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).[17]

---

[15] *See* § 3059 (deeming it an unfair or deceptive practice under 15 U.S.C. § 45(a) to fail to disclose to a buyer that a horse was administered "a bisphosphonate" before its fourth birthday or any other prohibited substance).

[16] *See* § 3054(c)(1)(B) (providing the "Authority . . . with respect to an unfair or deceptive act or practice described in section 3059 of this title, may recommend that the Commission commence an enforcement action").

[17] Following our original *Horsemen's II* decision, a split panel of the Eighth Circuit disagreed with us on this point. *See Walmsley v. Fed. Trade Comm'n*, 117 F.4th 1032, 1039–40 (8th Cir. 2024). In partial dissent, Judge Gruender agreed with our view. *See id.* at 1041–44 (GRUENDER, J., concurring in part and dissenting in part). The Supreme Court subsequently vacated the Eighth Circuit's judgment and remanded for further consideration in light of *Consumers' Research. See* 145 S. Ct. 2870 (2025) (mem.). The Eighth Circuit has not yet issued a decision on remand.

Additionally, the Sixth Circuit believed the FTC could supervise the Authority through a slightly different kind of rulemaking—that is, by issuing rules governing *how* the Authority enforces HISA. *See Oklahoma I*, 62 F.4th at 231. For instance, the agency could issue rules against "overbroad subpoenas or onerous searches" or "provid[ing] a suspect with a full adversary proceeding and with free counsel." *Ibid.* Unhappily, we again disagree with our sister circuit.

The Horsemen are not complaining about *how* the Authority exercises its enforcement power. They are complaining about *where* the enforcement power is lodged: on its face, HISA empowers private entities to enforce it and permits agency oversight only after the enforcement process is over and done with (and then only with respect to fines, not injunctions). If the Horsemen were objecting only to overbroad subpoenas, unwarranted searches, or lack of free counsel, perhaps those complaints could be addressed through rulemaking or as-applied challenges. But their complaint is different. They contend that HISA facially delegates unsupervised enforcement power to private actors. They are right. *See Salerno*, 481 U.S. at 745 (recognizing challengers shoulder a "heavy burden" to demonstrate facial invalidity when they "establish that no set of circumstances exists under which the Act would be valid").[18]

---

[18] Moreover, consider the revealing premise of this line of argument. Suppose the FTC issued a rule saying, "The Authority can search racetracks only if it has probable cause." Well and good, but that rule still presupposes *the Authority* is the one doing the search. Merely because the Authority would have to obey the Fourth Amendment does not change the fact that a private entity is searching your racetrack without agency say-so. And it is no answer to say that the agency could issue a rule saying, "The Authority can search racetracks only if the FTC approves the search." That rule, as explained, would amend the statute's division of authority. *See* § 3054(h) ("The Authority shall have subpoena and investigatory authority with respect to civil violations committed under its jurisdiction.").

No. 23-10520

In sum, HISA's clear delineation of enforcement power between the FTC, the Authority, and HIWU cannot be altered through rulemaking.

**5.**

Finally, the Authority defends its enforcement role by analogizing it to the role of self-regulatory organizations ("SROs")—specifically, FINRA—which assist the SEC in enforcing securities laws. The Authority seeks support in circuit cases concluding that FINRA's enforcement role presents no private nondelegation problem. *See, e.g.*, *Oklahoma I*, 62 F.4th at 229, 232 (gathering cases).[19] For their part, the Horsemen argue that, for enforcement purposes, the FTC–Authority relationship is meaningfully different from the SEC–FINRA relationship. As we have before noted, HISA was modeled on the Maloney Act, which created FINRA. *See Horsemen's I*, 53 F.4th at 887; *supra* Part III(A). Moreover, we concluded in *Horsemen's I* that HISA lacked a key feature of the Maloney Act empowering the SEC to "abrogate, add to, and delete" rules proposed by FINRA. *Horsemen's I*, 53 F.4th at 887. As discussed, Congress added a similar provision to HISA, which remedied the nondelegation problem with the Authority's rulemaking powers. *Supra* Part III(A).

---

[19] The Sixth Circuit relied on several cases upholding the constitutionality of FINRA to hold that "[i]n case after case, the courts have upheld [the Maloney Act's] arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Oklahoma I*, 62 F.4th at 229. We do not read those cases quite so broadly. They relied largely on the grounds that the SEC ultimately approves any proposed rules and has its own generalized rulemaking power. *See, e.g.*, *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 696 (2d Cir. 1952) (considering only whether the SEC abused its discretion); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977) (considering only a nondelegation challenge to the SEC's legislative rulemaking authority); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979) (same); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982) (same). But none addressed a nondelegation challenge to executive power.

28

We agree with the Horsemen that, for enforcement purposes, HISA gives the Authority an enforcement role meaningfully different from FINRA's. Unlike the SEC–FINRA relationship, HISA does not give the FTC potent oversight power over the Authority's enforcement such as the power to enforce HISA itself, deregister the Authority as the enforcing entity, or remove its directors.

To begin with, Congress empowered the SEC to enforce FINRA's rules if needed. The SEC can "in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate" the Maloney Act. 15 U.S.C. § 78u(a)(1). The SEC can also, on its own accord, seek criminal sanctions, injunctive relief, or disgorgement. § 78u(c), (d), (d)(4). The FTC cannot. *See* § 3054(c)(1)(A)(iii) (granting the Authority investigatory power); § 3054(e) (granting the Authority and HIWU enforcement responsibility). The SEC has power to issue subpoenas, *see* §§ 77s(c), 78u(c), while HISA gives the Authority that power, § 3054(h), (c)(1)(A)(ii). The SEC can also revoke FINRA's ability to enforce its rules, § 78s(g)(2), and step in and enforce any written rule itself, § 78o(b)(4). HISA gives the FTC none of these tools.

Moreover, HISA diverges radically from the Maloney Act in empowering the Authority to sue. The SEC alone has the power to bring civil suits, §§ 78u-1(a)(1), 78u(d)(1), while HISA gives that power exclusively to the Authority, § 3054(j)(1). Giving a private entity the sole power to sue in federal court to enforce a statute cuts to the core of executive power. *See Buckley*, 424 U.S. at 138 ("A lawsuit is the ultimate remedy for a

breach of the law, and it is to the President . . . that the Constitution entrusts [this] responsibility[.]").[20]

Finally, the SEC "retains formidable oversight power to supervise, investigate, and discipline [FINRA] for any possible wrongdoing or regulatory missteps." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007). The FTC does not. This "formidable" power is manifest in the SEC's ability to derecognize FINRA's regulatory role entirely, § 78s(a)(3), (h)(1); remove FINRA board members for cause, § 78s(h)(4); remove any individual FINRA member, § 78s(h)(2); and bar any person from associating with FINRA, § 78*o*-3(g)(2). HISA, on the other hand, "recognize[s] for purposes of developing and implementing" the Act only "[t]he private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority.'" § 3052(a). And only the Authority's Board can remove members: directors by a two-thirds vote and committee members for any reason.[21]

––––––––––––––––––––––––––––

[20] One may reasonably ask whether HISA's delegation of enforcement authority is supported by an analogous delegation in qui tam statutes. We think not. The Horsemen note our decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (en banc), where we held that the False Claims Act ("FCA") does not violate Article I's Take Care Clause. They argue that *Riley* does not support HISA's delegation because qui tam relators are episodic and do not have a continuing relationship with the government. That is true, but we see a more fundamental distinction between the two statutes: under the FCA, the executive branch has substantial power over qui tam relators that the FTC does not have over the Authority. For example, the United States can intervene in any qui tam litigation, take control of the litigation, veto settlement agreements, and dismiss the suit "notwithstanding the objections of the [relator]." *Id.* at 753–54. HISA gives the FTC none of those powers.

[21] In saying all this, we express no opinion on whether the SEC–FINRA relationship poses any constitutional issues under the private nondelegation doctrine (or any other doctrine). Such questions are not posed by this case.

**6.**

We now consider whether the Supreme Court's recent *Consumers' Research* decision impacts our private nondelegation analysis in this case.

*Consumers' Research* addressed challenges to a federal law tasking the Federal Communications Commission ("FCC") with providing affordable communications services throughout the United States. The law required telecom carriers to pay quarterly into a Universal Service Fund ("USF"), which would be distributed to underserved populations. A "contribution factor," devised by the FCC, would set each carrier's USF share. *See Consumers' Rsch.*, 606 U.S. at 664, 666–67, 668; 47 U.S.C. §§ 151, 254.

Much of *Consumers' Research* addressed whether the law improperly delegated legislative power to the FCC (*i.e.*, a "public" nondelegation challenge). *See* 606 U.S. at 672–91. The Supreme Court held it did not. In brief, the Court explained that Congress had placed sufficiently "intelligible" guardrails around the FCC's exercise of its assigned powers. *See id.* at 680–91; *see generally J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (asking whether Congress enacted "intelligible principle[s]" to guide an agency's exercise of delegated authority).

The part of *Consumers' Research* relevant here concerned a separate challenge to the FCC's appointment of a private organization—the Universal Service Administrative Company (the "Administrator")—to manage the USF. *Consumers' Rsch.*, 606 U.S. at 669. Among other tasks, the Administrator produced the financial projections the FCC used to determine carriers' quarterly USF contribution. *Id.* at 669–70. The Administrator's role was challenged as the delegation of legislative power to a private organization. *Id.* at 692. The Court rejected this challenge. *Id.* at 692–95.

Drawing on its earlier precedents, the Court reaffirmed the basic idea that a federal agency can delegate power to a private organization only if it functions "subordinately" to the agency. *Ibid.* (first citing *Carter Coal*, 298 U.S. 238; and then citing *Adkins*, 310 U.S. 381 ). The Court summarized the doctrine this way: "As long as an agency . . . retains decision-making power, it may enlist private parties to give it recommendations." *Id.* at 692.

Applying that standard, the Court held the Administrator's role was permissible. The Administrator was "broadly subordinate to the [FCC]" because (1) the FCC appointed the Administrator's board and approved its budget; (2) the Administrator engaged in "no policy-making" but was "just doing arithmetic"; (3) the Administrator had to carry out all tasks consistent with FCC directives; and (4) the FCC could review the Administrator's actions *de novo. Id.* at 693. Critically, the FCC always had "a chance to review—and, if needed, to revise" the Administrator's projections before approving them. *Id.* at 694; *see also id.* at 695 (observing the Administrator's projections could not "go into effect without [the FCC's] say-so"). In sum, the FCC "alone" had decision-making authority, while the Administrator played only an "advisory role." *Id.* at 693. Accordingly, the Court concluded the FCC's "transfer of accounting functions to the Administrator" was proper because "[i]n every way that matters to the constitutional inquiry, the [FCC], not the Administrator, is in control." *Id.* at 695.

For the following reasons, we conclude the private nondelegation analysis in *Consumers' Research* does not change the outcome in this case.

### a.

To begin with, *Consumers' Research* articulated the same private nondelegation doctrine we applied before (and now reapply). An agency, the Court explained, may "rely on advice and assistance from private actors," provided they remain "broadly subordinate" to the agency's "authority and

surveillance." *Id.* at 692. That doctrinal formulation is identical to our own: "[A] private entity may wield government power only if it functions subordinately to an agency with authority and surveillance over it." *Horsemen's II*, 107 F.4th at 423 (internal citations omitted). Indeed, the Court drew on the same precedents we did. *Compare Consumers' Rsch.*, 606 U.S. at 692 (discussing *Schechter Poultry*, 295 U.S. 495; *Carter Coal*, 298 U.S. 238; *Adkins*, 310 U.S. 381), *with Horsemen's II*, 107 F.4th at 423 n.4 (citing same cases); *see also Horsemen's I*, 53 F.4th at 880–81 (same).

So, *Consumers' Research* did not alter the doctrine, whose touchstone remains the same it has always been—namely, whether the private organization is "subordinate" to a superintending agency.

**b.**

Nor does the Court's application of the doctrine to the USF Administrator change our conclusion in this case about the Authority's enforcement powers. As we held before and now reaffirm, in exercising those powers, the Authority does not function subordinately to the FTC.

To see why, just compare the private actors in the two cases. In *Consumers' Research*, the Administrator played merely an "advisory role," leaving the FCC "alone" with "decision-making authority." *Id.* at 693. The Administrator only recommended how to calculate the contribution factor—but its advice could not go into effect until the FCC reviewed it, revised it if necessary, and gave the final "say-so." *Id.* at 693–95. This arrangement meant "the [FCC], not the Administrator, [wa]s in control." *Id.* at 695.

The Authority wields power of an entirely different color. HISA gives the Authority (and its secondary private partner) power to investigate, subpoena, sue, and sanction covered entities. *See Horsemen's II*, 107 F.4th at 429. The FTC is given no statutory authority to approve, review, or

countermand any of the Authority's investigatory, prosecuory, or adjudicatory decisions. *Ibid.* All of that enforcement, according to HISA's "plain terms," "can be done by the private entities without the FTC's involvement." *Ibid.*; *see generally supra* Parts I(A), III(B)(2).

True, the FTC has some back-end review over the Authority's enforcement actions. *See supra* Part III(B)(3) (discussing §§ 3055(c)(4)(B), 3058(b)(3)–(c)(3)). So, one might ask: isn't that like the "*de novo* review" exercised over the Administrator by the FCC? *See Consumers' Rsch.*, 606 U.S. at 693. No, it is not. As the Supreme Court explained, nothing the USF Administrator does respecting the contribution factor has any "legal (or, indeed, practical) effect" until the agency "decides [it] should." *Id.* at 694. Contrast that with the Authority, which is empowered to launch numerous intrusive enforcement actions—investigations, subpoenas, searches, charges, adjudications—all without any agency oversight.[22]

All that is to say: *Consumers' Research* only reinforces our previous conclusion. By exercising a raft of unsupervised enforcement actions that go

---

[22] This is where we continue to differ with the Sixth Circuit. On remand, *see Oklahoma v. United States*, 145 S. Ct. 2836 (2025) (mem.), our sister circuit reaffirmed its holding that the Authority's enforcement powers are subordinate to the FTC. *See Oklahoma II*, 163 F.4th 294. Specifically, *Oklahoma II* relied on the agency's *de novo* review of Authority sanctions. *Id.* at 311. But we have already explained why that review comes far too late to constitute genuine oversight of the Authority's wide-ranging enforcement powers—such as investigations and subpoenas. *See supra* Part III(B)(3). In addition, we have previously explained why the FTC's § 3053(e) rulemaking authority cannot amend the statutory allocation of power between the agency and the Authority, *see supra* Part III(B)(4), another point on which we part ways with our Sixth Circuit colleagues. *Cf. Oklahoma II*, 163 F.4th at 312 (concluding FTC could constrain the Authority's investigatory powers by rule).

far beyond the USF Administrator's "recommendations," it is evident that "the [Authority], not the [FTC], is in control." *Id.* at 695.[23]

\* \* \*

In sum, we agree with the Horsemen that the FTC lacks adequate oversight and control over the Authority's enforcement power. HISA's explicit division of enforcement responsibility empowers the Authority with quintessential executive functions and gives the FTC scant oversight until enforcement has already occurred. Such back-end review by the FTC does not subordinate the Authority. And the FTC's general rulemaking power provides no answer because executive rulemaking cannot amend the plain division of enforcement power laid out in HISA's text. Such a radical delegation differs materially from the SEC–FINRA relationship because the FTC lacks any tools to ensure that the law is properly enforced. HISA's enforcement provisions thus facially violate the private nondelegation doctrine.

## C. Due Process Challenge

We turn next to the Horsemen's challenge based on the Fifth Amendment's Due Process Clause. They argue that HISA, both facially and as-applied, deprives them of due process by permitting economically self-interested actors to regulate their competitors. *See Carter Coal*, 298 U.S. at 311 (government violates due process by allowing regulation by "private

---

[23] Although the point is not strongly contested by the parties on remand, we note that *Consumers' Research* also does not change our previous holding concerning the Authority's rulemaking. *See supra* Part III(A). Texas points out that, unlike in *Consumers' Research*, the FTC neither appoints the Authority's Board nor approves its budget. True, but that feature is outweighed by the far more critical point that the HISA amendments give the agency final say-so over the content of any rule before it ever takes effect. *See supra* Part III(A); *see also Walmsley*, 117 F.4th at 1039; *Oklahoma II*, 163 F.4th at 308 (agreeing with us on this point).

persons whose interests may be and often are adverse to the interests of others in the same business"). Specifically, the Horsemen contend that *Carter Coal* does not require proof of economic self-interest, only that the private person "may be" adverse to those he regulates. They then argue that several members of the Board and standing committees violate the conflict of interest provisions due to their professions and prior financial interests. Finally, the Horsemen contend that the statute fails to properly protect against self-interested actors because it does not cover financial interests other than interests in a covered horse, as opposed to a racetrack or other facility.

The district court correctly rejected these claims. As to the Horsemen's facial challenge, the court concluded it was defeated by HISA's conflict-of-interest provisions. *See Black II*, 672 F. Supp. 3d at 252. Those provisions prohibit a range of individuals from serving as Board or independent committee members, including individuals with financial interests in, or who provide goods or services to, covered horses; officials, officers, or policy makers for an equine industry; and employees, contractors, or immediate family members of the prior individuals. § 3052(e)(1)–(4).

As to the as-applied challenge, the district court rejected it on the facts. Following a bench trial, the court found the Horsemen relied only on the committee members' biographical information but adduced no other evidence showing their adverse interests, financial or otherwise. *See Black II*, 672 F. Supp. 3d at 252 ("HISA affords sufficient protection through its conflicts-of-interest provisions, and the plaintiffs have not met their burden to show unconstitutional self-dealing by directors, committee members, or others associated with the Authority."). At most, the court observed that the biographical information may show the members do not qualify as "independent members." *Ibid.*; § 3052(b)(1)(A) ("[I]ndependent members [must be] selected from outside the equine industry."). But, as the court

pointed out, even assuming that to be true, it says nothing about the members' financial interests. *Black II*, 672 F. Supp. 3d at 252. On appeal, the Horsemen fail to show any error by the district court here.

## D. Appointments Clause Challenge

A separate plaintiff, Gulf Coast, challenges the Authority's structure under the Appointments Clause of Article II.[24] Recall that Gulf Coast raised this distinct challenge in a suit later consolidated with the Horsemen's. *See id.* at 230. Gulf Coast argues that, for constitutional purposes, the Authority is governmental, not private, and so is subject to the Appointments Clause. This means the Authority's directors, if they are principal officers, must be appointed by the President with Senate confirmation or, if they are inferior officers, by the President, courts, or department heads according to law. *See Free Enter. Fund*, 561 U.S. at 487–88; *Cochran v. SEC*, 20 F.4th 194, 198 (5th Cir. 2021) (en banc). The Authority's directors are not appointed in any of these ways,[25] and so, if Gulf Coast is right, their appointment would violate Article II.

The Authority and the FTC first respond that we previously decided this question in *Horsemen's I*. By applying the *private* nondelegation doctrine to the Authority, they argue we necessarily determined the Authority is not governmental for constitutional purposes. The district court took this view as well. *See Black II*, 672 F. Supp. 3d at 234. That is understandable.

---

[24] The Appointments Clause reads "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for" but provides "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

[25] The directors are appointed by the Authority itself. *See* § 3052(d)(3) (Board members are selected by the Authority's nominating committee).

Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive. For constitutional purposes, an entity is either governmental or not. *See, e.g.*, *Lebron*, 513 U.S. at 378–79; *Amtrak II*, 575 U.S. at 50–51. That is why the Horsemen themselves call Gulf Coast's claim "fundamentally incompatible" with their private nondelegation challenge. Texas seems to agree, noting that Gulf Coast's Appointments Clause theory would apply only if "the Court disagree[s]" with its assumption that the Authority is private.

That said, however, we cannot agree that we decided this question in *Horsemen's I*. The Appointments Clause question was never posed. Party presentation is a fundamental constraint on appellate decision-making. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("Courts . . . wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." (cleaned up)). The fact is that in *Horsemen's I*, all parties proceeded on the assumption that the Authority is private for constitutional purposes. *See Horsemen's I*, 53 F.4th at 875 n.11 ("The Horsemen also claimed HISA was unconstitutional under the . . . Appointments Clause. The district court did not rule on those claims and so they are not before us."). No one suggested that the Authority might qualify as a government entity or that its directors were subject to the Appointments Clause. So, because we did not settle the question previously, we can address it now. *See Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 561 (5th Cir. 2013) ("Appellate powers are limited to reviewing issues raised in, *and decided by*, the district court." (cleaned up)); *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 281 (5th Cir. 2001) ("[T]he law of the case doctrine only applies to issues we actually decided[.]").

The basic premise of Gulf Coast's argument is that the Authority is part of the federal government for Appointments Clause purposes. *See*

*Amtrak II*, 575 U.S. at 50–51. We of course recognize that HISA calls the Authority private, as does the Authority's own charter. *See* § 3052(a) ("The private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority,' is recognized for purposes of developing and implementing [HISA]."); Horseracing Integrity & Safety Auth., Inc., Del. Sec'y of State, Certificate of Incorporation 1 (2020) ("The Corporation is organized and shall be operated as a nonprofit business league[.]"). But deeming an entity "private" does not settle whether it is legally part of the federal government. Otherwise, the government could evade constitutional restrictions by mere labeling. *See Lebron*, 513 U.S. at 397 ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."). So, we must determine whether the Authority qualifies as part of the federal government for constitutional purposes.

The analysis guiding that inquiry comes from *Lebron*. In that case, the Supreme Court examined "the long history of corporations created and participated in by the United States for the achievement of governmental objectives." *Id.* at 386.[26] The specific question before the Court was whether "Amtrak, though nominally a private corporation, must be regarded as a Government entity for First Amendment purposes." *Id.* at 383. The answer was yes. That was so, the Court held, because "the Government create[d] [the Amtrak] corporation by special law, for the furtherance of governmental objectives, and retain[ed] for itself permanent authority to appoint a majority

---

[26] *See also id.* at 386–91 (discussing corporations such as the first and second Banks of the United States, the Panama Railroad Company, the United States Grain Corporation, the Reconstruction Finance Corporation, the Federal Deposit Insurance Corporation, the Communications Satellite Corporation, the Corporation for Public Broadcasting, and the Legal Services Corporation).

of the directors of that corporation." *Id.* at 399. The Supreme Court and circuit courts have since used *Lebron*'s analysis to discern whether corporations are part of the government for constitutional purposes.[27] Applying *Lebron*, we conclude that the Authority is not a federal instrumentality for purposes of the Appointments Clause.

First, the Authority was not created by the federal government "by special law," *ibid.*, but was incorporated under Delaware law shortly before HISA's passage. Contrast this with Amtrak, which "Congress established" by enacting the Rail Passenger Service Act of 1970. *Id.* at 383–84; *see also Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 454 (1985) (observing "Congress established the National Railroad Passenger Corporation, a private, for-profit corporation that has come to be known as Amtrak").

Second, the Authority was not created to further "governmental objectives," *Lebron*, 513 U.S. at 399, but instead as a private association to address doping, medication, and safety issues in the thoroughbred racing industry. Again, contrast this with Amtrak, which Congress created "to avert

---

[27] *See Nebraska*, 600 U.S. at 490–93 (applying *Lebron* to conclude that the Missouri Higher Education Loan Authority is "an instrumentality of Missouri"); *Free Enter. Fund*, 561 U.S. at 486 (citing *Lebron* when referencing parties' agreement that the Public Company Accounting Oversight Board ("PCAOB") "is 'part of the Government' for constitutional purposes"); *Amtrak II*, 575 U.S. at 54–55 (explaining *Lebron* "provides necessary instruction" and "teaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress'[s] disclaimer of Amtrak's governmental status"); *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 158–59 (4th Cir. 2018) (applying *Lebron* to conclude that the Metropolitan Washington Airports Authority ("MWAA") is not "a federal entity" because "MWAA was not created by the federal government" and "is not controlled by the federal government"); *Montilla v. Fed. Nat'l Mortg. Ass'n*, 999 F.3d 751, 759–61 (1st Cir. 2021) (applying *Lebron* to conclude that Fannie Mae and Freddie Mac are not government actors).

the threatened extinction of passenger trains in the United States" and for other goals Congress itself "establish[ed]." *Id.* at 383–84.

Third, the federal government does not "control[] the operation of the [Authority]," nor has it "retain[ed] for itself permanent authority to appoint a majority of the [Authority's] directors." *Id.* at 399. To the contrary, the government has no role in appointing the Authority's Board. Once again, contrast this with Amtrak—where a majority of its directors was appointed by the President. *Id.* at 397–98; *see also Amtrak II*, 575 U.S. at 51 (observing that seven of nine Amtrak board members "are appointed by the President and confirmed by the Senate"); *cf. Free Enter. Fund*, 561 U.S. at 484, 484–85 (noting the PCAOB—despite being statutorily deemed "private"—is a "Government-created, Government-appointed entity," whose five members are "appointed . . . by the [SEC]").

Instead of engaging with *Lebron*, Gulf Coast argues that *Lebron*'s analysis is not "the *only* way" to tell whether a corporation is a government instrumentality. That takes too narrow a view of precedent, however. *Lebron* canvassed "the long history of corporations created and participated in by the United States" and set out a detailed analysis to determine whether a particular corporation—despite its designation as "private"—counts as a government instrument for constitutional purposes. *See* 513 U.S. at 386, 386–91. That is precisely the question we must answer with respect to the Authority. How can we, as an inferior court, simply bypass *Lebron*? We cannot.

Gulf Coast tries to offer us a way around *Lebron*, but it is a dead end. Gulf Coast argues that *Lebron* addressed only government-created corporations "that in no way exercised government power." But *Lebron* did not limit itself in that way—to the contrary, it relied on cases where Congress turned to private corporations to "accomplish purely governmental

purposes." *Id.* at 395 (quoting *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946)).[28] Furthermore, the corporation actually addressed in *Lebron*—Amtrak—itself exercised regulatory power, as the Supreme Court, the D.C. Circuit, and our court have all recognized. *See Amtrak II*, 575 U.S. at 50 ("Amtrak . . . cannot constitutionally be granted the regulatory power[.]" (citation and quotation omitted)); *Amtrak I*, 721 F.3d at 671 ("No case prefigures the unprecedented regulatory powers delegated to Amtrak."); *Horsemen's I*, 53 F.4th at 889 (discussing how Congress gave "regulatory power to the 'economically self-interested Amtrak'" (citation omitted)).

Gulf Coast also argues that, to determine whether directors of a private entity are "Officers of the United States," we should focus on their duration in office and the nature of the entity's power. We disagree. The two principal cases Gulf Coast relies on for this argument addressed whether individuals *already part* of the government should be considered "Officers." So, *Buckley* examined whether Federal Election Commission appointees wielded "significant authority pursuant to the laws of the United States." 424 U.S. at 126. And *Lucia v. SEC* applied this same test to SEC ALJs. 585 U.S. 237, 244–45 (2018). Gulf Coast urges us to extend *Buckley* and *Lucia* well beyond their facts to analyze whether persons in a *private* entity are "Officers." Even if we were inclined to take that step, however, *Lebron* would remain an insuperable hurdle. As explained, *Lebron* addressed when a private entity qualifies as part of the government for constitutional purposes. That is precisely the question before us. Post-*Lebron*, no case has applied

---

[28] *See also Inland Waterways Corp. v. Young*, 309 U.S. 517, 524 n.4 (1940) ("The corporations, of course, perform 'governmental' functions." (citation omitted)); *id.* at 522 ("The banking system which Congress thus established embodied a blend of governmental and private purposes.").

*Buckley* to private actors. Instead, the Supreme Court has repeatedly applied *Lebron* for three decades. *See supra* note 27. We are not at liberty to displace the Supreme Court's governing framework.[29]

Finally, Gulf Coast argues that if *Lebron* is the test, then the federal government can simply vest all executive power in a private corporation and avoid the Appointments Clause. This argument ignores the role of the private nondelegation doctrine. The government cannot delegate core governmental powers to unsupervised private parties. *Pittston*, 368 F.3d at 394. A private entity can only act "subordinately to an agency with authority and surveillance over it." *Horsemen's I*, 53 F.4th at 881 (quotations omitted). The private nondelegation doctrine thus corrals any attempts to evade *Lebron* by giving unaccountable governmental power to a pre-existing private entity.

In sum, *Lebron* is the governing test to determine whether an entity is private or public and, under that test, the Authority is a private entity not subject to Article II's Appointments Clause.

## E.  Anti-Commandeering Challenge

Finally, we turn to Gulf Coast's argument that HISA unconstitutionally commandeers state officials. The Constitution forbids Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also New York v. United States*,

---

[29] That principle also answers Gulf Coast's reliance on a 2007 Office of Legal Counsel ("OLC") opinion. The opinion argued that the Appointments Clause applies to someone with significant and continuing government authority, whether he is a private or a government employee. Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 121–22 (2007). If the opinion was suggesting its analysis as an alternative to *Lebron* (a decision, it should be noted, the opinion cited, *see id.* at 121), that is a suggestion only the Supreme Court could act upon, not a circuit court bound by *Lebron*.

505 U.S. 144, 165, 188 (1992). Gulf Coast argues HISA violates that principle by coercing state racing commissions to remit fees to fund the Authority's operations. If state officials refuse, the Authority collects fees directly from covered persons—but, in that event, HISA prohibits the state from imposing taxes or fees to finance the state's own horseracing programs. *See* § 3052(f). This scheme, argues Gulf Coast, "puts a gun to the head of Texas" by coercing state officials to administer a federal program rather than a state program.

The problem with this claim, as the district court pointed out, is that Gulf Coast lacks standing to raise it. Specifically, Gulf Coast's alleged injury—that it prefers Texas's racetrack safety rules to HISA's—is "no injury at all." *Black II*, 672 F. Supp. 3d at 250. As the district court correctly reasoned, "[a] party cannot establish constitutional injury by suggesting that he may be subject to rules that he does not prefer." *Ibid.*; *see also, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 350 (5th Cir. 2024) (holding that "merely being subject to . . . regulations, in the abstract, does not create an injury").

On appeal, Gulf Coast fails to explain how the district court erred. It merely argues that the coercive pressure the funding scheme allegedly places on Texas will lead it to implement HISA's rules rather than the current Texas regulations, which makes Gulf Coast subject to "a new set of unwanted (federal) regulations." Again, though, this does not explain why Gulf Coast experiences an injury sufficient to assert an anti-commandeering challenge to HISA.

## IV. Conclusion

In sum, we affirm the district court's judgment that (1) Congress's recent amendment to HISA cured the private nondelegation flaw in the Authority's rulemaking power; (2) HISA does not violate due process;

(3) the Authority's directors are not subject to the Appointments Clause under *Lebron*; and (4) Gulf Coast lacks standing to challenge HISA on anti-commandeering grounds.

We reverse the district court's judgment in one respect. Insofar as HISA is enforced by private entities that are not subordinate to the FTC, we DECLARE that HISA violates the private nondelegation doctrine.

Accordingly, the district court's judgment is AFFIRMED in part and REVERSED in part.